T.C. Memo. 1999-407


UNITED STATES TAX COURT


INVESTMENT RESEARCH ASSOCIATES, LTD.,
AND SUBSIDIARIES, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.    43966-85,    712-86,   Filed December 15, 1999.
               45273-86,  1350-87,
               31301-87, 33557-87,
                3456-88, 30830-88,
               32103-88, 27444-89,
               16421-90, 25875-90,
               26251-90, 20211-91,
               20219-91, 21555-91,
               21616-91, 23178-91,
               24002-91,  1984-92,
               16164-92, 19314-92,
               23743-92, 26918-92,
                7557-93, 22884-93,
               25976-93, 25981-93.

_____

[1]     Cases of the following petitioners are consolidated
herewith:  Burton W. and Naomi R. Kanter, docket No. 712-86;
Investment Research Associates, Ltd., and Subsidiaries, docket
No. 45273-86; Burton W. and Naomi R. Kanter, docket No. 1350-87;
Burton W. and Naomi R. Kanter, docket No. 31301-87; Burton W. and
Naomi R. Kanter, docket No. 33557-87; Burton W. and Naomi R.
Kanter, docket No. 3456-88; Investment Research Associates, Ltd.,
and Subsidiaries, docket No. 30830-88; Burton W. and Naomi R.
                                              (continued...)

Randall G. Dick and Jeffrey I. Margolis, for petitioners in docket Nos. 43966-85, 712-86, 45273-86, 1350-87, 31301-87, 33557-87, 3456-88, 30830-88, 32103-88, 27444-89, 25875-90, 26251-90, 23178-91, 24002-91, 19314-92, 26918-92, 25976-93, and 25981-93.

Royal B. Martin and Steven S. Brown, for petitioners in docket Nos. 16421-90, 20211-91, 20219-91, 21555-91, 21616-91, 1984-92, 16164-92, 23743-92, 7557-93, and 22884-93.

---

(...continued)
Kanter, docket No. 32103-88; Investment Research Associates, Ltd., and Subsidiaries, docket No. 27444-89; Claude M. and Mary B. Ballard, docket No. 16421-90; Investment Research Associates, Ltd., and Subsidiaries, docket No. 25875-90; Burton W. and Naomi R. Kanter, docket No. 26251-90; Claude M. and Mary B. Ballard, docket No. 20211-91; Estate of Robert W. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-executors, and Estate of Donna M. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-executors, docket No. 20219-91; Estate of Robert W. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-executors, and Estate of Donna M. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-executors, docket No. 21555-91; Claude M. and Mary B. Ballard, docket No. 21616-91; Investment Research Associates, Ltd., and Subsidiaries, docket No. 23178-91; Burton W. and Naomi R. Kanter, docket No. 24002-91; Claude M. and Mary B. Ballard, docket No. 1984-92; Estate of Robert W. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-executors, and Estate of Donna M. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-executors, docket No. 16164-92; Investment Research Associates, Ltd., and Subsidiaries, docket No. 19314-92; Claude M. and Mary B. Ballard, docket No. 23743-92; Burton W. and Naomi R. Kanter, docket No. 26918-92; Estate of Robert W. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-executors, and Estate of Donna M. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-executors, docket No. 7557-93; Claude M. and Mary B. Ballard, docket No. 22884-93; Investment Research Associates, Ltd., and Subsidiaries, docket No. 25976-93; and Burton W. and Naomi R. Kanter, docket No. 25981-93.

<u>Mark E. O'Leary</u>, <u>John J. Comeau</u>, <u>James M. Cascino</u>, <u>Jonathan P. Decatorsmith</u>, <u>James M. Klein</u>, <u>G. Roger Markley</u>, and <u>Pamela V. Gibson</u>, for respondent.

CONTENTS

<u>Issue 1. Whether Payments Made By the Five in the Prudential, Travelers, and Kanter Transactions During the Years at Issue Are Properly Taxable to Kanter, Ballard, and Lisle, and, if so, whether they are liable for the fraud additions to tax and penalty with respect to such income</u> . . . . . . . . . . . . . . . . . . . . . . . 25

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 25

I.  Background . . . . . . . . . . . . . . . . . . . . . . . 25
    A.  Petitioners' Residences and Principal Place of Business . . . . . . . . . . . . . . . . . . . . . 25
    B.  Kanter . . . . . . . . . . . . . . . . . . . . . . 26
    C.  Ballard . . . . . . . . . . . . . . . . . . . . . 28
    D.  Lisle . . . . . . . . . . . . . . . . . . . . . . 29
II.  The Kanter Enterprise . . . . . . . . . . . . . . . . 30
    A.  Overview . . . . . . . . . . . . . . . . . . . . . 30
    B.  Investment Research Associates, Inc., and Its Subsidiaries . . . . . . . . . . . . . . . . . . . 34
        1.  IRA Stock . . . . . . . . . . . . . . . . . . 34
        2.  IRA Stockholders . . . . . . . . . . . . . . 35
            a.  Mildred Schott and Delores Keating . . . 36
            b.  The Bea Ritch Trusts . . . . . . . . . . 37
        3.  IRA Officers and Directors . . . . . . . . . 40
        4.  IRA Subsidiaries . . . . . . . . . . . . . . 41
    C.  Holding Co. . . . . . . . . . . . . . . . . . . . 42
    D.  Administration Co. and Principal Services: The Banking Corporations . . . . . . . . . . . . . . . 43
    E.  The Other Lending Corporations . . . . . . . . . . 46
        1.  HELO . . . . . . . . . . . . . . . . . . . . 47
        2.  Int'l Films . . . . . . . . . . . . . . . . . 48
III.  Transactions Involving the Five . . . . . . . . . . . 48
    A.  The Weaver Arrangement: Hyatt Corp.'s Embarcadero Hotel Management Contract . . . . . . . . . . . . . 49
    B.  The Frey Arrangement: Condominium Conversions. . . 57
    C.  The Schaffel Arrangement: Real Estate Construction and Financing . . . . . . . . . . . . . . . . . . . 71
        1.  Schaffel/Prudential Transactions . . . . . . 73
        2.  Schaffel/Travelers Transactions . . . . . . 75
        3.  FPC Subventure Associates Partnership . . . . 77

D. The Schnitzer Arrangement: Sale and Repurchase of Property Management Systems Stock. . . . . . . . . 79

E. The Eulich Arrangement: Essex Hotel Management Co. . . . . . . . . . . . . . . . . . . . . . . . . . 88
    1. Eulich's Background . . . . . . . . . . . . . 88
    2. Prudential's Gateway Hotel . . . . . . . . . . 90

F. Diagram: Summary of Payments From the Five 1977 Through 1989 . . . . . . . . . . . . . . . . . . . . 102

G. Changes in IRA and Subsidiaries Corporate Structure From 1974 Through 1988 . . . . . . . . . 103

H. Changes in Holding Co. & Subsidiaries Corporate Structure 12/76 Through 8/87 . . . . . . . . . . . 125

I. Holding Co. & Subsidiaries Returns . . . . . . . 131

J. HELO 1979 Through 1983 . . . . . . . . . . . . . 140

IV. Flow of Money . . . . . . . . . . . . . . . . . . . 141

A. Payments to IRA and Subsidiaries: The Prudential Transactions . . . . . . . . . . . . . . . . . . . 141
    1. Overview . . . . . . . . . . . . . . . . . . . 141
    2. Flow of the Funds 1977 Through 1983 . . . . . 142
        a. Flow of Money From KWJ Corp. to IRA: 1978 Through 1983 . . . . . . . . . . 143
        b. Flow of Money From Zeus: 1979 Through 1983 . . . . . . . . . . . . . . . . . . 146
        c. Payments From Schnitzer-PMS, Essex, and Schaffel 1979 Through 1983 . . . . . . . 150
        d. Funds Accumulated in IRA at Close of 1983 . . . . . . . . . . . . . . . . . . 150
    3. 1984 Distributions to Carlco, TMT, and BWK, Inc. . . . . . . . . . . . . . . . . . . . . . 152
        a. 1984 Distributions of Cash From IRA to Carlco, TMT, and BWK, Inc. . . . . . . 152
        b. 1984 Distribution of Essex Partnership Interest to Carlco, TMT, and BWK, Inc. . 153
        c. Transfer of Sherwood Partnership Interest From IRA to Carlco, TMT, and BWK, Inc. . . . . . . . . . . . . . . . . 155
        d. 1984 Distributions to Carlco, TMT, and BWK, Inc. as Reflected on the Books of the Corporations . . . . . . . . . . . . 157
    4. Flow of Payments by the Five 1985 Through 1989 . . . . . . . . . . . . . . . . . . . . . 158
        a. Zeus 1984 Through 1988 . . . . . . . . 158
        b. Distributions of Schnitzer-PMS and Essex Payments Made During 1985 Through 1989 . 160
        c. Loans From IRA to KWJ Partnership Through 1989 . . . . . . . . . . . . . . 163
        d. Balance Sheets of Carlco, TMT, and BWK, Inc. 1983 Through 1989 . . . . . . . . 163

B.    Flow of the Funds Paid By the Five Through IRA and
Its Subsidiaries to Kanter, Ballard, and Lisle . . 166
    1.   Overview . . . . . . . . . . . . . . . . . . . 166
    2.   Payments from IRA, KWJ Corp., and KWJ Co.
        Partnership . . . . . . . . . . . . . . . . 166
        a.   1982: IRA Payments to Ballard and Lisle . 166
        b.   Consulting Fees Paid to Ballard's and
            Lisle's Children . . . . . . . . . . . . 167
        c.   KWJ Partnership 1989 Payments to Lisle
            and Ballard . . . . . . . . . . . . . . . 168
    3.   Disposition of Funds out of Carlco, TMT, and
        BWK to Kanter . . . . . . . . . . . . . . . 169
        a.   Creation of Carlco, TMT, and BWK, Inc. . 169
        b.   Control and Management of Carlco, TMT,
            and BWK, Inc. . . . . . . . . . . . . . . 171
        c.   Ballard: Disposition of Funds out of
            TMT . . . . . . . . . . . . . . . . . . . 173
        d.   Lisle: Disposition of Funds out of
            Carlco . . . . . . . . . . . . . . . . . 178
        e.   Kanter: Disposition of Funds out of BWK,
            Inc. . . . . . . . . . . . . . . . . . . 180
    4.   Loans . . . . . . . . . . . . . . . . . . . . 181
        a.   IRA Loans to Kanter . . . . . . . . . . . 181
        b.   Loans to Ballard, Lisle, Their Family
            Members and Trusts . . . . . . . . . . . 181
    5.   Writeoff of Loans and Losses . . . . . . . . 185
C.    Payments to Holding Co. and Its Subsidiaries . . . 211
D.    Distributions to Kanter . . . . . . . . . . . . . 212
E.    Examination of Petitioners' Returns . . . . . . . 215

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

I.   Position of the Parties . . . . . . . . . . . . . . . . 227
II.  Omitted Income . . . . . . . . . . . . . . . . . . . . . 229
    A.    The Transactions . . . . . . . . . . . . . . . . . 230
        1.   The Hyatt Payments . . . . . . . . . . . . . 230
        2.   The Frey Arrangement . . . . . . . . . . . . 238
        3.   The Schaffel Arrangement . . . . . . . . . . 240
        4.   The Schnitzer Arrangement . . . . . . . . . 243
        5.   The Eulich/Essex Arrangement . . . . . . . . 249
        6.   Conclusion . . . . . . . . . . . . . . . . . 255
    B.    Overview of the Law . . . . . . . . . . . . . . . 256
        1.   Sham Corporations . . . . . . . . . . . . . 258
        2.   Assignment of Income . . . . . . . . . . . . 271
        3.   Section 482 . . . . . . . . . . . . . . . . 277
        4.   Conclusion . . . . . . . . . . . . . . . . . 279
III. Fraud Additions to Tax and Penalties . . . . . . . . . . 286
    A.    Positions of the Parties . . . . . . . . . . . . . 286

B.   Applicable Statutory Provisions . . . . . . . . . . 287
C.   General Legal Principles Relating to Civil Fraud  . 289
D.   Underpayments of Tax . . . . . . . . . . . . . . . . 290
E.   Intent to Evade Tax . . . . . . . . . . . . . . . . 300
     1.   Lisle's Fraud  . . . . . . . . . . . . . . . . 303
     2.   Ballard's Fraud  . . . . . . . . . . . . . . . 307
     3.   Kanter's Fraud . . . . . . . . . . . . . . . . 311
F.   Summary and Conclusions as to Fraud . . . . . . . . 318

Issue 2.  Whether Certain Commitment Fees Paid to Century
     Industries, Ltd., Are Includable in Kanter's Income for
     1981, 1982, 1983, 1984, and 1986 . . . . . . . . . . . . 320

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 320

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 326

Issue 3.  Whether Kanter Received Unreported Income From Hi-
     Chicago Trust for 1981, 1982, and 1983 . . . . . . . . . 331

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 331

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

Issue 4.  Whether Kanter is Taxable on the Income of the Bea
     Ritch Trusts for 1986 and 1987 . . . . . . . . . . . . . 346

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 346

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

Issue 5.  Whether Kanter Had Unreported Income for 1982,
     1983, 1984, 1987, 1988, and 1989 From the CMS Investors
     Partnership . . . . . . . . . . . . . . . . . . . . . . 370

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 370

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 370

Issue 6.  Whether Kanter had Unreported Income in 1983 From
     Equitable Leasing Co., Inc. . . . . . . . . . . . . . . 377

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 377

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 379

Issue 7.  Whether Kanter Had Unreported Income in 1982 Based
     on the Bank Deposit Analysis Method . . . . . . . . . . 380

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 380

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381

Issue 8.  Whether Kanter Received Barter Income From
          Principal Services in 1988 and 1989 . . . . . . . . . . 385

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 385

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 386

Issue 9.  Whether the Kanters Are Entitled to Certain
          Deductions Claimed on Schedule A and Schedule C for
          1986 Through 1989 . . . . . . . . . . . . . . . . . . . 387

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 387

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

Issue 10.  Whether Kanter, in 1983, Realized Capital Gains
           Under Section 357(b) and (c) From the Assumption by
           Cashmere Investment Associates, Inc., of Partnership
           Interests Having Negative Capital Accounts and Whether,
           Under Section 453, the Installment Method was Available
           for the Reporting of Such Gains . . . . . . . . . . . . 391

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 391

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 405

Issue 11.  Whether Kanter Is Entitled to Research and
           Development and Business Expense Deductions From
           Immunological Research Corporation for 1979 . . . . . . 414

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 414

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 418

Issue 12.  Whether Kanter had Unreported Partnership Income
           for 1978 . . . . . . . . . . . . . . . . . . . . . . . 429

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 429

Issue 13.  Whether the Kanters Are Entitled to a Loss From
           GLS Associates for 1981 . . . . . . . . . . . . . . . . 429

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 429

<u>Issue 14.  Whether the Kanters Are Entitled to a Loss From
     Computer Leasing Transactions Involving Equitec for
     1983 and 1984</u> . . . . . . . . . . . . . . . . . . . . . . 430

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 430

<u>Issue 15.  Whether the Kanters Are Entitled to Investment
     Interest Expense Deductions for 1981</u> . . . . . . . . . . 430

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 430

<u>Issue 16.  Whether the Kanters Are Entitled to an Investment
     Tax Credit Carryover for 1978</u> . . . . . . . . . . . . . 431

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 431

<u>Issue 17.  Whether the Kanters Are Entitled to an Interest
     Deduction for 1986</u> . . . . . . . . . . . . . . . . . . . 434

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

<u>Issue 18.  Whether the Kanters Received Unreported Interest
     Income from a Bank in 1988</u> . . . . . . . . . . . . . . . 435

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 435

<u>Issue 19.  Whether Kanter Is Entitled to a Business Loss
     Deduction in 1980 in Connection With the Sale of a
     Painting</u> . . . . . . . . . . . . . . . . . . . . . . . . 435

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 435

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 437

<u>Issue 20.  Whether the Kanters Are Entitled To Deduct a
     Claimed Charitable Contribution of $15,000 to the
     Jewish United Fund in 1982</u> . . . . . . . . . . . . . . . 441

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 441

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 443

<u>Issue 21.  Whether the Kanters Are Entitled to Claimed
     Capital Gains and Losses for 1987</u> . . . . . . . . . . . 446

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . 446

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 453

Issue 22.  Whether Respondent Correctly Made Adjustments to
the Rental Income, Depreciation, Interest Expense, and
Investment Tax Credits Claimed by Investment Research
Associates, Ltd. (IRA) in Connection with Equipment
Leasing Transactions for 1979, 1980, and 1982 Through
1989 . . . . . . . . . . . . . . . . . . . . . . . . . . 465

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . 465

I.   Background and Adjustments Made in Deficiency Notices . 465
     A.   IRA and Cedilla Investment . . . . . . . . . . . . 465
          1.   Schott . . . . . . . . . . . . . . . . . . . 467
          2.   Mallin . . . . . . . . . . . . . . . . . . . 467
     B.   Richard Uhl, Funding Systems Corp., and Funding
          Systems Asset Management Corp. . . . . . . . . . . 469
     C.   FSAM Partnership . . . . . . . . . . . . . . . . . 470
II.  Equipment Leasing . . . . . . . . . . . . . . . . . . . 470
     A.   Equipment Leasing Generally . . . . . . . . . . . 470
     B.   General Facts Relative to Lack of Economic
          Substance, Profit Motive and Residual Value . . . 470
     C.   General Facts Relating to Invalid Indebtedness and
          Financing Circularity . . . . . . . . . . . . . . 472
     D.   Miscellaneous Additional Facts Generally
          Applicable to the Transactions . . . . . . . . . . 476
III. The Specific Leasing Transactions . . . . . . . . . . . 476
     A.   Cedilla Invest.-1976 Domestic (O.P.M.
          Transaction) . . . . . . . . . . . . . . . . . . . 476
     B.   Cedilla Invest.-1977 Domestic Transaction Master
          Lease Transaction) . . . . . . . . . . . . . . . . 478
     C.   Cedilla Invest.-1979 Foreign Transaction (British
          Aerospace Transaction) . . . . . . . . . . . . . . 479
     D.   IRA-1980 Domestic Transaction ("Mini Computer
          Transaction") . . . . . . . . . . . . . . . . . . 487
     E.   IRA-1980 Foreign/Domestic Transaction ("Alfred
          Teves Transaction") . . . . . . . . . . . . . . . 490
     F.   Cedilla Invest. "Lexet Transactions" . . . . . . . 492
     G.   Cedilla Invest. "Ben Energy Transactions" . . . . 495
     H.   Cedilla Invest. "Dard Systems Transactions" . . . 498

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 501

I.   Leasing Transactions Generally . . . . . . . . . . . . 501
II.  Specific Leasing Transactions . . . . . . . . . . . . . 516
     A.   Cedilla Invest.-1976 Domestic (O.P.M.
          Transaction) . . . . . . . . . . . . . . . . . . . 516

B.   Cedilla Invest. - 1977 Domestic Transaction
     (Master Lease Transaction)  . . . . . . . . . . . . 518
C.   Cedilla Invest.-1979 Foreign Transaction (British
     Aerospace Transaction)  . . . . . . . . . . . . . . 519
D.   IRA-1980 Domestic Transaction (Mini Computer
     Transaction)  . . . . . . . . . . . . . . . . . . . 524
E.   IRA-1980 Foreign/Domestic Transaction (Alfred
     Teves Transaction)  . . . . . . . . . . . . . . . . 525
F.   Cedilla Invest.-"Lexet Transactions", "Ben Energy
     Transactions", and "Dard Systems Transactions"  . . 526
G.   Equitable Leasing . . . . . . . . . . . . . . . . . 529

Issue 23.   Whether IRA is Entitled to a Claimed Loss on Form
            4797 of $1,073,835 for 1988  . . . . . . . . . . . . . 536

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 536

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 540

Issue 24.   Whether IRA Is Entitled to a Charitable
            Contribution Carryover Deduction for 1983  . . . . . . 545

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 545

Issue 25.   Whether IRA Is Entitled to Certain Claimed
            Capital Losses for 1985  . . . . . . . . . . . . . . . 545

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 545

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 548

Issue 26.   Whether IRA Is Entitled to Claimed Bad Debt
            Deductions for 1987  . . . . . . . . . . . . . . . . . 556

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 556

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 558

Issue 27.   Whether IRA Is Entitled to Claimed Ordinary
            Losses on Sales of Notes Receivable for 1987 . . . . . 561

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 561

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 564

Issue 28.   Whether IRA Is Entitled to Certain Capital Losses
            for 1987 . . . . . . . . . . . . . . . . . . . . . . . 571

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 571

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 572

Issue 29.  Whether IRA Is Entitled To Deduct as Business
           Expenses Amounts Paid to J.D. Weaver in 1979, 1981, and
           1982 . . . . . . . . . . . . . . . . . . . . . . . . . 574

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 574

Issue 30.  Whether the Assessment and Collection of the
           Deficiency and Additions to Tax as to IRA for 1980 Are
           Barred by the Statute of Limitations . . . . . . . . . 576

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 576

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 578

Issue 31.  Whether IRA Is Liable for the Fraud Addition to
           Tax for 1987 . . . . . . . . . . . . . . . . . . . . . 580

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 580

Issue 32.  Whether Assessment and Collection of Federal
           Income Taxes of Kanter, Ballard, and Lisle Are Barred
           by the Statute of Limitations for Some Years . . . . . 581

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 581

Issue 33.  The Liabilities of Kanter, Ballard, and Lisle for
           Additions to Tax for Negligence  . . . . . . . . . . . 582

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 582

Issue 34.  Whether the Kanters Are Liable for the Section
           6659 Addition to Tax for 1981  . . . . . . . . . . . . 586

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 586

Issue 35.  Whether Kanter Is Liable for Section 6661
           Additions to Tax for 1982 Through 1984, and 1986
           Through 1988 . . . . . . . . . . . . . . . . . . . . . 589

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . 589

Issue 36.  Whether Kanter Is Liable for Section 6621(c)
           Increased Interest for 1978, 1979, 1980 Through 1984,
           and 1986, and 1987, and 1988 . . . . . . . . . . . . . 592

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 592

Issue 37.  Whether IRA Is Liable for the Section 6651(a)(1)
            Addition to Tax for 1980 . . . . . . . . . . . . . . 596

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 596

Issue 38.  Whether IRA Is Liable for the Section 6653(a)
            Additions to Tax for 1980, and 1982 Through 1988 . . . . 597

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 597

Issue 39.  Whether IRA Is Liable for the Section 6659(a)
            Additions to Tax for 1982 and 1983 . . . . . . . . . . 601

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 601

Issue 40.  Whether IRA Is Liable for the Section 6661
            Additions to Tax for 1983 Through 1988 . . . . . . . . 602

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 602

Issue 41.  Whether IRA Is Liable for the Section 6662(a)
            Accuracy-Related Penalty for 1989 . . . . . . . . . . . 606

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 606

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These consolidated cases were assigned to Special Trial Judge D. Irvin Couvillion pursuant to Rules 180, 181, and 183.[2]  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

---

[2]     Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

OPINION OF THE SPECIAL TRIAL JUDGE

COUVILLION, Special Trial Judge:   In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes, additions to tax,[3] penalties, and increased interest, as follows:

Investment Research Associates, Ltd., and Subsidiaries

Docket No. 43966-85:

| Year | Deficiency | Addition to Tax Sec. 6659(a) |
|------|-----------|------------------------------|
| 1979 | $18,791 | $5,637 |

Docket No. 45273-86:

| | | Additions to Tax | | |
|------|-----------|-----------|-------------|-----------|
| Year | Deficiency | Sec. 6653 | Sec. 6659(a) | Sec. 6661 |
| 1982 | $174,225 | $8,711 | $49,154 | $1,038 |

---

[3]   With respect to the additions to tax under sec. 6653, as to all of the cases before the Court, for the years 1979 and 1980, the addition to tax is under sec. 6653(a).  For the years 1981 through 1985, the addition to tax is under sec. 6653(a)(1).  For the years 1981 through 1985, respondent also determined the addition to tax under sec. 6653(a)(2), which is 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules or regulations.  For the years 1986 and 1987, the addition to tax is under sec. 6653(a)(1)(A), and the determined 50-percent interest due on the underpayment is under sec. 6653(a)(1)(B).  For 1988, the addition to tax is under sec. 6653(a)(1), and there is no corresponding addition to tax for 50 percent of the interest due on the underpayment.  See Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 1015(b)(2)(A), 102 Stat. 3342, 3568, applicable to returns the due date for which, without regard to extensions, is after Dec. 31, 1988.

Docket No. 30830-88:[1]

|  |  | Additions to Tax | | |
| Year | Deficiency | Sec. 6653 | Sec. 6659(a) | Sec. 6661 |
| 1983 | $595,838 | $29,792 | $16,767 | $134,987 |
| 1984 | 410,317 | 20,516 | -- | 102,579 |

[1]In docket No. 30830-88 the deficiencies in tax determined in the notice of deficiency are $595,838 and $410,317, respectively, for 1983 and 1984. Page 2 of respondent's opening brief states the deficiencies to be $181,546 and $123,095, respectively, for 1983 and 1984. The Court assumes that the amounts stated in respondent's opening brief are in error.

Docket No. 27444-89:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6653 | Sec. 6661 |
| 1985 | $400,488 | $20,024 | $100,122 |

Docket No. 25875-90:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6653 | Sec. 6661 |
| 1986 | $2,110,643 | $105,532.15 | $527,660.75 |

Docket No. 23178-91:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6653 | Sec. 6661 |
| 1987 | $5,739,249 | $286,962 | $1,434,812 |

Docket No. 19314-92:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653 |
| 1980 | $1,304,063 | $195,609.45 | $65,203.15 |

Docket No. 25976-93:

|  |  | Additions to Tax | | Penalty |
| Year | Deficiency | Sec. 6653 | Sec. 6661 | Sec. 6662(a) |
| 1988 | $768,025 | $38,401 | $192,006 | -- |
| 1989 | 878,898 | -- | -- | $175,780 |

Burton W. and Naomi R. Kanter

| Docket No. | Year | Deficiency | Additions to Tax | | | Penalty |
| | | | Sec. 6653 | Sec. 6659 | Sec. 6661 | Sec. 6662 |
|---|---|---|---|---|---|---|
| 712-86 | 1981 | $340,578.00 | $17,029.00 | $42,682 | -- | -- |
| 1350-87 | 1982 | 2,086,913.00 | 104,346.00 | -- | $208,691.00 | -- |
| 31301-87 | 1978 | 476,999.00 | -- | -- | -- | -- |
| 33557-87 | 1980 | 454,396.00 | 22,720.00 | -- | -- | -- |
| 3456-88 | 1979 | 183,809.37 | 9,190.47 | -- | -- | -- |
| 32103-88 | 1984 | 3,825,078.00 | 191,254.00 | -- | 949,211.00 | -- |
| 26251-90 | 1983 | 1,150,652.00 | 57,532.60 | -- | 287,663.00 | -- |
| | 1986 | 897,224.00 | 44,861.00 | -- | 223,666.00 | -- |
| 24002-91 | 1987 | 1,434,529.00 | 71,726.45 | -- | 358,632.25 | -- |
| 26918-92 | 1988 | 523,234.00 | 26,162.00 | -- | 130,809.00 | -- |
| 25981-93 | 1989 | 835,847.00 | -- | -- | -- | $167,169 |

Claude M. and Mary B. Ballard

Docket No. 16421-90:

| | | Additions to Tax | |
| Year | Deficiency | Sec. 6653 | Sec. 6661 |
|---|---|---|---|
| 1982 | $55,338 | $2,766.90 | $8,774 |

Docket No. 20211-91:

| | | Additions to Tax | | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653 | Sec. 6661 |
|---|---|---|---|---|
| 1984 | $981,072 | [1]$51,3311 | $88,788.05 | $245,268 |

[1] On brief, respondent concedes this addition to tax.

Docket No. 21616-91:

| | | Additions to Tax | |
| Year | Deficiency | Sec. 6653 | Sec. 6661 |
|---|---|---|---|
| 1987 | $208,449 | $10,422.45 | $52,112.25 |

Docket No. 1984-92:

| | | Additions to Tax | |
| Year | Deficiency | Sec. 6653 | Sec. 6659 |
|---|---|---|---|
| 1975 | $23,453 | $1,173 | -- |
| 1976 | 34,024 | 1,701 | -- |
| 1977 | 11,502 | -- | -- |
| 1978 | 3,923 | -- | -- |
| 1979 | 21,630 | -- | -- |
| 1980 | 92,481 | -- | -- |
| 1981 | 193,743 | 9,687 | $17,138 |

Docket No. 23743-92:

| | | Addition to Tax |
| Year | Deficiency | Sec. 6653 |
|---|---|---|
| 1988 | $125,136 | $6,257 |

Docket No. 22884-93:

| Year | Deficiency | Penalty Sec. 6662 |
|------|-----------|-------------------|
| 1989 | $179,924  | $35,985           |

Estate of Robert W. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-executors, and Estate of Donna M. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-executors

| Docket No. | Year | Deficiency | Additions to Tax Sec. 6653 | Sec. 6661 | Penalty Sec. 6662(a) |
|-----------|------|-----------|----------|----------|-----------|
| 20219-91 | 1984 | $827,955 | $41,397.75 | $206,988.75 | -- |
| 21555-91 | 1987 | 195,498 | 9,774.90 | 48,874.50 | -- |
| 16164-92 | 1988 | 109,048 | 5,452.00 | 27,262.00 | -- |
| 7557-93 | 1989 | 109,049 | -- | -- | $21,810 |

In the following cases, respondent determined in the notices of deficiency or asserted in amended answers that the underpayments in tax were subject to increased interest under section 6621(c), formerly section 6621(d):[4]

Investment Research Associates, Ltd., and Subsidiaries:

| Docket No. | Year |
|-----------|------|
| 43966-85 | 1979 |
| 45273-86 | 1982 |

---

[4] Sec. 6621(d)(1) was added by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 144(a), 98 Stat. 682, and provides for interest of 120 percent of the adjusted interest rate due on any substantial underpayment of tax attributable to tax-motivated transactions. The increased interest is effective for interest accruing after Dec. 31, 1984. Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744, and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89 sec. 7721(d), 103 Stat. 2400.

Burton W. and Naomi R. Kanter:

| Docket No. | Year |
|------------|------|
| 1350-87 | 1982 |
| 33557-87 | 1980 |
| 3456-88 | [1]1979 |
| 32103-88 | 1984 |
| 26251-90 | 1983, 1986 |
| 24002-91 | 1987 |

[1]On brief, respondent concedes that the underpayment attributable to the disallowed loss from Immunological Research Corp. is not subject to increased interest under sec. 6621(c), following Estate of Cook v. Commissioner, T.C. Memo. 1993-581.

Claude M. and Mary B. Ballard:

| Docket No. | Year |
|------------|------|
| 16421-90 | 1982 |
| 20211-91 | 1984 |
| 21616-91 | 1987 |
| 1984-92 | 1975, 1976, 1977, 1978 1979, 1980, 1981 |
| 23743-92 | 1988 |

Estate of Robert W. Lisle, Deceased, etc.:

| Docket No. | Year |
|------------|------|
| 20219-91 | 1984 |
| 21555-91 | 1987 |
| 16164-92 | 1988 |

In amended answers, respondent alleged increases in the deficiencies in tax and additions to tax in the following cases:

| Petitioner | Docket No. | Year(s) |
|---|---|---|
| Investment Research Associates, | 45273-86 | 1982 |
| Ltd., and Subsidiaries | 43966-85 | 1979 |
| Burton W. and Naomi R. Kanter | 712-86 | 1981 |
| | 1350-87 | 1982 |
| | 31301-87 | 1978 |
| | 33557-87 | 1980 |
| | 3456-88 | 1979 |
| | 32103-88 | 1984 |
| | 26251-90 | 1983, 1986 |
| | 24002-91 | 1987 |
| | 26918-92 | 1988 |
| | 25981-93 | 1989 |
| | | |
| Claude M. and Mary B. Ballard | 16421-90 | 1982 |
| | 20211-91 | 1984 |
| | 21616-91 | 1987 |
| | 1984-92 | 1975, 1976, 1977 |
| | | 1978, 1979, 1980 |
| | | 1981 |
| | 23743-92 | 1988 |
| | 22884-93 | 1989 |
| | | |
| Estate of Robert W. Lisle, | 20219-91 | 1984 |
| Deceased, etc. | 21555-91 | 1987 |
| | 16164-92 | 1988 |
| | 7557-93 | 1989 |

In the amended answers, respondent alleged that the underpayments in tax with respect to all or, alternatively, with respect to substantial portions of the increased deficiencies in tax were subject to the addition to tax for fraud pursuant to section 6653(b) or the penalty for fraud pursuant to section 6663(a) in the following cases:[5]

---

[5] For the years 1976 through 1981, the addition to tax for fraud is under sec. 6653(b). For the years 1982 through 1985, the addition to tax for fraud is under sec. 6653(b)(1) and (2). For 1986 and 1987, the addition to tax for fraud is under sec. 6653(b)(1)(A) and (B). For 1988, the addition for fraud is under
(continued...)

| Petitioner | Docket No. | Year(s) |
|---|---|---|
| Investment Research Associates, Ltd. and Subsidiaries | 23178-91 | 1987 |
| Burton W. and Naomi R. Kanter | 712-86 | 1981 |
| | 1350-87 | 1982 |
| | 31301-87 | 1978 |
| | 33557-87 | 1980 |
| | 3456-88 | 1979 |
| | 32103-88 | 1984 |
| | 26251-90 | 1983, 1986 |
| | 24002-91 | 1987 |
| | 26918-92 | 1988 |
| | 25981-93 | 1989 |
| Claude M. and Mary B. Ballard | 16421-90 | 1982 |
| | 20211-91 | 1984 |
| | 21616-91 | 1987 |
| | 1984-92 | 1975, 1976, 1977 1978, 1979, 1980 1981 |
| | 23743-92 | 1988 |
| | 22884-93 | 1989 |
| Estate of Robert W. Lisle, Deceased, etc. | 20219-91 | 1984 |
| | 21555-91 | 1987 |
| | 16164-92 | 1988 |
| | 7557-93 | 1989 |

Introduction

In each of the cases in which fraud is alleged, respondent alleged that, if the Court holds that the underpayments in tax are not subject to fraud additions, alternatively, the underpayments in tax are subject to additions to tax under sections 6653(a)(1) and (2) and 6659(a), and the increased interest under section 6621(c), or if the underpayment is for 1989, that it is subject to a penalty under section 6662.

---

(...continued)
sec. 6653(b)(1). For 1989, the penalty for fraud is under sec. 6663(a).

In all of the amended answers in which respondent asserted increased deficiencies in tax, as well as increased additions to tax and penalties, respondent did not calculate or assert the amounts of the increased tax deficiencies or the amounts of the additions to tax or penalties. Respondent asserted only the amounts of increased income or the amounts of disallowed expenses that would result in increased deficiencies in tax and additions to tax. As a result of these amended answers, and as a result of numerous concessions and stipulations of settlement that were made by the parties before, during, and after the trial, as well as concessions of certain issues by respondent on brief, Rule 155 computations will be necessary in some of the cases.[6]

These cases are part of a larger group of cases that have also been identified by respondent as a litigation project. The sobriquet for this project is "Levenfeld/Kanter". These cases were selected for trial because, as the Court understands, they involve common issues that the other cases in this project do not have.

References to Kanter, Ballard, and Lisle are to Burton W. Kanter, Claude M. Ballard, and Robert W. Lisle, respectively. Reference to the Kanters, Ballards, and Lisles are to Burton W.

---

[6]    In some of the cases, if petitioners are sustained on the fraud issue, respondent will be barred by the statute of limitations from assessment as to those petitioners.

and Naomi R. Kanter, Claude M. and Mary B. Ballard, and Robert W. and Donna M. Lisle, respectively.

The issues to be decided are:

(1) Whether payments made by the Five in the Prudential, Travelers, and Kanter transactions during the years at issue are properly taxable to Kanter, Ballard, and Lisle, and, if so, whether they are liable for the fraud additions to tax and penalty with respect to such income;

(2) whether certain commitment fees paid to Century Industries, Ltd., are includable in Kanter's income for 1981, 1982, 1983, 1984, and 1986;

(3) whether Kanter received unreported income from Hi-Chicago Trust for 1981, 1982, and 1983;

(4) whether Kanter is taxable on the income of the Bea Ritch Trusts for 1986, and 1987;

(5) whether Kanter had unreported income for 1982, 1983, 1984, 1987, 1988, and 1989 from the CMS Investors Partnership;

(6) whether Kanter had unreported income in 1983 from Equitable Leasing Co., Inc.;

(7) whether Kanter had unreported income in 1982 based on the bank deposit analysis method;

(8) whether Kanter received barter income from Principal Services in 1988 and 1989;

(9)  whether the Kanters are entitled to certain deductions claimed on Schedule A and Schedule C for 1986 through 1989;

(10)  whether Kanter, in 1983, realized capital gains under section 357(b) and (c) from the assumption by Cashmere Investment Associates, Inc., of partnership interests having negative capital accounts and whether, under section 453, the installment method was available for the reporting of such gains;

(11)  whether Kanter is entitled to research and development and business expense deductions from Immunological Research Corporation for 1979;

(12)  whether Kanter had unreported partnership income for 1978;

(13)  whether the Kanters are entitled to a loss from GLS Associates for 1981;

(14)  whether the Kanters are entitled to a loss from computer leasing transactions involving Equitec for 1983 and 1984;

(15)  whether the Kanters are entitled to investment interest expense deductions for 1981;

(16)  whether the Kanters are entitled to an investment tax credit carryover for 1978;

(17)  whether the Kanters are entitled to an interest deduction for 1986;

(18) whether the Kanters received unreported interest income from a bank in 1988;

(19) whether Kanter is entitled to a business loss deduction in 1980 in connection with the sale of a painting;

(20) whether the Kanters are entitled to deduct a claimed charitable contribution of $15,000 to the Jewish United Fund in 1982;

(21) whether the Kanters are entitled to claimed capital gains and losses in 1987;

(22) whether respondent correctly made adjustments to the rental income, depreciation, interest expense, and investment tax credits claimed by Investment Research Associates, Ltd. (IRA) in connection with equipment leasing transactions for 1979, 1980, and 1982 through 1989;

(23) whether IRA is entitled to a claimed loss on Form 4797 of $1,073,835 for 1988;

(24) whether IRA is entitled to a charitable contribution carryover deduction for 1983;

(25) whether IRA is entitled to certain claimed capital losses for 1985;

(26) whether IRA is entitled to claimed bad debt deductions for 1987;

(27) whether IRA is entitled to claimed ordinary losses on sales of notes receivable for 1987;

(28) whether IRA is entitled to certain capital losses for 1987;

(29) whether IRA is entitled to deduct as business expenses amounts paid to J.D. Weaver in 1979, 1981, and 1982;

(30) whether the assessment and collection of the deficiency and additions to tax as to IRA for 1980 are barred by the statute of limitations;

(31) whether IRA is liable for the fraud addition to tax for 1987;

(32) whether assessment and collection of Federal income taxes of Kanter, Ballard, and Lisle are barred by the statute of limitations for some years;

(33) the liabilities of Kanter, Ballard, and Lisle for additions to tax for negligence;

(34) whether the Kanters are liable for the section 6659 addition to tax for 1981;

(35) whether Kanter is liable for section 6661 additions to tax for 1982 through 1984, and 1986 through 1988;

(36) whether Kanter is liable for section 6621(c) increased interest for 1978, 1979, 1980 through 1984, and 1986, and 1987, and 1988;

(37) whether IRA is liable for the section 6651(a)(1) addition to tax for 1980;

(38)  whether IRA is liable for the section 6653(a) additions to tax for 1980, and 1982 through 1988;

(39)  whether IRA is liable for the section 6659(a) additions to tax for 1982 and 1983;

(40)  whether IRA is liable for the section 6661 additions to tax for 1983 through 1988; and

(41)  whether IRA is liable for the section 6662(a) accuracy-related penalty for 1989.

For convenience and clarity, the Court's findings of fact and opinion are set forth under each issue.  The findings of fact with respect to any issue incorporate by this reference the findings of fact as found in any preceding issue.

Issue 1. Whether Payments Made By the Five in the Prudential, Travelers, and Kanter Transactions During the Years at Issue Are Properly Taxable to Kanter, Ballard, and Lisle, and, if so, whether they are liable for the fraud additions to tax and penalty with respect to such income

FINDINGS OF FACT

The parties have filed several stipulations of fact.  The facts reflected in these stipulations, with the annexed exhibits, are so found and are incorporated herein by reference.

I.   Background

A.   Petitioners' Residences and Principal Place of Business

At the time the petitions were filed, the principal place of business of Investment Research Associates, Ltd. (IRA), was in the State of Illinois, the Kanters' legal residence was in the

State of Illinois, the Ballards' legal residence was in the State of Florida, and the Lisles' legal residence was in the State of Texas. Donna Lisle died on April 12, 1993, and Robert W. Lisle died on September 17, 1993. Their two children, Amy L. Albrecht and Thomas W. Lisle, are the coexecutors of the Estates of Robert W. Lisle and Donna M. Lisle. The estates have been substituted as parties and the two children as representatives of the estates. Amy Albrecht and Thomas Lisle were legal residents of the State of Texas at the time they were substituted as representatives of the estates of their deceased parents.

B.  Kanter

Kanter is an attorney who has been engaged continuously in the practice of law in Chicago, Illinois, since about 1956. He received a J.D. degree from the University of Chicago in 1952. From 1952 to 1954, he was a teaching associate at the University of Indiana Law School. Since 1956, his law practice has been in Chicago, Illinois. His primary expertise is in Federal income and estate taxation. From 1964 to 1981, Kanter was a partner in the law firm of Levenfeld & Kanter, which later became Levenfeld, Kanter, Baskes & Lippitz. That firm was dissolved in 1981, and Kanter thereafter practiced with the firm of Kanter & Eisenberg. As of the time of trial, Kanter was of counsel with the Chicago firm of Neal, Gerber & Eisenberg.

At the time of the trial and for the prior 10 years, Kanter taught courses in estate and gift taxation and estate planning at the University of Chicago Law School. Kanter has lectured and written extensively in the area of Federal tax law. He has also been an active participant in professional bar associations. For a number of years, Kanter has been a writer and contributor to the Journal of Taxation, a national monthly publication devoted exclusively to Federal taxation. One of the features of this publication is the Shop Talk section which he originated. At the time of trial, Kanter was a senior editor with the Journal of Taxation. Kanter is generally recognized as well known in his field. This recognition has resulted in a successful law practice, which has led to Kanter's being involved in consultation, development, and investments in a number of business fields and enterprises. For instance, Kanter has performed extensive legal work for the Pritzker family, majority owners of the Hyatt Corp., a major hotel company. Kanter also served as a director on the boards of several corporations and charitable organizations.

Petitioner Naomi R. Kanter, Kanter's wife, was not involved in any of the activities giving rise to this litigation. However, she filed joint Federal income tax returns with Kanter for the years at issue.

C.  Ballard

Ballard was an employee in the real estate department of The Prudential Insurance Co. of America (Prudential) from 1948 until his retirement in 1982.  During the course of his career at Prudential, Ballard was assigned to several regional offices of Prudential, including Houston and Dallas, Texas, and beginning in 1966 in the corporate headquarters of Prudential at Newark, New Jersey, and then again, for a short time, at the Houston regional office.  In 1973, he was reassigned to Prudential's Newark corporate headquarters, where he remained until his retirement in early 1982.  At the time he left Prudential, Ballard was a senior vice president in charge of equities and worked under Donald Knab (Knab), who was in charge of all of Prudential's real estate operations.

Ballard's work with Prudential in its real estate equity operations involved the purchase, development, management, and sale of property.  Ballard supervised the staff of this department at Prudential's headquarters, as well as the real estate department staff at Prudential's regional and field offices throughout the United States.   Ballard could influence the choice of builders and contractors for Prudential projects and could influence or prevent a project from going forward.

Shortly after leaving Prudential, Ballard became a general partner with Goldman Sachs, an investment firm in New York City.

In November of 1988, he retired as a general partner and became a limited partner with Goldman Sachs.

In his position with Prudential, Ballard met and was in contact with attorneys, developers, businessmen, and contractors involved in or affected by Prudential's real estate activities.

D.   Lisle

Lisle graduated from the University of Missouri with a B.S. degree in public administration.  He attended law school at the University of Missouri, graduate schools of management and business at Columbia University, and the graduate school of management at Princeton University.

Like Ballard, Lisle was employed by Prudential.  Lisle worked for Prudential in real estate development and in mortgage financing from September 1950 to April 1982.  Lisle headed the division responsible for lending money and buying and building real estate for Prudential.  He had authority to commit any loan up to $20 million and to award construction contracts.  The development aspect of his work was conducted through a subsidiary corporation of Prudential known as PIC Realty Corp. (PIC Realty).[7]  Lisle was president of PIC Realty.

---

[7]    Prudential conducted its real estate equity and joint venture operations in the name of PIC Realty in those States that prohibited insurance corporations from directly engaging in real estate development.

To a large extent, Lisle's career paralleled Ballard's. Like Ballard, Lisle worked in various regional offices of Prudential and ultimately was promoted to a senior executive position at Prudential's Newark corporate headquarters. The offices of Lisle and Ballard were next door to each other, and Lisle's supervisor at Prudential was also Donald Knab. To some extent, Ballard and Lisle's duties overlapped. At the time Lisle left Prudential in 1982, he was a vice president of Prudential.

In April 1982, after leaving Prudential, Lisle began working for The Travelers Insurance Co. (Travelers), doing virtually the same kind of work he had done for Prudential. He worked for Travelers until April 1988.

Donna M. Lisle, Lisle's wife, was not involved in any of the activities giving rise to this litigation, and her estate is a party to these proceedings solely by virtue of Mrs. Lisle's having filed joint Federal income tax returns with Lisle for the years at issue.

II. The Kanter Enterprise

A. Overview

Kanter met Ballard and Lisle sometime between 1968 and 1970. The three had numerous contacts and business dealings in succeeding years.

Kanter entered into arrangements pursuant to which he would use his business and professional contacts, including his

relationships with the Pritzkers, Ballard, and Lisle, to assist individuals and/or entities in obtaining business opportunities or in raising capital for business ventures. Kanter established a complex organization of corporations, partnerships, and trusts to receive, distribute, and disguise the payments from these arrangements.

Some of these arrangements involved payments from a group of individuals referred to by the parties as "the Five". The Five made payments for Ballard's and Lisle's influence in awarding contracts with Prudential (the Prudential transactions), for Lisle's influence in awarding contracts with Travelers (the Travelers transactions), and for Kanter's influence in transactions that did not involve Prudential or Travelers (the Kanter transactions). The payments most often were made to corporations controlled by Kanter and then distributed through various means to Kanter, Ballard, and/or Lisle, their family members, or to entities established for the benefit of their families.

Most of the payments made in the Prudential transactions were paid through IRA or one of its subsidiaries. Those made in the Travelers and Kanter transactions generally were made through another corporation controlled by Kanter, The Holding Co. (Holding Co.) or one of its subsidiaries. Funds received by IRA and its subsidiaries and Holding Co. and its subsidiaries, as

well as funds of other Kanter entities and associates, were commingled in accounts administered by another Kanter controlled entity, The Administration Co. (Administration Co.) (and later Principal Services Corp.).

Some distributions to Kanter, Ballard, and Lisle were characterized as commissions, consulting fees, or directors fees. Others were recorded as receivables or loans, many of which were traded or transferred between the various entities and eventually written off as uncollectible with IRA and/or Kanter taking deductions for the writeoffs. Some of the distributions that were treated as loans were made through two Kanter entities, International Films, Inc. (Int'l Films) and Harbor Exchange Lending Operation (HELO).

Large portions of the payments made in the Prudential transactions eventually were distributed to three of IRA's subsidiaries; more specifically, 45 percent to Carlco, Inc. (Carlco) (controlled by Lisle), 45 percent to TMT, Inc. (TMT), (controlled by Ballard), and 10 percent to BWK, Inc. (controlled by Kanter).

An overview of the Kanter enterprise is shown by the following diagram:



B.    Investment Research Associates, Inc., and Its Subsidiaries

IRA was originally incorporated in the State of Delaware on August 26, 1974, under the name of Cedilla Co.  In 1979, the name of Cedilla Co. was changed to Investment Research Associates, Ltd.  Reference hereinafter to IRA also refers to its predecessor, Cedilla Co. during years prior to the name change.

1.    IRA Stock

At the time of its incorporation in 1974, IRA was authorized to issue 1,000 shares of 10-cent par value common stock, 8,000 shares of $1 par value class A preferred stock, and 1,000 shares of 10-cent class B preferred stock.  By 1977 IRA was also authorized to issue 1,000 shares of $5,000 par value class C preferred stock.

IRA's annual franchise reports filed with the State of Delaware from 1975 to 1988 reported that the following shares of stock were issued and outstanding:

| Year | Common | Preferred | | |
|------|--------|-----------|---|---|
| | | Class A | Class B | Class C |
| 1975 | [blank] | [blank] | [blank] | [not authorized] |
| 1976 | [blank] | [blank] | [blank] | [not authorized] |
| 1977 | 1,000 | 1,000 | 500 | [not authorized] |
| 1978 | 1,000 | 1,000 | none | none |
| 1979 | none | 1,000 | 1,000 | none |
| 1980 | 1,000 | 1,000 | none | none |
| 1981 | [blank] | [blank] | [blank] | [blank] |
| 1982 | none | none | none | none |
| 1983 | 1,000 | 1,000 | [blank] | [blank] |
| 1984 | [blank] | [blank] | [blank] | [blank] |
| 1985 | [blank] | [blank] | [blank] | [blank] |
| 1986 | 1,000 | -0- | -0- | -0- |
| 1987 | [blank] | [blank] | [blank] | [blank] |
| 1988 | [blank] | [blank] | [blank] | [blank] |

IRA's end-of-year balance sheets from 1975 to 1989 indicate the following stockholder equity attributable to the preferred and common stock:

| Year | Preferred | Common |
|------|-----------|--------|
| 1975 | $1,050 | $100 |
| 1976 | 1,050 | 100 |
| 1977 | 1,000 | 100 |
| 1978 | 1,000 | 100 |
| 1979 | 1,000 | 100 |
| 1980 | 1,000 | 100 |
| 1981 | 1,000 | 100 |
| 1982 | 1,000 | 100 |
| 1983 | -0- | 100 |
| 1984 | -0- | 100 |
| 1985 | -0- | 100 |
| 1986 | -0- | 100 |
| 1987 | -0- | 100 |
| 1988 | -0- | 100 |
| 1989 | -0- | 100 |

2.  IRA Stockholders

IRA's 1976 return reported that no individual, partnership, corporation, estate, or trust at the end of the year owned (or was attributed ownership under section 267(c)) 50 percent or more

of the corporation's total voting stock.  IRA's returns reported that from 1977 through 1982, Solomon Weisgal, trustee of the Bea Ritch Trusts, owned 50 percent of IRA's voting stock, and Mildred Schott owned the remaining 50 percent of IRA's voting stock.  The Bea Ritch Trusts owned 1,000 shares of common stock, and Schott owned 1,000 shares of class A preferred voting stock.  IRA's returns for 1984 through 1989 indicated that no individual, partnership, corporation, estate, or trust at the end of the year owned (or was attributed ownership under section 267(c)) 50 percent or more of the corporation's total voting stock.

a.   Mildred Schott and Delores Keating

Mildred Schott (Schott) worked as a legal secretary and had a real estate broker's license.  She was introduced to Kanter by a mutual acquaintance.  Before she obtained her broker's license, she worked as a real estate sales person for Delores Keating (Keating).

Prior to October 28, 1975, Keating owned 1,000 shares of common stock of Cedilla Co.  On October 28, 1975, Keating's 1,000 shares of common stock were exchanged for 500 shares of the class B preferred stock, and 1,000 shares of common stock were issued to the Bea Ritch Trusts.  By 1978, Keating's 500 shares of class B preferred stock were redeemed by the corporation.

Schott held 1,000 shares of the class A preferred stock until 1982. She held the stock to enable IRA to hold a corporate real estate license.

b.    The Bea Ritch Trusts

Twenty-five trusts known collectively as the Bea Ritch Trusts were established in 1969 and were named after Beatrice K. Ritch, Kanter's mother. Kanter's mother is the named grantor, ostensibly contributing $100 to each of the 25 trusts.

Originally, when the 25 Bea Ritch Trusts were established in 1969, the beneficiaries of the trusts were Kanter, his family, and other relatives of Kanter. By about 1977, Kanter had formally renounced all of his interest as a beneficiary in the Bea Ritch Trusts. At some time, many additional trusts were added as beneficiaries to the trusts. The identities of the beneficiaries of the additional trusts are not in the record.

The original individual and additional trust beneficiaries of the Bea Ritch Trusts are as follows:

| Trust Name | Original Beneficiaries | Additional Beneficiaries |
|---|---|---|
| BWK Trust | Burton Kanter | JSK 1st Trust #5 |
| | | JSK 2d Trust #5 |
| | | JSK 3d Trust #5 |
| Naomi Trust | Naomi Kanter | JSK 3d Trust #19 |
| | | JSK 1st Trust #20 |
| BN Trust | Burton & Naomi | JSK 1st Trust #4 |
| | | JSK 2d Trust #4 |
| | | JSK 3d Trust #4 |
| Joel Trust | Burton & Joel Kanter | JSK 1st Trust #17 |
| | | JSK 2d Trust #17 |
| Janis Trust | Burton & Janis Kanter | JSK 3d Trust #15 |
| | | JSK 1st Trust #16 |

| Trust Name | Original Beneficiaries | Additional Beneficiaries |
|---|---|---|
| Joshua Trust | Burton & Joshua Kanter | JSK 2d Trust #18 JSK 3d Trust #18 |
| Joel Children's Trust | Burton, Naomi, Joel & Joel's children living from time to time | JSK 3d Trust #17 JSK 1st Trust #18 |
| Janis Children's Trust | Burton, Naomi, Janis & Janis children living from time to time | JSK 2d Trust #16 JSK 3d Trust #16 |
| Joshua Children's Trust | Burton, Naomi, Joshua & Joshua's children living from time to time | JSK 1st Trust #19 JSK 2d Trust #19 |
| JL-1 Trust | Burton, Joel, Harriet Blum & Joel's 1st child | JSK 3d Trust #11 JSK 1st Trust #12 |
| JL-2 Trust | Burton, Joel, Debbie Blum & Joel's 2d child | JSK 2d Trust #12 JSK 3d Trust #12 |
| JL-3 Trust | Burton, Joel, Jeff Blum & Joel's 3d child | JSK 1st Trust #13 JSK 2d Trust #13 |
| JA-1 Trust | Burton, Janis, Henry Krakow & Janis' 1st child | JSK 1st Trust #9 JSK 2d Trust #9 JSK 3d Trust #9 |
| JA-2 Trust | Burton, Janis, Helen Krakow & Janis' 3d child | JSK 1st Trust #10 JSK 2d Trust #10 |
| JA-3 Trust | Burton, Janis, Helen Krakow & Janis' 3d child | JSK 1st Trust #11 JSK 2d Trust #11 |
| JS-1 Trust | Burton, Joshua, Gerald L. Kanter & Joshua's 1st child | JSK 3d Trust #13 JSK 1st Trust #14 |
| JS-2 Trust | Burton, Joshua, Ruth Kanter & Joshua's 2d child | JSK 2d Trust #14 JSK 3d Trust #14 |
| JS-3 Trust | Burton, Joshua, Joshua's 3d child & all of the children of Gerald L. Kanter living from time to time | JSK 1st Trust #15 JSK 2d Trust #15 |

| Trust Name | Original Beneficiaries | Additional Beneficiaries |
|---|---|---|
| BK Children's Trust | Burton, Naomi and all of the children of the Grantor's son living from time to time | JSK 1st Trust #1 JSK 2d Trust #1 JSK 3d Trust #1 |
| BK Descendant's Trust | Burton, Naomi and all of the descendants of the of the Grantor's son living from time to time | JSK 1st Trust #2 JSK 2d Trust #2 JSK 3d Trust #2 |
| BK Grandchildren's Trust | Burton, Naomi and Burton's Grand-children living from time to time | JSK 1st Trust #3 JSK 2d Trust #3 JSK 3d Trust #3 |
| Lillian Trust | Burton, Naomi and Lillian Walker | JSK 2d Trust #20 JSK 3d Trust #20 |
| J-1 Wife's Trust | Burton, Joel's Wife and the children of Carl I. Kanter living from time to time | JSK 1st Trust #6 JSK 2d Trust #6 JSK 3d Trust #6 |
| J-2 Husband's Trust | Burton, Janis' husband and the children of Aloysius B. and Helen M. Osowski | JSK 1st Trust #7 JSK 2d Trust #7 JSK 3d Trust #7 |
| J-3 Wife's Trust | Burton, Joshua's wife and Ruth & Philip Loshin | JSK 1st Trust #8 JSK 2d Trust #8 JSK 3d Trust #8 |

Solomon Weisgal (Weisgal), an accountant and a longtime friend and business associate of Kanter, has been the sole named trustee of the Bea Ritch Trusts since 1969. As trustee of the Bea Ritch Trusts, Weisgal had broad power either to accumulate the Bea Ritch Trusts' income or to distribute (i.e., sprinkle) the trusts' income and assets among all or any of the trusts' beneficiaries in a manner he deemed appropriate. Weisgal did not

act independently as a trustee.  Rather, he acted as Kanter directed in all matters regarding the trusts.

### 3.   IRA Officers and Directors

Prior to October 27, 1975, Keating was president and secretary of IRA.  On October 27, 1975, Keating resigned and Schott was elected as president and Sharon Meyers (Meyers) as secretary by the unanimous consent of the directors (Schott, Meyers, and Patricia Grogan (Grogan)).  From 1977 to 1980, the president of IRA was Schott, and the vice president was Weisgal.

Lawrence Freeman (Freeman), an attorney in Miami, Florida, was a friend and business associate of Kanter.  At Kanter's request, Freeman served as IRA's president from 1980 to 1989.  Although Freeman was not paid for serving as IRA's president, he and his law firm received significant legal business through referrals from Kanter.  In 1989, Kanter became IRA's acting president.

From 1976 through 1980, Schott, Weisgal, and Grogan served as IRA's directors.  From 1981 through 1989, Freeman served as a director.  For most of those years Freeman was the sole director.  Although Ballard was not listed as a director, IRA paid Ballard $12,500 as directors fees in 1981.  IRA deducted $12,500 as a director fee expense on its 1981 return.

Meyers served as an officer or director of IRA at various times.  Meyers originally worked as Kanter's secretary at

Kanter's law firm. By the 1970's, her duties at the law firm evolved to her being an administrative assistant to Kanter. By 1981, she was no longer an employee of the law firm. During the years at issue, Meyers also served as an officer or director of many of Kanter's other corporations.

At all times, IRA's officers and directors made decisions and performed their duties in accordance with Kanter's instructions.

4. IRA Subsidiaries

IRA owned, from time to time, controlling interests in several subsidiary corporations. These subsidiary corporations included Brickell Enterprises, Inc., Cedilla Co., Cedilla Investment Co., IRA Florida Apartments, Inc., KWJ Corp., Zeus Ventures, Carlco, TMT, and BWK, Inc. IRA also, at one point, owned a majority stock interest in Int'l Films.

Carlco, TMT, and BWK, Inc., were incorporated in the State of Delaware in 1982 but remained inactive until 1983. In December of 1983, IRA acquired 1,000 shares (100 percent) of the common stock of each of Carlco, TMT, and BWK, Inc. In December 1983 and January 1984, Carlco, TMT, and BWK, Inc., each issued shares of preferred stock. Carlco preferred shares were issued to the Christie Trust established by Kanter for the benefit of Lisle's family; TMT preferred shares were issued to the Orient Trust established by Kanter for the benefit of Ballard's family;

and BWK, Inc., preferred shares were issued to the BK Children's Trust, the beneficiaries of which were members of Kanter's family.

C.    Holding Co.

Holding Co. was incorporated on December 8, 1976.  Holding Co. owned several subsidiary corporations, including the Citra Co., Active Business Corp., HELO, LBG Properties, Inc., The Nominee Corp., Oil Investments, Ltd., Tanglewood Properties, Inc., and Zion Ventures, Inc.

Kanter, his family, and trusts established for the benefit of his family, including the Bea Ritch Trusts and the Everglades Trusts,[8] owned substantially all of the stock in Holding Co.

Kanter, Weisgal, Meyers, and Linda Gallenberger (Gallenberger) most often served as directors and officers of Holding Co.

Holding Co.'s end-of-year balance sheets indicate the following stockholder equity attributable to the preferred and common stock:

| Year | Common | Preferred | | | | Paid-in |
|------|--------|-----------|---------|---------|---------|---------|
| | | Class A | Class B | Class C | Class D | Capital |
| 1979 | $23 | $775 | $3 | $50,000 | -- | $407,087 |
| 1980 | 23 | 775 | 3 | 50,000 | 1,500,000 | 407,087 |
| 1981 | 23 | 775 | 3 | 50,000 | -- | 407,087 |

---

[8]    The Everglades Trusts 1-5, shareholders in Holding Co., were grantor trusts in which Kanter was the deemed owner under secs. 671 through 678.

Prior to August 1981, another Kanter entity, Computer Placement Services, had a $1,729,300 loan outstanding to Holding Co. In August 1981, $1,500,000 of the loan was converted to Holding Co. class D preferred stock. In 1983, the stockholder equity of class D preferred stock was decreased by $1,499,999 and the paid-in capital was increased by the same amount.

D.   Administration Co. and Principal Services: The Banking Corporations

The funds of the various Kanter entities (as well as the funds of some of Kanter's associates) were commingled in accounts held by Administration Co. and later the Principal Services Accounting Corp. (Principal Services), both of which were also controlled by Kanter.

Administration Co. was incorporated in the State of Delaware on September 21, 1981, and was authorized to do business in the State of Illinois. Administration Co.'s offices were located either at Kanter's law firm offices or in close proximity thereto.[9]

The sole shareholder of Administration Co. was the Pyramid Trust. Weisgal was trustee of the Pyramid Trust, and Meyers was the sole beneficiary.

---

[9]   Administration Co. was organized at the insistence of some of the members of Kanter's law firm who complained that law firm employees working under Kanter were performing extensive nonlegal services for which the law firm was not being compensated.

Meyers was the sole director of Administration Co. and was its president from 1981 to 1985. Gallenberger was the vice president of Administration Co. and worked under the direction of Meyers. When Meyers left Administration Co. in 1985, Kanter briefly served as acting president of Administration Co., and, thereafter, Gallenberger became Administration Co.'s president from 1985 through 1988.[10]

Administration Co. had several employees, mostly clerical assistants, bookkeepers, and accountants. Meyers directed the staff and employees of Administration Co. until 1985. In 1983, Administration Co. paid $143,489 in employee compensation and distributed over $500,000 as nonemployee compensation, including $400,000 to the Rainbow Trusts (Rainbow Trust Nos. 1-25).

Administration Co. administered funds that it collected from or on behalf of various Kanter entities and associates, referred to as clients. Administration Co. clients included individuals (including Kanter, Ballard, and Lisle), corporations (including IRA, Holding Co., and their subsidiaries), partnerships, trusts, various Kanter-related entities, and members of Kanter's law firm.

---

[10] Gallenberger was an accountant. Shortly after arriving in Chicago, Illinois, she passed the certified public accountant's examination. Gallenberger became an employee of Administration Co. in 1982.

Administration Co. opened a bank account in Administration Co.'s name known as the Special E Account. The Special E Account functioned generally as a checking account for its various clients. Administration Co.'s books and records reflected each client's balance in the account and also reflected deposits or withdrawals affecting that client's account.

Administration Co. also maintained at its bank a second account known as the Special Account that served more like a savings or money market account. The moneys in this account were used to buy certificates of deposit because a higher rate of return could be realized by aggregating the funds to purchase larger denomination certificates of deposit.

Funds from both the Special E Account and the Special Account were lent to Administration Co. clients. Deposits to and withdrawals from the Special E Account and the Special Account were posted to the appropriate client accounts. If a client had a negative balance in the accounts, that debit amount was recorded as a receivable owed by the client to Administration Co. Any positive balance a client had in the accounts was considered money belonging to the client.

Administration Co. issued annual tax statements and reports to its clients and the Internal Revenue Service (IRS) for the interest earned by each client on that client's funds in the Special E Account and the Special Account.

Administration Co. maintained books and records for each of its clients and, in many instances, prepared clients' tax returns.  Administration Co. prepared Kanter's income tax returns for all or some of the years at issue.  Administration Co. charged a fee for its services.

Administration Co. filed for bankruptcy in February 1988, and Principal Services was organized.  All of Principal Services' outstanding shares of stock were initially owned by ARO Trust, of which trust Kanter was the trustee.

Principal Services took over a number of Administration Co.'s clients, including Kanter, IRA, and Holding Co.  Principal Services performed services for clients similar to those provided by Administration Co.  Principal Services also established two accounts similar to the Special E Account and the Special Account.  During the years at issue, Principal Services made loans to Holding Co. and BWK, Inc.

In 1990, Gallenberger purchased from ARO Trust all of Principal Services's shares for $100.  In October of 1993, Principal Services moved (along with all of its clients files) to Wisconsin.

E.   The Other Lending Corporations

During the years at issue Kanter often used two additional entities, HELO and Int'l Films to distribute funds including

distributions to Ballard and Lisle or trusts established for the benefit of their families.

1.   HELO

HELO's predecessor, Harbor Investments, Inc., was incorporated on July 21, 1978, and the stated business purpose was investments.  The name was changed in fiscal year ending August 31, 1980, to Harbor Exchange Lending Operation.  The Active Business Corp. (Active) owned 100 percent of the voting stock of HELO.  Holding Co. owned 100 percent of the stock of Active and filed consolidated returns with HELO and Active.

On August 31, 1984, all of the shares of HELO were transferred by Active to Kanter as the trustee of the ARO Trusts. At the time of the transfer, HELO's only significant assets were loan receivables totaling $2,331,326, and its liabilities included short-term loans of $2,518,589 and long-term loans of $10,557.  Holding Co. also disposed of 100 percent of the voting stock of Active Corp. in 1984.

Holding Co.'s consolidated returns reported the following income, net assets, and stockholder equity with respect to HELO:[11]

---

[11]   The record does not contain the information for 1982.

| | 08/78 | 08/79 | 08/80 | 08/81 | 08/83 | 08/84 |
|---|---|---|---|---|---|---|
| Income | -- | -- | $1,485 | $4,597 | -- | $136 |
| Deductions | -- | ($115) | (31,309) | (149,974) | -- | (30) |
| Total | -- | (115) | (29,824) | (145,377) | -- | 106 |
| NOL | -- | | (115) | (29,939) | -- | (198,135) |
| Taxable | -- | | (29,939) | (175,316) | -- | (198,029) |
| Assets | | | | | | |
| Cash | $500 | 131 | 4,294 | (879,704) | $31 | 322 |
| Receivables | -- | -- | 2,871,082 | 4,691,912 | 2,331,326 | 1,320,059 |
| Money market | -- | -- | 718 | 259 | -- | -- |
| Pooled funds | -- | -- | -- | -- | -- | 4,636 |
| Intangibles | | 151 | 120 | 89 | 27 | |
| Total | 500 | 382 | 2,876,214 | 3,812,556 | 2,331,384 | 1,325,017 |
| Liabilities | | | | | | |
| Short term | -- | -- | 322,987 | 849,680 | 2,518,589 | 1,522,700 |
| Shareholder | -- | -- | 1,255,600 | 10,557 | -- | -- |
| Long term | -- | -- | 1,327,100 | 3,127,200 | 10,557 | |
| Total | -- | -- | 2,905,687 | 3,987,437 | 2,529,146 | 1,522,700 |
| Net assets | 500 | 382 | (29,473) | (174,881) | (197,762) | (197,683) |
| | 500 | | | | | |
| Capital stock | | 500 | 500 | 500 | 500 | 500 |
| Ret. earnings | | (118) | (29,973) | (175,381) | (198,262) | (198,183) |

## 2.  Int'l Films

Int'l Films was incorporated in September 1973.  Although the record does not disclose who originally owned the stock of Int'l Films, on August 31, 1984, IRA owned 71 percent of the voting stock of Int'l Films.  As of August 31, 1983, Int'l Films had loans receivable of $878,227.  As of August 31, 1984, Int'l Films had loans receivable of $1,050,827.

## III. Transactions Involving the Five

Prior to and during the years at issue, Prudential was one of the largest holders of commercial real estate in the United States.  By the late 1970's, Prudential either held or was responsible for managing an estimated $20 billion in commercial real estate properties.  Prudential also developed commercial

real properties and provided financing to other real estate developers for various real estate projects around the country.

As stated previously, Kanter entered into arrangements pursuant to which he would use his relationships with the Pritzkers, Ballard, and Lisle to assist individuals and/or entities in obtaining business opportunities or in raising capital for business ventures. Some of these arrangements involved payments by a group of individuals referred to by the parties as "the Five". The Five include J.D. Weaver (Weaver), Bruce Frey (Frey), William Schaffel (Schaffel), Kenneth Schnitzer (Schnitzer), and John Eulich (Eulich).

A.   The Weaver Arrangement: Hyatt Corp.'s Embarcadero Hotel Management Contract

Hyatt Corp. manages hotels in the United States, Canada, and the Caribbean. As indicated previously, members of the Pritzker family control Hyatt Corp. Kanter has represented the Pritzkers for years as their attorney.

The Houston Hyatt Hotel was co-owned by Prudential and Tenneco Corp. (Tenneco) and managed by Hyatt Corp. Weaver was an executive with Tenneco. From 1968 through 1972, Ballard and Weaver were involved in the development of the Houston Hyatt Hotel, and Ballard negotiated the hotel's management contract with Hyatt Corp.

During the early 1970's, Prudential was also a participant in a joint venture to develop and own the Embarcadero Hotel in

San Francisco.  The joint venture participants sought an experienced major hotel management company to operate the hotel under a long-term management contract.  Del Webb (Webb), a well-known hotel operator and owner of a large hotel management company, and Intercontinental Co., another large hotel management company, were competing for the management contract.  A.N. Pritzker wanted the Hyatt Corp. to obtain the management contract for the Embarcadero Hotel; the hotel would become the third or fourth Hyatt-operated hotel in the United States at which major conventions could be held.

Lisle was supervising development of the Embarcadero Hotel for Prudential and was involved in the selection of a management company to manage the hotel.  Although Hyatt Corp. was about to enter into the long-term management contract to operate the Houston Hyatt Hotel owned by Prudential and Tenneco Corp., Lisle was not interested in having the Hyatt Corp. manage the Embarcadero Hotel.

Pritzker offered to pay Weaver, who had worked with Ballard in developing the Houston Hyatt Hotel, a portion of the management fees if Weaver helped Hyatt Corp. obtain the management contract for the Embarcadero Hotel.  Weaver then persuaded Lisle to consider Hyatt Corp. for the Embarcadero Hotel's management contract.

Since Ballard had negotiated the Houston Hyatt Hotel's management contract, Knab (Ballard and Lisle's superior at Prudential) directed Ballard to review and evaluate the terms of the proposed management contracts to be considered for the San Francisco Embarcadero Hotel.

Subsequently, representatives of the Embarcadero joint venture participants met with Webb and Pritzker to obtain bids on the Embarcadero Hotel's management contract. Ballard and Lisle, as well as other Prudential employees, represented Prudential at the meeting. For reasons not fully shown in the record, representatives of Intercontinental Co. were not present at the meeting, and Webb refused to submit a bid during the meeting because he thought he had been promised the contract. Pritzker offered to have Hyatt Corp. enter into a management contract for the Embarcadero Hotel substantially similar to the Houston Hyatt Hotel's management contract. At the meeting Hyatt Corp. submitted the only bid, and the management contract was awarded to Hyatt Corp.

Shortly after being awarded the contract, Hyatt Corp. entered into an agreement with KWJ Corp., an S corporation solely owned by Weaver. Under the written agreement dated February 25, 1971, Hyatt Corp. agreed to pay KWJ Corp. a commission generally equal to 10 percent of Hyatt Corp.'s fees under the Embarcadero Hotel management contract. The agreement acknowledged that "KWJ"

was the principal factor in bringing Hyatt Corp. and the owners of the Embarcadero Hotel together and aiding in the negotiations.

Over the period from about 1972 through 1994, Prudential eventually built a total of about 10 large, major-convention-size hotels that Hyatt Corp. managed for it. During discussions about Hyatt Corp.'s obtaining the management contract on one of the first of these other hotels built after the Embarcadero Hotel, Pritzker discussed Weaver's finder's fee with respect to the Embarcadero Hotel's management contract with Ballard and Lisle. Pritzker told Ballard and Lisle that Hyatt Corp.'s payment of this finder's fee was a one-time occurrence. Pritzker told them that no similar finder's fees would be paid with respect to future management contracts that Hyatt Corp. obtained for other Prudential hotels.

The Embarcadero Hotel opened in May 1973. In early 1975, a dispute arose between Weaver and Hyatt Corp. with regard to the commission due for 1974. A Hyatt Corp. official informed Weaver that the Embarcadero Hotel did not generate a net profit for 1974. Weaver claimed that Hyatt Corp. was entitled to $623,201 under its agreement with Prudential and that he was entitled to 10 percent of those fees. Pritzker responded that Weaver's share of the fees should bear his share of the home office expenses. By November of 1975, Weaver and Hyatt Corp. had settled the dispute.

During the period when Weaver and Hyatt were disputing the computation of Weaver's share of the management fees, Kanter and Weaver agreed that IRA would purchase the stock of KWJ Corp. In a letter to Kanter dated March 10, 1976, Weaver confirmed "our understanding regarding my granting to your client a right to purchase all of the outstanding shares of stock of KWJ Corp." for $150,000. The letter further provided that in addition to the purchase price for the KWJ Corp. stock, KWJ Corp. would continue to engage Weaver as its president and chief operating officer. In addition, Weaver was to receive 30 percent of all payments made by Hyatt Corp. under the contract with KWJ Corp. for as long as the contract was in existence, regardless of whether he performed any services for KWJ Corp.

At that time, Hyatt Corp. was in the process of becoming privately owned, and Kanter did not want the transfer of the KWJ Corp. stock to take place until after Hyatt Corp. became privately owned. Therefore, the agreement was framed as an offer to sell the stock for a period of 4 years.

On March 14, 1977, Hyatt Corp. paid KWJ Corp. $54,848 for fees earned during 1976. Sometime prior to November 1978, Hyatt Corp.'s management contract with the hotel was modified, and Hyatt Corp. wanted to revise its agreement with KWJ Corp. By letter dated November 14, 1978, Hyatt Corp. notified Weaver that, under the proposed change, KWJ Corp. would have been overpaid by

$54,848 for 1976 and would be due $12,095 for 1977. By letter dated November 21, 1978, Weaver informed Kanter of the proposed changes in the Hyatt arrangement. The letter indicated that Weaver would call Kanter to discuss the proposed change. In a letter to Hyatt Corp. dated November 30, 1978, Weaver stated that the KWJ Corp. contract would not be affected by any modifications to Hyatt Corp.'s Embarcadero Hotel contract. On December 12, 1978, Hyatt Corp. paid KWJ Corp. $60,739 for 1977.

In February 1979, Hyatt Corp. had become a privately owned entity. By letter dated September 27, 1979, Kanter informed Weaver that Kanter wanted to proceed with the purchase of the KWJ Corp. stock, effective retroactively to November 1, 1978. IRA purchased 100 percent of KWJ Corp.'s outstanding shares of stock from Weaver. IRA was to pay $10,000 of the purchase price in November 1979 and the balance by August 1980.

As a result of IRA's purchase of the KWJ Corp. stock, KWJ Corp. was included as a subsidiary on IRA's 1979 consolidated return. The 1979 consolidated return reported KWJ Corp.'s 1979 gross receipts of $171,027 and payment of the 30 percent fee to Weaver of $51,308. The 1979 consolidated return reflected KWJ Corp.'s assets, liabilities, and net worth as of January 1, 1979, as follows:

Assets
Cash $40,626
Accrued income 108,521
Total assets 149,147

Liabilities
Mortgages, notes,
and bonds payable 19,400
Accrued expenses 14,663
Total liabilities 34,063

Net Worth 115,084

Common Stock 1,000
Retained earning
unappropriated 53,968
Previously taxed income 60,116
Total stockholder equity 115,084

The commissions paid over by Hyatt Corp. attributable to operations from 1978 through 1982 were as follows:

| Operating Year | Payment Year | Payment |
|---|---|---|
| 1978 | 1979 | -- |
| 1979 | 1980 | $171,027 |
| 1980 | 1981 | 128,671 |
| 1981 | 1982 | 246,717 |
| 1982 | 1983 | 245,843 |

Except for the $171,027 payment received in 1980 from operations of the Hyatt hotel during 1979 that it reported on its 1979 return, IRA included the payments as income on the returns for the years of payment.

Hyatt Corp. was not informed about the sale of the KWJ Corp. stock to IRA and, therefore, continued to send the payments to Weaver, who then sent the check to IRA. IRA then paid Weaver his 30 percent and deducted the payments as a commission expense.

A letter dated March 29, 1983, from Weaver to Kanter states:

Attached is the check from the Hyatt Corporation in the amount of $245,843.00, which represents K.W.J.'s commission for the year ending December 31, 1982.

Will you please deposit and issue appropriate checks to the participants.

This represents approximately the same amount as last year, per the attached balance sheet.

By August 1983, Weaver advised IRA that he wanted to modify his arrangement with KWJ Corp. The new arrangement provided that Weaver could retire from any and all activities with respect to KWJ at any time after December 31, 1983. Weaver would continue to receive 30 percent of any amount received by KWJ Corp. from Hyatt Corp. with respect to the management contract of the Embarcadero Hotel. Weaver's 30-percent interest would pass to his estate or such other specific persons as he might designate in writing.

In December 1983, KWJ Corp. was liquidated, and its assets were distributed to IRA. On January 2, 1984, IRA's new subsidiaries BWK, Inc. (managed by Kanter), Carlco (managed by Lisle), and TMT (managed by Ballard) formed a partnership called KWJ Co. (KWJ Co. partnership). Carlco and TMT each had a 45-percent interest in the KWJ Co. partnership, and BWK had a 10-percent interest in the partnership. Hyatt Corp. was not informed about the liquidation of KWJ Corp. or the formation of the KWJ Co. partnership at the time of the liquidation and

formation.  Hyatt Corp. continued to send payments to Weaver until Kanter notified Hyatt Corp. sometime around 1992.

From 1984 through 1989, Hyatt Corp. paid the following commissions with respect to the Embarcadero Hotel that were reported as income of the KWJ Co. partnership:

| Operating Year | Payment Year | Payment |
|---|---|---|
| 1984 | 1985 | $295,415 |
| 1985 | 1986 | 330,376 |
| 1986 | 1987 | 327,784 |
| 1987 | 1988 | 281,926 |
| 1988 | 1989 | 75,396 |
| 1989 | 1990 | 24,340 |

The KWJ Co. partnership paid Weaver his 30 percent and deducted the payment as a commission expense.

B.    The Frey Arrangement: Condominium Conversions.

Bruce Frey (Frey), was a certified property manager, real estate broker, and insurance broker.  Frey began working at the real estate firm of Downs, Mohl & Co. in 1965.  While at Downs, Mohl & Co., Frey met Kanter.  In the early 1970's, Frey formed D.M. Interstate, Inc., a real estate management company that was an S corporation.  In 1975, James Wold (Wold), became a shareholder and employee of D.M. Interstate, Inc.  Sometime later, Frey also formed BJF Development, Inc., a corporation that engaged in real estate development and management.  Frey was the sole shareholder of BJF Development, Inc.  Hereinafter, D.M. Interstate, Inc. and BJF Development, Inc., are each sometimes referred to as a Frey corporation.

In 1978 or 1979, Frey began converting rental property into condominiums. Frey or a Frey Corporation purchased rental property, refurbished it, and then sold the individual units as condominiums. Frey or a Frey corporation earned development fees for managing and supervising the renovation and conversion work on the property. A condominium project typically involved the use of a limited partnership. As a partner in the partnership, Frey or a Frey corporation would also receive profit distributions that were based upon sales of condominiums. Frey or his Corporation also earned management fees for their services in managing the condominium units following the conversion.

Frey's first condominium conversion project was called Moon Lake Village and involved an apartment building located in Hoffman Estates, Illinois. A joint venture limited partnership was formed to purchase the apartment building and convert it to condominiums. Frey was the general partner in the partnership and there were several investors who made contributions to the partnership. A Frey corporation received development fees, profit participation, and management fees in the Moon Lake Village project. Neither Kanter nor Prudential was involved in the Moon Lake Village project.

After successfully engaging in the Moon Lake Village conversion in 1978, Frey met and consulted with Kanter to obtain tax advice in connection with that project. During their meeting

or shortly thereafter, Frey and Kanter discussed Frey's need to raise capital for future condominium conversion projects. At that time, condominium conversions were occurring frequently in metropolitan areas throughout the country, and Frey was faced with having to raise capital to acquire and convert apartment building properties in which he and other competing condominium converters were interested. Although Frey generally could obtain financing from a bank for most of a condominium conversion project's cost, the bank usually required Frey and other investors to have a substantial investment in the project. Kanter said that he could help raise some of the capital Frey needed for the condominium conversion projects. In consideration for such assistance, Kanter required Frey to share the development and management fees that Frey earned from such projects. Frey agreed to pay Kanter a share of the development and management fees if Kanter caused a third party to invest money in a project. Furthermore, if Kanter invested in a conversion project, he would also share in the profit participation of the partnership.

From 1978 to 1987, a number of condominium conversion projects were undertaken by limited partnerships that Frey and the Frey corporations formed with other investors. Frey or a Frey corporation often served as the general partner in such limited partnerships. In many instances, the limited

partnerships acquired an apartment complex, renovated and converted it into condominium units, and sold the condominium units to individual purchasers.

Beginning with Frey's second condominium conversion project, entities associated with Kanter received limited partnership interests in many of Frey's condominium conversion projects. The Kanter entities that received such partnership interests included Zeus Ventures, Inc. (Zeus), a subsidiary of IRA, and Zion Ventures, Inc. (Zion), a subsidiary of Holding Co. Kanter also brought other investors into some of Frey's condominium conversion projects for which Kanter entities received a share of development and management fees. Projects in which Kanter entities received fees or interests included the Lakewood Associates project and the 535 Michigan Avenue project.

The first condominium conversion project that Frey undertook involving Prudential was a 1,000-unit townhouse apartment complex called Village of Kings Creek at Miami, Florida. About 1979, Frey approached a Prudential real estate department executive working in Prudential's Miami, Florida, regional office about purchasing the Village of Kings Creek apartment complex. The apartment complex was owned by a pension fund managed by Prudential. Frey offered to purchase the apartment complex for a cash price of about $20 million. He also advised the Prudential executive that Connecticut Mutual Life Insurance Co. would be

joining Frey in purchasing the property. Prudential previously had considered selling the apartment complex, and Frey's $20 million offer for the property significantly exceeded the property's appraised market value.

The Prudential executive consulted with Ballard about Frey's offer. Ballard thought that Prudential's refusal of such offer might constitute a breach of fiduciary duty as investment manager of the pension fund. Ballard advised the executive that Prudential should accept the offer.

On January 16, 1980, the Village of Kings Creek partnership was formed for the purpose of purchasing the property from Prudential and converting it into condominiums. In 1980, the Village of Kings Creek apartment complex was sold by Prudential to the partnership. Zeus (a subsidiary of IRA) and Zion (a subsidiary of Holding Co.) became limited partners in this limited partnership. Kanter also brought in another investor, First Illinois Enterprises (an Illinois general partnership), that invested $1.5 million in the project. The financing for the Village of Kings Creek project came from the following sources: The First National Bank of Chicago was the first mortgage lender; Connecticut Mutual Life Insurance Co. and First Illinois Enterprises were the two primary equity participants.

Under the partnership agreement, Zeus was required to make an initial contribution of $100,000 for its 6.14-percent interest

in the partnership. Zion was required to make an initial contribution of $108,014 for its 6.66-percent interest in the partnership. In the event of certain circumstances, the partners agreed to make additional contributions to the partnership. The partnership agreement provided that the partnership would reimburse or credit the capital accounts of the Frey corporation, Frey, Wold, and Zion for "the advances made by them in negotiating, entering into and performing the terms and conditions of Purchase and Sale Contract and Contractual Commitments".

Following Prudential's sale of the Village of Kings Creek property, the executive in the Miami regional office who had dealt with Frey in the sale approached Frey about converting another Prudential apartment property in Florida into condominiums. Beginning with this property, Prudential participated in a number of successful condominium conversion projects with Frey. Most of these projects that Frey and Prudential undertook were joint ventures.

Frey did not have to raise much capital to engage in these joint venture projects with Prudential, because Prudential owned the apartment property to be converted and participated as co-owner in a joint venture to convert and sell the property as condominium units. Prudential would contribute the property and receive (1) all initial condominium unit sale proceeds up to a

specified amount based, in large part, on the property's appraised fair market value as a rental property, and (2) 50 percent of all other unit sale proceeds above the initial specified amount. A limited partnership received 50 percent of the proceeds above Prudential's initial specified amount of the proceeds from the sale of units. A Frey corporation was responsible for renovating and converting the property and selling the condominium units in exchange for development fees and management fees from the owners of the condominiums for managing the property after the conversion. Some of the Frey-Prudential agreements included the Calais and Chatham agreements, both dated August 1, 1981, the Valleybrook agreement dated October 1, 1981, Old Forge agreement entered into prior to October 12, 1981, and The Greens agreement entered into prior to December 30, 1981.

Frey's agreement that he would share development and management fees with Kanter entities was formalized in two separate written agreements each dated October 12, 1981. One agreement was between Frey and IRA's subsidiary Zeus, and the other agreement was between Frey and Holding Co.

The written agreement with Zeus covered development fees from projects in which Prudential apartment properties were being converted. The letter agreement, from Frey to Meyers (president

of Zeus), referred to Zeus' "Participation in Proceeds on

Prudential Conversions" and provided:

>  As requested, we are writing to confirm our prior agreement regarding the participation in the amounts realized or to be realized on the condominium conversion of properties of or for The Prudential Insurance Company of America ("Prudential").

>  The terms of this letter agreement shall apply with respect to all conversions of Prudential properties heretofore and hereafter.

>  As used in this letter agreement, the term "amounts realized" includes all amounts to be received by the converter as Developers' Fees and shares of assigned profits but excluding any management or other fees (which shall be retained by the Manager). * * *

>  *    *    *    *    *    *    *

>  Of the amounts received as a Developers' Fee on Prudential conversions, BJF (or its counterpart in any future conversion) shall retain 75% of the amount received in reimbursement for any costs and expenses paid or incurred by it.  BJF shall retain this 75% amount without regard to the actual amount of its costs and expenses and without any need to account for the same.  Of the remaining 25%, BJF SHALL RETAIN 80% and shall distribute the remaining 20% to you.

>  Of the amounts received as shares of assigned profits, BJF shall distribute 20% to you and retain the balance.  BJF shall retain amounts under this letter agreement for itself and for distribution to its affiliates in such percentages as they have agreed.

>  BJF shall make all distributions to you not later than 30 days after the date of this letter or receipt from Prudential of the Developers' Fees and assigned profits (as the case may be).

Pursuant to this letter agreement, the BJF corporation paid

the following amounts to Zeus during the years 1980 through 1985:

| Year | Zeus |
|------|------|
| 1980 | $127,372 |
| 1981 | 105,764 |
| 1982 | 538,781 |
| 1983 | 110,125 |
| Total | 882,042 |
| | |
| 1984 | 103,500 |
| 1985 | 128,763 |
| Total | 232,263 |

The second letter agreement was from Frey to Kanter as president of Holding Co. and specifically excluded developers' fees from projects involving Prudential properties (covered in the Zeus agreement) but included other amounts related to projects involving Prudential.  The letter agreement referred to "Participation in Condominium Conversions" and provided:

> As requested, we are writing to confirm our prior agreement regarding the participation by us and our affiliates in capital contributions, profits and losses and Developers' Fees (excluding Developers' Fees in condominium conversions of properties of or for The Prudential Insurance Company of America and excluding legal, management or any other fees, which shall be retained by the recipients) in condominium conversions of properties.

> The provisions of this letter agreement shall apply in the case of condominium conversions of those properties listed below and any other condominium conversions in which we agree to participate.  Each of us may terminate this agreement at any time on forty-five (45) days or more prior written notice.  The termination, however, shall be effective only with respect to new condominium conversions (i.e. conversions of properties not under discussion between us or otherwise in process on the last day of the forty-five (45) day period).

> The participation in capital contributions and profits and losses shall be as follows:

The Holding Company, a Delaware corporation,
its nominees and/or affiliates - ("THC")  33%

Bruce J. Frey and his nominee and/or
affiliates - ("BJF")                      67%

The participation in Developers' Fees shall commence
with respect to fees received after October 1, 1981,
and shall be as follows:

Holding Co.                               5%
BJF                                      95%
                                        100%

As used herein, the terms capital contributions,
profits and losses and Developers' Fees refer to those
items allocated or allocable to us and our affiliates.

The properties presently subject to this letter
agreement are those properties which we are converting
as consultant to the Prudential Insurance Company of
America.  As you know, we are, of course, also
participating as partners in various other condominium
conversions (e.g. 535 N. Michigan Ave. Condominium,
Lake Howell Condominium, etc.), but our agreements in
those instances are subject to the terms of various
limited partnership agreements.

Pursuant to this second letter agreement, the Frey

corporation paid to Holding Co. $80,616 as a distribution in 1981

and $16,200 from participation in fees in 1983.  Payments made in

1982 are not in the record.

On June 15, 1984, BJF Development, Ltd. (the Frey

partnership), an Illinois limited partnership, was formed.  Frey,

Wold, and the Frey corporation were the general partners of the

Frey partnership.  The limited partners were TSG Holdings, Inc.,

FWID, Ltd., and Holding Co.  Under the partnership agreement

Holding Co. was entitled to distributions of 13.125 percent of

available cash-flow.  Generally, the purpose of the partnership was to conduct business activities related to development of condominiums and cooperatives and property management.

TSG Holdings, Inc. contributed $750,00 to the Frey partnership.  Transcontinental Services Group, N.V., a Netherlands Antilles corporation and TSG Holdings, Inc.'s parent corporation, lent $1.75 million to the Frey partnership.

In addition to other assets contributed to the Frey partnership, the remaining partners assigned their right to receive fees under other management, consulting, and/or partnership agreements, including the Village of Kings Creek, Lakewood, Calais, Chatham, Valleybrook, The Greens, and Galaxy Towers that had previously been subject to the letter agreement between Holding Co. and the Frey corporation.  The partnership agreement also listed two participation agreements with "Burton J. Kanter" regarding certain condominium conversions.  The agreement indicated that the two participation agreements had been canceled with respect to new condominium conversions.

A letter dated June 20, 1984, to Kanter described Holding Co.'s obligation to contribute to the capital of the partnership as follows:

With the recording of the Certificate of Limited Partnership, The Holding Company should:

a.  make its cash capital contribution of $29,913.80 to the Partnership;

b.  pay FWID, Ltd. ("FWID"), $86,789.57 for contributing cash equivalents to the Partnership on its behalf;

c.  issue a $88,387.46 secured note to FWID for contributing other assets to the capital of the Partnership on its behalf; and

d.  confirm its agreement to remit to FWID its share of Partnership distributions resulting from the Partnership's realization of the fees and profits shown on Part II of Appendix A.

The parties contributed a total of $170,936 in cash to the capital of the Partnership.  See item 8 of Part 1 of Appendix A.  Of this amount, The Holding Company is responsible for 17-1/2 percent or, as shown above, $29,913.80.

The parties contributed a total of $495,940.31 in cash equivalents to the Partnership.  The Holding Company's share of this amount is, as noted above, 17-1/2 percent or $86,789.54.  The cash equivalents consist of the items shown as numbers 6, 7, and 9 on Part I of Appendix A.  The items are:

6.  October 31, 1983, Agreement with
Lazard Freres & Co.                       $273,547.00

7.  April 14, 1983, Real Estate Sale
Agreement as amended with Norman
Rudenberg and Edna Davidson                211,082.00

9.  Furniture, fixtures, and
equipment                                   11,311.31

                        Total              $495,940.31

As shown in the enclosed chart, The Holding Company's remaining obligation for capital contributions to the Partnership was $145,798.66.  Of this amount, The Holding Company satisfied $57,409.20

by the transfer to the Partnership of a 20 percent interest in the $287,046 of purchase money mortgages relating to the condominium units at 535 North Michigan Avenue.  Accordingly, after satisfying its share of the cash capital contributions, The Holding Company's remaining obligation to FWID is $88,387.46.

The Holding Company now should satisfy its obligation for the cash contribution to the Partnership by transferring $29,913.80 in cash to it.  The Holding Company should satisfy its obligation to FWID for the transfer of the cash equivalents by paying FWID $86,789.54.  In addition, The Holding Company should satisfy its responsibility for the balance of $88,387.46 by signing a note for this amount payable to FWID and pledging as security either third-party paper or other acceptable collateral.

The note should provide for cash payments as the Partnership realizes cash from the capital contributions to it.  I believe that you should discuss the procedures regarding the issuance of the $88,387.46 secured note with Jim Wold or, in my absence, my associate, Claire Pensyl.

The remaining item is, as noted above, for The Holding Company to confirm its agreement to remit its share of Partnership distribution to FWID.  The Holding Company's agreement is to remit distributions (a) only after The Holding Company has received Partnership distributions equal to The Holding Company's original capital contribution of $262,500 and (b) then only in an amount equal to 13.125 percent of the amount realized by the Partnership from all the items shown on Part II of Appendix A.  The 13.125 percent equals The Holding Company's share of all Partnership distributions under Section 3.2 of the Agreement of Limited Partnership.

In January 1985, approximately 6 months after the formation of the partnership, TSG Holdings purchased additional interests in the Frey partnership for $1,382,575, of which $241,950 was payable to Holding Co.  The purchase price was paid to Holding

Co. in two installments.  The letter dated January 8, 1985, accompanying the first installment provided as follows:

Enclosed is FWID, Ltd. check number 113 in the amount of $66,507.00.  This check represents your allocable share of the above-mentioned transaction after reducing your loan from Bruce Frey by one-half, or $44,194.00.

The following is a brief analysis of the transaction, your allocable share and a calculation of the manner in which check number 113 was derived:

| | | |
|---|---|---|
| 1. | Gross Sales Price | $1,382,575 |
| 2. | Ownership Percentage of BJF Development, Ltd. (11.1895 divided by 63.94 percent) | 17.5 |
| 3. | Allocable Share of Gross Sales Proceeds | 241,950 |
| 4. | Sales Proceeds Received to Date | 632,575 |
| 5. | Allocable Share of Sales Proceeds Received to Date | 110,701 |
| 6. | Less:  One-Half of Outstanding Loan from Bruce Frey ($88,388.00 divided by 2) | 44,194 |
| 7. | Check Number 113 | $66,507 |

The letter dated January 24, 1985, accompanying the second installment provides as follows:

Enclosed please find check number C 1148 in the amount of $131,250.00.  This check represents the second and final installment payment with regard to your sale of partnership interest in BJF Development, Ltd. to TSG Holdings.

The entire second installment payment to the selling partners was $750,000.00. Your allocable share of the transaction was 17.5 percent, thus equaling the $131,250.00.

From 1984 through 1987, the Frey partnership paid a total of $403,954 to Holding Co. ($113,827 in 1984, $256,557 in 1985, and $33,570 in 1987). Of the $113,827 paid in 1984, $98,437 was identified as a distribution and $25,391 as Holding Co.'s share of fees. Of the $256,557 paid in 1985, $197,757 was Holding Co.'s share of proceeds from the sale of the additional partnership interest to TSG Holdings, $55,950 as a distribution, and $2,850 represented participation in developers' fees.

## C. The Schaffel Arrangement: Real Estate Construction and Financing

Schaffel was a mortgage broker and a real estate developer. In the summer of 1979, Kanter invited Schaffel to dinner at a New York City restaurant to discuss a business proposition. He told Schaffel that Ballard and Lisle would also be joining them for dinner. Schaffel accepted Kanter's invitation. In addition to learning more about the potential business opportunity that Kanter had mentioned, Schaffel was eager to meet and socialize with Ballard and Lisle, as he knew that they were senior Prudential real estate executives.

During the dinner, Kanter asked whether Schaffel would be interested in arranging the financing for a casino hotel to be built in Atlantic City, New Jersey. Prudential was not involved

in that project.  Kanter offered to introduce Schaffel to the
people who wanted to build the casino hotel provided Schaffel
would agree to pay to one of Kanter's entities 50 percent of
Schaffel's brokerage fee earned in the transaction.  Schaffel
agreed to pay the fee to an entity that held a real estate
brokerage license.  The casino hotel project, however, never
materialized.

Although the casino hotel project fell through, Schaffel
agreed to share certain finder's fees with Kanter in other
projects.  With Kanter's "concurrence", Schaffel negotiated a
finder's fee arrangement with Benedict Torcivia (Torcivia),[12] the
sole shareholder of Torcon, Inc. (Torcon).  At the time, Torcon
was probably the largest general contracting company in New
Jersey.  By letter agreement dated July 23, 1979, Torcivia agreed
to pay Schaffel a fee for any construction projects that Schaffel
helped obtain for Torcon.  The agreement reached between Kanter
and Schaffel as applied to Schaffel's arrangement with Torcon was
set forth in a letter agreement with IRA dated August 2, 1979, as
follows:

> The purpose of this letter is to confirm that I
> will pay you fifty (50%) percent of any fees received
> by me with respect to construction jobs obtained for
> Torcon, Inc. in which I determine that you or your
> associates have been instrumental or helpful.  My
> arrangement with Torcon, Inc. concluded with your

---

[12]    Prior to 1979, Schaffel had rented office space from
Torcivia.

concurrence that said Company will pay to me one (1%) percent based on the gross amount of the contract price of any such construction job.  It is our understanding that you will receive payment ordinarily over a period of time depending on draws under the construction job. Accordingly, you will expect to receive payment only as I am paid.

It is further understood that the foregoing pertains only to negotiated contract situations and should any bid situation arise, the amount of your participation will be negotiable.

Schaffel also entered into a finder's fee arrangement with William Walters (Walters), a real estate developer in Denver, Colorado, similar to the one with Torcivia, and agreed to share those fees with IRA.

1.   Schaffel/Prudential Transactions

As a result of his introduction to Lisle and Ballard, Schaffel began doing millions of dollars' worth of business with Prudential.  These business dealings included construction contracts that he helped obtain for Torcon and financing for a number of large commercial real properties being developed by Walters, as well as transactions involving others.

The first transaction Schaffel negotiated with Prudential was the sale of the IBM headquarters building in Lexington, Kentucky.  The property was brought to Schaffel's attention by Transatlantic Consultants (Transatlantic), the company brokering the sale.  Schaffel introduced the Transatlantic representative to Ballard.  After the initial meeting with Ballard, Transatlantic dealt with Prudential's local office in Kentucky.

Seven months after the initial meeting with Ballard, Prudential bought the building. Schaffel received a fee from brokering the sale of the building and paid half of the fee to IRA.

Some of the projects Schaffel assisted Torcivia in obtaining with Prudential included the Parsippany Business Campus, the Parsippany Hilton Hotel (located outside of Newark, New Jersey), the Gateway (located in Newark, New Jersey), and the Interplex Complex (located in Princeton, New Jersey).

Walters agreed to pay Schaffel a finder's fee with respect to two joint ventures that Walters helped negotiate with Prudential. Schaffel entered into separate written agreements dated October 19, 1981, with Cherry Creek Place Associates II (Prudential funding of $15.6 million) and Aurora Plaza & Conference Center, Ltd. (Prudential funding of $17 million), with respect to the joint ventures. In each agreement, the partnership acknowledged that Prudential's participation in the venture was primarily the result of Schaffel's efforts and that Schaffel was entitled to be compensated.

From 1979 through 1983, pursuant to his arrangement with Kanter, Schaffel shared with IRA fees from these business deals with Prudential. Schaffel paid the following amounts from Prudential transactions to IRA from 1979 through 1983:

| Year | Amount |
|------|--------|
| 1979 | $100,000 |
| 1980 | 244,920 |
| 1981 | 361,525 |
| 1982 | 447,450 |
| 1983 | 30,981 |
| Total | 1,184,876 |

After Ballard and Lisle left Prudential, Schaffel no longer negotiated any transactions with Prudential.

2.  Schaffel/Travelers Transactions

Lisle left Prudential in late 1981. He was employed by Travelers from April 1982 until April 1988. After Lisle began working for Travelers, Schaffel met with Lisle and others from Travelers. Thereafter, Schaffel began brokering substantial business dealings with Travelers on behalf of Torcon and Walters.

The first project Walters entered into with Travelers was Stanford Place II. By check dated November 9, 1983, Schaffel paid IRA $213,750 of the fee earned from Stanford Place II. After that payment, Schaffel stopped paying IRA a share of the fees earned on business deals with Travelers. Sometime during 1984, Kanter contacted Schaffel and asked why IRA was not receiving 50 percent of Schaffel's fees on Travelers transactions. Schaffel took the position that the August 2, 1979, agreement did not apply to deals with Travelers after Lisle had left Prudential. Kanter disagreed and maintained that the August 2, 1979, agreement continued to apply.

In a letter dated August 28, 1984, to Schaffel, Kanter stated:

> I am bothered by your failure to respect what I would have considered the essential intent of the agreement you entered into vis-a-vis the introduction of you to Prudential and the arrangement under which you would share the benefits of that introduction in connection with real estate transactions from which you were able to earn commissions, as well as the other construction contracts won by Ben [Torcivia].
>
> I appreciate that there may be some technical difficulty with the previous agreements as to whether they extend in the new circumstances to Travelers. However, in my view Travelers has replaced Prudential as a principal source of transactions because of the very personnel to whom you were first introduced. Accordingly, I am inclined to believe that the arrangement should have been continued.

Lisle and Schaffel discussed the dispute between Schaffel and Kanter. Lisle feared a lawsuit might result, and because such a lawsuit might cause some embarrassment for Lisle at Travelers, he urged Schaffel to settle the dispute.

Schaffel agreed to resume paying 50 percent of his fees on business deals with Travelers. Those fees, however, were paid to Holding Co. rather than IRA.

For some of the Walters projects brokered by Schaffel, Travelers entered into joint venture agreements with Walters' company pursuant to which Walters' company contributed the property and Travelers provided the financing. Travelers entered into joint ventures with Walters' company for the permanent financing of Stanford Place II (Travelers provided $15 million

plus a $31.5 million loan), Cherry Creek National Bank (Travelers provided $8.25 million plus a $19.95 million loan), the Stanford Corporate Center (Travelers provided $43,612,622), and Boettcher Building (a.k.a the Boston Building) (Travelers' contribution to this project is not reflected in the record). For other Walters projects brokered by Schaffel, Travelers provided financing without becoming a partner in the underlying joint venture. These projects included Orchard Place VIII (Travelers provided a $9 million loan), Orchard Place VII (Travelers provided a $8.5 million loan), and Cherry Creek Place III (Travelers provided a $10.8 million loan).

From 1984 through 1986, Schaffel paid a share of his fees on Walters-Travelers transactions to Holding Co. in the following amounts:

| Year | Amount |
| --- | --- |
| 1984 | $600,000 |
| 1985 | 1,160,000 |
| 1986 | 1,003,500 |
| Total | 2,763,500 |

3.   FPC Subventure Associates Partnership

On March 21, 1980, Kanter acquired an 8-percent limited partnership interest in Four Ponds Center Associates (Four Ponds), a joint venture involving Schaffel and Torcivia. On his 1980 Federal income tax return, Kanter reported his share of the partnership's losses.

The FPC Subventure Associates partnership (FPC Subventure) was formed as of January 1, 1981. The partners of FPC Subventure and their respective interests were: Lisle, 90 percent; the Everglades Trust (Roger Baskes, trustee), 9 percent; and Burton W. Kanter Revocable Trust (Kanter trustee), 1 percent. On January 1, 1981, Kanter transferred his 8-percent interest in Four Ponds to FPC Subventure, effectively transferring 90 percent of his interest in Four Ponds to Lisle in exchange for a receivable of $2,880 from Lisle.

A joint venture called One River Associates (One River) was formed as of November 16, 1981. Schaffel and Torcivia were the general partners. Kanter held an 8-percent interest in One River. On January 1, 1982, Kanter transferred his interest in One River to FPC Subventure in exchange for a $2,000 receivable from FPC Subventure. Beginning in 1982, the 8-percent interest in One River held by Kanter was treated as held by FPC Subventure, and 90 percent of the income, loss, and distributions were allocated to Lisle.

On April 5, 1982, Four Ponds distributed $400,000 to Kanter. Kanter treated the distribution as a distribution to FPC Subventure. FPC Subventure retained $5,000 and distributed $395,000 to the partners, 90 percent to Lisle and 10 percent to the Kanter trusts. An additional $33,600 was distributed by Four Ponds to FPC Subventure through Kanter during 1982. During 1982

Lisle received total distributions of $384,840 from FPC

Subventure.  Kanter and Lisle reported on their tax returns their

respective distributive shares of the FPC Subventures'

partnership's income and losses.

D.    The Schnitzer Arrangement:  Sale and Repurchase of Property
Management Systems Stock.

During the 1960's and 1970's, Schnitzer was a major real

estate developer in the Houston, Texas, area.  Schnitzer met

Ballard and Lisle when they worked in Prudential's regional

office in Houston, probably in the late 1960's.

Schnitzer had been involved in developing and managing high-

rise office buildings through Century Development Co., Inc.

(Century Development), a subsidiary of Century, Inc. (Century),

Schnitzer's family holding company.

The real estate development business, however, typically was

cyclical.  In 1974, to diversify its operations and to secure a

steady source of earnings, a subsidiary of Century acquired for

$1.3 million the assets of a small real estate management company

called Fletcher Emerson Co., Inc. (Fletcher Emerson).[13]  Fletcher

Emerson managed office buildings and other commercial real

estate.  A relatively small portion of its business included

---

[13]    The $1.3 million purchase price was roughly based on a
multiple of five times net earnings.  At the time, the company
had before-tax net income of $250,000.

cleaning or janitorial services on some Texas commercial properties it managed.

Shortly after Century's subsidiary acquired the assets of Fletcher Emerson, the subsidiary's name was changed to Fletcher Emerson Co. and then to Property Management Systems, Inc. For convenience Property Management Systems, Inc., is hereinafter referred to as Schnitzer-PMS. Schnitzer became the chairman and chief executive officer of Schnitzer-PMS.

Originally, Schnitzer-PMS's property management business was conducted primarily in Houston and Dallas, Texas. Schnitzer-PMS usually managed office buildings and other commercial real estate owned by others under property management contracts on a month-to-month basis. Schnitzer wanted to expand the size of Schnitzer-PMS's property management business, as Schnitzer-PMS typically earned only a relatively modest profit margin on its individual property management contracts. Schnitzer felt that the only way to increase Schnitzer-PMS's profits was having a large volume of such management contracts.

Fletcher Emerson had been managing a relatively small number of Prudential's commercial real properties when Century acquired its assets in 1974. Schnitzer wanted to develop business from Prudential and American Building Maintenance Industries (AMBI). To that end, Schnitzer offered AMBI the opportunity to acquire 50 percent of the company. AMBI, however, declined the offer.

In 1974, Schnitzer approached Ballard (who Schnitzer had known for many years and previously had dealt with in developing office buildings in Houston, Texas) and offered to have Century give Prudential a 50-percent stock interest in Schnitzer-PMS. Although Prudential would not be required to pay for the 50-percent Schnitzer-PMS stock interest, Schnitzer hoped Prudential would award Schnitzer-PMS a large number of additional property management contracts. Ballard informed his superiors at Prudential of Schnitzer's offer.

Initially, Prudential was interested in Schnitzer's offer and invited Schnitzer to Prudential's Newark, New Jersey, corporate headquarters for further meetings and discussions with Prudential's management. Schnitzer met with Prudential's senior executives and corporate headquarters staff, including Prudential's chairman, and with Knab (who headed Prudential's real estate department). Prudential was particularly interested in standardizing the reports it received on the operation of its various commercial real properties around the country. However, Prudential ultimately declined Schnitzer's offer because of the substantial number of pension plans whose real estate investment accounts Prudential managed. Prudential believed that having an ownership interest in Schnitzer-PMS might be a potential conflict of interest and might present problems under the pension laws.

Ballard introduced Schnitzer to Kanter sometime between the early and mid-1970's.  At some time prior to September 1976, Schnitzer and Kanter began discussing the sale of a stock interest in Schnitzer-PMS to Kanter.  Kanter indicated that, through his business contacts, including the Pritzker family, he could obtain additional property management business for Schnitzer-PMS.  Before Schnitzer made the offer to Kanter, Schnitzer had a conversation with Ballard to confirm that Kanter could bring in business for Schnitzer-PMS.

The initial proposal contemplated that Schnitzer-PMS would be recapitalized in order to provide for the issuance of two classes of stock, common and preferred.  The preferred stock would be $1,000 par value per share, one vote per share, priority as to dividends, when, if, and as declared out of available earnings and profits up to a maximum of 8 percent of the par value in the year of declaration, and priority on liquidation. The common stock would be no par common stock carrying one vote per share.  Kanter's client (IRA) would purchase 50 percent of the common stock for $50,000 and closing would be set for October 1, 1976.

Because of difficulties in finalizing the agreement, however, closing did not take place in 1976.  In a letter dated April 12, 1977, to Melvin Dow, Kanter stated:

> As you know, the president of The Cedilla Company is
> Mildred D. Schott and The Cedilla Company is actively

engaged in certain phases of real estate activity.  We
are hopeful that the sooner the acquisition of * * *
[Schnitzer-PMS] shares can be closed, the sooner that
serious efforts can begin to create that synergism that
could result in a sharply expanded business for * * *
[Schnitzer-PMS] in its property management through the
extensive contacts Schott maintains, the broad scope of
opportunity that may be available to Solomon A. Weisgal
and the opportunities that may arise in the course of
my practice which involves representation of numerous
very wealthy groups holding large property interests.

By letter agreement dated November 7, 1977, Kanter and
Schnitzer agreed that Schnitzer-PMS would be recapitalized and
reorganized as a Delaware corporation with an authorized
capitalization of 250 voting preferred shares of $1,000 par value
each and 108 voting common shares of $1 par value each.  Each
preferred share would be entitled to a cumulative preferred
dividend of $80 per year, plus a special one-time dividend equal
to 1/250 of the indebtedness of Schnitzer-PMS to American General
Investment Corp. existing at the time the special dividend was
declared.  The special dividend was to be declared when the
assets of the corporation available for payment of dividends
equaled the remaining amount outstanding on the loan.  At the
time of the reorganization, $1.1 million that Century Development
had borrowed to purchase Fletcher Emerson was still owing.  The
purpose of the special dividend was to permit Century Development
to recover its initial investment.  Kanter's client (IRA) had the
option to purchase 51.3 shares of common stock (47.5 percent of
the common stock) in Schnitzer-PMS for $150,000.

The reorganization was completed on January 31, 1978, and 51.3 shares of the common stock of Schnitzer-PMS were issued to IRA on February 14, 1978.  All shares of Schnitzer-PMS (including those issued to IRA) were pledged to secure Century Development's loan balance.

In conjunction with the sale of the Schnitzer-PMS stock to IRA, IRA and Century entered into a stock agreement.  Article III of the agreement gave Century an option to purchase the Schnitzer-PMS stock upon the death of last to die of Kanter, Weisgal, and Schott.  Section 3.03 of the stock agreement provided that the purchase price for IRA's shares of Schnitzer-PMS stock would be an amount equal to the sum of:

> (a)  Eight (8) times the average annual pretax operating income of the Corporation for the five (5) full fiscal years of the Corporation ending on or immediately preceding the Option Date or such lesser number of full years of operation of the Corporation as shall have expired from the date of this Agreement; plus

> (b)  The difference (but not less than zero) between (i) the book value of the assets of the Corporation used in its business of building management, consulting and cleaning and (ii) the lesser of Three Hundred Thousand Dollars ($300,000) or one and one-half (1-1/2) times the Corporation's average receipts for one (1) month, computed for the twelve (12) month period immediately preceding the Option Date; plus

> (C)  The fair market value of any other assets of the Corporation.

> The computation of operating income in Subsection (a) hereof shall be computed solely with reference to the Corporation's business of building management, consulting and cleaning.  The computation of the

purchase price shall be made by the certified public accountants regularly retained by the Corporation.

By late 1977, Schnitzer-PMS's property management business had increased substantially.  Although Prudential had declined Schnitzer's offer to give Prudential an interest in Schnitzer-PMS, Prudential became Schnitzer-PMS's biggest customer. Pursuant to Schnitzer's discussions with Prudential's management and corporate headquarters staff in 1974, Schnitzer-PMS standardized its reports on the Prudential commercial real properties that Schnitzer-PMS managed.  By 1977, Schnitzer-PMS had expanded its property management operations to other cities around the country, including Atlanta, Georgia, Los Angeles and San Francisco, California, Newark, New Jersey, and Portland, Oregon.

Schnitzer-PMS year-end balance sheets and profit/loss statements for 1976 through 1978 showed the following:

| Assets | 1976 | 1977 | 1978 |
|---|---|---|---|
| Current | $529,225 | $527,025 | $690,257 |
| Property | 97,913 | 127,645 | 133,970 |
| Other | 8,142 | 36,542 | 137,459 |
| Total | 635,280 | 691,212 | 961,686 |
| Liabilities | | | |
| Current | 287,829 | 156,947 | 237,681 |
| Long-term | 6,515 | 21,647 | 33,935 |
| Stockholder equity | | | |
| Common | 1,000 | 1,000 | 108 |
| Preferred | n/a | n/a | 250,000 |
| Contributed capital | 200,000 | 200,000 | n/a |
| Retained earnings | 139,936 | 311,618 | 439,962 |
| Total | 635,280 | 691,212 | 961,686 |
| Earnings | | | |
| Revenues | | | |
| Property management | 1,044,173 | 1,448,101 | -- |
| Cleaning | 2,343,512 | 2,811,034 | -- |
| Other | 39,411 | 41,352 | -- |
| Total | 3,427,096 | 4,300,487 | 5,977,383 |
| Costs & expenses | | | |
| Property management | 255,824 | 266,794 | 4,064,014 |
| Cleaning | 1,986,343 | 2,483,019 | |
| General | 864,715 | 1,095,499 | 1,078,503 |
| Interest | 2,599 | 4,117 | 3,037 |
| Total | 3,109,481 | 3,849,429 | 5,145,555 |
| | | | |
| Pretax earnings | 317,615 | 451,058 | 831,828 |
| Tax allocation | 143,163 | 155,527 | -- |
| Net earnings | 174,452 | 295,531 | -- |

By March 1979, Schnitzer had decided that Schnitzer-PMS should have received more opportunities for new business from Kanter and his associates and informed Kanter that he wanted to repurchase the stock held by IRA. Kanter and Schnitzer decided that one party would set a price at which that party was willing to either sell its stock to the other or buy the other's stock. By letter dated July 17, 1979, Kanter informed Schnitzer that IRA would sell its stock in Schnitzer-PMS or purchase Century Development Corp.'s stock in Schnitzer-PMS for $3.1 million.

Schnitzer agreed to buy back IRA's stock for $3.1 million.  On November 30, 1979, Century repurchased the 47.5-percent owned by IRA in July 1979, for $3.1 million, payable over a 10-year period with interest.  At the time of the repurchase, approximately $700,000 remained outstanding on the loan from the original purchase of the Fletcher Emerson assets.

Schnitzer-PMS balance sheets and profit/loss statements for 6 months ending June 30, 1978 and June 30, 1979 showed the following:

|  | 6/30/78 | 6/30/79 |
|---|---|---|
| Assets |  |  |
| Cash | $124,632.16 | $284,760.00 |
| Life insurance | 41,968.71 | 96,144.81 |
| Accounts receivable | 555,308.63 | 496,200.83 |
| Supplies | 3,450.04 | 14,614.58 |
| Prepaid expenses | 13,877.99 | 45,007.01 |
| Transportation equipment | 14,101.56 | 17,268.74 |
| Other equipment | 116,190.70 | 130,547.74 |
| Total | 869,529.79 | 1,084,543.71 |
|  |  |  |
| Liabilities |  |  |
| Accounts payable | 6,569.23 | -- |
| Accrued payroll expense | 97,763.69 | 134,094.52 |
| Other accrued expenses | 109,892.85 | 121,486.51 |
| Total | 214,225.77 | 255,581.03 |
|  |  |  |
| Stockholder's equity |  |  |
| Capital stock | 250,108.00 | 250,108.00 |
| Retained earnings | 384,885.60 | 1,198,788.79 |
| Funds to CDC | (431,036.94) | (955,412.90) |
| 1977 net income | 451,347.36 | n/a |
| 1978 net income | n/a | 335,478.79 |
| Total owner's equity | 655,304.02 | 828,962.68 |
|  |  |  |
| Total liabilities & equity | 869,529.79 | 1,084,543.71 |

|                            | 6/30/78      | 6/30/79      |
|----------------------------|--------------|--------------|
| Profit/Loss (6 months)     | 2,916,478.65 | 3,650,217.86 |
| Gross income               | 1,824,034.25 | 2,485,250.27 |
| Operating expenses         | 1,092,444.40 | 1,164,967.59 |
| Operating income           | 542,291.04   | 740,191.69   |
| Overhead expense           | 550,153.36   | 424,775.90   |
| Income before acquisition  | 98,806.00    | 89,178.98    |
| Acquisition expense        | 451,347.36   | 335,596.92   |
| Net income                 |              |              |

Around the end of 1979 or early 1980, Schnitzer discussed the sale of Schnitzer-PMS to Minneapolis Honeywell for a price between $12 million and $13 million. Honeywell, however, decided not to purchase Schnitzer-PMS.

In 1989, IRA accepted a reduced final payment for early payment of the balance due on the sale of the stock.

IRA received the following payments of principal and interest and reported the following gain on the installment sale of the Schnitzer-PMS stock:

| Year  | Payment   | Principal | Interest  | Gain      |
|-------|-----------|-----------|-----------|-----------|
| 1979  | $150,000  | $150,000  | --        | $142,740  |
| 1980  | 533,425   | 211,468   | $321,957  | 201,233   |
| 1981  | 534,696   | 309,308   | 225,388   | 294,338   |
| 1982  | 361,692   | 172,441   | 189,251   | 164,094   |
| 1983  | 361,692   | 186,655   | 175,037   | 177,621   |
| 1984  | 361,692   | 202,042   | 159,650   | 192,263   |
| 1985  | 361,692   | 218,696   | 142,996   | 208,111   |
| 1986  | 361,692   | 236,724   | 124,968   | 225,266   |
| 1987  | 361,692   | 256,217   | 105,475   | 243,816   |
| 1988  | 361,692   | 277,360   | 84,332    | 263,936   |
| 1989  | 840,423   | 822,841   | 17,582    | 783,016   |
| Total | 4,590,388 | 3,043,752 | 1,546,636 | 2,896,434 |

E.    The Eulich Arrangement: Essex Hotel Management Co.

1.    Eulich's Background

For many years, Eulich had been a real estate developer of office buildings, shopping malls, and warehouses in Houston and

Dallas, Texas.  Eulich had known Ballard and Lisle since at least 1965.  Eulich dealt with Ballard and Lisle in connection with Prudential's financing his real estate development work, when Ballard and Lisle worked in Prudential's Houston regional office.[14]  Eulich was also a close personal friend of A.N. Pritzker.  Eulich met Kanter through Pritzker in the late 1960's or early 1970's.   Kanter and Eulich had many business dealings with each other.  Kanter helped raise capital for some of Eulich's business ventures.

Eulich's real estate development activities were primarily conducted through Vantage, Inc., a corporation that he owned.  In 1968, Eulich acquired Rodeway Inns, a company that owned a small chain of garden court motels.  Over the years,  Rodeway Inns increased the number of its motels.  Rodeway Inns and Eulich obtained financing from Prudential for the acquisition of many of the additional motels.  From 1968 through about 1973, Eulich dealt with Ballard in securing the financing from Prudential for Rodeway Inns.

In about 1974, Eulich and Prudential became dissatisfied with the performance of the hotel management company that was managing and operating 16 Rodeway Inns motels that had been financed by Prudential.  Eulich decided to establish his own

---

[14]    After Lisle began working for Travelers in 1982, he dealt with Eulich in connection with the managing of Travelers' properties.

hotel management company, Motor Hotel Management, Inc. (Eulich-Management), to operate the motels. Eulich-Management was incorporated on January 1, 1975.

Eulich asked Robert James (James) who had substantial hotel management experience, to serve as Eulich-Management's president and to manage Eulich-Management's day-to-day operations. Eulich-Management's three shareholders eventually included Eulich (who was the majority shareholder), James, and another longtime business associate of Eulich.

By the end of 1975, Eulich-Management had 17 management contracts that were part of the joint venture in which Prudential was the lender and Eulich's company Vantage, Inc., was the developer. By the late 1970's, Eulich-Management had a good reputation in providing hotel management services. Prudential's real estate department staff generally was satisfied with Eulich-Management's management of a number of hotel properties in which Prudential was involved. By about the early 1980's, Eulich-Management managed hotel properties nationwide in about 20 to 25 States. At that time, however, Eulich-Management did not manage large hotels.

2. Prudential's Gateway Hotel

In about 1976, Ballard decided that Prudential's real estate department needed to hire an individual possessing substantial expertise in hotels and hotel operations. Allen Ostroff

(Ostroff) had worked for a number of years for Hilton Hotels as a hotel manager and executive. Ballard hired Ostroff to serve as Prudential's in-house consultant on hotels and hotel operations.

When Ostroff began working for Prudential, the real estate department staff in Prudential's regional offices negotiated hotel management contracts for Prudential's hotel properties on an ad hoc basis. By 1979, Ostroff had devised a model hotel management contract that Prudential's real estate department staff could use in negotiating such management contracts. Ostroff also worked on various hotel projects with Knab, Ballard, and Lisle.

One of Ostroff's first assignments at Prudential was to improve the operating condition of the Gateway Hotel located a few blocks from Prudential's corporate headquarters in Newark, New Jersey. Prudential had recently acquired the Gateway Hotel through foreclosure, and the hotel was in shabby condition. Moreover, Prudential wanted to upgrade the hotel because Prudential executives and individuals transacting business at Prudential's headquarters office frequently stayed at the hotel.

Ostroff first obtained a Hilton franchise for the Gateway Hotel.[15] Ostroff next hired a new hotel management company to

---

[15] Although Hilton Hotels had been reluctant to grant Prudential a franchise, Ostroff obtained the franchise by pointing out to Hilton Hotels the other profitable business dealings it had with Prudential.

take over the Gateway Hotel's management and operation.  The new management company was owned by Stanley Cox (Cox), an experienced hotel manager Ostroff had known during Ostroff's prior employment with Hilton Hotels.  At some point, Cox assigned John Connolly (Connolly) to be the Gateway Hotel's on-site manager.

Ostroff was extremely successful in turning around and substantially improving the Gateway Hotel's operating condition. Prudential executives made significant use of the hotel facilities for meetings and entertainment and were very pleased with the service that they and their guests received at the hotel.

Cox did not spend much of his own time in actually running the Gateway Hotel.  Over the years, he had delegated more and more duties in the hotel's operation to Connolly.  Connolly frequently interacted with Prudential executives, including Ballard and Lisle.  Sometime in 1978 or 1979, Connolly met Kanter at the Gateway Hotel.

In 1981, Connolly informed Ostroff that he was considering leaving his position as on-site manager of the Gateway Hotel, because he felt he was not being adequately compensated for his services.  Ostroff attempted unsuccessfully to have Cox increase Connolly's pay.  Ostroff and his superiors at Prudential, including Ballard, decided to terminate Prudential's management

contract with Cox and to award the management contract to
Connolly.

Ostroff told Connolly that Prudential wanted him to manage
the Gateway Hotel.  Ostroff informed Connolly that he would have
to establish a management company of his own and that all hotel
employees would have to be employees of Connolly's hotel
management company.[16]  Establishing such a hotel management
company, however, presented a problem for Connolly.  The
management company would be required, among other things, to
employ a financial manager and an accounting staff to prepare and
issue the financial reports required by Prudential on the Gateway
Hotel's operations.  The full-time employment of such personnel
to perform these and other required services could well be
uneconomical, since Connolly's company would be managing only one
or two hotels.

Ballard introduced Connolly to Eulich.  Eulich also knew
Kanter from certain prior business ventures in which Kanter had
helped raise capital.  Kanter and Eulich were aware Connolly
would need assistance for his hotel management company.  Eulich
also wanted Eulich-Management's business to include the
management of a number of large hotels.  He believed that

---

[16]     Prudential did not want to have its employees involved in
operating the hotel and did not want any of the hotel's employees
to be Prudential employees.

Kanter's business contacts, including contacts with the Pritzker family, could be beneficial to Eulich-Management.

Eulich, Kanter, and Connolly decided to organize several entities to further their objectives. A hotel management company called Gateway Hotel Management Corp. (Gateway Corp.) was incorporated in 1981. Another corporation, Essex Hotel Management Co. (Essex Corp.), was also formed.

A letter from Eulich to Connolly dated October 16, 1981, indicated that Eulich provided $10,000 for the initial capitalization of Gateway Corp. The letter also indicated that initially Essex Corp. owned 80 shares (80 percent) of the Gateway Corp. stock, that Connolly owned 20 shares (20 percent), and that Connolly had an option to purchase Essex Corp.'s 80 shares.[17]

---

[17] The letter stated:

Per our telephone conversation today, I am enclosing the following material:

1.    Your 20 shares of stock in Gateway
      Hotel Management Company
      representing 20% of the company.

2.    A xerox copy of 80 shares of stock owned
      by Essex Hotel Management Company
      representing 80% of the company.

3.    A copy of the minutes of the first
      meeting of the Board of Gateway - the
      original is being circulated for
      signature and will be sent for signature
      soon.

4.    A xerox copy of your option on the Essex

(continued...)

By March 2, 1982, however, Connolly owned 100 shares (100 percent) of the Gateway Corp. stock.  A stock option agreement "made and entered into" September 18, 1981, but "executed as of" March 2, 1982, recites that Connolly owned 100 shares of $1 par value common stock of Gateway Corp.  Under the stock option agreement, Connolly granted Essex Corp. a 10-year option to purchase 80 shares of the common stock of Gateway Corp. for $100 per share.[18]  In consideration for the option, Essex Corp. agreed to pay Connolly $1,000 per year for the term of the option.

Eulich, Kanter, and Connolly also formed a partnership called Essex Hotel Management Co. (the Essex partnership or Essex), which was organized effective January 1, 1982.  The

---

(...continued)

> Hotel Management Company stock - the original is being circulated for signature currently.

As we discussed on the phone, we will be sending you a check for $10,000.00 which represents the capitalization of Gateway that should be used as the corporation's initial bank deposit.  When the first profit distribution is made we would appreciate your sending us a check for $2,000 representing 20% of this capital.

If you have any questions about this transaction, please let me know.  We are looking forward to working with you in what is hopefully a mutually pleasant and profitable venture.

[18]  On Dec. 21, 1984, Essex Corp. assigned its option to purchase the 80 shares of Gateway Corp. to the Essex partnership.

partners of Essex and their partnership interests were as follows:

| Partner | Partnership Interest |
|---|---|
| Eulich-Management | 47.500 |
| IRA | 26.125 |
| Holding Co. | 21.375 |
| Connolly | 5.000 |

Although the Essex partnership agreement required its partners to contribute any capital needed to operate the partnership, very little, if any, actual capital contributions were ever required from them. The Essex partnership had no office, equipment, or employees.

In late 1981, Gateway Corp. entered into a management contract with Prudential to operate the Gateway Hotel and entered into a second management contract effective February 1, 1982, to operate another Hilton-franchised hotel that Prudential owned at Midland, Texas (the Midland Hotel).[19]

The Essex partnership entered into "Representation and Marketing" agreements with Eulich-Management and Gateway Corp., also effective January 1, 1982.[20] At the time, Eulich-

---

[19] Although Ostroff and Prudential ultimately awarded the Midland, Texas, hotel's management contract to Gateway Corp., Gateway Corp. and Eulich-Management had each submitted bids on the Midland hotel's management contract. During this time, Prudential usually obtained bids from at least three hotel management companies for a particular hotel's management contract.

[20] The Eulich-Management agreement indicates that, although it was effective as of Jan. 1, 1982, it was executed as of July 5,
(continued...)

Management managed the Allentown Hilton and the Madison Hotel.
Although both were owned by third parties, Prudential had helped
finance the construction of the two hotels.  Essex's agreement
with Eulich-Management (the Eulich-Management/Essex agreement)
required Eulich-Management to pay to Essex 30 percent of its
management fees from the operation of the Madison Hotel and 43
percent of the fees from the operation of the Allentown Hilton.
The agreement with Gateway Corp. (the Gateway Corp./Essex
agreement) required Gateway Corp. to pay to Essex 75 percent of
Gateway Corp.'s management fees from the operations of the
Gateway Hotel and the Midland Hotel.

Employees of Eulich-Management performed record-keeping and
reporting services for Gateway Corp.  A number of Eulich-
Management's personnel were instructed to do whatever they could
to help Connolly with Gateway Corp.'s operations.  For instance,
Eulich-Management employees helped perform the financial and
accounting services that Gateway Corp. required in connection
with its Gateway and Midland hotel management contracts.  In yet
another instance, a Eulich-Management employee helped Connolly
with union negotiations.  Also, after Prudential awarded the
Midland, Texas, hotel's management contract to Gateway Corp.,
Eulich-Management's employees helped Connolly find an on-site

---

(...continued)
1982.

manager for that hotel.  Eulich-Management did not charge Gateway Corp. for these services.  IRA and Holding Co., in contrast to Eulich-Management, provided no services to Gateway Corp.

The Essex partners agreed that Gateway Corp. and Eulich-Management generally would pay the same fees to the Essex partnership.  The partnership's specified percentage of fees under each consulting and fee participation agreement could easily be adjusted and modified, as each consulting and participation agreement was cancelable by a 30- to 90-day notice. As a result, if a significant change occurred with respect to the compensation that Gateway Corp. or Eulich-Management received under a particular hotel management contract, an offsetting change then could be effectuated in the other consulting and fee participation agreements Gateway Corp. and Eulich Management had with Essex.

In late 1983, Eulich-Management received a hotel management contract for Prudential's Hilton-franchised Twin Sixties Hotel at Dallas, Texas.  A new Eulich-Management/Essex agreement was made effective January 1, 1984, whereby Eulich-Management agreed to pay to Essex 70 percent of the fees from the Madison Hotel, 57 percent of the fees from Allentown Hilton, and 57 percent of the fees from Twin Sixties.[21]

---

[21]    The consulting and participation agreement for the Twin Sixties hotel was entered into to replace the income that Essex
(continued...)

Effective January 1, 1986, a new Gateway Corp./Essex agreement reduced Essex's share of Gateway Corp.'s fees from the operations of the Gateway Hotel and the Midland Hotel from 75 percent to 40 percent.

Although Eulich-Management was sold by Eulich to an unrelated company called Aircoa in 1986, Eulich-Management continued to participate as a partner in Essex until about 1990.

In early 1990, Gateway Corp. lost the management contracts on the Gateway and Midland hotels and ceased operating. The Essex partnership terminated by 1991.

During the years 1982 through 1988, Essex reported the following amounts as received and/or accrued[22] commission fee payments from Gateway Corp. and Eulich-Management:

| Year | Gateway | Eulich-Mgt. |
|------|---------|-------------|
| 1982 | $234,170 | $104,121 |
| 1983 | 222,557 | 235,718 |
| 1984 | 268,663 | 242,116 |
| 1985 | 225,487 | 230,847 |
| 1986 | 68,000 | 123,089 |
| 1987 | 172,963 | 388,632 |
| 1988 | 142,761 | 238,889 |
| Total | 1,334,601 | 1,563,412 |

_____

(...continued)
would lose following the expected termination of Eulich-Management's management contract for the Allentown Hilton, as the Allentown Hilton was then in the process of being sold.

[22] Essex reported its income on the cash method until 1987. For the 1987 taxable year and thereafter Essex reported on the accrual method.

For the 1989 taxable year, Essex reported $293,261 in total income from consulting fees from Eulich-Management and Gateway Corp.

For the taxable years 1982 through 1989, Essex made distributions to IRA, Holding Co., Connolly, and Eulich-Management in the following amounts:

| Year | IRA | Holding | Connolly | Eulich-Mgt. |
|------|-----|---------|----------|-------------|
| 1982 | $86,212 | $70,538 | $16,500 | $156,750 |
| 1983 | 78,375 | 64,125 | 15,000 | 142,500 |
| 1984 | 133,238 | 109,013 | 25,499 | 242,250 |
| 1985 | 120,175 | 98,325 | 23,000 | 218,500 |
| 1986 | 80,465 | 65,835 | 15,400 | 146,300 |
| 1987 | 120,698 | 98,752 | 23,100 | 219,450 |
| 1988 | 117,562 | 96,118 | 22,500 | 213,750 |
| 1989 | 51,727 | 42,322 | 9,900 | 94,051 |
| Total | 788,452 | 645,028 | 150,899 | 1,433,551 |

The distributions to all partners from 1982 through 1989 totaled $3,017,930.

The following diagram illustrates the Essex arrangement:



F.   Diagram: Summary of Payments From the Five 1977 Through 1989

The following diagram shows the money paid by the Five to IRA, Zeus, KWJ Corp. and Holding Co. from 1977 through 1989:



Most of the payments made by the Five were attributable to Ballard's and Lisle's influence in awarding contracts with Prudential (the Prudential transactions), some were attributable to Lisle's influence in awarding contracts with Travelers (the Travelers transactions), and some were attributable to Kanter's influence in transactions that did not necessarily involve Prudential or Travelers (the Kanter transactions).

G.   Changes in IRA and Subsidiaries Corporate Structure From
1974 Through 1988

IRA's predecessor, Cedilla Co., was incorporated in 1974.
Keating acquired 1,000 shares of the common stock, and Schott
acquired 1,000 shares of its preferred class A stock.  In 1975,
Weaver agreed to sell KWJ Corp. to Kanter's "client".  In 1975,
Keating's common stock was exchanged for 500 shares of class B
preferred stock, and Weisgal as trustee of the Bea Ritch trusts
acquired 1,000 shares of the common stock.  The Cedilla Co's.
1975 balance sheet at the end of 1975 reflected the following:

|  |  |
|---|---:|
| Assets |  |
| Cash | $564 |
| Loans receivable | 21,100 |
| Prepaid expenses | 89 |
| Total | 21,753 |
| Liabilities | 5,000 |
| Net assets | 16,753 |
|  |  |
| Capital stock |  |
| Preferred | 1,050 |
| Common | 100 |
| Capital surplus | 50 |
| Retained earnings | 15,553 |

The following series of diagrams illustrates the changes in
the IRA organizations during the years at issue to accommodate
the various transactions.

1976-77



CEDILLA CO.

CEDILLA
INVEST.

Cedilla Co. acquired Cedilla Investment Co. (engaged in equipment leasing transactions) in December 1976. During 1976 Kanter negotiated IRA's purchase of KWJ Corp. from Weaver and began discussing the purchase of Schnitzer-PMS from Schnitzer. In 1977 Keating's preferred stock was redeemed.

IRA's consolidated returns for 1976 and 1977 reported consolidated net losses[23] of $7,954 in 1976 and $271,394 in 1977, a net loss for Cedilla Investment Co. of $174,003 in 1976 and $345,950 in 1977, and reflected the following income and end-of-year balance sheets with respect to IRA (unconsolidated):

---

[23] During the years at issue the consolidated net losses did not equal the total of the net losses of the consolidated group because of special deductions.

|                          | 1976      | 1977      |
|--------------------------|-----------|-----------|
| **Income**               |           |           |
| Gross receipts           | $640,000  | $112,982  |
| Dividends                | --        | 9,217     |
| Interest                 | 9,525     | 9,409     |
| Partnership              | (260,934) | 5,214     |
| Total                    | 388,591   | 136,822   |
|                          |           |           |
| **Deductions**           |           |           |
| Compensation/officers    | --        | 19,300    |
| Salaries/wages           | --        | 986       |
| Commissions              | 213,333   | 12,000    |
| Other                    | 9,209     | 22,866    |
| Total                    | 222,542   | 55,152    |
| Net Income               | 166,049   | 81,670    |
| Special deductions       |           | (7,114)   |
| Taxable Income           | 166,049   | 74,556    |
|                          |           |           |
| **Assets**               |           |           |
| Cash                     | 301,401   | 134,270   |
| Loans receivable         | 40,000    | 370,500   |
| Securities               |           |           |
|  Marketable              | 15,663    | 290,213   |
|  Non-marketable          | --        | 65,000    |
| Investment in sub.       | 15,000    | 15,000    |
| Investment in pship      | (185,834) | (180,620) |
| Cedilla trust            | --        | 5,000     |
| Other                    | 361       | 2,213     |
| Total                    | 186,591   | 701,576   |
| **Liabilities**          |           |           |
| Payables                 | --        | 2,000     |
| Short term               | --        | 65,000    |
| Long term                | --        | 370,000   |
| Other                    | 6,900     | 3,182     |
| Total                    | 6,900     | 440,182   |
| Net assets               | 179,691   | 261,394   |
| **Capital stock**        |           |           |
| Preferred                | 1,050     | 1,000     |
| Common                   | 100       | 100       |
| Capital surplus          | 50        |           |
| Retained earnings        | 178,491   | 260,344   |
| Cost of treasury stock   | --        | (50)      |

1978



In January 1978, IRA purchased the Schnitzer PMS stock.  In 1978, Cedilla Co. changed its name to Investment Research Associates, Ltd. (IRA).  In April 1978, IRA acquired 1,000 shares (100 percent) of the voting stock of Arba Investments, Inc., and changed Arba's name to Cedilla Co.

IRA's consolidated return for 1978 reported consolidated net losses of $18,673 and a net loss for Cedilla Investment Co. of $605,992 and reflects the following income and end-of-year balance sheets with respect to IRA and Cedilla Co. (unconsolidated):

|                          | IRA        | Cedilla Co. |
|--------------------------|-----------:|------------:|
| **Income**               |            |             |
| Gross receipts           | $777,499   | $10,697     |
| Dividends                | 20,572     | --          |
| Interest                 | 38,885     | 18          |
| Capital gain             | 69,715     | --          |
| Partnership              | 4,829      | --          |
| Total                    | 911,500    | 10,715      |
| **Deductions**           |            |             |
| Compensation--officers   | 15,000     | 7,500       |
| Salaries/wages           | 5,051      | 4,287       |
| Consulting Fees          | 51,900     | --          |
| Commissions              | 207,237    | --          |
| Other                    | 18,565     | 8,446       |
| Total                    | 297,753    | 20,233      |
| Net income               | 613,747    | (9,518)     |
| Special deductions       | (16,910)   | --          |
| Taxable income           | 596,837    | (9,518)     |
|                          |            |             |
| **Assets**               |            |             |
| Cash                     | 28,600     | 70,996      |
| Loans                    |            |             |
|   Stockholders | 287,900    | --          |
|   Others       | 734,350    | 6,385       |
| Securities               |            |             |
|   Marketable   | 318,197    | --          |
|   Nonmarketable| 215,000    | --          |
| Investment in sub.       | 34,024     | --          |
| Investment in pship.     | (180,703)  | --          |
| Cedilla trust            | 4,511      | --          |
| Other                    | 1,051      | 2,060       |
| Total                    | 1,442,930  | 79,441      |
| **Liabilities**          |            |             |
| Payables                 |            | 70,000      |
|   Short term    | 197,575    | --          |
|   Long term     | 370,000    | --          |
| Other                    | 1,211      | 555         |
| Total                    | 568,786    | 70,555      |
| Net assets               | 874,144    | 8,886       |
| **Capital stock**        |            |             |
| Preferred                | 1,000      | --          |
| Common                   | 100        | 1,000       |
| Capital surplus          |            | 18,024      |
| Retained earnings        | 873,094    | (10,138)    |
| Cost of treasury stock   | (50)       |             |

1979



Although IRA acquired 100 shares (100 percent) of KWJ Corp. in November 1978, IRA first included KWJ Corp. on its 1979 consolidated return.[24]  During 1979, IRA sold its Schnitzer-PMS stock back to Century Development.  Schaffel's payments to IRA began in 1979.  Frey's arrangement began in 1979 and, in December 1979, IRA acquired 1,000 shares of Zeus Ventures, Inc. (Zeus).

IRA's consolidated return for 1979 reported a consolidated net loss of $20,728, a net loss for Cedilla Investment Co. of $320,425, and net taxable income from KWJ Corp. of $119,646 and reflects the following income and end-of-year balance sheets with respect to IRA and Cedilla Co. (unconsolidated):

---

[24]    IRA's 1978 return reported $1,442,930 total assets as of the close of the year, $34,024 of which was the amount of its investment in subsidiaries.  The 1979 return reported $1,592,930 of total assets as of the beginning of the year, $184,024 of which was the amount of its investment in subsidiaries.  The $150,000 difference is the amount IRA agreed to pay for the KWJ Corp. stock.

|                          | IRA         | Cedilla Co. |
|--------------------------|-------------|-------------|
| Income                   |             |             |
| Gross receipts           | $73,280     | $101,274    |
| Dividends                | 3,125       | --          |
| Interest                 | 112,804     | 1,038       |
| Gross rents              | 225         | --          |
| Capital gain             | 141,519     | --          |
| Partnership              | 1,157,861   | --          |
| Management fees          | --          | 2,750       |
| Consulting fees          | 100,000     |             |
| Total                    | 1,588,814   | 105,062     |
| Deductions               |             |             |
| Compensation--officers   | --          | 26,800      |
| Salaries/wages           | --          | 4,100       |
| Depreciation             | 638,550     | --          |
| Consulting fees          | 125,000     | --          |
| Commissions              | 209,440     | --          |
| Other                    | 60,911      | 19,470      |
| Total                    | 1,033,901   | 50,370      |
| Net income               | 554,913     | 54,692      |
| Special deductions       | (2,055)     | --          |
| Taxable income           | 542,858     | 54,692      |
|                          |             |             |
| Assets                   |             |             |
| Cash                     | 962,964     | 11,806      |
| Loans                    |             |             |
| Stockholders             | 1,200       | --          |
| Others                   | 3,725,675   | 21,885      |
| Treasury bills           | --          | 24,308      |
| Securities               | --          | --          |
| Marketable               | 177,951     | --          |
| Nonmarketable            | 65,000      | --          |
| Investment in sub.       | 234,024     | --          |
| Investment in pship.     | 130,907     | 1,800       |
| Depreciable assets       | 5,108,573   | --          |
| Less accumulated dep.    | (638,550)   | --          |
| Cedilla trust            | 4,511       | --          |
| Deferred expenses        | 91,640      | --          |
| Other                    | 1,029       | 2,060       |
| Total                    | 9,864,924   | 61,859      |
| Liabilities              |             |             |
| Payables                 |             |             |
| Short term               | 309,795     | --          |
| Long term                | 5,319,924   | --          |
| Deferred income          | 2,807,260   | --          |
| Total                    | 8,436,979   | --          |
| Net assets               | 1,427,945   | 61,859      |
| Capital stock            |             |             |

|  |  |  |
|---|---|---|
| Preferred | 1,000 | -- |
| Common | 100 | 1,000 |
| Capital surplus | -- | 18,024 |
| Retained earnings | 1,426,895 | 42,835 |
| Cost of treasury stock | (50) | -- |

1980



In January 1980, IRA acquired 1,000 shares (100 percent) of Brickell Enterprises, Inc. (Brickell).

IRA's consolidated return for 1980 reported consolidated taxable income of $65,094, a net loss for Cedilla Investment Co. of $145,887, net taxable income for Zeus of $118,269, a net loss for KWJ Corp. of $2,620, and net taxable income from Brickell of $90,225 and reflects the following income and end-of-year balance sheets with respect to IRA and Cedilla Co. (unconsolidated):

|  | IRA | Cedilla Co. |
|---|---|---|
| Income |  |  |
| Dividends | $15,467 | -- |
| Interest | 578,031 | $2,373 |
| Gross rents | 581,180 | 300 |
| Capital gain | 217,981 | -- |
| Partnerships | 1,448,542 | -- |
| Commissions & fees | 244,920 | 38,311 |
| Total | 3,086,121 | 40,984 |

| Deductions | | |
|---|---|---|
| Compensation--officers | -- | 19,800 |
| Salaries/wages | -- | 6,918 |
| Interest | 916,507 | -- |
| Depreciation | 2,115,376 | 2,294 |
| Commissions/fees | -- | -- |
| Other | 14,226 | 33,705 |
| Total | 3,046,109 | 62,717 |
| Net income | 40,012 | (21,733) |
| Special deductions | (13,147) | -- |
| Taxable income | 26,865 | (21,733) |

| Assets | | |
|---|---|---|
| Cash | 1,399,085 | 1,510 |
| Trade receivables | 703 | -- |
| Loans | | |
| Stockholders | 1,200 | -- |
| Others | 1,896,320 | 15,885 |
| Installment receivable | 2,738,532 | -- |
| Securities | | |
| Marketable | 411,481 | -- |
| Nonmarketable | 348,024 | -- |
| Investment in sub. | -- | -- |
| Investment in pship. | 326,072 | -- |
| Depreciable assets | 12,468,476 | 22,937 |
| Less accumulated dep. | (2,753,926) | (2,294) |
| Cedilla trust | 4,511 | -- |
| Deferred expenses | 91,640 | -- |
| Other | 1,325 | 2,060 |
| Total | 16,933,443 | 40,098 |
| Liabilities | | |
| Payables | 118,756 | -- |
| Short term | 606,000 | -- |
| Long term | 12,258,949 | -- |
| Deferred gain | 2,606,029 | -- |
| Other | 2,869 | -- |
| Total | 15,592,603 | -- |
| Net assets | 1,340,840 | 40,098 |
| Capital stock | | |
| Preferred | 1,000 | -- |
| Common | 100 | 1,000 |
| Capital surplus | | 18,024 |
| Retained earnings | 1,339,740 | 21,074 |

1981-82



During 1981, Essex Corp. and Gateway Corp. were organized. In November 1981, IRA acquired 1,000 shares of IRA Florida Apartments, Inc. (IRA Flor. Apts.).  During 1982, the Essex partnership was organized.  During 1982, Ballard and Lisle retired from Prudential; Lisle began employment with Travelers, and Ballard began employment with Goldman-Sachs.

IRA's consolidated returns for 1981 and 1982 reported consolidated net losses of $615,852 and $121,501, respectively, which included a net loss of $25,057 in 1981 and net taxable income of $72,407 for Cedilla Investment Co., net income of $107,887 in 1981 and $448,691 in 1982 for Zeus, net income of $91,118 in 1981 and $155,842 in 1982 for KWJ Corp., net income of $5,954 in 1981 and a net loss of $19,184 in 1982 from Brickell, and net losses of $6,568 in 1982 from IRA Florida Apts. and reflects the following income and end-of-year balance sheets with respect to IRA and Cedilla Co. (unconsolidated):

|  | 1981 | | 1982 | |
|---|---|---|---|---|
|  | IRA | Cedilla Co. | IRA | Cedilla Co. |
| **Income** | | | | |
| Dividends | $2,306 | -- | $333,611 | -- |
| Interest | 673,674 | 1,747 | 354,531 | 7,587 |
| Gross rents | 2,484,330 | 8,550 | 2,437,715 | 4,828 |
| Capital gain | 304,883 | -- | -- | -- |
| Partnerships | 725,964 | -- | (483,219) | -- |
| Commissions | 205,275 | 62,585 | 325,000 | 112,958 |
| Parking income | -- | 823 | -- | -- |
| Management fees | -- | 2,375 | 5,832 | -- |
| Other fees | 156,250 | -- | 447,450 | -- |
| Miscellaneous | 91 | -- | 1,514 | 478 |
| Total | 4,552,773 | 76,080 | 3,422,434 | 125,851 |
| **Deductions** | | | | |
| Compensation--officers | -- | 26,300 | -- | -- |
| Directors fees | 12,500 | -- | -- | -- |
| Salaries/wages | 9,969 | 9,361 | 26,079 | 9,231 |
| Bad debts | 395,600 | -- | 162,200 | -- |
| Interest | 2,164,579 | -- | 1,872,881 | 32 |
| Depreciation | 2,561,361 | 5,047 | 1,610,457 | 5,047 |
| Consulting fees | -- | -- | 29,000 | -- |
| Commissions | 115,400 | -- | -- | 66,776 |
| Other | 85,284 | 30,678 | 58,580 | 34,764 |
| Total | 5,344,693 | 71,386 | 3,759,197 | 115,850 |
| Net Income | (791,920) | 4,694 | (336,763) | 10,001 |
| NOL | -- | -- | (793,880) | -- |
| Special deductions | (1,960) | -- | (322,569) | -- |
| Taxable income | (793,880) | 4,694 | (1,453,212) | 10,001 |
| | | | | |
| **Assets** | | | | |
| Cash | 28,671 | 1,885 | 57,110 | 104 |
| Money market | 107,379 | 8,684 | 43,885 | 14,065 |
| Receivables | | | | |
| Notes & accounts | 2,429,224 | -- | 2,256,783 | -- |
| Rents | 3,570 | -- | -- | -- |
| Loans | | | | |
| Stockholders | 366,350 | -- | 340,930 | -- |
| Others | 3,066,284 | 26,860 | 3,002,131 | 37,600 |
| Securities | | | | |
| Short term | 1,030,000 | -- | 1,460,000 | -- |
| Marketable | 405,293 | -- | 492,663 | -- |
| Nonmarketable | 200,700 | -- | 312,700 | -- |
| Investment in sub. | 236,024 | -- | 268,924 | -- |
| Investment in pship. | 2,607,473 | -- | 2,149,204 | -- |
| Depreciable assets | 12,478,152 | 24,550 | 10,270,651 | 24,550 |
| Less accumulated dep. | (5,315,286) | (7,341) | (6,000,765) | (12,388) |
| Other | -- | 447 | 1,190 | 1,380 |
| Total | 17,643,834 | 55,085 | 14,655,406 | 65,311 |
| **Liabilities** | | | | |
| Short term notes | 585,000 | 9,600 | 1,038,099 | 9,600 |
| Long term notes | 13,754,966 | -- | 11,259,516 | -- |
| Loan from stockholder | 262,400 | -- | 2,400 | -- |
| Deferred gain | 2,311,689 | -- | 2,147,594 | -- |
| Other | -- | 693 | 914 | 981 |
| Total | 16,914,055 | 10,293 | 14,448,523 | 10,581 |
| Net assets | 729,779 | 44,792 | 206,883 | 54,730 |

| Capital stock | | | | |
|---|---|---|---|---|
| Preferred | 1,000 | -- | 1,000 | -- |
| Common | 100 | 1,000 | 100 | 1,000 |
| Capital surplus | -- | 18,024 | -- | 18,024 |
| Retained earnings | 728,679 | 25,768 | 205,783 | 35,706 |

<u>1983</u>



IRA reported that it liquidated Brickell, IRA Florida Apts., and KWJ Corp. under section 332 during 1983. In December 1983, IRA acquired 1,000 shares (100 percent) of the common stock of Carlco, TMT, and BWK, Inc.

IRA's 1983 consolidated return and adjusting journal entries show that Schott's shares of IRA preferred stock were redeemed in 1983 in exchange for IRA's 1,000 shares of Cedilla Co. common stock. IRA reported that its shares of Cedilla Co. were redeemed for $1,000 in April 1983 and reported a long-term capital loss of $18,024 on the sale. IRA's consolidated income also included a $35,000 net operating loss from Cedilla Co. Cedilla Co. had no

income and claimed a deduction of $35,000 for commission
expenses.  Cedilla Co.'s 1983 adjusting journal entry indicates
that the $35,000 due to Schott was paid by offsetting amounts
owed by Schott to Cedilla Co.

IRA's consolidated return for 1983 reported a consolidated
net loss of $425,538, net income of $140,065 for Cedilla
Investment Co., net income of $149,128 for Zeus, net income of
$139,783 for KWJ Corp., a net loss of $21,567 from Brickell, and
a net loss of $18,356 from IRA Florida Apts. and reflects the
following income and end-of-year balance sheets with respect to
IRA (unconsolidated):

|                      | IRA           |
|----------------------|---------------|
| Income               |               |
| Dividends            | $343,080      |
| Interest             | 402,022       |
| Gross rents          | 2,581,652     |
| Capital gain         | 314,855       |
| Partnerships         | (689,461)     |
| Commissions          |               |
| General fees         | 244,732       |
| Consulting fees      | 26,000        |
| Total                | 3,222,880     |
| Deductions           |               |
| Bad debts            | 22,075        |
| Interest             | 1,834,892     |
| Depreciation         | 1,636,137     |
| Commissions/fees     |               |
| Other                | 88,311        |
| Total                | 3,581,415     |
| Net Income           | (358,535)     |
| NOL                  | (1,453,212)   |
| Special deductions   | (336,303)     |
| Taxable Income       | (2,148,050)   |

```
Assets
 Cash                            110,281
 Pooled funds                     38,250
 Notes Receivable              2,070,128
 Loans
  Stockholders                   292,260
  Others                       1,592,983
 Securities
  Short term                   3,776,000
  Marketable                     564,827
  Nonmarketable                  192,700
 Investment in sub.              83,000
 Investment in pship.         1,640,284
 Depreciable assets          11,286,020
  Less accumulated dep.      (7,636,902)
 Other                            2,365
   Total                      14,012,196
Liabilities
 Payables
  Short term                  1,341,617
  Long term                  11,060,633
 Deferred gain               1,969,973
 Other
   Total                     14,372,223
Net assets                     (360,027)
Capital stock
 Preferred
 Common                             100
Capital surplus
Retained earnings              (360,127)
```

1984-87



IRA distributed cash accumulated from Prudential transactions, including cash received from Zeus and the liquidation of KWJ Corp. and its interests in the Essex and Sherwood partnerships, in the ratio of 45 percent each to Carlco and TMT and 10 percent to BWK, Inc.  Carlco, TMT, and BWK, Inc., contributed the Hyatt contract rights to a new partnership called KWJ Co.

IRA's consolidated returns for 1984 to 1987 reported the following consolidated net losses, net income or loss for Cedilla Investment Co. and Zeus, and income for IRA, and reflect the following end-of-year balance sheets with respect to IRA (unconsolidated):

|  | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|
| Consolidated | | | | |
| income(loss) | ($175,946) | $96,363 | ($327,854) | ($16,942) |
| Cedilla Invest. | 331,263 | 376,929 | (1,148,003) | (704,460) |
| Zeus | (96,473) | (153,108) | (151,122) | (181,747) |
| IRA | | | | |
| Income | | | | |
| Dividends | 113,505 | 97,206 | 87,079 | 31,960 |
| Interest | 247,230 | 177,236 | 164,843 | 238,396 |
| Gross rents | 2,689,177 | 2,689,177 | 1,175,346 | 1,271 |
| Capital gain | 247,929 | -- | (62,833) | 604,750 |
| Partnerships | 24,821 | (202,702) | 373,779 | 186,845 |
| Loss notes | -- | -- | -- | (1,176,670) |
| Commissions/fees | -- | -- | -- | -- |
| Other | 356 | 1,000 | (546) | -- |
| Total | 3,323,018 | 2,761,917 | 1,737,668 | (113,448) |
| Deductions | | | | |
| Bad debts | -- | -- | -- | 132,013 |
| Interest | 1,778,953 | 1,477,807 | 543,077 | 274 |
| Depreciation | 1,748,335 | 1,222,686 | 316,192 | 3,228 |
| Consulting fees | -- | -- | -- | -- |
| Commissions | -- | 4,000 | -- | -- |
| Other | 20,752 | 22,784 | 29,683 | 37,094 |
| Total | 3,548,040 | 2,727,277 | 888,952 | 172,609 |
| Net income | (225,022) | 34,640 | 848,716 | (286,057) |
| NOL | (89,235) | (410,736) | (458,721) | -- |
| Special ded. | (96,479) | (82,625) | (86,412) | (31,960) |
| Taxable income | (410,736) | (458,721) | 303,583 | (318,017) |
| | | | | |
| Assets | | | | |
| Cash | 53,976 | 11,933 | 322,645 | 1,241,888 |
| Pooled funds | 38,250 | -- | -- | -- |
| Notes Receiv. | 1,868,086 | 1,649,390 | 2,528,266 | 1,156,439 |
| Loans | | | | |
| Stockholders | 292,479 | -- | -- | -- |
| Subsidiaries | -- | 292,569 | 345,869 | -- |
| Others | 1,543,454 | 1,146,668 | 1,186,973 | 620,594 |
| Securities | | | | |
| Short term | 422,000 | 415,000 | -- | -- |
| Marketable | 230,451 | -- | -- | -- |
| Nonmarketable | 4,430,107 | 4,848,613 | 5,291,069 | 5,718,826 |
| Invest. sub. | 65,000 | 65,000 | 65,000 | 65,000 |
| Invest. pship. | 1,129,898 | 1,041,875 | 1,194,093 | 345,491 |
| Deprec. assets | 11,286,020 | 11,286,020 | 23,721 | 23,721 |
| Less acc. dep. | (9,385,237) | (10,607,923) | (20,494) | (23,721) |
| Other | 2,365 | 2,365 | 2,365 | 2,365) |
| Total | 11,976,849 | 10,151,510 | 10,939,507 | 9,150,603 |
| Liabilities | | | | |
| Payables | -- | -- | -- | -- |
| Short term | 81,250 | 122,925 | 45,490 | 45,490 |
| Long term | 11,258,179 | 9,995,705 | 9,495,319 | 9,495,280 |
| Defer. gain | 1,777,711 | 1,569,599 | 2,459,893 | 1,100,516 |
| Other | -- | -- | -- | -- |
| Total | 13,117,140 | 11,688,229 | 12,000,702 | 10,641,286 |
| Net assets | (1,140,291) | (1,536,719) | (1,061,195) | (1,490,683) |

| Capital stock | | | | |
|---|---|---|---|---|
| Preferred | -- | -- | -- | -- |
| Common | 100 | 100 | 100 | 100 |
| Capital surplus | | | | |
| Retained earn. | (1,140,391) | (1,536,819) | (1,061,295) | (1,490,783) |

**1988-89**



In December 1988, IRA acquired 850 shares (85 percent) of Decisions Holding Corp. in a section 351 exchange for all of its shares of Cedilla Invest. and Zeus, plus $60,000.[25] Zeus continued to hold an $807,028 receivable from Holding Co. plus $64,000 of receivables (exchanged during 1988 for a $64,000 receivable from HELO). No payments were made by Holding Co. or the others on the receivables, and no efforts were ever made to collect on the receivables.

_____

[25] On IRA's 1988 consolidated return, IRA reported that it contributed $60,000 to Decisions Holding Corp. in the sec. 351 transaction in exchange for 85 percent of the stock of Decisions Holding Corp. The return, however, also reported the transfers of IRA's stock in Cedilla Invest. and Zeus to Decisions Holding Corp. See _infra_ Issue 23.

IRA's consolidated returns for 1988 and 1989 reported consolidated net losses, and net income or loss for Cedilla Investment Co., Zeus, and Decisions Holding Corp. and reflected the following income and end-of-year balance sheets with respect to IRA (unconsolidated):

|  | 1988 | 1989 |
|---|---|---|
| Consolidated income (loss) | ($637,842) | ($116,521) |
| Cedilla Invest. | | |
|   Net | 52,446 | 11,702 |
|   NOL | (704,460) | (652,014) |
|   Taxable | (652,014) | (640,312) |
| Zeus | | |
|   Net | (163,987) | (18,419) |
|   NOL | (181,747) | (345,734) |
|   Taxable | (345,734) | (364,153) |
| Decisions Holding Corp. | | |
|   Net income | (1,066,348) | (3,394) |
|   NOL | | (1,066,348) |
|   Taxable income | (1,066,348) | (1,069,742) |
| IRA | | |
|   Income | | |
|    Dividends | 65,093 | -- |
|    Interest | 180,828 | 120,555 |
|    Gross rents | 188 | -- |
|    Capital gain | 293,593 | 780,343 |
|    Partnerships | 106,970 | 110,087 |
|    Commissions/fees | | |
|    Total | 646,672 | 1,010,985 |
|   Deductions | | |
|    Commissions/fees | | |
|    Other | 44,001 | 59,927 |
|    Total | 44,001 | 59,927 |
|   Net income | 602,671 | 951,058 |
|   NOL | (311,625) | (419,626) |
|   Special deductions | (52,074) | -- |
|   Taxable income | 238,972 | 531,432 |

|                          | 1988         | 1989         |
|--------------------------|--------------|--------------|
| Assets                   |              |              |
|   Cash         | $1,320,716   | $611,752     |
|   Notes Receivable | 879,079  | --           |
|   Loans        |              |              |
|    Stockholders | --     | --           |
|    Others | 554,969      | 1,309,744    |
|   Securities   | --           | --           |
|    Marketable |          |              |
|    Nonmarketable | 6,145,610 | 6,806,346 |
|   Investment in sub. | 125,000 | 125,000    |
|   Investment in pship. | 390,091 | 478,847 |
|   Other        | 2,365        | 2,365        |
|    Total  | 9,417,830    | 9,334,054    |
| Liabilities              |              |              |
|   Payables/notes |            |              |
|    Short term | --       | --           |
|    Long term | 9,495,280 | 9,495,280   |
|   Deferred gain | 836,581     | --           |
|   Other         |             |              |
|    Total   | 10,331,861  | 9,495,280    |
|   Net assets    | (914,031)   | (161,226)    |
|   Capital stock |             |              |
|    Preferred | --        | --           |
|    Common  | 100         | 100          |
|   Capital surplus |           |              |
|   Retained earnings | (914,131) | (161,326) |

IRA's records show the following assets (unconsolidated) for
the years 1983 through 1989:

| IRA Assets | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|---|---|
| Cash and CD's | | | | | | | |
|   Amer. Natl Bank | $58,322 | $2,047 | -- | -- | -- | -- | (8,248) |
|   Skylark Bank | 49,966 | 49,966 | -- | -- | -- | -- | -- |
|   Perinne Bank | 1,993 | 1,963 | -- | -- | -- | -- | -- |
|   Administration Co. | 38,250 | 38,250 | -- | -- | -- | -- | -- |
|   CD's | 3,776,000 | 422,000 | 415,000 | -- | 915,000 | 998,051 | 620,000 |
|   Special E | -- | -- | 11,933 | 322,645 | -- | -- | -- |
|   Principal Services | -- | -- | -- | -- | 326,888 | 322,665 | -- |
|   Total | 3,924,531 | 514,226 | 426,933 | 322,645 | 1,241,888 | 1,320,716 | 611,752 |
| Notes Rec. | | | | | | | |
|   PMS Note | 2,070,128 | 1,868,086 | 1,649,390 | 1,412,666 | 1,156,439 | 879,079 | -- |
|   Aura | -- | -- | 175 | -- | -- | -- | -- |
|   Kanter | -- | -- | 16,612 | -- | -- | -- | 600,000 |
|   Funding Sys. | 183,750 | 122,500 | -- | -- | -- | -- | -- |
|   The Holding Co. | 5,027 | -- | 45,000 | 64,000 | 76,743 | 76,743 | 76,743 |
|   Int'l Films | 532,420 | 535,520 | 504,548 | 507,648 | -- | -- | -- |
|   HELO | 510,100 | 502,100 | 495,500 | 485,825 | -- | -- | -- |
|   Tanglewood | 350,000 | 350,000 | -- | -- | -- | -- | -- |
|   Cedilla Invst. | 292,260 | 292,479 | 292,569 | 345,869 | -- | -- | -- |
|   B. DiLanciano | 3,334 | 3,334 | 3,334 | -- | -- | -- | -- |
|   Larry Freeman | 8,351 | -- | -- | -- | -- | -- | -- |
|   KWJ Co. | -- | 30,000 | 75,500 | 113,500 | 161,500 | 181,500 | 249,870 |
|   Landing | -- | -- | 6,000 | -- | -- | -- | -- |
|   Forest Activity | -- | -- | -- | 16,000 | -- | -- | -- |
|   Hyatt Corp. | -- | -- | -- | 1,115,560 | -- | -- | -- |
|   Cablevision Sys. | -- | -- | -- | -- | 181,247 | 90,624 | -- |
|   Bea Ritch Trust | -- | -- | -- | -- | 200,000 | 200,000 | 200,000 |
|   MAF, Inc. | -- | -- | -- | -- | 1,002 | -- | -- |
|   CMB Cin. Vent. | -- | -- | -- | -- | 102 | 102 | 102 |
|   RWL Cin. Trust | -- | -- | -- | -- | -- | 6,000 | 6,000 |
|   Decisions Holding | -- | -- | -- | -- | -- | -- | 400 |
|   Carlco | -- | -- | -- | -- | -- | -- | 122,355 |
|   TMT | -- | -- | -- | -- | -- | -- | 54,274 |
|   Total | 3,955,370 | 3,704,019 | 3,088,628 | 4,061,068 | 1,777,033 | 1,434,048 | 1,309,744 |

| IRA Assets | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|---|---|
| Invest. in Stocks | | | | | | | |
| Newell | $14,535 | -- | -- | -- | -- | -- | -- |
| Marmom Group | 284,009 | -- | -- | -- | -- | -- | -- |
| Micro Z | 74,200 | -- | -- | -- | -- | -- | -- |
| Enterp. Tech. | 10,664 | -- | -- | -- | -- | -- | -- |
| Composit Cont. | 115,000 | $115,000 | -- | -- | -- | -- | -- |
| Modular Pwr. | 12,200 | 12,200 | -- | -- | -- | -- | -- |
| Greenwich Pharm. | 9,219 | -- | -- | -- | -- | -- | -- |
| Funds for Energy | 45,000 | 45,000 | -- | -- | -- | -- | -- |
| Int'l Films | 65,000 | 65,000 | $65,000 | $65,000 | -- | -- | -- |
| Cedilla Invst. | 15,000 | 15,000 | 15,000 | 15,000 | $15,000 | -- | -- |
| Zeus | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | -- | -- |
| Walnut Capital | 40,000 | 40,000 | 40,000 | 40,000 | 80,000 | $80,000 | $80,000 |
| Geocham | 87,700 | 87,700 | -- | -- | -- | -- | -- |
| Carlco | 6,000 | 1,856,942 | 2,040,992 | 2,203,362 | 2,395,676 | 2,558,437 | 2,936,627 |
| BWK | 6,000 | 417,321 | 458,221 | 494,303 | 530,473 | 566,642 | 650,684 |
| TMT | 6,000 | 1,962,144 | 2,243,400 | 2,488,403 | 2,712,677 | 2,940,531 | 3,139,035 |
| Brajdas | -- | 58,251 | -- | -- | -- | -- | -- |
| Hyatt Air | -- | 1,000 | 1,000 | -- | -- | -- | -- |
| Decision Holdings | -- | -- | -- | -- | -- | 125,000 | 125,000 |
| Total | 840,527 | 4,725,558 | 4,913,613 | 5,356,068 | 5,783,826 | 6,270,610 | 6,931,346 |
| Partnerships | | | | | | | |
| Micro Z | 26,191 | 28,387 | 30,104 | 31,059 | 31,059 | 30,041 | 30,032 |
| Brickell Biscayne | 135,245 | 160,559 | 169,885 | 180,205 | -- | -- | -- |
| TicketMaster | 39,631 | 39,624 | 39,617 | 39,615 | 39,615 | -- | -- |
| Polar | 1,181,470 | 879,177 | 576,587 | 274,069 | (3,269) | (3,356) | (3,356) |
| May Invest | (2,559) | (388) | (231) | (663) | 1,138 | (2,298) | (2,439) |
| Sandburg Village | 650,975 | 656,929 | 643,088 | 581,006 | -- | -- | -- |
| UP Associates | (211,287) | (329,185) | (447,419) | (449,561) | (542,452) | (542,489) | (542,803) |
| Essex | 45,283 | -- | -- | -- | -- | -- | -- |
| Sherwood | (51,742) | -- | -- | -- | -- | -- | -- |
| Chicago Cablevision | (90,375) | (156,319) | (224,202) | (292,880) | (337,678) | (364,038) | (384,914) |
| Cablevision Prog. | (82,547) | (148,886) | 254,446 | -- | -- | -- | -- |
| HICIP | -- | -- | -- | 831,243 | 1,157,078 | 1,272,231 | 1,382,327 |
| Total | 1,640,285 | 1,129,898 | 1,041,875 | 1,194,093 | 345,491 | 390,091 | 478,847 |
| Rental property | | | | | | | |
| Cost | 11,262,299 | 11,262,299 | 11,262,299 | -- | -- | -- | -- |
| Accum. dep. | (7,628,162) | (9,371,728) | (10,590,882) | -- | -- | -- | -- |
| Total | 3,634,137 | 1,890,571 | 671,417 | -- | -- | -- | -- |
| Other total | 17,346 | 12,577 | 9,045 | 5,592 | 2,365 | 2,365 | 2,365 |

Total assets        14,012,196   11,976,849   10,151,511   10,939,466
9,150,603    9,417,830    9,334,054

IRA and its subsidiaries' consolidated total income, taxable income, net operating losses, and taxes paid for the years 1978 through 1989 were as follows:

| Year | Total Income | Taxable Income | Net Operating Losses | Tax Paid |
|------|--------------|----------------|----------------------|----------|
| 1978 | $1,004,475 | ($18,673) | ($27,394) | -- |
| 1979 | 1,944,332 | 404,771 | (18,673) | $94,618 |
| 1980 | 3,557,198 | 65,094 | -- | -- |
| 1981 | 5,158,583 | (615,852) | -- | -- |
| 1982 | 4,536,122 | (121,501) | (143,987) | -- |
| 1983 | 3,849,742 | (435,535) | (121,501) | -- |
| 1984 | 3,606,785 | (175,964) | (89,235) | -- |
| 1985 | 3,118,893 | 96,363 | (175,946) | -- |
| 1986 | 2,345,762 | (328,854) | -- | -- |
| 1987 | 299,794 | (16,942) | (111,843) | -- |
| 1988 | (526,393) | (637,842) | (10,550) | -- |
| 1989 | 1,011,577 | (116,521) | (1,057,468) | 10,819 |

IRA and its subsidiaries' consolidated total income, rental income, and difference for the years 1978 through 1989 were as follows:

| Year | Total Income | Rental Income | Difference |
|------|--------------|---------------|------------|
| 1978 | $1,004,475 | $241,072 | $   763,403 |
| 1979 | 1,944,332 | 242,818 | 1,701,514 |
| 1980 | 3,557,198 | 831,264 | 2,725,934 |
| 1981 | 5,158,583 | 2,740,082 | 2,418,501 |
| 1982 | 4,536,122 | 2,681,385 | 1,854,737 |
| 1983 | 3,849,742 | 2,820,494 | 1,029,248 |
| 1984 | 3,606,785 | 2,928,019 | 678,766 |
| 1985 | 3,118,893 | 2,928,019 | 190,874 |
| 1986 | 2,345,762 | 1,627,094 | 718,668 |
| 1987 | 299,794 | 9,940 | 298,854 |
| 1988 | (526,393) | 188 | (526,205) |
| 1989 | $1,011,577 | -- | 1,011,577 |

On the consolidated returns, IRA reported that it paid (not including payments by subsidiaries) the following compensation of officers, compensation of directors, salaries and wages, commissions, and consulting fees for the years 1976 through 1989:

| Year | Officers | Directors | Wages | Commissions | Consulting |
|------|----------|-----------|-------|-------------|------------|
| 1976 | -- | -- | -- | $213,333 | -- |
| 1977 | $19,300 | -- | $986 | 12,000 | -- |
| 1978 | 15,000 | -- | 5,051 | 207,237 | $51,900 |
| 1979 | -- | -- | -- | 209,440 | 125,000 |
| 1980 | -- | -- | -- | -- | -- |
| 1981 | -- | $12,500 | 9,969 | 115,400 | -- |
| 1982 | -- | -- | 26,079 | -- | 29,000 |
| 1983 | -- | -- | -- | -- | -- |
| 1984 | -- | -- | -- | -- | -- |
| 1985 | -- | -- | -- | 4,000 | -- |
| 1986 | -- | -- | -- | -- | -- |
| 1987 | -- | -- | -- | -- | -- |
| 1988 | -- | -- | -- | -- | -- |
| 1989 | -- | -- | -- | -- | -- |

H.   Changes in Holding Co. & Subsidiaries Corporate Structure 12/76 Through 8/87

Holding Co. was incorporated on December 8, 1976. Holding Co.'s return for the fiscal year ending August 31, 1978, indicates that Kanter owned 75 percent of Holding Co.'s voting stock as of the close of the taxable year.  The return indicates that preferred shares as well as common shares of stock were outstanding at that time.

12/76 Through 8/31/77

By August 31, 1977, Holding Co. had acquired Citra Co. (Citra).



9/1/77 Through 8/31/78

On November 25, 1977, Holding Co. had acquired 1,000 shares (100 percent) of the common stock (no preferred stock was issued) of The Active Business Corp. (Active).  On July 21, 1978, Active acquired 500 shares (100 percent) of the voting stock of Harbor Investments, Inc., which later changed its name to Harbor Exchange Lending Operation (HELO).



## 9/1/78 Through 8/31/79

On May 22, 1979, Holding Co. acquired 1,000 shares (100 percent) of the voting stock of Oil Investments, Ltd. (Oil Investments).



9/1/79 Through 8/31/80

Holding Co. acquired 1,000 shares (100 percent) of the voting stock of The Nominee Corp. (Nominee) on January 7, 1980, and 100 shares (100 percent) of the voting stock of Tanglewood Properties, Inc., on April 30, 1980. Harbor Investments changed its name to Harbor Exchange Lending Operations (HELO) between September 1, 1979, and August 31, 1980.



9/1/80 Through 8/31/81

Holding Co. acquired the voting stock of L.B.G. Properties, Inc. (LBG Prop.), in November 1980, Zion in December 1980, and Twilight Properties, Inc. (Twilight), in April 1981.



### 9/1/81 Through 8/31/83

Between August 31, 1981, and August 31, 1983, Holding Co. acquired 100 percent of the voting shares of Columbus Projects, Inc. (Columbus), PPPD, Inc. (PPPD), and PPPI, Inc. (PPPI).  In 1981 Frey began making payments to Zion, and in 1982 Essex began making payments to Holding Co.



## 9/1/83 Through 8/31/84

In 1984, Schaffel began making payments to Holding Co. On August 31, 1984, Holding Co. sold or liquidated all of its stock in Active, Citra, Columbus, HELO, PPPD, and PPPI.



9/1/84 Through 8/31/85

On August 31, 1985, Holding Co. sold or liquidated its stock in Nominee.  It reacquired the stock in Nominee on September 1, 1986.

I.   Holding Co. & Subsidiaries Returns

The consolidated returns of Holding Co. and its subsidiaries show the following with respect to taxable years ending July 31, 1977 to 1987:

|                    | 8/31/77 | 8/31/78    | 8/31/79    | 8/31/80     | 8/31/81      |
|--------------------|---------|------------|------------|-------------|--------------|
| Income(loss)       |         |            |            |             |              |
| Consolidated       |         |            |            |             |              |
|   Income | --      | $594,653   | $900,572   | $1,076,933  | $1,110,335   |
|   Deductions | --  | (613,972)  | (813,324)  | (939,205)   | (3,828,869)  |
|   Net    | --      | (19,319)   | 87,248     | 137,728     | (2,718,534)  |
|   NOL & Special | -- | (112,776) | (160,468)  | (99,377)    | (80,124)     |
|   Taxable | --     | (132,095)  | (73,220)   | 38,351      | (2,798,658)  |
| Active             |         |            |            |             |              |
|   (acq. 11/77) |   |            |            |             |              |
|   Income | --      | 59,961     | 28,387     | 49,902      | 23,768       |
|   Deductions | -- | (1,106)    | (3,468)    | (5,863)     | (4,381)      |
|   Net    | --      | 58,855     | 14,919     | 44,039      | 19,387       |
|   NOL    | --      | --         | (1,658)    | --          | --           |
|   Taxable | --     | 58,855     | 13,261     | 44,039      | 19,387       |
| Citra              |         |            |            |             |              |
|   Income | --      | 19,327     | 82         | 6           | --           |
|   Deductions | -- | (335)      | (211)      | (1,221)     | (20)         |
|   Net    | --      | 18,992     | (129)      | (1,215)     | (20)         |
|   NOL    | --      | --         | --         | (129)       | (1,344)      |
|   Taxable | --     | 18,992     | (129)      | (1,344)     | (1,364)      |
| HELO               |         |            |            |             |              |
|   (acq. 7/78) |    |            |            |             |              |
|   Income | --      | --         | --         | 1,485       | 4,597        |
|   Deductions | -- | --         | (115)      | (31,309)    | (149,974)    |
|   Net    | --      | --         | (115)      | (29,824)    | (145,377)    |
|   NOL    | --      | --         | --         | (115)       | (29,939)     |
|   Taxable | --     | --         | (115)      | (29,939)    | (175,316)    |
| Nominee            |         |            |            |             |              |
|   Income | --      | --         | --         | --          | --           |
|   Deductions | -- | --         | --         | (31)        | (1,589)      |
|   Net    | --      | --         | --         | (31)        | (1,589)      |
|   NOL    | --      | --         | --         |             | (31)         |
|   Taxable | --     | --         | --         | (31)        | (1,620)      |
| Oil Investments    |         |            |            |             |              |
|   Income | --      | --         | --         | (444,493)   | (619,431)    |
|   Deductions | -- | --         | (54)       | (28,227)    | (5,637)      |
|   Net    | --      | --         | (54)       | (472,720)   | (625,068)    |
|   NOL    | --      | --         | --         | (54)        | (472,774)    |
|   Taxable | --     | --         | (54)       | (472,774)   | (1,097,842)  |

|  | 8/31/77 | 8/31/78 | 8/31/79 | 8/31/80 | 8/31/81 |
|---|---|---|---|---|---|
| **Tanglewood** | | | | | |
| Income | -- | -- | -- | $246,059 | $818,591 |
| Deductions | -- | -- | -- | (241,573) | (1,122,339) |
| Net | -- | -- | -- | 4,486 | (303,748) |
| NOL | -- | -- | -- | -- | -- |
| Taxable | -- | -- | -- | 4,486 | (303,748) |
| **Holding Co.** | | | | | |
| Income | | | | | |
| Dividends | -- | $118,940 | $35,069 | 30,773 | 78,130 |
| Interest | -- | 284,413 | 449,889 | 182,802 | 80,077 |
| Gross rents | -- | 182,357 | 264,538 | 264,338 | 264,938 |
| Capital Gain | -- | (35,277) | | 272,693 | |
| Partnerships | -- | (118,638) | 58,819 | (240,878) | (405,693) |
| Commissions | -- | 92,792 | 63,788 | 75,000 | 344,175 |
| Consulting fees | -- | -- | -- | -- | 150,000 |
| Condo conversion | -- | -- | -- | 579,394 | -- |
| Other | | | | 59,852 | -- |
| Total | | 524,587 | 872,103 | 1,223,974 | 511,627 |
| Deductions | | | | | |
| Bad debts | -- | -- | -- | -- | 799,552 |
| Interest | -- | 176,936 | 477,517 | 372,691 | 1,160,279 |
| Depreciation | -- | 442,276 | 315,911 | 225,651 | 161,179 |
| Commissions | | | | | |
| Consulting | -- | -- | -- | 15,000 | 600 |
| Legal & profess. | -- | -- | 5,796 | 15,297 | 2,689 |
| Other | -- | 2,541 | 252 | 2,342 | 14,192 |
| Total | -- | 621,753 | 799,476 | 630,981 | 2,138,491 |
| Net Income | -- | (97,166) | 72,627 | 592,993 | (1,626,864) |
| NOL | -- | -- | (209,008) | (166,190) | -- |
| Special ded. | -- | (112,776) | (29,809) | (26,157) | (66,950) |
| Taxable Income | -- | (209,942) | (166,190) | 400,646 | (1,693,814) |
| **Holding Co.** | | | | | |
| Assets | -- | -- | -- | -- | -- |
| Cash | 27,199 | 3,012 | (14,850) | 31,613 | (590,353) |
| Dividends receiv. | -- | 77,847 | -- | -- | -- |
| Mortgage Loan | -- | 94,479 | 14,479 | -- | -- |
| Loans | | | | | |
| Stockholders | 161,500 | 197,638 | 40,316 | -- | -- |
| Subsidiaries | | | | | |
| Others | 2,371,000 | 5,325,153 | 12,188,227 | 15,378,662 | 4,228,168 |

| | 8/31/77 | 8/31/78 | 8/31/79 | 8/31/80 | 8/31/81 |
|---|---|---|---|---|---|
| Securities | | | | | |
| Marketable | $263,887 | $2,177,889 | $1,299,799 | $2,076,472 | $235,609 |
| Nonmarketable | 34,956 | 99,888 | 207,139 | 511,042 | 455,828 |
| Invest. sub. | 50,000 | 100,000 | 178,849 | 180,849 | 194,447 |
| Invest. pship. | 70,890 | 82,406 | 350,033 | 42,755 | 263,305 |
| Deprec. assets | -- | 1,547,966 | 1,547,966 | 1,547,966 | 1,547,966 |
| Less acc. dep. | -- | (442,276) | (758,187) | (983,838) | (1,145,017) |
| Land | -- | -- | -- | 5,000 | 5,000 |
| Other | 9,899 | 3,039 | 2,999 | 4,103 | 3,170 |
| Total | 2,989,331 | 9,267,041 | 15,056,770 | 18,794,624 | 5,198,123 |
| Liabilities | | | | | |
| Loans/notes | | | | | |
| Short-term | 550,000 | 833,758 | 1,142,616 | 579,246 | 2,546,566 |
| Long-term | 2,269,000 | 6,743,486 | 13,150,752 | 16,528,988 | 1,352,085 |
| Stockholder | 45,000 | 138,000 | -- | 126,431 | 334,983 |
| Subscription | -- | -- | 45,000 | 45,000 | 53,000 |
| Due broker | -- | 1,068,091 | 363,498 | 567,487 | 651,595 |
| Other | 86,314 | 131,946 | -- | -- | 969 |
| Total | 2,950,314 | 8,915,281 | 14,701,866 | 17,847,152 | 4,939,198 |
| Net assets | 39,017 | 351,760 | 354,904 | 947,472 | 258,925 |
| Capital stock | | | | | |
| Preferred | 275 | 50,778 | 50,778 | 50,778 | 1,550,778 |
| Common | 2 | 23 | 23 | 23 | 23 |
| Capital surplus | 49,723 | 407,086 | 407,086 | 407,086 | 407,086 |
| Retained earn. | (10,983) | (106,127) | (102,983) | 489,585 | (1,698,962) |
| HELO | | | | | |
| Assets | | | | | |
| Cash | -- | -- | 231 | 4,294 | (879,704) |
| Pooled funds | -- | -- | -- | 718 | -- |
| Loans receiv. | -- | -- | -- | -- | -- |
| Others | -- | -- | -- | 2,871,082 | 4,691,912 |
| Other | -- | 500 | 151 | 120 | 348 |
| Total | | 500 | 382 | 2,876,214 | 3,812,556 |
| Liabilities | | | | | |
| Payables | -- | -- | -- | -- | -- |
| Short-term | -- | -- | -- | 322,987 | 849,680 |
| Long-term | -- | -- | -- | 1,327,100 | 3,127,200 |
| Shareholder | -- | -- | -- | 1,255,600 | 10,557 |
| Total | -- | -- | -- | 2,905,687 | 3,987,437 |
| Net assets | -- | 500 | 382 | (29,473) | (174,881) |

|                    | 8/31/77       | 8/31/78       | 8/31/79       | 8/31/80       | 8/31/81       |
|--------------------|---------------|---------------|---------------|---------------|---------------|
| Capital stock      |               |               |               |               |               |
| Preferred          | --            | --            | --            | --            | --            |
| Common             | --            | 500           | 500           | 500           | 500           |
| Capital surplus    | --            | --            | --            | --            | --            |
| Retained earn.     | --            | --            | (118)         | (29,973)      | (175,381)     |

|                    | 8/31/83       | 8/31/84       | 8/31/85       | 8/31/86       | 8/31/87       |
|--------------------|---------------|---------------|---------------|---------------|---------------|
| Income(loss)       |               |               |               |               |               |
| Consolidated       |               |               |               |               |               |
| Income             | --            | 2,747,847     | 5,453,080     | 2,103,200     | 607,736       |
| Deductions         | --            | (3,982,819)   | (4,028,682)   | (1,824,013)   | (1,118,480)   |
| Net                | --            | (1,234,972)   | 1,424,398     | 279,187       | (510,744)     |
| NOL & special      | --            | (6,317,893)   | (7,355,261)   | (5,932,002)   | (5,655,428)   |
| Taxable            | (6,316,713)   | (7,552,865)   | (5,930,863)   | (5,652,815)   | (6,166,172)   |
| Active             |               |               |               |               |               |
| Income             | --            | (22,311)      | --            | --            | --            |
| Deductions         | --            | (71,467)      | --            | --            | --            |
| Net                | --            | (93,778)      | --            | --            | --            |
| NOL                | --            | (1,648,466)   | --            | --            | --            |
| Taxable            | (1,648,466)   | (1,742,244)   | --            | --            | --            |
| Citra              |               |               |               |               |               |
| Income             | --            | 60            | --            | --            | --            |
| Deductions         | --            | (699)         | --            | --            | --            |
| Net                | --            | (639)         | --            | --            | --            |
| NOL                | --            | --            | --            | --            | --            |
| Taxable            | (639)         | (639)         | --            | --            | --            |
| Columbus Projects  |               |               |               |               |               |
| Income             | --            | (41,684)      | --            | --            | --            |
| Deductions         | --            | (169)         | --            | --            | --            |
| Net                | --            | (41,853)      | --            | --            | --            |
| NOL                | --            | (70,273)      | --            | --            | --            |
| Taxable            | (70,273)      | (112,126)     | --            | --            | --            |
| HELO               |               |               |               |               |               |
| Income             | --            | 136           | --            | --            | --            |
| Deductions         | --            | (30)          | --            | --            | --            |
| Net                | --            | 106           | --            | --            | --            |
| NOL                | --            | (198,135)     | --            | --            | --            |
| Taxable            | (198,135)     | (198,029)     | --            | --            | --            |

| | 8/31/83 | 8/31/84 | 8/31/85 | 8/31/86 | 8/31/87 |
|---|---|---|---|---|---|
| **LBG Properties** | | | | | |
| Income | -- | 257,663 | 219,000 | 382,823 | 300,000 |
| Deductions | -- | (277,218) | (219,062) | (461,384) | (300,067) |
| Net | -- | (19,555) | (62) | (78,561) | (67) |
| NOL | -- | (273,136) | (292,691) | (292,753) | (371,314) |
| Taxable | (273,136) | (292,691) | (292,753) | (371,314) | (371,381) |
| **Nominee** | | | | | |
| Income | -- | -- | 52 | -- | -- |
| Deductions | -- | (618) | (290) | -- | (80) |
| Net | -- | (618) | (238) | -- | (80) |
| NOL | -- | (512) | (1,130) | -- | (1,371) |
| Taxable | (512) | (1,130) | (1,368) | -- | (1,451) |
| **Oil Investments** | | | | | |
| Income | -- | (81,457) | 8,088 | (121,884) | 11,981 |
| Deductions | -- | (430) | (11,623) | (3,689) | (291) |
| Net | -- | (81,887) | (3,535) | (125,573) | 11,690 |
| NOL | -- | (1,652,325) | (1,734,212) | (1,737,747) | (1,863,320) |
| Taxable | (1,652,325) | (1,734,212) | (1,737,747) | (1,863,320) | (1,851,630) |
| **PPPD, Inc.** | | | | | |
| Income | -- | -- | -- | -- | -- |
| Deductions | -- | (375) | -- | -- | -- |
| Net | -- | (375) | -- | -- | -- |
| NOL | -- | (292) | -- | -- | -- |
| Taxable | (292) | (667) | -- | -- | -- |
| **PPPI, Inc.** | | | | | |
| Income | -- | -- | -- | -- | -- |
| Deductions | -- | (365) | -- | -- | -- |
| Net | -- | (365) | -- | -- | -- |
| NOL | -- | (283) | -- | -- | -- |
| Taxable | (283) | (648) | -- | -- | -- |
| **Tanglewood** | | | | | |
| Income | -- | 836,977 | 313,280 | 290,446 | 196,544 |
| Deductions | -- | (763,046) | (322,830) | (462,098) | (184,525) |
| Net | -- | 73,931 | (9,550) | (171,652) | 12,019 |
| NOL | -- | (260,287) | (186,356) | (195,906) | (367,558) |
| Taxable | (260,287) | (186,356) | (195,906) | (367,558) | (355,539) |

| | 8/31/83 | 8/31/84 | 8/31/85 | 8/31/86 | 8/31/87 |
|---|---|---|---|---|---|
| **Twilight Prop.** | | | | | |
| Income | -- | 1,336,393 | 3,531,431 | 45,893 | -- |
| Deductions | -- | (2,334,351) | (2,537,970) | (260,027) | -- |
| Net | -- | (997,958) | 993,461 | (214,134) | -- |
| NOL | -- | (2,316,873) | (3,314,831) | (2,321,370) | (2,535,504) |
| Taxable | (2,316,873) | (3,314,831) | (2,321,370) | (2,535,504) | (2,535,504) |
| **Zion** | | | | | |
| Income | -- | (93,233) | (262,786) | (315,749) | (84,538) |
| Deductions | -- | (396) | (354) | (1,120) | (120) |
| Net | -- | (93,629) | (263,140) | (316,869) | (84,658) |
| NOL | -- | (216,308) | (309,937) | (573,077) | (889,946) |
| Taxable | (216,308) | (309,937) | (573,077) | (889,946) | (974,604) |
| **Holding Co.** | | | | | |
| Income | | | | | |
| Dividends | -- | 1,388 | 500 | 2,949 | 3,266 |
| Interest | -- | 60,937 | 75,996 | 175,522 | 145,483 |
| Gross rents | -- | 262,138 | 262,138 | 129,200 | 18,400 |
| Capital gain | -- | 487,794 | 821,186 | (229,447) | (32,398) |
| Partnerships | -- | (343,048) | (352,711) | (219,551) | (630,754) |
| Commissions | -- | 14,341 | 266,650 | 1,100,000 | -- |
| Other fees | -- | 69,496 | 414,036 | 441,723 | 588,796 |
| Condo conversion | -- | -- | -- | | -- |
| Other | -- | 2,257 | 156,220 | -- | (498) |
| Total | -- | 555,303 | 1,644,015 | 1,400,396 | 92,295 |
| Deductions | | | | | |
| Bad debts | -- | -- | 30,000 | 45,000 | -- |
| Interest | -- | 68,129 | 146,076 | 141,905 | -- |
| Depreciation | -- | 135,847 | 8,511 | 21,167 | -- |
| Commissions/fees | -- | 875 | 600,000 | 175,000 | -- |
| Legal & profess. | -- | 302,900 | 116,492 | 222,678 | -- |
| Other | -- | 25,904 | 35,474 | 29,945 | -- |
| Total | -- | 533,655 | 936,553 | 635,695 | 633,397 |
| Net Income | -- | 21,648 | 707,462 | 764,701 | (541,102) |

|  | 8/31/83 | 8/31/84 | 8/31/85 | 8/31/86 | 8/31/87 |
|---|---|---|---|---|---|
| NOL | -- | -- | -- | (1,149,287) | (387,093) |
| Active | -- | -- | (1,742,244) | -- | -- |
| Citra | -- | -- | (639) | -- | -- |
| Columbus Proj. | -- | -- | (112,126) | -- | -- |
| PPPD | -- | -- | (667) | -- | -- |
| PPPI | -- | -- | (648) | -- | -- |
| Special ded. | -- | (1,180) | (425) | (2,507) | (2,613) |
| Taxable income | -- | (20,468) | (1,149,287) | (387,093) | (930,808) |
| Holding Co. |  |  |  |  |  |
| Assets |  |  |  |  |  |
| Cash | 103,880 | 215,579 | 190,832 | 129,934 | (396,758) |
| Pooled funds | 18,882 | 119,338 | 677,730 | 1,127,458 | 1,048,386 |
| CD | -- | -- | -- | 1,060,000 | 970,500 |
| Loans | -- | -- | -- | -- | -- |
| Stockholders | 111,301 | 19,785 | 19,785 | 975,000 | 700,000 |
| Others | 5,219,398 | 4,023,564 | 4,476,787 | 2,218,852 | 4,490,268 |
| Securities |  |  |  |  |  |
| Marketable | 788,807 | 1,351,225 | 1,712,093 | 358,991 | 198,991 |
| Nonmarketable | 336,451 | 276,075 | 227,735 | 234,402 | 235,903 |
| Invest. sub. | 223,932 | 36,060 | 36,060 | 25,060 | 36,060 |
| Invest. pship. | (1,509,414) | (3,628,091) | (4,429,619) | (4,191,984) | (4,608,659) |
| Condominiums | -- | -- | -- | 250,484 | 250,484 |
| Deprec. assets | 1,549,027 | 1,557,732 | 1,844,476 | 1,844,476 | 251,051 |
| Less acc. dep. | (1,413,981) | (1,549,828) | (1,558,338) | (1,579,505) | (45,753) |
| Other | 2,910 | 2,910 | 9,743 | 11,603 | 133,723 |
| Total | 5,431,193 | 2,424,349 | 3,207,284 | 2,464,771 | 3,264,196 |
| Liabilities |  |  |  |  |  |
| Loans/notes | -- | -- | -- | -- | -- |
| Short-term | 2,046,772 | 1,404,904 | 1,484,337 | -- | -- |
| Long-term | 923,529 | 991,950 | 1,045,743 | -- | -- |
| Stockholder | 425,528 | 33,620 | -- | -- | -- |
| Deferred income | 26,238 | 11,554 | 11,554 | -- | -- |
| Other | 49,750 | 4,750 | 4,750 | -- | -- |
| Total | 3,471,817 | 2,446,778 | 2,546,384 | -- | -- |
| Net assets | 1,959,376 | (22,429) | 660,900 | -- | -- |
| Capital stock |  |  |  |  |  |
| Preferred | 50,780 | 50,780 | -- | -- | -- |
| Common | 23 | 23 | -- | -- | -- |
| Capital surplus | 1,907,085 | 1,907,085 | -- | -- | -- |
| Retained earn. | 1,488 | (1,980,317) | -- | -- | -- |

| | 8/31/83 | 8/31/84 | 8/31/85 | 8/31/86 | 8/31/87 |
|---|---|---|---|---|---|
| **HELO** | | | | | |
| Assets | -- | -- | -- | -- | -- |
|   Cash | 31 | 322 | -- | -- | -- |
|   Pooled funds | -- | 4,636 | -- | -- | -- |
|   Loans Receiv. | 2,331,326 | 1,320,059 | -- | -- | -- |
|   Other assets | 27 | -- | -- | -- | -- |
|     Total | 2,331,384 | 1,325,017 | -- | -- | -- |
| Liabilities | | | | | |
|  Payables | | | | | |
|   Short-term | 2,518,589 | -- | -- | -- | -- |
|   Long-term | 10,557 | 1,522,700 | -- | -- | -- |
|    Total | 2,529,146 | 1,522,700 | -- | -- | -- |
| Net assets | (197,762) | (197,683) | -- | -- | -- |
| Capital stock | | | | | |
|  Preferred | -- | -- | -- | -- | -- |
|  Common | 500 | 500 | -- | -- | -- |
| Capital surplus | | | | | |
| Retained earn. | (198,262) | (198,183) | -- | -- | -- |
| **Zion** | | | | | |
| Assets | | | | | |
|   Cash | (84) | 7 | 55 | 9,719 | 9,094 |
|   Pooled funds | -- | 2,818 | 7,100 | -- | -- |
|   Marketable sec. | -- | 127,280 | 127,280 | 65,695 | -- |
|   Invest. pship. | 840,362 | 618,059 | 344,295 | 85,912 | 57,306 |
|   Other | 5,345 | 2,524 | -- | -- | -- |
|    Total | 845,623 | 750,688 | 478,730 | 161,326 | 66,400 |
| Liabilities | | | | | |
|  Loans/notes | | | | | |
|   Short-term | 9,264 | 3,014 | -- | -- | -- |
|   Long-term | 104,694 | 104,694 | 99,871 | -- | -- |
|   Stockholder | 629,650 | 636,000 | 636,000 | 636,000 | -- |
|   Other | -- | -- | -- | 99,336 | -- |
|    Total | 743,608 | 743,708 | 735,871 | 735,336 | 725,801 |
| Net assets | 102,015 | 6,980 | (257,141) | (574,010) | (659,401) |
| Capital stock | | | | | |
|  Preferred | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
|  Common | 100 | 100 | 100 | 100 | 100 |
| Capital surplus | 133,250 | 133,250 | 133,250 | 133,250 | 133,250 |
| Retained earn. | (39,335) | (134,370) | (398,491) | (715,360) | (800,751) |

J.   HELO 1979 Through 1983

Holding Co.'s consolidated returns reflect the following income (all interest), deductions, net assets, and stockholder equity with respect to HELO:

|  | 08/78 | 08/79 | 08/80 | 08/81 | 08/83 | 08/84 |
|---|---|---|---|---|---|---|
| Interest |  | $-0- | $1,485 | $4,597 | N/A | $136 |
| Deductions |  | (115) | (31,309) | (149,974) |  | (30) |
| Total |  | (115) | (29,824) | (145,377) |  | 106 |
| NOL |  |  | (115) | (29,939) |  | (198,135) |
| Taxable |  | (115) | (29,939) | (175,316) |  | (198,029) |
| Assets |  |  |  |  |  |  |
| Cash | $500 | 131 | 4,294 | (879,704) | $31 | 322 |
| Receivables |  |  | 2,871,082 | 4,691,912 | 2,331,326 | 1,320,059 |
| Money market |  |  | 718 | 259 |  |  |
| Pooled funds |  |  |  |  |  | 4,636 |
| Intangibles |  | 151 | 120 | 89 | 27 |  |
| Total | 500 | 382 | 2,876,214 | 3,812,556 | 2,331,384 | 1,325,017 |
| Liabilities |  |  |  |  |  |  |
| Loans |  |  |  |  |  |  |
| Short-term |  |  | 322,987 | 849,680 | 2,518,589 | 1,522,700 |
| Shareholder |  |  | 1,255,600 | 10,557 |  |  |
| Long-term |  |  | 1,327,100 | 3,127,200 | 10,557 |  |
| Total | -0- | -0- | 2,905,687 | 3,987,437 | 2,529,146 | 1,522,700 |
| Net assets | 500 | 382 | (29,473) | (174,881) | (197,762) | (197,683) |
| Capital stock | 500 | 500 | 500 | 500 | 500 | 500 |
| Retained earnings |  | (118) | (29,973) | (175,381) | (198,262) | (198,183) |

IV.  Flow of Money

A.   Payments to IRA and Subsidiaries: The Prudential Transactions

1.  Overview

The payments related to the Prudential transactions paid by the Five to IRA and its subsidiaries during the years 1977 through 1989, were as follows:

| Year | Hyatt[1] | Schaffel | Frey | Schnitzer PMS | Essex | Total |
|------|------|------|------|------|------|------|
| 1977 | $38,394 | | | | | $38,394 |
| 1978 | 42,517 | | | | | 42,517 |
| 1979 | 119,719 | $100,000 | | $303,088 | | 522,807 |
| 1980 | | 244,920 | $127,372 | 380,337 | | 752,629 |
| 1981 | 90,070 | 361,525 | 105,764 | 534,696 | | 1,092,055 |
| 1982 | 172,702 | 447,450 | 538,781 | 361,692 | $86,212 | 1,606,837 |
| 1983 | 172,090 | 30,981 | 110,125 | 361,692 | 78,376 | 753,264 |
| 1984 | 186,092 | | 103,500 | 361,692 | 133,238 | 784,522 |
| 1985 | 206,790 | | 128,763 | 361,692 | 120,175 | 817,420 |
| 1986 | 231,263 | | | 361,692 | 80,466 | 673,421 |
| 1987 | 229,449 | | | 361,692 | 120,698 | 711,839 |
| 1988 | 197,348 | | | 361,692 | 117,563 | 676,603 |
| 1989 | 52,777 | | | 840,423 | 51,727 | 944,927 |
| Total | 1,739,211 | 1,184,876 | 1,114,305 | 4,590,388 | 788,455 | $9,417,235 |

[1]Net Weaver's 30%.

Prior to 1984, all payments related to the Prudential transactions were paid to IRA or one of its subsidiaries.  By early 1982, Ballard and Lisle had left Prudential.  During 1982 Carlco, TMT, and BWK, Inc. were formed.  In 1983 the three corporations became part of IRA's consolidated group, KWJ Corp. was liquidated, and the funds accumulated by Zeus were distributed to IRA.  In 1984, IRA distributed the funds that had been accumulated from the Prudential transactions in the ratio of 45 percent to Carlco, 45 percent to TMT, and 10 percent to BWK, Inc.  From 1984 through 1989, most payments related to the

Prudential transactions were paid to or distributed to Carlco, TMT, and BWK, Inc.

2.  <u>Flow of the Funds 1977 Through 1983</u>

The following diagram shows the money paid by the Five to IRA, Zeus, and KWJ Corp. from 1977 through 1983 with respect to the Prudential transactions:

<u>1977-1983</u>



Prior to 1984, all payments by the Five in connection with the Prudential transactions were reported on the consolidated returns of IRA.  No tax was paid on this income because, during the years 1978 through 1983, IRA reported substantial net operating losses.  IRA reported the following consolidated total income, taxable income, and net operating losses for the years 1978 through 1983:

| Year | Total Income | Taxable Income | Net Operating Losses |
|------|-------------|----------------|----------------------|
| 1978 | $1,004,475 | ($18,673) | ($271,394) |
| 1979 | 1,944,332 | 404,771 | (18,673) |
| 1980 | 3,557,198 | 65,094 | -- |
| 1981 | 5,158,583 | (615,852) | -- |
| 1982 | 4,536,122 | (121,501) | (143,987) |
| 1983 | 3,849,742 | (435,535) | (121,501) |

a.   Flow of Money From KWJ Corp. to IRA: 1978 Through 1983

IRA acquired all of KWJ Corp.'s stock from Weaver in 1979. At the time of the purchase, KWJ Corp. had net assets of $115,084.  IRA's consolidated returns from 1979 through 1983 reported the following income, net assets, and stockholder equity with respect to KWJ Corp.:

|  | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | Total |
|---|---|---|---|---|---|---|---|
| Income |  |  |  |  |  |  |  |
| Commission | -- | $171,027 | -- | $128,671 | $246,717 | $245,843 | $792,258 |
| Interest | -- | 703 | -- | 2,512 | 6,237 | 4,356 | 13,808 |
| Total | -- | 171,730 | -- | 131,183 | 252,954 | 250,199 | 806,066 |
| Deductions | -- | -- | -- | -- | -- | -- | -- |
| Commission | -- | 51,308 | -- | 38,601 | 74,015 | 73,753 | 237,677 |
| Consulting | -- | -- | -- | -- | 21,000 | 36,000 | 57,000 |
| Other | -- | 776 | $2,620 | 1,464 | 2,097 | 663 | 7,620 |
| Total | -- | 52,084 | 2,620 | 40,065 | 97,112 | 110,416 | 302,297 |
| Net Income | -- | 119,646 | (2,620) | 91,118 | 155,842 | 139,783 | 503,769 |
|  |  |  |  |  |  |  |  |
| Assets | $40,626 | -- | -- | -- | -- | -- | -- |
| Cash | 108,521 | 3,095 | 503 | 1,828 | 79,950 | -- | -- |
| Accrued income | -- | 171,000 | -- | -- | -- | -- | -- |
| Pool funds | -- | -- | -- | -- | 76,720 | -- | -- |
| Loans |  |  |  |  |  |  |  |
| Stockholders(IRA) |  | -- | 171,000 | 262,400 | 2,400 | -- | -- |
| Others | -- | 66,241 | 66,241 | -- | -- | -- | -- |
| Total | 149,147 | $240,364 | 237,744 | 264,228 | 159,070 | -- | -- |
| Liabilities | 34,063 | 65,634 | 65,634 | 1,000 |  | -- | -- |
| Net assets | 115,084 | 174,730 | 172,110 | 263,228 | 159,070 | -- | -- |
|  | -- | -- | -- | -- | -- | -- | -- |
| Capital stock | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | -- | -- |
| Capital surplus | -- | -- | -- | -- | -- | -- | -- |
| Retained earnings | 114,084 | 173,730 | 171,110 | 262,228 | 158,070 | 298,853 | -- |
|  |  |  |  |  |  |  |  |
| Distributions | -- | 60,000 | -- | -- | 260,000 | – | – |

KWJ Corp. paid Weaver a total of $237,677 as commissions from 1979 through 1983.  KWJ Corp. paid $21,000 as consulting fees to unidentified payees during 1982.  KWJ Corp. paid three of Ballard's and Lisle's children (Melinda Ballard, Thomas Lisle, and Amy Albrecht) $1,000 each month during 1983 and deducted the $36,000 as consulting expenses for 1983.  KWJ Corp. had a total of $7,620 in other expenses from 1979 through 1983.

In 1979, KWJ Corp. distributed $60,000 to IRA.  During 1981 KWJ Corp. distributed $262,400 to IRA that was treated as a loan from KWJ Corp. to IRA.  In 1982, an offset of $260,000 of the loan was treated as a dividend distribution to IRA.  In 1983, IRA repaid the remaining $2,400 loan.  During 1983, KWJ Corp. was liquidated, and $298,853 was distributed to IRA.

From 1979 through 1983, KWJ Corp. had available or received a total of $921,150 from the following sources:



KWJ Corp. distributed the $921,150 as follows:



Commissions (Weaver) ← $237,677

Expenses ← $7,620

Consulting (Unidentified) ← $21,000

KWJ Corp. $921,150

$60,000 1979 dividend
$260,000 1982 dividend
$298,853 liquidation → IRA

$36,000 → Consulting (Ballard/Lisle children)

b.    Flow of Money From Zeus: 1979 Through 1983

In 1979, IRA organized Zeus and acquired all the common stock for $50,000.  The $50,000 paid by IRA for the stock was recorded on the books as $100 for the common stock and $49,900 as paid in capital.  IRA also lent Zeus $50,000.  In 1979, Zeus purchased a 6.14-percent interest in Village of Kings Creek (Frey's first condominium conversion project) for $100,000.

The Frey corporation paid the following amounts to Zeus during the years 1980 through 1983:

| Year | Payment |
|------|---------|
| 1980 | $127,372 |
| 1981 | 105,764 |
| 1982 | 538,781 |
| 1983 | 110,125 |
| Total | $882,042 |

All of Zeus' income from its incorporation through 1983 is attributable to the payments from the Frey corporation, interest income, and partnerships (including Frey condominium partnership, the Village of Kings Creek, and the Greens).  IRA's consolidated returns for 1979 through 1983 reported the following income, net assets, and stockholder equity with respect to Zeus:

| | 1979 | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|---|
| **Income** | | | | | |
| Interest | -- | -- | -- | $64,688 | $55,104 |
| Commission | -- | $127,372 | $64,574 | 538,781 | 110,125 |
| Partnership | -- | -- | 2,382 | (150,907) | (15,049) |
| Other fees | -- | -- | 32,567 | -- | -- |
| Misc. | -- | -- | 8,625 | 12 | -- |
| Total income | -- | 127,372 | 108,148 | 452,574 | 150,180 |
| Deductions | -- | 9,103 | 261 | 3,883 | 1,052 |
| Taxable | -- | 118,269 | 107,887 | 448,691 | 149,128 |
| Nontaxable | -- | -- | -- | -- | -- |
| Partnership | -- | 6,828 | -- | (27,061) | (753) |
| | | | | | |
| **Assets** | | | | | |
| Cash | -- | 393 | 27,990 | 284 | 7,832 |
| Loan receiv. | -- | -- | 64,000 | 64,000 | 866,000 |
| Securities | -- | -- | -- | 685,000 | -- |
| Money market | -- | -- | 69,002 | -- | -- |
| Partnerships | $100,000 | 234,200 | 172,896 | (5,073) | (20,875) |
| Pooled funds | -- | -- | -- | 11,339 | -- |
| Intangibles | -- | 128 | 96 | 64 | 32 |
| Total | 100,000 | 234,721 | 333,984 | 755,614 | 852,989 |
| Liabilities | 50,000 | 59,624 | 51,000 | 51,000 | -- |
| Net assets | 50,000 | 175,097 | 282,984 | 704,614 | 852,989 |
| | | | | | |
| Capital stock | 100 | 100 | 100 | 100 | 100 |
| Capital surplus | 49,900 | 49,900 | 49,900 | 49,900 | 49,900 |
| Retained earnings | -- | 125,097 | 232,984 | 654,614 | 802,989 |

The $50,000 liability in 1979 and $51,000 of the liabilities reflected on the balance sheet from 1980 through 1982 represented loans outstanding from IRA to Zeus. The $64,000 loan receivable is shown on Zeus' general ledger for 1984 as owed to Zeus by Holding Co.'s subsidiary HELO.

At the close of 1982, Zeus had liquid assets of $696,623 ($284 cash, $685,000 money market funds, and $11,339 in pooled funds). During 1983 Zeus received cash income of $165,229 ($55,104 interest and $110,125 commissions) and had cash

expenditures of $1,020 ($1,052 deductions less $32 for capitalized organizational expenses).  Thus, during 1983, Zeus had $860,832 in liquid assets ($696,623 + $165,229 - $1,020).

On March 25, 1983, Zeus repaid the $51,000 loan outstanding from IRA. On October 21, 1983, Zeus transferred $774,000 to IRA in exchange for a $774,000 receivable from Holding Co.  During 1983, Zeus transferred $28,000 to IRA in exchange for $28,000 of receivables from Holding Co.[26]  Thus, during 1983, Zeus transferred a total of $853,000 in cash to IRA in repayment of a loan and in exchange for Holding Co. receivables.

IRA's 1983 consolidated return reported that Zeus' assets at the end of the year included cash of $7,832, loans receivable of $866,000, partnership interests with a negative value of $20,875, and other assets (capitalized organizational expenses) of $32. From 1979 through 1983, Zeus apparently invested a net of $163,685 in partnerships.[27]

_____

[26]    On December 5, 1983, Zeus transferred $13,000 to IRA in exchange for a $13,000 receivable from Holding Co.  IRA's general ledger shows that in 1983 Holding Co.'s subsidiary Zion acquired from IRA a $15,000 receivable due from Holding Co. for $15,000. The 1984 general ledger shows that Zeus' loans receivable of $866,000 included $802,000 owed by Holding Co. and $64,000 owed by HELO.  The record does not disclose how Zeus acquired the remaining receivable of $15,000 from Holding Co.

[27]    Based on IRA's consolidated returns, Zeus contributed to unidentified partnerships $100,000 in 1979 and $127,372 in 1980 and received a return of capital of $63,696 in 1981 and $1 in 1982 (probably due to rounding of numbers) computed as follows:

(continued...)

From 1979 through 1983, Zeus received a total of $1,111,470

from the following sources:

---

(...continued)

| | | |
|---|---|---|
| 1979 Initial contribution | | $100,000 |
| Plus 1980 nontaxable income | | 6,828 |
| Total adjustments and contributions | | 106,828 |
| | | |
| Plus 1980 contributions | | |
| value end 1980 | 234,200 | |
| less prior adjustments and contributions | (106,828) | |
| 1980 contributions | 127,372 | 127,372 |
| Value end 1980 | | 234,200 |
| | | |
| Value end 1980 | | 234,200 |
| plus 1980 taxable income | | 2,382 |
| total adjustments and contributions | | 236,582 |
| | | |
| Less return of capital | | |
| value end 1981 | 172,896 | |
| less prior adjustments and contributions | (236,582) | |
| 1981 return of capital | (63,686) | (63,686) |
| Value end 1981 | | 172,896 |
| | | |
| Value end 1981 | | 172,896 |
| Less 1982 taxable loss | | (150,907) |
| Less 1982 nontaxable loss | | (27,061) |
| total adjustment and contributions | | (5,072) |
| | | |
| Less return of capital | | |
| value end 1982 | (5,073) | |
| less prior adjustments and contributions | 5,072 | |
| 1982 return of capital | (1) | (1) |
| Value end 1982 | | (5,073) |
| | | |
| Value end 1982 | | (5,073) |
| Less 1983 taxable loss | | (15,049) |
| Less 1983 nontaxable loss | | (753) |
| Value end 1983 | | (20,875) |



Zeus distributed the $1,111,470 of funds as follows:



DISTRIBUTION OF $1,111,470

### c. Payments From Schnitzer-PMS, Essex, and Schaffel 1979 Through 1983

From 1979 through 1983, Essex paid IRA a total of $164,587, PMS paid IRA a total of $1,941,505 in principal and interest on the repurchase of the PMS stock, and Schaffel paid $1,184,876 to IRA representing 50 percent of the broker's fees he received from Prudential transactions.[28]

### d. Funds Accumulated in IRA at Close of 1983

At the close of 1983, IRA had accumulated $4,771,445 from payments made by the Five related to the Prudential transactions as shown in the following diagram:

---

[28] Schaffel also paid $312,750 to IRA in 1983 for fees related to Traveler's transactions.



IRA's balance sheet showed the following assets,

liabilities, and stockholder equity at the close of 1983:

| Assets | |
|---|---:|
| Cash | $110,281 |
| Notes/accounts receivable | 2,070,128 |
| Loans receivable | 1,592,983 |
| Short-term securities | 3,776,000 |
| Loans to stockholders | 292,260 |
| Investment/partnerships | 1,640,284 |
| Investment/subsidiaries | 83,000 |
| Marketable securities | 564,827 |
| Non-marketable securities | 192,700 |
| Pooled funds | 38,250 |
| Buildings & other depreciable assets | 11,286,020 |
| Less accumulated depreciation | (7,636,902) |
| Deposits | 2,365 |
| Total | 14,012,196 |
| Liabilities | |
| Short-term mtg., notes, bonds | 1,341,617 |
| Long-term mtg., notes, bonds | 11,060,633 |
| Deferred gain | 1,969,973 |
| Total | 14,372,223 |
| Net assets | (360,027) |
| Capital stock | 100 |
| Retained earnings | (360,127) |

3.   <u>1984 Distributions to Carlco, TMT, and BWK, Inc.</u>

In 1984, IRA began distributing cash and other property to Carlco, TMT, and BWK, Inc.  The distributions were made in a ratio of 45/45/10 to Carlco, TMT, and BWK, Inc.

a.   <u>1984 Distributions of Cash From IRA to Carlco, TMT, and BWK, Inc.</u>

During 1984, IRA transferred $4,156,739 to Carlco, TMT, and BWK, Inc.  The $1,870,532 to each of Carlco and TMT and $415,675 to BWK, Inc., was distributed on the dates and in the amounts indicated:

| Date | Carlco | TMT | BWK, Inc. | Total |
|------|--------|-----|-----------|-------|
| 01/04/84 | $540,000 | $540,000 | $120,000 | $1,200,000 |
| 01/10/84 | 90,000 | 90,000 | 20,000 | 200,000 |
| 01/13/84 | 90,000 | 90,000 | 20,000 | 200,000 |
| 01/17/84 | 112,500 | 112,500 | 25,000 | 250,000 |
| 01/24/84 | 225,000 | 225,000 | 50,000 | 500,000 |
| 02/01/84 | 90,000 | 90,000 | 20,000 | 200,000 |
| 02/06/84 | 112,500 | 112,500 | 25,000 | 250,000 |
| 02/07/84 | 90,000 | 90,000 | 20,000 | 200,000 |
| 02/10/84 | 90,000 | 90,000 | 20,000 | 200,000 |
| 02/15/84 | 45,000 | 45,000 | 10,000 | 100,000 |
| 02/22/84 | 36,900 | 36,900 | 8,200 | 82,000 |
| 02/29/84 | 45,000 | 45,000 | 10,000 | 100,000 |
| 03/20/84 | 142,086 | 142,086 | 31,575 | 315,747 |
| 04/12/84 | 40,500 | 40,500 | 9,000 | 90,000 |
| 07/17/84 | 52,200 | 52,200 | 11,600 | 116,000 |
| 07/31/84 | 11,700 | 11,700 | 2,600 | 26,000 |
| 10/10/84 | 16,456 | 16,456 | 3,658 | 36,570 |
| 10/16/84 | 40,690 | 40,690 | 9,042 | 90,422 |
| Total | 1,870,532 | 1,870,532 | 415,675 | 4,156,739 |

b.   1984 Distribution of Essex Partnership Interest to Carlco,
TMT, and BWK, Inc.

For the taxable years 1982 through 1983, Essex made the

following distributions to IRA that were reported by IRA in the

year indicated:

| Payment Date | Year Reported | Amount |
|---|---|---|
| 09/28/82 | 1982 | $47,025 |
| 12/30/82 | 1983 | 39,187 |
| 06/03/83 | 1983 | 26,125 |
| 07/08/83 | 1983 | 26,125 |
| 10/03/83 | 1983 | 26,125 |
| Total | | 164,587 |

IRA also recorded its distributable share of income from

Essex as $89,214 for 1982 and $120,656 for 1983.  IRA recorded

the value of its interest in Essex as follows:

| | |
|---|---|
| 1982 beginning value | -- |
| Plus 1982 share of income | $89,214 |
| Less 11/30/82 payment | (47,025) |
| Investment end of 1982 | 42,189 |
| | |
| 1983 beginning value | 42,189 |
| Plus 1983 share of income | 120,656 |
| Less distributions | |
| 01/06/83 dividend | (39,187) |
| 06/07/83 distribution | (26,125) |
| 07/11/83 distribution | (26,125) |
| 10/15/83 distribution | (26,125) |
| Investment end of 1983 | 45,283 |

During 1984, IRA received the following distributions from

Essex:

| | |
|---|---|
| 01/26/84 Distrib from Essex | $44,413 |
| 05/08/84 Essex | 26,125 |
| 07/06/84 Essex distrib. | 26,125 |
| 10/04/84 Essex | 36,575 |

IRA recorded the receipt of the $44,413 payment received from Essex in January as payables of $19,986 due to each of Carlco and TMT and $4,441 due to BWK, Inc.[29]  On January 30, 1984, IRA issued checks in the appropriate amounts to each of the corporations and recorded the payments as payment of the payables owed to Carlco, TMT, and BWK, Inc.  The remaining $88,825 from Essex was also treated as distributed directly to Carlco, TMT, and BWK, Inc., by reducing the additions to capital attributable to IRA's contributions of cash made to the corporations during the year.

In December 1984, IRA distributed its Essex partnership interest in the ratio of 45 percent each to Carlco and TMT and 10 percent to BWK, Inc.  IRA recorded the distribution of the Essex partnership interest on its books as follows:

| | |
|---|---|
| 1984 beginning value | $45,283 |
| Less distribution of investment as paid in capital | (45,283) |
| Less distributions from Essex | |
| 05/08/84 | (26,125) |
| 07/06/84 | (26,125) |
| 10/04/84 | (36,575) |
| Plus "distb exxex dist as pd in" | 88,825 |
| Investment end of year | -0- |

Carlco, TMT, and BWK, Inc. recorded the receipt of the Essex partnership interest as follows (balance differences are due to rounding):

---

[29]  The difference between total of $44,412 and $44,413 is due to rounding of numbers.

| Item | Carlco | TMT | BWK | Total |
|------|--------|-----|-----|-------|
| Investment in Essex | | | | |
| Beginning year | -0- | -0- | -0- | -0- |
| Essex interest from IRA | $20,377 | $20,377 | $4,528 | $45,282 |
| K-1 from Essex | 60,520 | 60,520 | 13,449 | 134,489 |
| Distribution from Essex | (19,986) | (19,986) | (4,441) | (44,413) |
| 1984 Essex distribution | | | | |
| from IRA | (39,971) | (39,971) | (8,882) | (88,824) |
| End year investment | 20,940 | 20,940 | 4,653 | 46,533 |
| | | | | |
| Paid in Capital | | | | |
| Essex interest from IRA | 20,377 | 20,377 | 4,653 | 45,282 |
| Essex distribution | | | | |
| received from IRA | (39,971) | (39,971) | (8,882) | (88,824) |

c.  Transfer of Sherwood Partnership Interest From IRA to Carlco, TMT, and BWK, Inc.

In 1982, IRA invested $175,000 in a partnership called Sherwood Associates (Sherwood).  IRA held a 50-percent interest in Sherwood and reported an $89,577 loss from Sherwood for 1982. IRA's Sherwood partnership interest was reflected on IRA's books at the end of 1982 as follows:

| | |
|---|---|
| Opening balance | -- |
| Record transactions thru Nov. 1982 | $100 |
| Transfer via Administration Co. client | 124,900 |
| Reclassify loan to investment | 50,000 |
| Adjustment for 1982 loss | (89,577) |
| Account total | 85,423 |

In 1983, IRA invested an additional $150,000 in Sherwood and IRA was allocated a $287,165 loss for the year.  IRA's interest in the Sherwood partnership was reflected on the books at the end of 1983 as follows:

```
Opening balance                          $85,423
Contribution to partnership              150,000
1983 loss                               (287,165)
Account total                            (51,742)
```

On December 31, 1984, IRA transferred its 50-percent

interest in the Sherwood partnership, 45 percent each to Carlco

and TMT and 10 percent to BWK, Inc.  As a result, Carlco and TMT

each received a 22.5-percent interest in the Sherwood partnership

and BWK, Inc., received a 5-percent interest.  IRA reported a

gain of $51,742 (the excess of the $376,742 of total losses

claimed over IRA's total investment of $325,000) on the transfer

of its interest in Sherwood and recorded the transfer on its

books as follows:

```
Investment in Sherwood
 Opening balance                        ($51,742)
 Gain on distribution of Sherwood         51,742
 Account total                                 0

Investment in Carlco
 Rec. gain on dist of Sherw                    1

Investment in TMT
 Rec. gain on dist of Sherw                    1
Investment in BWK, Inc.
 Rec. gain on dist of Sherw                    1

Adjusting Journal Entry 21
 Invest in Sherwood                       51,742
 Invest in Carlco                              1
 Invest in BWK                                 1
 Invest in TMT                                 1
 Gain on sale of Pship                    51,745
```

Carlco, TMT, and BWK, Inc., recorded the contribution of the

Sherwood partnership as follows:

|  | Carlco | TMT | BWK, Inc. |
|---|---|---|---|
| Investment in Sherwood |  |  |  |
| Opening balance | – | – | – |
| Sherwood Associates | $41,400 | $41,400 | $9,200 |
| Rec. int. Sherwood from IRA | 1 | 1 | 1 |
| Rec. K-1 activity | (119,116) | (119,116) | (26,470) |
| Paid-in Capital | (77,715) | (77,715) | (17,269) |
|  |  |  |  |
| Rec. int. Sherwood from IRA | 1 | 1 | 1 |

d.    1984 Distributions to Carlco, TMT, and BWK, Inc. as Reflected on the Books of the Corporations

The transfers of cash to Carlco, TMT, and BWK, Inc., were recorded on the books of the corporations as, respectively, contributions of capital.  The distribution of the Essex partnership interest was recorded as paid-in capital of $20,377 each to Carlco and TMT and $4,528 to BWK, Inc.  The distribution of the Sherwood partnership interest was recorded as paid-in capital of $1 each to Carlco, TMT, and BWK, Inc.  Additionally, a receivable of $148 for the preferred shares of each of Carlco, TMT, and BWK, Inc. was treated as paid-in capital of each corporation. Thus, amounts recorded as additions to capital during 1984 and total paid-in capital at the close of 1984 for each of the corporations were as follows (balance differences are due to rounding):

| Item | Carlco | TMT | BWK, Inc. |
|---|---|---|---|
| Cash | $1,870,535 | $1,870,535 | $415,674 |
| Essex distribution | (39,971) | (39,971) | (8,882) |
| Essex partnership | 20,377 | 20,377 | 4,528 |
| Sherwood partnership | 1 | 1 | 1 |
| Receivable | 148 | 148 | 148 |
| Consent dividend |  | 105,202 |  |
| Total 1984 additions | 1,851,091 | 1,956,294 | 411,470 |
| Paid in capital |  |  |  |
| Beginning year | 7,398 | 7,398 | 7,398 |
| End year | 1,858,489 | 1,963,691 | 418,868 |

4.   Flow of Payments by the Five 1985 Through 1989

After IRA transferred money from the Five to Carlco, TMT, and BWK in 1984, the structure in which payments were received from the Five changed.  The payments from Essex and Hyatt (through KWJ Partnership) were no longer reported as IRA's income.  Carlco, TMT, and BWK became partners of the Essex partnership and formed the KWJ Co. partnership.  Hyatt payments were reported as income of KWJ Co. partnership.  Accordingly, the payments from the Essex and KWJ Co. partnerships were reported on the respective returns of Carlco, TMT, and BWK at that time, and Carlco, TMT, and BWK were no longer members of the consolidated group of IRA for tax purposes.

a.   Zeus 1984 Through 1988

IRA's consolidated returns for 1984 through 1988 reported the following income, net assets, and stockholder equity with respect to Zeus:

|              | 1984        | 1985        | 1986        | 1987        | 1988        |
|--------------|-------------|-------------|-------------|-------------|-------------|
| Income       |             |             |             |             |             |
| Interest     | $4,191      | $13,639     | $6,586      | $684        | $3,090      |
| Commission   | 103,500     | 128,763     | --          | --          | --          |
| Partnership  | (203,947)   | (198,310)   | --          | (31,204)    | (166,802)   |
| Total Income | (96,256)    | (55,908)    | 6,586       | (30,520)    | (163,712)   |
| Deductions   | (217)       | (727)       | (4,600)     | (105)       | (275)       |
| Net income   | (96,473)    | (56,635)    | 1,986       | (30,625)    | (163,987)   |
| NOL          | --          | (96,473)    | (153,108)   | (151,122)   | (181,747)   |
| Taxable      | (96,473)    | (153,108)   | (151,122)   | (181,747)   | (345,734)   |
|              |             |             |             |             |             |
| Assets       |             |             |             |             |             |
| Cash         | 219         | 855         | 3,971       | 3,866       | 3,591       |
| Loan rec.    | 871,028     | 871,028     | 871,028     | 871,028     | 871,028     |
| Partnerships | (224,822)   | (424,040)   | (424,040)   | (454,560)   | (618,272)   |
| Pooled funds | 110,091     | 251,130     | --          | --          | --          |
| Non-mar. sec | --          | --          | 250,000     | 250,000     | 250,000     |
| Total        | 756,516     | 698,973     | 700,959     | 670,334     | 506,347     |
| Liabilities  | --          | --          | --          | --          | --          |
| Net assets   | 756,516     | 698,973     | 700,959     | 670,334     | 506,347     |
|              |             |             |             |             |             |
| Capital stock | 100        | 100         | 100         | 100         | 100         |
| Capital      | 49,900      | 49,900      | 49,900      | 49,900      | 49,900      |
| surplus      | 706,516     | 648,973     | 650,959     | 620,334     | 456,347     |
| Retained earn. |           |             |             |             |             |

The Frey corporation paid Zeus $103,500 in 1984 and $128,763 in 1985 (totaling $232,263). During 1984, Zeus transferred $5,028 to Holding Co. The transfer increased the Holding Co. receivable from $802,000 owed by Holding Co. at the beginning of the year to $807,028 owed at the end of the year. During 1986, Zeus purchased 25 shares of preferred stock in another Kanter entity called Windy City, Inc. for $250,000. During 1988, Zeus eliminated the HELO receivable in exchange for the following receivables owed to HELO by the parties indicated:

|                    |          |
|--------------------|----------|
| APS Insurance      | $4,570   |
| Beach Trust        | 17,651   |
| R Trust            | 10,000   |
| Softy Trusts       | 10,600   |
| Grasshopper Trust  | 16,250   |
| Pamela Osowski     | 4,929    |
| Total              | 64,000   |

Zeus never accrued any interest or received any payments on any of those receivables or the receivables from Holding Co. and HELO.

### b. Distributions of Schnitzer-PMS and Essex Payments Made During 1985 Through 1989

During 1985, IRA received funds from Schnitzer-PMS and Essex and made distributions to Carlco, TMT, and BWK, Inc. as follows:

| 1985  |                                          | Receipts | Distributions |
|-------|------------------------------------------|----------|---------------|
| 01/15 | Qrtly payment                            | $90,423  |               |
| 01/21 | Carlco                                   |          | $40,500       |
|       | TMT                                      |          | 40,500        |
|       | BWK, Inc.                                |          | 9,000         |
|       | Essex-Blng to TMT, etc.                  | 41,800   |               |
| 01/30 | Pymt on amts owed re Essex               |          | 18,450        |
|       |                                          |          | 18,450        |
|       |                                          |          | 4,100         |
| 04/08 | Schnitzer Corp./qrtly inst /int balloon  | 90,423   |               |
| 04/16 | Carlco                                   |          | 40,500        |
|       | TMT                                      |          | 40,500        |
|       | BWK, Inc.                                |          | 9,000         |
| 04/18 | Essex 1st quarter dist.                  | 13,063   |               |
| 04/25 | Carlco                                   |          | 5,850         |
|       | TMT                                      |          | 5,850         |
|       | BWK, Inc.                                |          | 1,300         |
| 07/03 | Schnitzer Corp. qrt. pmt.($10,000 int BA) | 90,423   |               |
| 07/08 | Essex 2d quarter dist.                   | 36,575   |               |
| 07/11 | Carlco                                   |          | 16,200        |
|       | TMT                                      |          | 16,200        |
|       | BWK, Inc.                                |          | 3,600         |
| 10/03 | Essex 3d quarter                         | 28,738   |               |
| 10/04 | Schnitzer Corp. 3d quarter               | 90,423   |               |

```
10/15    Carlco                                          81,000
         TMT                                             81,000
         BWK, Inc.                                       18,000
```

IRA recorded the 1985 payments to Carlco ($184,050), TMT ($184,050), and BWK, Inc. ($40,900) as follows (balance differences are due to rounding):

| Item | Carlco | TMT | BWK, Inc. |
|---|---|---|---|
| **Note to** | | | |
| Beginning | -- | -- | -- |
| 07/11 additional | $16,200 | $16,200 | $3,600 |
| 04/18 Essex | (5,878) | (5,878) | (1,306) |
| 07/08 Essex | (16,459) | (16,459) | (3,658) |
| 10/03 Essex | (12,931) | (12,931) | (2,874) |
| 12/31 Rec to proper account | (16,200) | (16,200) | (3,600) |
| 12/31 To combine same acct | (360) | (360) | (80) |
| Ending | (35,629) | (35,629) | (7,917) |
| | | | |
| **Notes payable** | | | |
| Beginning | -- | -- | -- |
| 01/13 Pymt on amts owed re Essex | 18,450 | 18,450 | 4,100 |
| 01/21 FM Essex--blngs to TMT etc | (18,810) | (18,810) | (4,180) |
| 12/31 To combine same account | 360 | 360 | 80 |
| Ending | -- | -- | -- |
| | | | |
| **Investment in stock** | | | |
| Beginning | 1,856,942 | 1,962,144 | 417,321 |
| 01/21 additional capital | 40,500 | 40,500 | 9,000 |
| 04/16 additional capital | 40,500 | 40,500 | 9,000 |
| 04/25 additional capital | 5,850 | 5,850 | 1,300 |
| 10/14 additional capital | 81,000 | 81,000 | 18,000 |
| 12/31 R/C to proper account | 16,200 | 16,200 | 3,600 |
| To record consent dividend | | 97,206 | |
| Ending | 2,040,992 | 2,243,400 | 458,221 |

## 1986

The record does not contain detailed general ledgers for IRA after 1985.  The record indicates, however, that IRA recorded the 1986 payments from Schnitzer-PMS and Essex and distributions to Carlco, TMT, and BWK, Inc. as follows:

| Item | Carlco | TMT | BWK, Inc. |
|---|---|---|---|
| Note to | | | |
| Beginning | ($35,629) | ($35,629) | ($7,917) |
| Pd 2/86 | 35,629 | 35,629 | 7,917 |
| Ending | -0- | -0- | -0- |
| | | | |
| Investment in stock | | | |
| Beginning | 2,040,992 | 2,243,400 | 458,221 |
| Ending | 2,203,362 | 2,488,403 | 494,303 |
| Contri. consent dividend | | 82,633 | |
| Cash additions | 162,370 | 162,370 | 36,082 |

1987

IRA recorded the 1987 payments from Schnitzer-PMS and Essex
and distributions to Carlco, TMT, and BWK, Inc. as follows:

| Item | Carlco | TMT | BWK, Inc. |
|---|---|---|---|
| Note to | | | |
| Beginning | -- | -- | -- |
| 08/06/87 Essex 2d quarter | ($29,626) | ($29,626) | ($6,584) |
| 10/08/87 Distr. Essex | 29,626 | 29,626 | 6,584 |
| 12/10/87 Essex 3d quarter | (8,229) | (8,229) | (1,829) |
| 12/15/88 Distr. Essex | 8,229 | 8,229 | 1,829 |
| Ending | -- | -- | -- |
| | | | |
| Investment in stock | | | |
| Beginning | 2,203,362 | 2,488,403 | 494,303 |
| Additions | | | |
| 01/14/87 | 40,690 | 40,690 | 9,042 |
| 05/07/87 | 40,690 | 40,690 | 9,042 |
| 09/10/87 | 40,690 | 40,690 | 9,042 |
| 10/19/87 | 40,690 | 40,690 | 9,043 |
| 12/11/87 | 29,553 | 29,553 | |
| Total cash contrib. | 192,313 | 192,313 | 36,169 |
| 12/31/87 consent div. | | 31,960 | |
| Ending | 2,395,676 | 2,712,677 | 530,473 |

1988

IRA recorded the 1988 payments from Schnitzer-PMS and Essex
and distributions to Carlco, TMT, and BWK, Inc. as follows:

| Item | Carlco | TMT | BWK, Inc. |
|---|---|---|---|
| Investment in stock | | | |
| Beginning | $2,395,676 | $2,712,677 | $530,473 |
| Additions | | | |
| 02/03/88 | 40,690 | 40,690 | 9,042 |
| 05/12/88 | 40,690 | 40,690 | 9,042 |
| 08/05/88 | 40,690 | 40,690 | 9,042 |
| 12/13/88 | 40,690 | 40,690 | 9,043 |
| Total | 162,761 | 162,761 | 36,169 |
| 2/31/88 consent div. | | 65,093 | |
| Ending | 2,558,437 | 2,940,531 | 566,642 |

1989

IRA recorded the 1989 payments from Schnitzer-PMS and Essex and distributions to Carlco, TMT, and BWK, Inc. as follows:

| Item | Carlco | TMT | BWK, Inc. |
|------|--------|-----|-----------|
| Note receivable from | | | |
| Beginning | -- | -- | -- |
| 09/14/89  loan | $55,000 | $35,000 | -- |
| 09/18/89  void check | (55,000) | (35,000) | -- |
| 09/18/89  loan | 117,000 | 44,000 | -- |
| 12/04/89  loan | 5,355 | 10,274 | -- |
| Ending | 122,355 | 54,274 | -- |
| | | | |
| Notes payable to | | | |
| Beginning | -- | -- | -- |
| 01/11/89 Essex 4th quarter dist. | (20,573) | (20,573) | ($4,572) |
| 01/11/89 Dist. | 20,573 | 20,573 | 4,572 |
| 01/18/89 Dist. | 20,573 | 20,573 | -- |
| 01/18/89 void check | (20,573) | (20,573) | -- |
| 07/26/89 Essex 1&2 quarter dist. | (15,048) | (15,048) | (3,344) |
| 08/02/89 Dist. | 15,048 | 14,048 | 3,344 |
| 08/23/89 Essex dist. | (8,229) | (8,229) | (1,829) |
| 08/28/89 Dist. | 8,229 | 8,229 | 1,829 |
| Ending | -- | -- | -- |
| | | | |
| Investment in stock | | | |
| Beginning | 2,558,437 | 2,940,531 | 566,642 |
| Additions | | | |
| 03/20/89 | 378,190 | 378,190 | 84,042 |
| Rcls amended consent dividend | | | |
|   from TMT 1986-1988 | | (179,686) | |
| Ending | 2,936,627 | 3,139,035 | 650,684 |

c.   Loans From IRA to KWJ Partnership Through 1989

In addition to payments made to Carlco, TMT, and BWK, Inc., that were treated as additions to capital, IRA made distributions recorded as loans to KWJ partnership as follows:

| Receivable | 1985 | 1986 | 1987 | 1988 | 1989 |
|------------|------|------|------|------|------|
| Beginning year | $30,000 | $75,500 | $113,500 | $161,500 | $181,500 |
| Loans during year | 45,500 | 38,000 | 48,000 | 20,000 | 68,370 |
| End year | 75,500 | 113,500 | 161,500 | 181,500 | 249,870 |

d.   Balance Sheets of Carlco, TMT, and BWK, Inc. 1983 Through 1989

The balance sheets for Carlco, TMT, and BWK, Inc. for the years 1983 through 1989 were as follows:

| Carlco | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|---|---|
| Assets | $7,500 | $1,967,188 | $2,327,066 | $2,699,998 | $3,078,545 | $3,728,530 | $4,404,569 |
| Liabilities | | | 4,000 | | 4,000 | | 122,355 |
| Net assets | 7,500 | 1,967,188 | 2,323,066 | 2,699,998 | 3,074,545 | 3,728,530 | 4,282,214 |
| | | | | | | | |
| Cap. stock | | | | | | | |
| Common | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Preferred | 2 | 3 | 3 | 3 | 3 | 3 | 3 |
| Capital surplus | 7,398 | 1,858,489 | 2,042,539 | 2,168,127 | 2,397,222 | 2,559,983 | 2,938,173 |
| Retained earnings | | 108,596 | 280,424 | 531,768 | 677,220 | 1,168,444 | 1,343,938 |
| Total equity | 7,500 | 1,967,188 | 2,323,066 | 2,699,998 | 3,074,545 | 3,728,530 | 4,282,214 |
| | | | | | | | |
| Increase in surplus | | 1,851,091 | 184,050 | 125,588 | 229,095 | 162,761 | 378,190 |

| TMT | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|---|---|
| Assets | $7,500 | $2,015,911 | $2,293,151 | $2,518,717 | $2,735,965 | $3,215,925 | $3,880,997 |
| Liabilities | | | 4,000 | | | | 54,274 |
| Net assets | 7,500 | 2,015,911 | 2,289,151 | 2,518,717 | 2,735,965 | 3,215,925 | 3,826,723 |
| | | | | | | | |
| Cap. stock | | | | | | | |
| Common | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Preferred | 2 | 3 | 3 | 3 | 3 | 3 | 3 |
| Capital surplus | 7,398 | 1,963,692 | 2,244,947 | 2,489,950 | 2,714,224 | 2,942,077 | 3,140,582 |
| Retained earnings | | 52,116 | 44,101 | 28,664 | 21,638 | 273,745 | 686,038 |
| Total equity | 7,500 | 2,015,911 | 2,289,151 | 2,518,717 | 2,735,965 | 3,215,925 | 3,826,723 |
| | | | | | | | |
| Increase in surplus | | 1,956,294 | 281,255 | 245,003 | 224,274 | 227,853 | 198,505 |
| | | | | | | | |
| Book income | | 157,318 | | | | | |
| Consent dividend | | 105,202 | 97,206 | 82,633 | 31,960 | 65,093 | -0- |
| Retained earnings | | 52,116 | | | | | |
| | | | | | | | |
| Surplus increase | | 1,956,294 | 281,255 | 245,003 | 224,274 | 227,853 | 378,190 |
| Consent dividend | | 105,202 | 97,206 | 82,633 | 31,960 | 65,093 | *179,786 |
| Difference | | 1,851,092 | 184,049 | 162,370 | 192,314 | 162,760 | 198,404 |

*Reverse 86, 87 & 88 consent dividend paid to IRA.

| BWK, Inc. | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|---|---|
| Assets | $7,500 | 418,558 | 406,909 | 388,362 | 395,808 | 451,711 | 515,772 |
| Liabilities | | 7,534 | 1,000 | 286 | 8,000 | -0- | 2,253 |
| Net assets | 7,500 | 411,024 | 405,909 | 388,076 | 387,808 | 451,711 | 513,519 |
| | | | | | | | |
| Cap. stock | | | | | | | |
| Common | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Preferred | 2 | 3 | 3 | 3 | 3 | 3 | 3 |
| Capital surplus | 7,398 | 418,868 | 459,768 | 495,869 | 532,038 | 568,207 | 652,250 |
| Retained earnings | | (7,947) | (53,962) | (107,896) | (144,333) | (116,599) | (138,834) |
| Total equity | 7,500 | 411,024 | 405,909 | 388,076 | 387,808 | 451,711 | 513,519 |
| | | | | | | | |
| Increase in surplus | | 411,470 | 40,900 | 36,101 | 36,169 | 36,169 | 84,043 |

B.  Flow of the Funds Paid By the Five Through IRA and Its
Subsidiaries to Kanter, Ballard, and Lisle

1.  Overview

The payments from the Prudential transactions were
distributed by various means either directly to Ballard, Lisle,
and Kanter or indirectly through their family members or trusts
and other entities established for the benefit of their families.
Some distributions were recorded as receivables owed by the
person or entity receiving the distribution; others were recorded
as consulting fees or director's fees.  Distributions from KWJ
Corp. and later KWJ partnership to Ballard's and Lisle's children
were treated as consulting fees.

In 1983, IRA began distributing the funds accumulated from
the Prudential transactions to Carlco, TMT, and BWK, Inc.  Lisle
was given control over the funds in Carlco, Ballard was given
control over the funds in TMT, and Kanter was given control over
the funds in BWK, Inc.  Lisle, Ballard, and Kanter treated the
funds as their own and used the funds for their personal benefit.

2.  Payments from IRA, KWJ Corp., and KWJ Co. Partnership

a.  1982: IRA Payments to Ballard and Lisle

In 1982, Ballard received $12,500 from IRA as a "director's
fee".  The check was dated in 1981 but cashed in 1982.  On March
2, 1982, IRA paid Lisle $1,157.84.

b.    Consulting Fees Paid to Ballard's and Lisle's Children

Melinda Ballard and Karen Ballard Hart were Ballard's daughters.  Amy Albrecht was Lisle's daughter, and Thomas Lisle was Lisle's son.  In 1982, KWJ Corp. (and later the KWJ partnership) began paying Thomas Lisle, Amy Albrecht, and Melinda Ballard $1,000 each per month.[30]  In 1984, the KWJ partnership began paying Karen Hart $1,000 each month.  The payments continued until at least 1989.  From 1982, KWJ Corp. and the KWJ partnership paid the Lisle and Ballard children the following amounts as consulting fees:[31]

|  | Lisle Children | | Ballard Children | |
| Year | Thomas Lisle | Amy Albrecht | Melinda Ballard | Karen Hart |
| --- | --- | --- | --- | --- |
| 1982 | $7,000 | $7,000 | $7,000 | -- |
| 1983 | 12,000 | 12,000 | 12,000 | -- |
| 1984 | 12,000 | 12,000 | 12,000 | $2,000 |
| 1985 | 12,000 | 11,000 | 12,000 | 12,000 |
| 1986 | 12,000 | 13,000 | 12,000 | 12,000 |
| 1987 | 12,000 | 12,000 | 12,000 | 12,000 |
| 1988 | 12,000 | 12,000 | 12,000 | 12,000 |

---

[30]    Thomas Lisle and Amy Albrecht admitted that they received consulting fees from 1983 to 1989.  Melinda Ballard admitted that she received the consulting fees from 1983 to 1988.  Karen Hart admitted that she received the consulting fees from 1984 to 1989. No one except the Lisle and Ballard children received consulting fees from 1983 through 1989.  We conclude that the payments made in 1982 were also made to Thomas Lisle, Amy Albrecht, and Melinda Ballard.

[31]    Approximately $4,000 per month was paid to the Ballard and Lisle children.  IRA made distributions to KWJ Corp. and KWJ partnership that were also approximately $4,000 a month.  The money distributed to KWJ Corp. and KWJ partnership was never repaid during the years in question, and no interest was ever paid on the amounts outstanding.

During 1989, KWJ partnership paid the Lisle and the Ballard children $36,000. Of the $36,000 paid, Lisle's children received at least $18,000 and Ballard's children received at least $12,000.[32]

None of the Ballard or the Lisle children performed any services for KWJ Corp. or KWJ partnership. The Hyatt payments and interest were the only sources of income KWJ Corp. or KWJ partnership ever received.

In February 1990, after the Internal Revenue Service began examining Ballard's, Kanter's, and Lisle's returns for the years at issue, Kanter sent letters to the children terminating KWJ Co's. "consulting arrangement" with them. In the letters Kanter stated that the children had done nothing for a number of years.

c.  KWJ Partnership 1989 Payments to Lisle and Ballard

As noted earlier, Carlco, TMT, and BWK, Inc., organized the KWJ Partnership. The Hyatt payments were issued by Hyatt to Weaver who forwarded the payments to the KWJ Partnership, out of which Weaver was paid his 30 percent and the balance was distributed to Carlco, TMT, and BWK, Inc.

---

[32]   The record is unclear whether all four each received $9,000, or whether Thomas Lisle, Amy Albrecht, and Karen Hart each received $12,000. Melinda Ballard testified that she resigned from KWJ Co. in 1988. If that was the case, then of the $36,000 paid by KWJ Co. in 1989, Thomas Lisle, Amy Albrecht, and Karen Hart each received $12,000. If Melinda Ballard did not resign, then each of the four children received $9,000 during 1989. Thomas Lisle and Amy Albrecht together received at least $18,000 during 1989, and Ballard's children received at least $12,000.

On August 2, 1989, IRA issued checks in the amount of $22,618.80 each to Ballard and Lisle. After the checks were issued to Ballard and Lisle, IRA records reflected a transfer of $45,237 to "KWJ Company" on August 8, 1989. Also on August 8, 1989, ledger entries reflected that the check to Lisle for $22,618.80 was "void". Another ledger entry, on August 15, 1989, reflected that the check to Ballard for $22,618.80 was "void". Despite the fact that IRA's ledger entries stated that these checks were void, Lisle's 1989 return reflected that he received this money and that the check was not "voided." Lisle reported the $22,619 on his return as income from the "KJW [sic] Company."

3. <u>Disposition of Funds out of Carlco, TMT, and BWK to Kanter</u>

a. <u>Creation of Carlco, TMT, and BWK, Inc.</u>

The certificates of incorporation of Carlco, TMT, and BWK, Inc., authorized each corporation to issue 1,000 shares of 10-cent par value common stock. Certificates of amendment for each corporation were filed in December 1983. The amended certificates authorized the corporations to issue 11,000 shares of stock comprised of 10,000 shares of 1-cent par value preferred stock and 1,000 shares of 10-cent par value common stock. The amended certificates granted each corporation's board of directors authority to fix the dividend rights, dividend rate, conversion rights, voting rights, the rights and terms of redemption (including sinking fund provisions), the redemption

price or prices, and the liquidations preferences of the preferred shares. The record does not contain copies of any resolutions by the board of directors of any of the three corporations setting preferences or limitations on the preferred stock.

Kanter was a beneficiary of a trust called the Morkan Trust.[33] On October 17, 1983, Kanter exercised a power of appointment over the Morkan Trust to form the Christie and Orient Trusts. Sharon Meyers was named as trustee of the Christie and Orient Trusts. Members of Lisle's family were named as beneficiaries of the Christie Trust, and members of Ballard's family were named as beneficiaries of the Orient Trust.

In December 1983, IRA acquired 1,000 shares (100 percent) of the common stock of each of Carlco, Inc. (Carlco), TMT, Inc. (TMT), and BWK, Inc. (BWK). IRA paid $6,000 to each of the corporations for the shares of stock. Also in December 1983, Carlco, TMT, and BWK each issued 150 shares of preferred stock for $1,500. Carlco preferred shares were issued to the Christie Trust (Lisle's family trust); TMT preferred shares were issued to the Orient Trust (Ballard's family trust); BWK preferred shares were issued to the BK Children's Trust, the beneficiaries of which were members of Kanter's family.

---

[33] The Morkan Trust is named after Kanter's father, Morris Kanter.

In January 1984, Carlco, TMT, and BWK each issued 150 additional shares of preferred stock for $150. Carlco issued the additional preferred shares to the Christie Trust, TMT issued the additional preferred shares to the Orient Trust, and BWK issued the additional preferred shares to the BK Children's Trust. As a result of those trusts' ownership of these preferred shares, Carlco, TMT, and BWK, Inc., no longer qualified as members of IRA's consolidated group of corporations and were not included in the consolidated tax returns IRA filed.

b.    Control and Management of Carlco, TMT, and BWK, Inc.

Kanter directed Freeman (IRA's president) to distribute funds received by IRA related to Prudential transactions in the ratio of 45 percent to Carlco, 45 percent to TMT, and 10 percent to BWK. From 1984 through 1989, IRA generally transferred funds and other assets to Carlco, TMT, and BWK, Inc., in the respective 45-45-10 allocation ratio Kanter had directed.

Lisle managed and controlled Carlco's investments. Lisle and members of his family, including his wife Donna Lisle and his son Thomas Lisle, had signatory authority over Carlco's accounts. In 1982 Kanter, his brother Carl Kanter, and Meyers were the officers and/or directors of Carlco. In 1983, Meyers and Freeman were the directors, president, and treasurer, and Gallenberger was secretary. From 1984 through 1989, there were no directors listed; Lisle, his brother Henry Lisle, his son Thomas Lisle, and

his wife Donna Lisle served as president or vice president, D. Dubanevich was secretary; and, except for 1985,[34] Meyers or Gallenberger was treasurer.

Ballard managed and controlled TMT's investments. Ballard and members of his family, including his wife Mary Ballard, had signatory authority over TMT's accounts. In 1982, Kanter, his son Joshua, and Meyers were the directors of TMT, Kanter was president, his son Joshua was treasurer, and Meyers was vice president and secretary. Between 1983 and 1989, Freeman, Meyers, and/or Gallenberger were the directors and officers.

Kanter managed and controlled BWK, Inc.'s investments. In 1982, Kanter, his son Joshua, and Meyers were the directors and officers of BWK, Inc. From 1983 through 1989, Weisgal was the sole director and president, Kanter, Meyers, and/or Gallenberger were the remaining officers.[35] In 1990, Kanter was the sole director and president, and Gallenberger was secretary.

After Carlco, TMT, and BWK, Inc., were organized, the payments by the Five were distributed to Carlco, TMT, and BWK, Inc.

---

[34]   No treasurer was listed for 1985.

[35]   No treasurer was listed from 1985 through 1990, and no vice president was listed from 1983 through 1987 and in 1990.

c.  Ballard: Disposition of Funds out of TMT

During the years 1982 through 1989, the following individuals were listed as the "officers" and "directors" of TMT:

| Title | 1982 | 1983 | 1984 |
|-------|------|------|------|
| Directors | Kanter | Freeman | Freeman |
| | Joshua Kanter | Meyers | Meyers |
| | Meyers | | |
| President | Kanter | Meyers | Meyers |
| Vice president | Meyers | | |
| Secretary | Meyers | Gallenberger | Gallenberger |
| Treasurer | Joshua Kanter | Meyers | Meyers |
| Assistants | Joshua Kanter | | |

| Title | 1985 | 1986 | 1987 |
|-------|------|------|------|
| Directors | Meyers | Gallenberger | Gallenberger |
| President | Meyers | Gallenberger | Gallenberger |
| Vice president | | | |
| Secretary | Gallenberger | Gallenberger | Gallenberger |
| Treasurer | Meyers | Gallenberger | Gallenberger |
| Assistants | | | |

| Title | 1988 | 1989 |
|-------|------|------|
| Directors | Gallenberger | Gallenberger |
| President | Gallenberger | Gallenberger |
| Vice president | | |
| Secretary | Gallenberger | Gallenberger |
| Treasurer | | |
| Assistants | | |

The records for TMT were maintained at Ballard's home. TMT's business address was the same as Ballard's residence in Seabright, New Jersey.  Mail for TMT was received at Ballard's home.  Correspondence from TMT was sent from Ballard's home address.

i.  TMT Accounts

During 1984, IRA transferred over $1 million to TMT.  The money generally was deposited into TMT's account with the

Administration Co., and certificates of deposit (CD's) were purchased through Administration Co.'s account at the American National Bank in Chicago.

At the end of 1984, the money designated for TMT in CD's at the American National Bank in Chicago, purchased through the Administration Co. account, totaled $1,604,000. By the end of the year 1985, no money designated for TMT was in CD's at the American National Bank in Chicago. The money that had been in CD's at the American National Bank in Chicago was transferred into CD's at the Wells Fargo Bank in San Francisco. By the end of the year 1985, the amount of money in CD's at the Wells Fargo Bank San Francisco totaled $1,874,295.

During the years 1984 through 1989, moneys other than CD's for TMT were deposited in an account maintained at the Wells Fargo Bank, in San Francisco, account No. 170-752. The mailing address of this account was 65 Island View Townhouses, Seabright, New Jersey, which was the Ballard residence address. Ballard opened this account in the name of "TMT", and he and his wife had signatory authority over it. The money in this account at the end of the years 1984 through 1989 was as follows:

| Year | Wells Fargo |
|------|-------------|
| 1984 | – |
| 1985 | $8,768 |
| 1986 | 19,438 |
| 1987 | 157,489 |
| 1988 | 192,915 |
| 1989 | 141,968 |

By the end of the year 1986, the amount of money in CD's at the Wells Fargo Bank decreased to zero. Of the money that had been in CD's, $1,205,900 had been transferred to a Goldman Sachs brokerage account. The money in the Goldman Sachs brokerage account at the end of the years 1987 through 1989 was as follows:

| Year | Goldman Sachs |
|------|---------------|
| 1987 | $53,803 |
| 1988 | 75,460 |
| 1989 | 155,300 |

During the years 1986 through 1989, moneys for TMT were deposited in an account maintained at the Citizen Bank. The balance in this account at the end of the years 1986 through 1989 was as follows:

| Year | Citizen Bank |
|------|--------------|
| 1986 | $25,248 |
| 1987 | 26,600 |
| 1988 | 1,929 |
| 1989 | 2,023 |

TMT also had a money market account (Kemper Money Market account). At the end of the year 1989, there was a balance of $349,182 in the Kemper Money Market account.

ii. "Loans" From TMT

In 1984 receivables owed by Ballard's Seabright Trust and Seabright Corp. respectively in the amounts of $12,255 and $31,440 were transferred from Administration Co. to TMT. From 1984 through 1989, the Seabright Trust and Seabright Corp. received additional "loans" totaling $132,980 from TMT. The balances on these loans at the end of each year were as follows:

| Year | Seabright Trust | Increase | Seabright Corp. | Increase |
|---|---|---|---|---|
| Trans. from | | | | |
| Special E | $12,255 | -- | $31,440 | -- |
| 1984 | 53,055 | $40,800 | 31,440 | -- |
| 1985 | 79,155 | 26,100 | 31,520 | $80 |
| 1986 | 100,155 | 21,000 | 36,520 | 5,000 |
| 1987 | 100,155 | -- | 41,520 | 5,000 |
| 1988 | 135,155 | 35,000 | 41,520 | -- |
| 1989 | 135,155 | -- | 41,520 | -- |
| Total | | 122,900 | | 10,080 |

There were no notes in connection with the "loans" to the Seabright Trust or the Seabright Corp. There is no evidence that either the Seabright Trust or Seabright Corporation paid interest on the "loans" from TMT. The loans were never repaid.

From 1984 through 1989, Claude Ballard and Mary Ballard received a total of $303,943 from TMT as "loans". The balances due on these loans at the end of each year were as follows:

| Year | Claude Ballard | Mary Ballard |
|---|---|---|
| 1984 | $10,599 | - |
| 1985 | 10,599 | $160,000 |
| 1986 | 16,599 | 160,000 |
| 1987 | 36,943 | 160,000 |
| 1988 | 136,943 | 160,000 |
| 1989 | 146,943 | 160,000 |

With respect to the $160,000 "loan" to Mary Ballard, during 1985, a document dated December 26, 1986, purported to provide for the repayment of this "loan" with Macy's stock held privately by Ballard. The records of TMT do not indicate that the $160,000 "loan" was repaid. The records of TMT do not indicate that the Macy's stock was given to TMT in accordance with the December 26, 1986, document.

In 1986, $100,000 of TMT funds were used to purchase land described in the TMT general Ledger as "St. Francis Arkansas - Land." The cost of this land was $100,000. In 1987, this property was transferred to Ballard. Book entries were made to reflect this transaction. "Loans" to Ballard were increased by $100,000. The land was no longer reflected as a TMT asset. The adjusting journal entry that went with the transfer to Ballard described the property as the "Fairfield Planting Company". This "loan" has never been repaid. In 1987, TMT paid an additional $20,344 for the Fairfield property, which amount was treated as an additional loan to Ballard.

The Fairfield Planting Co. is an S corporation which owned the Fairfield Plantation, a farm in Arkansas. The income and loss from the Fairfield Plantation Co. were reported on Ballard's 1987, 1988, and 1989 returns.

At the time of trial of these cases, TMT owned the following farms or other entities: Ashland Plantation in Mississippi, Fairfield in Arkansas, and Loch Leven in Mississippi. The Ballards referred to the Loch Leven farm as "our big farm." According to Mary Ballard, TMT, at one time, had been involved with Lock Leven, but it was owned by the Ballards.

Mrs. Ballard did not know who owned the stock of TMT. She referred to TMT as her husband's business.

Ficom was a sole proprietorship formed by Ballard's daughter Melinda Ballard in 1983. In 1986, $4,000 from TMT was transferred to Ficom. In 1988, TMT transferred another $15,000 to Ficom. When the transfer was made, a bookkeeping notation was also made to write off the investment in 1989. The investment in Ficom was subsequently written off as worthless in 1989.

d.   Lisle: Disposition of Funds out of Carlco

During the years 1982 through 1989, the following individuals were listed as the "officers" and "directors" of Carlco:

| Title | 1982 | 1983 | 1984 |
|---|---|---|---|
| Directors | Kanter | Freeman | (deleted) |
| | Carl Kanter | Meyers | |
| President | Carl Kanter | Meyers | Henry Lisle |
| Vice president | Kanter | _____ | Donna Lisle |
| Secretary | Meyers | Gallenberger | D. Dubanevich |
| Treasurer | Meyers | Meyers | Meyers |

| Title | 1985 | 1986 | 1987 |
|---|---|---|---|
| Directors | None | None | None |
| President | Henry Lisle | Henry Lisle | Henry Lisle |
| Vice president | Donna Lisle | Donna Lisle | Donna Lisle |
| Secretary | Dubanevich | Dubanevich | Dubanevich |
| Treasurer | _____ | Gallenberger | Gallenberger |
| Assistants | Meyers | Lisle | Lisle |

| Title | 1988 | 1989 |
|---|---|---|
| Directors | None | None |
| President | Henry Lisle | Robert Lisle |
| Vice president | Donna Lisle | Thomas Lisle |
| Secretary | Dubanevich | Donna Lisle |
| Treasurer | Gallenberger | Gallenberger |

During the years 1984 through 1989, moneys from Carlco were deposited in a brokerage account maintained at Goldman Sachs (Carlco Goldman Sachs account). The mailing address of the

Carlco Goldman Sachs account was in care of Robert Lisle, 47 Cheltenham Way, Avon, Connecticut, which was the address of the Lisle family residence. Lisle, Mrs. Lisle, and Henry Lisle (Lisle's brother) had signatory authority over this account. The balance in this account at the end of 1984 to 1988 was as follows:

| Year | Goldman Sachs |
|------|---------------|
| 1984 | $113,255 |
| 1985 | 42,362 |
| 1986 | 90,601 |
| 1987 | 70,372 |
| 1988 | 392,252 |
| 1989 | 82,559 |

During the years 1984 through 1989, other money from Carlco was deposited into an account in the name of Carlco at the Hartford Bank in Connecticut (Hartford account). The mailing address of the Hartford account was in care of Lisle at the Lisle family residence. Lisle and his wife had signatory authority over the account. The balance in the account at the end of the years 1984 through 1988 was as follows:

| Year | Hartford |
|------|----------|
| 1984 | $18,198 |
| 1985 | 10,871 |
| 1986 | 211,618 |
| 1987 | 161,573 |
| 1988 | 153,767 |

On April 12, 1985, Lisle withdrew $3,000 from Carlco's Hartford account to pay a receivable owed to Administration Co. by his grantor trust, the RWL Cinema Trust. The payment did not create a receivable owed to Carlco by RWL Cinema Trust.

Around 1989, the Lisles moved to Dallas, Texas.  During the year 1989, money from Carlco was deposited in an account maintained at the North Dallas Bank, Dallas, Texas (North Dallas account).  The mailing address of the North Dallas account was 5519 Bent Trial, Dallas, Texas, which was the address of the Lisles' Dallas residence.  Lisle and his wife had signatory authority over the North Dallas account.  At the end of 1989 there was $123,323 in the account.

e.    Kanter: Disposition of Funds out of BWK, Inc.

During the years 1984 through 1989, Kanter and his son, Joshua Kanter, received a "salary" from BWK, Inc., in the amounts indicated:

| Year | Burton Kanter | Joshua Kanter |
|------|---------------|---------------|
| 1984 | $40,000 | -- |
| 1985 | 40,000 | $9,000 |
| 1986 | 40,000 | 13,000 |
| 1987 | 30,000 | 4,000 |
| 1988 | 30,000 | -- |
| 1989 | 30,000 | -- |
| Total | 210,000 | 26,000 |

On April 11, 1985, $400,000 was transferred from BWK, Inc. to Kanter.  The transfer was recorded on BWK, Inc.'s books as a receivable owed by Kanter.  Beginning in 1988, although book entries continued to show that BWK, Inc., paid Kanter a $30,000 salary, Kanter did not receive the money.  Instead, BWK, Inc., reduced the $400,000 receivable from Kanter by $30,000 per year.

4.   Loans

a.   IRA Loans to Kanter

IRA's records reflect the following amounts transferred to

Kanter and recorded as receivables:

<u>Burton W. Kanter</u>

| | | |
|---|---|---:|
| 1982 | Beginning balance | -- |
| | Adj for bal in Cedilla Trust | $4,450 |
| | Ending balance | 4,450 |
| 1983 | Beginning balance | 4,450 |
| | Loan repymt. from BWK | -- |
| | Ending balance | |
| 1984 | No entry | |
| 1985 | Beg. balance | -- |
| | Sold Geochem to BWK | 500 |
| | Sell TWOOD rec to BWK | 10,000 |
| | Sold funds for Energy | 5,000 |
| | Rec sale of assets sold | 1,110 |
| | Ending balance | 16,610 |
| 1986 | Unexplained acct. total | (39,940) |
| 1987 | Beg. balance | (39,940) |
| | Repay BWK RE H BLUM | 219 |
| | HB Rpymt (S/B to BWK) | (219) |
| | Move to notes payable | 39,940 |
| | Ending balance | -- |
| 1988 | No entry | |
| 1989 | Beg. balance | -- |
| | B. Kanter/Ln | 250,000 |
| | Unavailable history | 350,000 |
| | Ending balance | 600,000 |

b.   Loans to Ballard, Lisle, Their Family Members and Trusts

Ballard and Lisle established the following grantor trusts,

the income (or losses) of which was includable in Ballard's and

Lisle's income pursuant to sections 671 through 678:

| Date Established | Ballard | Lisle |
|---|---|---|
| 10/23/73 | CMB Cinema Trust[36] | RWL Cinema Trust |
| 7/15/75 | CMB Cinema Trust II | RWL Cinema Trust II |
| 6/03/80 | Summit Trust | Basking Ridge Trust |
| 11/02/81 | Seabright Trust | |

Mrs. Lisle and/or Lisle's children or descendants were the beneficiaries of Lisle's grantor trusts, and Kanter and/or Weisgal were the trustees. Mrs. Ballard and/or Ballard's children were the beneficiaries of Ballard's grantor trusts, and Kanter and/or Weisgal were the trustees.

The CMB Cinema Trust and CMB Cinema Trust II, RWL Cinema Trust, and RWL Cinema Trust II (hereinafter collectively referred to as the Cinema trusts) each made investments, as limited partners, in certain movie shelter partnerships. Each trust financed the acquisition of its movie partnership interest through loans from IRA and Int'l Films.

The Seabright Corp. was owned by the Mary Family Trust. The Seabright Corp. owned a farm called Seabright Farm located near Little Rock, Arkansas. The beneficiaries of the Mary Family Trust were Mary Ballard and her three daughters. The records of the Seabright Corp. were maintained at Ballard's residence. Mary Ballard was an officer of the Seabright Corp.

On May 29, 1976, the CMB Cinema Venture partnership was formed. The CMB Cinema Trust and the CMB Cinema Trust II were

---

[36] In 1979, the CMB Cinema Trust was divided into 10 separate trusts.

partners in the CMB Cinema Venture partnership.  As of the end of
1987, CMB Cinema Venture partnership was a shareholder of Int'l
Films.

The movie ventures in which the trusts invested proved
unsuccessful and were not profitable.  Substantial losses from
the ventures were reported by Ballard on his income tax returns.
The Internal Revenue Service later disallowed the deductions that
Ballard claimed on his tax returns with respect to these movie
investments.  As a result, the Ballards were required to pay
additional taxes.  In July 1985, Mrs. Ballard borrowed $160,000
from TMT to pay this income tax liability.

Kanter entities made the following loans to Ballard, his
family members, and entities established for the benefit of his
family members:

Ballard Loans

| Lender | Year | Distributee | Amount |
|--------|------|-------------|--------|
| Int'l Films | 1974 | CMB Cinema Trust | $10,000 |
| Int'l Films | 1975 | CMB Cinema Trust | 21,500 |
| Int'l Films | 1975 | CMB Cinema Trust II | 12,500 |
| Int'l Films | 1976 | CMB Cinema Trust | 8,200 |
| Int'l Films | 1976 | CMB Cinema Trust | 19,000 |
| Int'l Films | 1976 | CMB Cinema Trust II | 1,100 |
| Int'l Films | 1977 | CMB Cinema Trust | 2,200 |
| Int'l Films | 1977 | CMB Cinema Trust II | 3,400 |
| Int'l Films | 1978 | CMB Cinema Trust | 3,000 |
| Int'l Films | 1978 | Ballard | 9,500 |
| Int'l Films | 1979 | Ballard | 8,784 |
| HELO | 1980 | Summit Trust | 85,000 |
| HELO | 1981 | Summit Trust | 20,700 |
| Int'l Films | 1981 | CMB Cinema Trust | 4,000 |
| IRA | 1982 | Ballard | 160,400 |
| IRA | 1983 | Ballard | 500 |
| Administration Co. | 1983 | Seabright Trust | 11,300 |
| Administration Co. | 1984 | Ballard | 10,000 |
| Administration Co. | 1984 | Seabright Corp. | 25,840 |
| TMT | 1985 | Mary Ballard | 160,000 |
| Administration Co. | 1988 | Seabright Corp. | 5,000 |

Kanter entities made the following loans to Lisle, his family members, and entities established for the benefit of his family members:

## Lisle Loans

| Lender | Year | Distributee | Amount |
|--------|------|-------------|--------|
| Int'l Films | 1974 | RWL Cinema Trust | $15,000 |
| Int'l Films | 1975 | RWL Cinema Trust II | 20,000 |
| Int'l Films | 1975 | Lisle | 10,000 |
| Int'l Films | 1976 | RWL Cinema Trust | 5,000 |
| Int'l Films | 1976 | RWL Cinema Trust II | 18,000 |
| Int'l Films | 1977 | RWL Cinema Trust II | 5,000 |
| Int'l Films | 1978 | Lisle | 9,500 |
| Int'l Films | 1978 | RWL Cinema Trust II | 3,750 |
| Int'l Films | 1978 | RWL Cinema Trust II | 4,469 |
| Int'l Films | 1979 | Lisle | 8,784 |
| Int'l Films | 1979 | RWL Cinema Trust II | 3,000 |
| Int'l Films | 1980 | RWL Cinema Trust II | 250 |
| Int'l Films | 1981 | RWL Cinema Trust II | 2,750 |
| Int'l Films | 1982 | RWL Cinema Trust II | 2,320 |
| Int'l Films | 1983 | RWL Cinema Trust II | 3,000 |
| HELO | 1983 | Basking Ridge Trust | 95,000 |
| IRA/Int'l Films | 1983 | Lisle | 3,000 |
| Int'l Films | 1984 | RWL Cinema Trust II | 3,000 |
| Administration Co. | 1985 | RWL Cinema Trust II | 3,000 |
| Int'l Films | 1986 | RWL Cinema Trust II | 3,000 |
| Administration Co. | 1987 | RWL Cinema Trust II | 2,463 |
| IRA | 1988 | RWL Cinema Trust II | 6,000 |
| BWK | 1989 | RWL Cinema Trust II | 3,000 |
| BWK | 1990 | RWL Cinema Trust II | 2,969 |

5. <u>Writeoff of Loans and Losses</u>

Kanter traded receivables between various entities and used convoluted bookkeeping entries to eliminate the receivables and to create bad debt and worthless stock deductions.

IRA distributed $160,400 to Ballard in 1982 and $500 in 1983 and recorded the transfers as receivables owed by Ballard. IRA immediately transferred the receivables to Int'l Films. IRA's general ledgers reflected Ballard's receivable account for 1982 and 1983 as follows:

## Claude Ballard

| 1982 | Beg. balance | |
|---|---|---|
| | Record trns Dec 1982 | $160,400 |
| | Asgn Ballard ln to IFI | (160,400) |
| | Ending balance | -0- |
| 1983 | Beg. balance | -0- |
| | TACI E ln for C. Ballard | 500 |
| | Asgn to IFI ck 1120 | (500) |
| | Ending balance | -0- |

IRA's general ledger showed Int'l Films' receivable for 1982 as follows:

## Int'l Films

| 1982 | Beg. balance | $70,200 |
|---|---|---|
| | Int'l Films | 13,000 |
| | Int'l Films | 4,000 |
| | Int'l Films-loan | 1,250 |
| | Trans. thru Nov. 1982 | 7,130 |
| | Trans. thru Dec. 1982 | 5,465 |
| | Ballard loan asgn to Int'l Films | 160,400 |
| | Ending balance | 261,445 |

By the end of 1982, IRA had transferred $1,189,900 to HELO that was recorded as a receivable owed to IRA by HELO.[37] In 1983 HELO had $95,000 receivables owed to it from Lisle's Basking Ridge Trust and $106,200 from Ballard's Summit Trust.[38]

In 1983, a transaction took place between IRA, the Bea Ritch Trusts, Int'l Films, and HELO which had the effect of (1)

---

[37] In 1983, HELO was a subsidiary of Holding Co. On Aug. 31, 1984, Kanter as trustee of the ARO Trusts became the owner of 100 percent of HELO's voting stock.

[38] It is not clear from the record whether HELO made the distributions to the Basking Ridge and Summit trusts during 1983 or at some earlier time.

increasing the receivables due to IRA from the Bea Ritch Trusts
by $500,000; (2) decreasing IRA's outstanding receivables due
from HELO by $701,200; (3) eliminating HELO's $95,000 receivables
from Lisle's Basking Ridge Trust and $106,200 from Ballard's
Summit Trust; and (4) creating IRA receivables of $95,000 from
the Basking Ridge Trusts and $106,200 from the Summit Trust.
IRA's general ledger and adjusting journal entries reflected the
effect of the transfers on receivables owed to it as follows:

## HELO Receivables Owed to IRA

| 1983 | | |
|---|---|---:|
| | Beginning balance | $1,189,900 |
| | Loan repymt from HELO | (11,200) |
| | Part. loan repymt HELO | (900) |
| | Repymt frm HELO via BRT[1] | (500,000) |
| | Lns Bask Rg & Summit via HELO | (201,200) |
| | Ln fm FIN Acq. via HELO | 33,500 |
| | Ending balance | 510,100 |

[1] No actual payment was made.  Instead the receivable due
from Bea Ritch Trusts was increased by $500,000.

## Summit Trust Receivables Owed to IRA

| 1983 | | |
|---|---|---:|
| | Beg. balance | -0- |
| | Ln rpymt from Summit | ($10,100) |
| | Lns BSK RG & SMT via HELO | 106,200 |
| | Asgn SMT & BSK RG to IFI | (96,100) |
| | Ending balance | -0- |

## Basking Ridge Trust Receivables Owed to IRA

| 1983 | | |
|---|---|---:|
| | Beg. balance | -0- |
| | Ln rpymt Frm Bask Rdg | ($10,300) |
| | Lns BSK RG & SMt via HELO | 95,000 |
| | Asgn SMT & BSK RT to IFI | (84,700) |
| | Ending balance | -0- |

1983 AJE 9 - To adj. for loans made to Basking Ridge & Summit via HELO (remove HELO from middle)

|                                | Debit   | Credit    |
|--------------------------------|---------|-----------|
| 1191-0256 Due from Basking Ridge | 95,000  |           |
| 1191-0255 Due from Summit        | 106,200 |           |
| 1191-032  Due to HELO            |         | (201,200) |

1983 AJE 26 To record transfer of receivables from Basking Ridge & Summit to IFI on 10/31/83)

|                                  | Debit   | Credit    |
|----------------------------------|---------|-----------|
| 1191-0121 Due from IFI           | 180,800 |           |
| 1191-0255 Due from Summit        |         | (96,100)  |
| 1191-0256 Due from Basking Ridge |         | (84,700)  |

### Int'l Films Receivables Owed to IRA

| 1983 | Beg. balance                         | 261,445 |
|------|--------------------------------------|---------|
|      | Loan to Int'l Films                  | 1,400   |
|      | Loan to Int'l Films                  | 1,000   |
|      | IF- loan on behalf of R Lisle        | 3,000   |
|      | Loan to Int'l Films                  | 100     |
|      | Loan to Int'l Film                   | 200     |
|      | Loan to Int'l Film                   | 100     |
|      | Loan repymt from Int'l Films         | (1,000) |
|      | Loan repymt from Int'l Films         | (500)   |
|      | Loan repymt from Int'l Films         | (325)   |
|      | Loan repymt from Int'l Films         | (700)   |
|      | Asgn. to Int'l Films[1]              | 500     |
|      | Asgn Summit and Basking Ridge Int'l Films[2] | 180,800 |
|      | Asgn 1984 Devlp to Int'l Films[3]    | 86,400  |
|      | Acct. Total                          | 532,420 |

[1]Check #1120 - Administration Co. loan for C. Ballard  $500.
[2]1983 AJE 26 - to record transfer of receivables from Basking Ridge & Summit to Int'l Films on 10/31/83.
[3]1983 AJE 28 - to record assignment of interest in 1984 Development to Int'l Films on 10/31/83.

In essence, IRA obtained HELO's receivable due from Basking Ridge and Summit.  Simultaneously with this book entry transaction, IRA transferred to Int'l Films the $180,800 balance of the receivables due from Basking Ridge and Summit that it had just obtained from HELO and in exchange, IRA entered on its books

a receivable due from Int'l Films for the amount of the Summit and Basking Ridge receivables, $180,800, $201,200 less a credit of $10,300 that was treated as a "loan repayment" from Basking Ridge, and $10,100 credit for a "loan repayment" from Summit. The sources of the credits are not shown in the record.  In addition to the receivables, IRA transferred to Int'l Films its interest in a partnership called 1984 Development valued at $86,420.

In 1987, receivables were again reshuffled.  On December 17, 1987, Int'l Films' records reflected receivables owing by Ballard, Lisle, and their trusts totaling $582,682, as shown here:

| Int'l Films | Receivables |
|---|---|
| Ballard | $35,784 |
| Ballard | 160,900 |
| CMB Cinema | 70,650 |
| CMB II | 16,675 |
| Summit | 96,100 |
| CMB Cinema Ventures | 250 |
| Subtotal | 380,359 |
| Lisle | 28,284 |
| RWL Cinema | 21,500 |
| RWL II | 67,839 |
| Basking Ridge | 84,700 |
| Subtotal | 202,323 |
| Total | 582,682 |

On December 17, 1987, Int'l Films had additional receivables totaling $538,243 owing by the following entities in the amounts shown:

| Entity/Individual | Amount |
|-------------------|--------:|
| Safari Trust | $98,450 |
| HGA Cinema | 133,695 |
| Elk Invest. | 76,500 |
| Inter Alia | 125,000 |
| Hargen | 8,000 |
| Holding Co. | 29,500 |
| Abernathy | 67,098 |
| Total | 538,243 |

Although the record does not contain a complete history of the outstanding receivables, the record does disclose the following loans made by Int'l Films through April 1981:

Inter Alia Investments

| | | |
|---|---|--------:|
| 10/26/73 | | $140,000 |
| 12/16/77 | Principal payment | (10,000) |
| 03/27/78 | Principal payment | (5,000) |
| Balance | | 125,000 |

Elk Investment

| | |
|---|--------:|
| 11/09/76 | 76,500 |

Claude M. Ballard

| | |
|---|--------:|
| 07/27/78 | 9,500 |
| 08/14/79 | 8,784 |
| Balance | 18,284 |

CMB Cinema Trust

| | |
|---|--------:|
| 10/29/74 | 10,000 |
| 12/23/75 | 21,500 |
| 04/12/76 | 8,200 |
| 05/27/76 | 19,000 |
| 12/16/77 | 2,200 |
| 11/01/78 | 3,000 |
| 04/81/81 | 4,000 |
| Balance | 67,900 |

CMB Cinema Trust II

| | |
|---|--------:|
| 09/29/75 | 12,500 |
| 08/25/76 | 1,100 |
| 12/16/77 | 3,400 |
| Balance | 17,000 |

Robert W. Lisle
  10/31/75                        10,000
  07/27/78                         9,500
  03/14/79                         8,784
  Balance                         28,284

RWL Cinema Trust
  10/29/74                        15,000
  05/27/76                         5,000
  Balance                         20,000

RWL Cinema Trust II
  11/25/75                        20,000
  04/12/76                        18,000
  12/16/77                         5,000
  11/01/78                         3,750
  03/28/78                         4,469
  01/04/79                         3,000
  02/07/80                           250
  02/23/81                         2,750
  Balance                         57,219

HGA Cinema Trust
  12/23/75                        52,200
  04/12/76                        17,000
  05/27/76                        37,125
  03/14/79                         5,000
  11/08/79                         3,500
  01/08/80                           100
  Balance                        114,925

Safari Trusts
  12/23/75                        33,800
  06/15/76                        64,000
  Balance                         97,800

Hargen
  07/27/76                         8,000

Harold G. Abernathy (stockholder)
  05/10/74                        45,000
  09/11/74                        20,000
  01/06/75                        40,000
  Dividend
  08/31/74                       (11,238)
  08/31/75                        (7,878)
  08/31/76                       (18,786)
  Balance                         67,098

Although some of the receivables indicated an interest rate, there is no evidence that any interest was ever paid, and the outstanding balances were never increased to reflect accruing interest.

In 1987, IRA held 1,500 shares of stock in Int'l Films. IRA's basis in the Int'l Films stock was $65,000. Additionally, in 1987, IRA had a $507,648 receivable owing to it by Int'l Films.

Int'l Films' trial balance sheet for the taxable year ending 8/31/87 showed the following:

| Assets | |
|---|---|
| Receivables | |
| Safari Trust | $98,450 |
| CMB Cinema Trust | 70,650 |
| CMB Cinema Trust II | 16,675 |
| RWL Cinema Trust | 21,500 |
| RWL Cinema Trust II | 67,839 |
| HGA Cinema Trust | 133,695 |
| Elk Investment | 76,500 |
| Inter Alia | 125,000 |
| Hargen | 8,000 |
| HELO[1] | 180,800 |
| Ballard | 35,784 |
| Ballard II | 160,900 |
| Lisle | 28,284 |
| HGA Cinema Trust | 67,098 |
| CMB Cinema Venture | 250 |
| Holding Co. | 29,500 |
| Total receivables | 1,120,925 |
| Other assets | |
| 1984 Development Partnership | 55,288 |
| Other taxes | 80 |
| Total assets | 1,176,293 |
| Liabilities | |
| Cash deficit | 60 |
| IRA | 507,648 |
| I&F Corp. | 774 |
| Total liabilities | 508,482 |

Stockholder equity
Preferred                                       150
Common                                          606
Paid-in capital                             655,889
Retained earnings                            11,167
 Total equity                               667,812

[1]Int'l Films received the HELO receivable in exchange for the Summit Trust receivable of $96,100 and Basking Ridge Trust receivable of $84,700.

IRA advanced $60 to cover Int'l Films' cash deficit and increased the receivable owed by Int'l Films from $507,648 to $507,708.  On December 17, 1987, IRA canceled the $507,708 receivable due from Int'l Films in exchange for (1) the interest in 1984 Development partnership valued at $55,288[39] plus (2) $1,120,925 of receivables.  IRA had transferred the interest in 1984 Development partnership to Int'l Films in 1983.  Thus the notes and partnership interest that Int'l Films transferred to IRA constituted all of Int'l Films' assets.

IRA apportioned the $507,708 basis in the Int'l Films receivable among the receivables transferred to IRA from Int'l Films  and the interest in the 1984 Development, Ltd., partnership interest as follows (balance differences are due to rounding):

---

[39]    IRA had transferred the interest in the 1984 Development partnership as part of the 1983 writeoff.  The value of the interest for that transfer was $86,400.

| Receivable | Basis Int'l Films | Weighted Average | Basis IRA | Int'l Films Writeoff |
|---|---|---|---|---|
| Safari | $98,450 | 8.37 | $42,495 | $55,955 |
| CMB Cinema | 70,650 | 6.01 | 30,513 | 40,137 |
| CMB Cinema II | 16,675 | 1.42 | 7,209 | 9,466 |
| RWL Cinema | 21,500 | 1.83 | 9,291 | 12,209 |
| RWL Cinema II | 67,839 | 5.77 | 29,295 | 38,544 |
| HGA Cinema | 133,695 | 11.37 | 57,726 | 75,969 |
| Elk Invest. | 76,500 | 6.50 | 33,001 | 43,499 |
| Inter Alia | 125,000 | 10.63 | 53,969 | 71,031 |
| Hargen | 8,000 | 0.68 | 3,452 | 4,548 |
| HELO | 180,800 | 15.37 | 78,035 | 102,765 |
| Ballard | 196,684 | 16.72 | 84,889 | 111,795 |
| Lisle | 28,284 | 2.40 | 12,185 | 16,099 |
| Abernathy | 67,098 | 5.70 | 28,939 | 38,159 |
| CMB Cin. Vent. | 250 | 0.02 | 102 | 148 |
| Holding Co. | 29,500 | 2.51 | 12,743 | 16,757 |
| 1984 Pship. | 55,288 | 4.70 | 23,862 | 31,426 |
| Total | 1,176,213 | 100 | 507,706 | 668,507 |

IRA immediately sold the partnership interest in 1984 Development, Ltd., for $1,000 and 10 of the notes (HELO, Safari, CMB Cinema Trust, CMB Cinema Trust II, RWL Cinema Trust, RWL Cinema Trust II, HGA Cinema Trust, Elk Investment Partnership, Inter Alia, and Hargen) for $1 each to another Kanter entity, MAF, Inc. (MAF),[40] and IRA claimed capital losses on the sale or exchange of such notes.

As reflected by a memorandum dated July 17, 1987, Freeman (IRA's president) and Gallenberger agreed that the loans IRA was holding that had been made to Ballard and Lisle, individually, and to their respective grantor trusts would be "forgiven". IRA claimed bad debt deductions with respect to the Ballard notes, the Lisle

---

[40] MAF was a wholly owned subsidiary of Computer Placement Services, Inc. (Computer Placement Services).

note, and the Abernathy note.  IRA's worksheet reflects all of the
1984 sales by IRA of these various interest and accounts as set
forth in the following table:

| IRA Worksheet | Sale Price | Basis Average | Loss on Sale |
|---|---|---|---|
| Safari | $1 | $42,495 | $42,494 |
| CMB Cinema | 1 | 30,513 | 30,512 |
| CMB Cinema II | 1 | 7,209 | 7,208 |
| RWL Cinema | 1 | 9,291 | 9,290 |
| RWL Cinema II | 1 | 29,295 | 29,294 |
| HGA Cinema | 1 | 57,726 | 57,725 |
| Elk Invest. | 1 | 33,001 | 33,000 |
| Inter Alia | 1 | 53,969 | 53,968 |
| Hargen | 1 | 3,452 | 3,451 |
| HELO | 1 | 78,035 | 78,034 |
|  | 10 | 344,990 | 334,978 |
| 1984 Develop. | 1,000 | 23,862 | 22,862 |
|  | 1,010 | 368,850 | 367,840 |
| Ballard |  | 84,888 | 84,888 |
| Lisle |  | 12,185 | 12,185 |
| Abernathy |  | 28,939 | 28,939 |
|  |  | 126,012 | 126,012 |
| CMB Cinema Vent. |  | 102 |  |
| Holding Co. |  | 12,743 |  |
|  |  | 12,845 |  |
| Total |  | 507,708 | 493,852 |

On December 31, 1987, IRA sold its Int'l Films stock to
Gallenberger for $1.  In addition to receiving the Int'l Films
stock, Gallenberger was also given $3,000.  As a result of the
transactions, IRA claimed the following losses on its 1987
return:  (1) A $65,000 long-term capital loss on 1,500 shares of
Int'l Film stock acquired October 2, 1976, with a basis of

$65,000 and sold for a price of $zero; (2) a $22,862 long-term capital loss on its investment in 1984 Development, Ltd., partnership interest acquired in 1982 having an adjusted basis of $23,962 and a selling price of $1,000; (3) a $132,013 bad debt; (4) a $1,176,670 loss on business notes.

The IRA general ledger for January 1 to December 31, 1987, shows the following transactions with respect to the receivables:

```
Holding Co.
  Unavailable history                            $64,000
  Assets from Int'l Films      ADJ 12             12,743
  New balance                                     76,743

Int'l Films
  Unavailable history                            507,648
  Int'l Films/loan  10/20/87                          60
  Payment from Int'l Films     AJE 08          (507,708)
  New balance                                          0

HELO
  Unavailable history                            485,825
  Sell N/R to MAF              ADJ 32          (485,825)
  Payment from Int'l Films     ADJ 08            114,870
  Sold to MAF                  ADJ 09          (114,870)
  Int'l Films on amts owed     ADJ 10            (7,433)
  MAF purchase HELO N/R                              (1)
  Assets from Int'l Films      ADJ 12              7,433
  ADJ CR                       ADJ 24                  1
  New balance                                          0

Safari Trust
  Payment from Int'l Films     ADJ 08             62,550
  Sold to MAF                  ADJ 09           (62,550)
  Int'l Films on amts owed     ADJ 10            (4,048)
  Assets from Int'l Films      ADJ 12              4,048
  New balance                                          0

CMB Cinema Trust
  Payment from Int'l Films     ADJ 08             44,887
  Sold to MAF                  ADJ 09           (44,887)
  Int'l Films on amts owed     ADJ 10            (2,905)
  Assets from Int'l Films      ADJ 12              2,905
  New balance                                          0
```

```
CMB Cinema Trust II
  Payment from Int'l Films    ADJ 08        10,594
  Sold to MAF                 ADJ 09       (10,594)
  Int'l Films on amts owed    ADJ 10          (686)
  Assets from Int'l Films     ADJ 12           686
  New balance                                    0

RWL Cinema Trust
  Payment from Int'l Films    ADJ 08        13,660
  Sold to MAF                 ADJ 09       (13,660)
  Int'l Films on amts owed    ADJ 10          (884)
  Assets from Int'l Films     ADJ 12           884
  New balance                                    0

RWL Cinema Trust II
  Payment from Int'l Films    ADJ 08        43,101
  Sold to MAF                 ADJ 09       (43,101)
  Int'l Films on amts owed    ADJ 12        (2,789)
  Assets from Int'l Films     ADJ 10         2,789
  New balance                                    0

HGA Cinema Trust
  Payment from Int'l Films    ADJ 08        84,942
  Sold to MAF                 ADJ 09       (84,942)
  Int'l Films on amts owed    ADJ 12        (5,497)
  Assets from Int'l Films     ADJ 10         5,497
  New balance                                    0

Elk Investment
  Payment from Int'l Films    ADJ 08        48,604
  Sold to MAF                 ADJ 09       (48,604)
  Int'l Films on amts owed    ADJ 10        (3,145)
  Assets from Int'l Films     ADJ 12         3,145
  New balance                                    0

Inter Alia
  Payment from Int'l Films    ADJ 08        79,418
  Sold to MAF                 ADJ 09       (79,418)
  Int'l Films on amts owed    ADJ 10        (5,139)
  Assets from Int'l Films     ADJ 12         5,139
  New balance                                    0

Steve Hargen
  Payment from Int'l Films    ADJ 08         5,083
  Sold to MAF                 ADJ 09        (5,083)
  Int'l Films on amts owed    ADJ 10          (329)
  Assets from Int'l Films     ADJ 12           329
  New balance                                    0
```

Claude Ballard
  Assets from Int'l Films      ADJ 12        84,889
  W/O worthless notes          ADJ 28       (84,889)
  New balance                                     0

Robert Lisle
  Assets from Int'l Films      ADJ 12        12,185
  W/O worthless notes          ADJ 28       (12,185)
  New balance                                     0

Harold Abernathy
  Assets from Int'l Films      ADJ 12        28,939
  W/O worthless notes          ADJ 28       (28,939)
  New balance                                     0

CMB Cinema Venture
  Assets from Int'l Films      ADJ 12           102
  New balance                                   102

Invest in 1984 Development partnership
  Int'l on amounts owed        ADJ 10        32,854
  Sold to MAF                  ADJ 11       (32,854)
  New balance                                     0

Invest in Int'l Films
  Unavailable history                        65,000
  Int'l Films stock worthless ADJ 34        (65,000)
  New balance                                     0

Loss on sale of note receivable
  Sold to MAF                  ADJ 09       507,608
  Assets from Int'l Films      ADJ 12      (162,721)
  Sell N/R $1 not $10          ADJ 23            90
  Sell N/R to MAF              ADJ 32       831,692
  New balance                            1,176,670

Loss on worthless securities
  Int'l Films stock worthless AJE 34        65,000
  New balance                               65,000

Loss on sale of 1984 Development Partnership
  Sold to MAF                  ADJ 11        31,854
  Assets from Int'l Films      ADJ 12        (8,992)
  New balance                               22,862

Bad Debts
  W/O worthless notes          AJE 28       126,012
  N/R-Forest worthless         AJE 33         6,000
  New balance                              132,013

The following journal entries demonstrate the convoluted accounting Kanter engaged in to record the transactions on its books:

AJE 08: To record payment of Int'l Films $507,708 receivable by receipt of 10 receivables from Int'l Films:

|                             | Debit     | Credit    |
|-----------------------------|-----------|-----------|
| N/R Safari Trust            | $62,550   |           |
| N/R CMB Cinema Trust        | 44,887    |           |
| N/R CMB Cinema Trust II     | 10,594    |           |
| N/R RWL Cinema Trust        | 13,660    |           |
| N/R RWL Cinema Trust II     | 43,101    |           |
| N/R HGA Cinema Trust        | 84,942    |           |
| N/R Elk Inv.                | 48,604    |           |
| N/R Inter Alia              | 79,418    |           |
| N/R Hargen, Karen & Steve   | 5,083     |           |
| N/R HELO                    | 114,870   |           |
| N/R Int'l Films             |           | $507,708  |

AJE 09: To record the sale of the 10 receivables to MAF for $10

each:

|  | Debit | Credit |
|---|---|---|
| Due from MAF | $100 | |
| Loss on sale of notes rec. | 507,608 | |
| N/R Safari Trust | | $62,550 |
| N/R CMB Cinema Trust | | 44,887 |
| N/R CMB Cinema Trust II | | 10,594 |
| N/R RWL Cinema Trust | | 13,660 |
| N/R RWL Cinema Trust II | | 43,101 |
| N/R HGA Cinema Trust | | 84,942 |
| N/R Elk Inv. | | 48,604 |
| N/R Inter Alia | | 79,418 |
| N/R Hargen, Karen & Steve | | 5,083 |
| N/R HELO | | 114,870 |

AJE 23: To reduce the sale price of the receivables from $10 each

to $1 each:

|  | Debit | Credit |
|---|---|---|
| Loss on sale of N/R | $90 | |
| Due from MAF | | $90 |

AJE 10: To record the receipt of Int'l Films' 1984 Development

partnership interest by adjusting the 10 receivables transferred

from Int'l Films and sold to MAF creating "negative" receivables:

|  | Debit | Credit |
|---|---|---|
| Investment in 1984 Dev. Pship | $32,854 | |
| N/R Safari | | $4,048 |
| N/R CMB Cinema Trust | | 2,905 |
| N/R CMB Cinema Trust II | | 686 |
| N/R RWL Cinema Trust | | 884 |
| N/R RWL Cinema Trust II | | 2,789 |
| N/R HGA Cinema Trust | | 5,497 |
| N/R Elk Inv. | | 3,145 |
| N/R Inter Alia | | 5,139 |
| N/R Hargen | | 329 |
| N/R HELO | | 7,433 |

AJE 11: To record the sale of the 1984 Development partnership interest to MAF for $1,000:

|  | Debit | Credit |
|---|---|---|
| Due from MAF | $1,000 | |
| Invest. in 1984 Dev. pship | | $32,854 |
| Loss on sale 1984 Dev. Ltd. | 31,854 | |

AJE 12: To again adjust assets from Int'l Films (1) to record receivables from Ballard, Lisle, Abernathy, CMB Cinema Venture, and Holding Co. and (2) to eliminate the 10 "negative" receivables, by reducing the amount of the loss on the sale of the 10 receivables to MAF by $162,721 and reducing the amount of the loss on the sale of the 1984 Development partnership interest by $8,992:

|  | Debit | Credit |
|---|---|---|
| Loss on sale of N/R | | $162,721 |
| Loss on sale of Pship 1984 Dev. | | 8,992 |
| N/R Claude Ballard | $84,889 | |
| N/R Robert Lisle | 12,185 | |
| N/R Harold Abernathy (HGA) | 28,939 | |
| N/R CMB Cinema Venture | 102 | |
| N/R Holding Co. | 12,743 | |
| N/R Safari | 4,048 | |
| N/R CMB Cinema Trust | 2,905 | |
| N/R CMB Cinema Trust II | 686 | |
| N/R RWL Cinema Trust | 884 | |
| N/R RWL Cinema Trust II | 2,789 | |
| N/R HGA Cinema Trust | 5,497 | |
| N/R Elk Inv. | 3,145 | |
| N/R Inter Alia | 5,139 | |
| N/R Hargen | 329 | |
| N/R HELO | 7,433 | |

AJE 28: To write off Ballard, Lisle, and Abernathy receivables as bad debts:

|  | Debit | Credit |
|---|---|---|
| Bad debts | $126,012 | |
| N/R Claude Ballard | | $84,889 |
| N/R R. Lisle | | 12,185 |
| N/R H. Abernathy | | 28,939 |

IRA computed the loss on sale of notes receivable from Int'l Films sold to MAF:

| Sold to MAF | ADJ 09 | $507,608 |
|---|---|---|
| Assets from Int'l Films | ADJ 12 | (162,721) |
| SL N/R $1 not $10 | AJE 23 | 90 |
| Loss on return | | 344,887 |

IRA computed the money loss on sale of 1984 Development as follows:

| Sold to MAF | ADJ 11 | $31,854 |
|---|---|---|
| Assets form Int'l Films | ADJ 12 | (8,992) |
| Loss on return | | 22,862 |

The adjusting journal entries and losses reported on IRA's return are summarized in the following chart:

RECEIVABLES

OWED TO INT'L FILMS

| | | AJE 8 | AJE 9 | AJE 23 | AJE 10 | AJE 11 | AJE 12 | AJE 28 |
|---|---|---|---|---|---|---|---|---|
| | | ($62,550) | $62,550 | | $4,048 | | ($4,048) | |
| SAFARI | $98,450 | (44,877) | 44,877 | | 2,905 | | (2,905) | |
| CMB CIN | 70,650 | (10,594) | 10,594 | | 686 | | (686) | |
| CMB CIN II | 16,675 | (13,660) | 13,660 | | 884 | | (884) | |
| RWL CIN | 21,500 | (43,101) | 43,101 | | 2,789 | | (2,789) | |
| RWL CIN II | 67,839 | (84,942) | 84,942 | | 5,497 | | (5,497) | |
| HGA CIN | 133,695 | (48,604) | 48,604 | | 3,145 | | (3,145) | |
| ELK INV | 76,500 | (79,418) | 79,418 | | 5,139 | | (5,139) | |
| INTER ALIA | 125,000 | (5,083) | 4,083 | | 329 | | (329) | |
| HARGEN | 8,000 | (114,870) | 114,870 | | 7,433 | | (7,433) | |
| HELO | 180,800 | (507,708) | 507,870 | | | | | |
| | 799,109 | | | | | | | |
| | | | | | | | | |
| BALLARD | 196,684 | | | | | | (84,889) | $84,889 |
| LISLE | | | | | | | (12,185) | 12,185 |
| 28,284 | | | | | | | (28,939) | 28,939 |
| ABERNATHY | 67,098 | | | | | | (102) | |
| CMB CIN VEN | | | | | | | (12,743) | |
| 250 | | | | | | | | |
| HOLDING CO. | | | | | | | | |
| 29,500 | | | | | | | | |
| | 321,816 | | | | | (32,855) | $32,854 | |
| | | | | | | | | |
| Total | 1,120,925 | | | | | | | |
| | | | | | | | | |
| 1984 Devl | 55,288 | $507,708 | | | | | | |
| | | | | | | | | |
| Total | 1,176,213 | | ($100) | $90 | | (1,000) | | |
| | | | (507,608) | (90) | | | 162,720 | |
| Int'l Films receivable | | | | | | (31,854) | 8,992 | |

Due from MAF
Loss on sale receiv
Loss on sale pship

| Bad debts | | | | | | | | (126,013) |

In addition to the HELO note acquired from Int'l Films, IRA had another $485,825 receivable owed by HELO.[41] This second note was also sold to MAF along with a $345,869 note receivable from Cedilla Investment Co., one of IRA's subsidiaries, for $1 each, resulting in an additional $831,692 loss. As of August 31, 1987, Holding Co. had total assets of $11,552,887. Holding Co. had the resources to pay either IRA or Int'l Films when the receivable was written off.

In addition to the receivables MAF purchased from IRA, MAF purchased from Kanter for $27,949, a $311,878 promissory note owing by Victorian Village and a $23,356 promissory note from S. Block for $1. Kanter sold these promissory notes to MAF to create a $307,284 loss for tax purposes. By selling the notes, Kanter claimed the loss as having been realized by way of a sale or exchange rather than as bad debt losses.

MAF neither inquired into nor independently ascertained the value of the purchased promissory notes. MAF did not examine and consider a particular note's collectibility or the creditworthiness of its maker or obligors. MAF later wrote off the notes as uncollectible.

By the end of 1987, neither Ballard nor Lisle owed any portion of their original "loans" totaling $196,648 and $28,284,

---

[41] By Sept. 1, 1985, HELO was no longer a subsidiary of Holding Co.

respectively, to either IRA or Int'l Films.  CMB Cinema Ventures no longer owed $250 to either IRA or Int'l Films.  Likewise, Ballard's and Lisle's grantor trusts' original "loans" totaling $357,464 were no longer owed to IRA or Int'l Films.

In 1987, Ballard reported $2,400,252 total income on his Federal income tax return.  Included in the $2,400,252 was $212,309 interest and dividend income and $1,018,367 capital gain income.  In 1987, Ballard had the resources to pay either IRA or Int'l Films the "loans" owing by him and his grantor trusts.  In 1987, when IRA wrote off Ballard's "receivable" as worthless, Ballard did not report the discharge of this indebtedness as income on his 1987 return or on subsequent returns.

In 1987, Lisle reported $746,923 total income on his Federal income tax return.  Included in the $746,923 was $255,707 interest and dividend income.  In 1987, Lisle had the resources to pay either IRA or Int'l Films the "loans" that he had received individually and through his trusts.  In 1987, when IRA wrote off Lisle's "receivable" as worthless, Lisle did not report the discharge of this indebtedness as income on his 1987 return or subsequent returns.  In 1988, the year after IRA wrote off loans owing by Lisle and his trusts (RWL Cinema, RWL Cinema II, and Basking Ridge), IRA made another "loan" to the RWL Cinema Trust in the amount of $6,000.  In addition, KWJ, Inc., or Kanter

continued to "lend" money in 1989 and again in 1990 to Lisle's RWL Cinema Trust.

Neither Ballard, Lisle nor their trusts paid any interest to Int'l Films on the "loans" to them which were subsequently written off as worthless or sold for $1 by IRA.  There were no notes or any other loan documentation evidencing the purported loans to Ballard, Lisle, and their trusts.

On March 8, 1989, approximately 2 years after Int'l Films transferred $1,120,889 of "receivables" to IRA, Int'l Films filed for bankruptcy.  At the time of the bankruptcy filing, Gallenberger was the vice president of Int'l Films and owned 100 percent of its stock.  At the time of Int'l Films' bankruptcy, Int'l Films owed debts to the following creditors:

| Creditors | Reason | Amount |
|---|---|---|
| IRS | 1984 taxes | $5,500 |
| Kanter | Legal services | 750 |
| Neal Gerber & Eisenberg | Legal services | 550 |
| Personal Service Corp. | Services | 700 |
| I&F Corp. | Services | 775 |
| Total | | $8,275 |

Question 15 of the Statement of Financial Affairs for Debtor Engaged in Business attached to Int'l Films' Voluntary Petition for Bankruptcy asked:

Accounts and other receivables:

Have you assigned, either absolutely or as security, any of your accounts of other receivables during the year immediately preceding the filing of the original petition herein?  (If so, give names and addresses of assignees)?

In response to this question, Gallenberger answered "No."

The transfer and write-off of the receivables shown in the following series of diagrams:

1983 Step 1:



1983 Step 2:



1987 Step 1:



1987 Step 2:



$132,013 LOSS

LISLE RECEIVABLE
BALLARD RECEIVABLE
ABERNATHY RECEIVABL

$270,700

IFI RECEIVABLES

SAFARI RECEIVABLE
CMB CINEMA RECEIVABLE
CMB CINEMA II RECEIVA
RWL CINEMA RECEIVABLE
RWL CINEMA II RECEIVAB
HGA CINEMA RECEIVABLE
ELK INVEST RECEIVABLE
INTER ALIA RECEIVABLE
HARGEN RECEIVABLE
HELO RECEIVABLE

RECEIVABLES

CEDILLA INVEST RECEIV
HELO RECEIVABLE

$1,176,670 LOSS
$12

IRA

PARTNERSHIP INTEREST        $22,862 LOSS

1984
DEVEL

$1,000

STOCK        $65,000 LOSS

INT'L FILMS
(IFI)

$1

$3,000

GALLENBERGER        INT'L FILMS

1984
DEVEL

CEDILLA INVEST RECEIVABLE
HELO RECEIVABLE

MAF

SAFARI RECEIVABLE
CMB CINEMA RECEIVABLE
CMB CINEMA II RECEIVABLE
RWL CINEMA RECEIVABLE
RWL CINEMA II RECEIVABLE
HGA CINEMA RECEIVABLE
ELK INVEST RECEIVABLE
INTER ALIA RECEIVABLE
HARGEN RECEIVABLE
HELO RECEIVABLES

$27,950

KANTER

VICTORIAN VILLAGE RECEIVABLE
BLOCK RECEIVABLE

$307,284 LOSS

$311,878 VICTORIAN VILLAGE RECEIVABLE
$23,356 BLOCK RECEIVABLE

C.    Payments to Holding Co. and Its Subsidiaries

After Ballard and Lisle left Prudential, Lisle began working for Travelers.  Schaffel paid IRA $213,750, 50 percent of the fees he earned from the first Travelers' financing approved by Lisle.  After the first payment, Schaffel failed to pay Kanter on succeeding projects financed by Travelers.  After discussions with Lisle, Schaffel agreed to make payments to Kanter, but under a different arrangement.  Kanter directed Schaffel to make the payments to Holding Co.  Schaffel paid Holding Co. $600,000 in 1984, $1,160,000 in 1985, and $1,003,500 in 1986 for transactions with Travelers.

Frey and Essex made the following payments to Holding Co., during the years 1981 through 1989:

| Year | Frey | Essex | Total |
|------|------|-------|-------|
| 1981 | $80,616 | -- | $80,616 |
| 1982 | -- | $70,538 | 70,538 |
| 1983 | 16,200 | 64,125 | 80,325 |
| 1984 | 113,827 | 109,013 | 222,840 |
| 1985 | 256,557 | 98,325 | 354,882 |
| 1986 | -- | 65,835 | 65,835 |
| 1987 | 33,570 | 98,753 | 132,323 |
| 1988 | -- | 96,188 | 96,188 |
| 1989 | -- | 42,332 | 42,332 |
| Total | 500,770 | 645,099 | 1,145,879 |

The following diagram shows the money paid to IRA and Holding Co. by Schaffel for the Travelers financing transactions, and by Essex and Frey to Holding Co. and Zion:



D.    Distributions to Kanter

Kanter had funds in both the Administration Co. Special E Account and the Special Account.  Administration Co. paid some of Kanter's business and personal expenses out of Kanter's funds in these accounts.  During 1982 Kanter received the following amounts from the payers or sources indicated:

| Payer/Source | Funds Received |
|---|---|
| Holding Co. | $787,129 |
| Computer Placement Service | 40,000 |
| Special E Account | 190,078 |
| Special Account | 286,000 |
| Total | $1,303,207 |

In 1983, Administration Co. paid $143,489 in employee compensation and distributed over $500,000 as nonemployee compensation, including $400,000 to the Rainbow Trusts (Rainbow Trust Nos. 1-25).   Prior to 1987, Administration Co.'s assets consisted primarily of cash and receivables.  For example, for the years 1983, 1984, and 1986, Administration Co. listed the following assets on its tax returns:

| Fiscal Year | Cash on Hand | Current Assets (Notes Receivable) | Total Assets |
|---|---|---|---|
| 6-30-83 | $77,735 | $ 998,118 | $1,117,457 |
| 6-30-84 | 23,941 | 4,501,125 | 4,577,701 |
| 6-30-86 | 55,821 | 4,365,144 | 4,512,704 |

Some of Administration Co.'s receivables represented money distributed to Kanter or trusts for the benefit of his family. For example, in 1984, Administration Co. distributed $660,000 to Kanter that was recorded as a receivable. Administration Co.'s trial balance for the twelve months ended 6/30/84 reflects the following notes receivable from Kanter and his grantor trusts:

| Entity | Amount |
|---|---|
| Everglades Trust 1-5 | $23,595 |
| Everglades Trust 2 | 1,000 |
| Everglades Trust 3 | 1,000 |
| Everglades Trust 4 | 1,000 |
| Kanter, Burton W. | 660,845 |
| Total | $687,440 |

As of January 1, 1987, Kanter's general ledger indicated that Administration Co. had distributed a total of $1,056,751 to him. By the end of Administration Co.'s fiscal year ended June 30, 1987, its total assets were as follows:

| Fiscal Year | Cash on hand | Current Assets (Notes Receivable | Total Assets |
|---|---|---|---|
| 6-30-87 | $ 100 | $6,929 | $63,880 |

Administration Co.'s return for the year ended June 30, 1987, was the last return filed for Administration Co. Although the receivables on Administration Co.'s books decreased, as of October 31, 1987, Kanter still had an outstanding loan from Administration Co. in the amount of $1,346,641.

Administration Co. filed for bankruptcy. Sometime in either 1987 or 1988, during the bankruptcy proceedings, Gallenberger gave to Kanter Administration Co.'s records, including Administration Co.'s bank statements and canceled checks and the records related to Kanter, IRA, and Holding Co. The documents were never returned by Kanter to Gallenberger. The records would show the amount of moneys in Administration Co.'s accounts held for Kanter and the related Kanter entities. Administration Co.'s bankruptcy was terminated on April 19, 1988.

During Administration Co.'s bankruptcy, a new company called Administrative Enterprises began its operations. By the end of the year December 31, 1987, Administrative Enterprises filed its initial return, which reported cash on hand of $11,548 and current assets (receivables) of $100.

For each of the years 1979 through 1989, Kanter filed his individual Federal income tax returns which reported adjusted gross income and income taxes paid as follows:

| Year | Adjusted Gross Income (Loss) | Income Tax Paid |
|------|------|------|
| 1978 | ($44,386) | $ 1,671 |
| 1979 | (105,084) | – |
| 1980 | (155,026) | – |
| 1981 | (53,614) | – |
| 1982 | (287,536) | – |
| 1983 | (819,449) | – |
| 1984 | (804,482) | – |
| 1985 | (954,695) | – |
| 1986 | (1,529,213) | – |
| 1987 | (2,004,257) | – |
| 1988 | (1,340,459) | – |

1989          (1,331,576)                    -

Kanter paid no Federal income taxes for an 11-year period, and only minimum tax in 1978 of $1,671.  However, he did pay self-employment tax for the years 1978 ($1,434), 1979 ($1,855), 1980 ($2,098) and 1983 ($3,338).

E.    Examination of Petitioners' Returns

In November 1989, the Internal Revenue Service began an examination of Kanter's income tax returns.  Several years were under examination.

In connection with the investigation of IRA for 1987, an IRS agent received documents from Gallenberger and Kanter.  The types of documents which the agent received included financial records, billings, invoices, expense items and various accounting records and corporate records.  The agent reviewed the records to determine who the shareholders of IRA were in 1983.  The records indicated that the shareholders of IRA for the year 1983 were: The Ballard Family Trust; The Lisle Family Trust; Weisgal as trustee of the Bea Ritch Trust; and Schott.  IRA's minute books reflected that, as of 1984, the only shareholder of IRA was the Bea Ritch Trusts.

Pursuant to a summons to testify, Ballard was interviewed by IRS agents in February of 1990 at his residence in Florida.  At the time of the interview, Ballard was not under audit.  Ballard understood that he was not under audit and testified under oath.

The purpose for the interview was to ask Ballard questions about Kanter's transactions involving Ballard.

Sometime after the interview, Ballard's and Lisle's returns also were audited. The group of examining agents auditing the returns of Kanter, Ballard, and Lisle encountered difficulties because of the numerous entities related to Kanter involving transactions with him.

The investigation expanded. The IRS began interviewing more and more witnesses. By November of 1989, the Criminal Investigation Division (CID) was conducting an investigation.

In February 1990, Kanter sent letters to Ballard's and Lisle's children terminating the payments they had been receiving. In Kanter's letter, he stated that the Ballard and the Lisle children had not done anything for a number of years and blamed Freeman for continuing to have paid them. On November 20, 1990, Lisle wrote a letter to Kanter explaining to Kanter the reasons why he managed Carlco for no compensation. Lisle stated that there could have been a conflict of interest with Travelers, and it was "a learning experience managing a municipal bond fund." He told Kanter that he was going to begin charging a fee because what he was doing took more of his time. Likewise, after Ballard was interviewed by the IRS in 1990, Ballard began taking a salary from TMT.

By letter dated December 17, 1992, Kanter wrote Ballard regarding an obligation purportedly due by Ballard to Int'l Films in the amount of $196,684. In the letter, Kanter requested that Ballard pay $120,000 in satisfaction of this prior obligation, to "simply avoid any controversy with me or anyone else." The $196,684 was the amount that had been written off by IRA as a bad debt in 1987.

During the audit of Kanter's 1987 and 1988 returns, the IRS requested information including data pertaining to transactions with the Five. The documents produced by Kanter during the audit were in many instances incomplete with many missing pages. Moreover, no documents pertaining to the $1,345,641 that Kanter received as a loan from Administration Co. were provided. Kanter, Ballard, and Lisle did not produce the records sought by the IRS in connection with the business entities relating to them. Nor did the IRS receive records voluntarily from any of the entities that had transactions with them. The records that were produced generally were relevant only to Schedule A substantiation items, such as records related to charitable contributions.

As a result of petitioners' failure to produce documents voluntarily, the complexity of the transactions involved, and the number of entities involved, the IRS issued summonses in order to obtain the necessary documents and information to conduct the

examination.  Numerous summonses were issued to Kanter, Ballard, and Lisle, as well as to many of the entities involved.

The IRS issued the following summonses to the following on the dates indicated:

| Summons issued to | Tax Year | Date of Summons |
|---|---|---|
| Claude Ballard | 1984 | July 25, 1991 |
| Linda Gallenberger<br>  In the matter of<br>   Claude & Mary Ballard | 1984 | January 10, 1991 |
| Linda Gallenberger<br>  In the matter of<br>   Robert Lisle & Donna Lisle | 1984 | January 10, 1991 |
| Linda Gallenberger<br>  In the matter of<br>   Claude & Mary Ballard | 1984 | January 10, 1991 |
| Donna Lisle | 1984 | July 30, 1991 |
| Linda Gallenberger | 1984 | January 10, 1991 |
| Robert Lisle | 1988 | July 30, 1991 |
| Linda Gallenberger, Officer<br> Principal Service Corp.<br>  In the matter of<br>   Robert Lisle & Donna Lisle | 1984 | January 10, 1991 |
| Principal Service Corp.<br>  In the matter of<br>   Burton & Naomi Kanter | 1983,<br>1985-1988 | October 1, 1990 |
| Mildred Schott<br> In the matter of<br>  Burton & Naomi Kanter | 1983,<br>1985-1988 | April 30, 1990 |

Summonses were also served on Administrative Enterprises, Principal Services, Zion, and BK Childrens Trust.

The summons to Ballard dated July 25, 1991, requested, in part, documents in his possession pertaining to TMT, IRA, and the Orient Trust.

One of the summonses to Gallenberger dated January 10, 1991, in the matter of Ballard, requested, in part, documents in her possession pertaining to TMT, KWJ Co., Sherwood Associates,

Orient Trust, Essex Hotel Management, and all documents evidencing loans to and from the Ballards with TMT.  The other summons to Gallenberger dated January 10, 1991, in the matter of Ballard, requested, in part, documents in her possession pertaining to IRA, KWJ Co., Sherwood Associates, Essex Hotel Management, Int'l Films, and all documents evidencing loans to and from the Ballards with IRA.

The summons to Gallenberger dated January 10, 1991, in the matter of Lisle, requested, in part, documents in her possession pertaining to IRA, Int'l Films, KWJ Co., Sherwood Associates, Essex Hotel Management, and all documents evidencing loans to and from the Lisles with IRA.

The other summons to Gallenberger dated January 10, 1991, in the matter of Lisle, requested, in part, documents in her possession pertaining to Carlco, Christie Trust, KWJ Co., Sherwood Associates, and Essex Hotel Management and loans between Carlco and the Lisles.

The summons to Donna Lisle dated July 30, 1991, requested, in part, documents in her possession as officer of Carlco pertaining to Carlco, IRA, and the Christie Trust.

The summons to Lisle dated July 30, 1991, requested, in part, documents in his possession pertaining to Carlco, IRA, Christie Trust, and loans between Lisle and IRA, Carlco, and Christie Trust.

The summons to Gallenberger as an officer of Principal Services dated January 10, 1991, requested, in part, documents in Principal Services's possession pertaining to Carlco, Christie Trust, and loans related to Lisle.

The summons to Principal Services dated October 1, 1990, requested, in part, documents pertaining to Principal Service Corporation, IRA and its subsidiaries, Holding Co. and its subsidiaries, BWK, Inc., and the Bea Ritch Trusts. The summons requested production of the cash receipts, cash disbursement journals, general ledgers and ledgers for all bank accounts including the Special E account. The summons also requested production of documents pertaining to any corporation or partnerships in which Kanter, his family or family trusts were shareholders.

The summons to Schott dated April 30, 1990, requested, in part, documents pertaining to Cedilla Company, IRA and its subsidiaries, Kanter, Ballard, Lisle, Schaffel, Frey, Weaver, KWJ Corp., Motor Hotel Management Inc., Essex Hotel Management Co., and Schnitzer-PMS.

The documentation sought in the summonses served on petitioners, Principal Services, Linda Gallenberger on behalf of Principal Services, and Mildred Schott was relevant to the issues in these cases. Petitioners, Gallenberger, Principal Services, and Schott did not voluntarily turn over documents and

information listed on the summonses to the agents during the audit.

None of the above information requested was produced pursuant to the summonses.  In fact, petitioners did not produce anything in response to the summonses, including documents evidencing loans between themselves and the various entities.

Principal Services maintained Kanter's personal records, the records of his family entities and trusts, the records of IRA and Holding Co.  Kanter controlled Principal Services and Gallenberger.  During discovery in these cases, respondent requested receipts and disbursement journals for Holding Co. for all of the years at issue.  Kanter first promised to produce Holding Co.'s books and records in the possession of Principal Services and then, in early February 1994, notified respondent that the Holding Co. was a third-party over which he had no control.  Initially, Gallenberger had in her possession the records of Holding Co. for the years 1986, 1987, and 1988.  After respondent requested production of the Holding Co. records, Kanter never asked Gallenberger for them.  At some point, however, she turned those records over to Kanter.

On April 1, 1994, the Government sought enforcement of four summonses that had been served in 1990 and 1991 on Administrative Enterprises, Principal Services, Zion, and BK Childrens Trust (which is one of the twenty-five trusts which comprise the Bea

Ritch Trust group).  See <u>United States v.  Administration Co.</u>, 74 AFTR 2d 94-5252, 94-2 USTC par.50,479 (N.D. Ill. 1994).  On April 4, 1994, the District Court issued an order to show cause why the Kanter-related entities should not be compelled to obey the four summonses.

In connection with the instant cases, Gallenberger was served by respondent with a discovery subpoena to produce documents.  On May 18, 1994, Gallenberger appeared at the deposition without the requested documents.  At the deposition, Gallenberger stated that she did not have the records because of a 3-year retention policy.  Even under Gallenberger's alleged records retention policy, however, documents of an individual or entity under audit were not destroyed until the audit was completed.

On the following day, May 19, 1994, a hearing was held in the District Court on the Government's motion to enforce the administrative summonses.  At the hearing, Weisgal, who was served as the named trustee of the BK Childrens Trust, admitted that, after he received the summons, some of the documents, including documents relating to the Kanters, had been turned over to Administration Co. and that some had been discarded as part of a 3-year record retention and discard policy.

Gallenberger, who had been served with summonses as president of Administration Co., Principal Services, and

Administrative Enterprises, also admitted at the hearing that she disposed of some documents after she received the IRS summons and claimed that documents relating to Administration Co. were never returned to her from bankruptcy counsel.[42]  On May 20, 1994, the District Court ordered the records sought by the summonses be produced to the IRS by May 24, 1994.  United States v. Administration Co., 74 AFTR 2d 94-5252, 94-2 USTC par. 50,480 (N.D. Ill. 1994).

Although Gallenberger appeared, testified, and produced some documents on May 24, 1994, in accordance with the District Court's order, she did not search all of the approximately 52 filing cabinets of records in her possession, but instead looked in every fifth or seventh file.  The Government filed another motion on June 10, 1994, and, on June 22, 1994 a hearing was held.  See United States v. Administration Co., 74 AFTR 2d 94-5256, 94-2 USTC par. 50,480 (N.D. Ill. 1994).  At this second hearing, Gallenberger admitted that Principal Services operated

---

[42]   During the bankruptcy proceeding for Administration Co., the only documents that bankruptcy counsel for Administration Co. may have received from Administration Co. were copies of its tax returns.  He received none of the books and records of the clients of Administration Co.  The documents sought by the summons which was the subject of the summons enforcement proceeding did not ask for the tax returns of Administration Co.  The summons sought the books and records relating to transactions involving the Kanters for the years 1983, 1985, 1986, 1987 and 1988.  These records were not given to the bankruptcy counsel.  They were given to Kanter.

much like a registered agent and a document repository, but existing primarily for the Kanters' benefit. Gallenberger knew that most of the documents held by Principal Services were related to Kanter entities. The District Court concluded that Gallenberger's sampling of documents did not discharge her duty to make all reasonable efforts to comply with the court's order. Finding a "glaring deficiency in her compliance," the District Court held Gallenberger in contempt of court and granted her until July 1, 1994 to comply fully with the court's order. Id. at 5258, 94-2 USTC ¶50,480 at 85,770. Gallenberger complied with the District Court's order of June 22, 1994, but appealed the order to the Court of Appeals for the Seventh Circuit. The Court of Appeals affirmed the District Court's order in United States v. Administrative Enters., Inc., 46 F.3d 670 (7th Cir. 1995).[43]

The trial of these cases commenced on June 13, 1994. At the start of the trial, respondent's counsel indicated that subpoenas duces tecum had been served on various entities for documents that were to be produced at that time. Counsel for IRA and Kanter informed the Court that the subpoenas requesting documents from IRA, BWK, Inc., Carlco, and TMT had been served on Gallenberger, but that Gallenberger was not the custodian of the

---

[43] The Court of Appeals stated: "It is apparent that the Government is interested in transactions in which Kanter and his family and their investment vehicles are involved and not just in the terms of the custodianship arrangement." United States v. Administrative Enters., Inc., 46 F.3d 670, 673 (7th Cir. 1995).

records.  Rather, Kanter was the custodian of the records.

Respondent immediately served Kanter with a subpoena requesting

records relating to Holding Co. and its subsidiaries, IRA and its

subsidiaries, Carlco, TMT, and BWK, Inc.  The subpoena requested

corporate minute books, corporate minutes, articles of

incorporation and all amendments thereto, stock registers, stock

certificates, certificates of authority, bylaws and all

amendments thereto, and all subscription agreements and

agreements thereto.  In addition to the books and records,

respondent also requested production of documents reflecting the

ownership of IRA, Holding Co., Carlco, TMT, and BWK.

Specifically, respondent requested production of the following

original documents:

> All books, records or other documents evidencing the
> ownership of the following entities:  IRA, Holding Co.,
> Carlco, TMT, BWK, .  .  .  including but not limited to
> stock ledgers and records of stockholders.

Although Kanter produced some documents, many records were

not produced.  Absent from the record are resolutions by the

board of directors of Carlco and TMT setting forth the

preferences of the preferred stock.

With respect to Holding Co., Kanter produced Holding Co.

trial balances only for the years 1980 and 1981.  Respondent had

from prior audits partial general ledgers of Holding Co. for

1983, 1984, and 1985, and partial trial balances of Holding Co.

for 1983, and 1984.  There are no receipts and disbursement

journals, general ledgers, or trial balances for Holding Co. for the years 1980, 1981, 1982, 1985 (partial), 1986, 1987, 1988, and 1989. Respondent sought the records because the Five made payments to Holding Co. during those years.

When the trustees of Kanter's family trusts, Baskes and Weisgal, were asked to produce documents, they, likewise, failed to do so on the ground that they did not have the requested information in their possession.

Gallenberger took the position that a request for documents in the possession of Principal Services was a request for the documents of Principal Services, and not the records maintained by Principal Services for Kanter or Kanter-related entities. She claimed that Principal Services had a policy of refusing to turn documents over to anyone other than the owner.

## OPINION

By this point, the complexity of these cases is apparent. That complexity is reflected in the sheer magnitude of the record and is exacerbated by the contentiousness of the parties. The trial in these consolidated cases lasted almost 5 weeks, and produced a transcript of 5,411 pages. The parties' combined briefs contain 4,668 pages and address over 40 issues. We have plodded through thousands of exhibits containing hundreds of thousands of pages. Not surprisingly, our task of finding the facts has been laborious and frequently frustrating.

Unless otherwise indicated, references hereinafter to petitioners are to Ballard, Lisle, and Kanter, collectively.

I.   Position of the Parties

Respondent contends that the payments made by the Five to the various Kanter entities were kickbacks paid to petitioners for their influence and assistance in acquiring business with Prudential, Travelers, and others.  Specifically, respondent alleges that (1) when Ballard and Lisle were employed by Prudential, petitioners received kickbacks from the Five that petitioners agreed to split 45 percent each to Ballard and Lisle and 10 percent to Kanter (the Prudential transactions), (2) when Lisle worked for Travelers, Lisle and Kanter received kickbacks that were split 90 percent to Lisle and 10 percent to Kanter (the Travelers transactions), and (3) Kanter alone received kickbacks for transactions that were not necessarily related to Prudential and Travelers (the Kanter transactions).

Respondent contends that the payments constituted income to petitioners that they failed to report on their Federal income tax returns.  It is asserted that the payments related to the Prudential transactions are taxable 45 percent each to Ballard and Lisle and 10 percent to Kanter, the payments related to the Travelers transactions are taxable 90 percent to Lisle and 10 percent to Kanter, and the payments related to the Kanter transactions are taxable 100 percent to Kanter.  In the

alternative, respondent asserts that, if any of the payments related to the Prudential and Travelers transactions are not taxable to Ballard and Lisle, the payments are taxable 100 percent to Kanter.

Respondent maintains that Kanter, in carrying out the Prudential and Travelers schemes, routed the kickback payments through IRA and Holding Co., two entities that he controlled, to conceal from Prudential and Travelers (Ballard's and Lisle's employers) the fact that Ballard and Lisle were receiving kickbacks.  As a further part of the Prudential kickback scheme, respondent argues, Kanter later directed and allocated much of the kickbacks IRA received from the Five to IRA's subsidiaries, Carlco, TMT, and BWK, Inc., roughly in accordance with the respective 45-45-10-percent split agreed to by Ballard, Lisle, and Kanter.  In doing this, respondent claims that Ballard, Lisle, and Kanter each then controlled and managed his respective share of the kickbacks from the Prudential scheme.  Although Ballard's and Lisle's purported shares of the kickbacks were not immediately paid to them, respondent asserts that substantial funds eventually were either paid out or provided to them and their families through "loans" and "consulting payments" to their children.

Respondent argues that IRA, its subsidiaries Carlco, TMT, and BWK, Inc., and Holding Co. were sham or dummy corporations

that should not be recognized as separate taxable entities.  In the event the Court decides that the corporations were not sham or dummy corporations, respondent argues in the alternative that petitioners are taxable on the income under the assignment of income doctrine or pursuant to section 482.

Petitioners, on the other hand, dispute respondent's characterization of such payments as kickbacks and their attribution to Kanter, Ballard, and Lisle.  Petitioners deny that any kickback schemes existed and contend that the payments from the Five were properly taxable to IRA, Holding Co., or one of their subsidiaries.  Petitioners contend that all of the payments were reported on the respective tax returns of IRA and Holding Co. during the years at issue and that such income was properly taxable to IRA, Holding Co., and/or their subsidiaries, and not to Ballard, Lisle, and/or Kanter, as respondent asserts.

Petitioners contend that the corporations were not shams and that the assignment of income doctrine and section 482 are inapplicable.

## II.  Omitted Income

Since all of the payments by the Five were made to entities associated with and controlled by Kanter, and, from there, the payments flowed through to Kanter, Ballard, and Lisle, it is appropriate to consider first whether the payments made to Kanter's entities are attributable to petitioners, because if we

conclude that such payments were not attributable to them, it follows that such payments or portions thereof are attributable to the entities that received the payments.

A.   The Transactions

We begin by examining the transactions at issue.

1.   The Hyatt Payments

In a joint venture with others, Prudential built the Embarcadero Hotel and sought a management company to operate it. Originally, only Webb and Intercontinental were considered for the management contract on the hotel. Although Hyatt had successfully negotiated the management contract for the Houston Hyatt Hotel, in which Prudential was involved, Lisle was not interested in having Hyatt bid on the management contract for the Embarcadero Hotel. Pritzker offered to pay 10 percent of the management fees to Weaver if he could get Prudential to award the contract to Hyatt. Weaver then convinced Lisle to allow Hyatt to bid on the contract.

Representatives of the hotel's owners, including Lisle and Ballard representing Prudential, then met with Webb and Pritzker to obtain bids on the management contract. Apparently, since Intercontinental was not represented at the meeting, Intercontinental either withdrew or was eliminated from consideration prior to the meeting. Webb refused to submit a bid at the meeting because he thought he had previously been promised

the contract. Hyatt submitted the only bid and was subsequently awarded the contract. Hyatt then executed a written agreement with Weaver's KWJ Corp. dated February 25, 1971, pursuant to which Hyatt agreed to pay KWJ Corp. 10 percent of the management fees Hyatt earned from management of the hotel. The agreement acknowledged that "KWJ" was the principal factor in bringing Hyatt Corp. and the owners of the Embarcadero Hotel together and aiding in the negotiations.

The hotel opened in May 1973. Apparently, Hyatt did not make a profit the first year, and no payments were made to KWJ Corp.

In 1975, a dispute arose between Weaver and Hyatt as to whether KWJ Corp. was entitled to management fees for 1974. The dispute was settled in November 1975.

Before the dispute was settled, Weaver and Kanter agreed that Weaver would sell all the stock of KWJ Corp. to IRA. They executed an agreement dated March 10, 1976, acknowledging the agreement. The agreement gave IRA the option to purchase the stock within 4 years for $150,000 plus an amount equal to 30 percent of all payments received by KWJ Corp. from Hyatt after the purchase. In September 1979, Kanter informed Weaver that he wanted to proceed with the purchase of the KWJ Corp. stock. The sale was made effective retroactively to November 1, 1978.

Petitioners would have us end our examination of the transaction at this point and hold that the sale was a valid arm's-length sale of the stock to IRA.  The Court declines to do so because it would ignore the true substance of the transaction and give new meaning to the expression "blind justice".  We think the true substance of the transaction is clearly disclosed when one follows the flow of the money.

The only activity conducted by KWJ Corp. and later the KWJ Co. partnership, was receiving the Hyatt payments.  IRA was to pay $10,000 of the purchase price in November 1979 and the balance by August 1980.  Hyatt paid over $170,000 to KWJ Corp. in 1979.  Thus, IRA simply paid the purchase price from the Hyatt payments.

After paying 30 percent of each of the Hyatt payments to Weaver, the remaining funds were (1) distributed as "consulting fees" to Ballard's and Lisle's children, (2) filtered along with other payments from the Five through IRA, Int'l Films, and HELO as loans to Ballard, Lisle, and Kanter, and (3) distributed to Carlco, TMT, and BWK, Inc.  Lisle's control over the Carlco assets, Ballard's control over the TMT assets, and Kanter's control over the BWK, Inc. assets went unfettered.  Petitioners had unrestricted power to use the funds for their personal benefit and in fact did so.

The record clearly and convincingly shows that Weaver agreed to split his Hyatt commissions with Ballard and Lisle in exchange for their influence in having the management contract awarded by Prudential and its co-owners to Hyatt. The record also shows by clear and convincing evidence that Lisle and Ballard agreed to pay Kanter 10 percent of their share of the payments in exchange for Kanter's facilitating the concealment and distribution of the funds. Additionally, the transfer of the stock to IRA allowed petitioners to offset the income from the Hyatt payments with tax-shelter losses claimed on IRA's consolidated returns. The entire arrangement was implemented in order to conceal Ballard's and Lisle's participation from Prudential and Kanter's participation from Hyatt and to avoid Federal taxes.

When Weaver sent to IRA the 1983 payment from Hyatt for the management fees earned in 1982, he wrote in the letter dated March 29, 1983: "Will you please deposit and issue appropriate checks to the participants." If there was no agreement to split the fees with petitioners, we think it more likely that Weaver would simply have directed IRA to remit to him his 30 percent. KWJ Corp. had not been liquidated; Carlco, TMT, and BWK were not "active" (no stock had been issued); and the KWJ Co. partnership had not yet been formed. We are convinced that the reference to the "participants" was to Ballard, Lisle, and Kanter, as well as Weaver.

Petitioners assert that Ballard and Lisle did not have the power to award the contract to Hyatt in part because their positions with Prudential did not give them such authority and in part because there were others besides Prudential participating in the project. Although Ballard and Lisle may not have been in a position to guarantee that the contract would be given to Hyatt, their opinions as Prudential executives would have influenced the other owners. Certainly a negative opinion with respect to a bidder would have foreclosed the possibility of the bidder getting the contract. Strum, CEO of the Prudential Realty Group for Development and Retail Property Investments, testified that Ballard had the "hierarchy power" either to influence the selection of contractors or to prevent a project from going forward. Initially, Lisle used his "prevention power" to keep Hyatt even from being considered for the management contract. Ballard and Lisle may not have had the power to guarantee that Hyatt would get the contract, but they did have the power to guarantee that it would not get the contract.

Kanter claims that he did not know about Hyatt's arrangement with Weaver until Pritzker later asked him about some language in the agreement. The copies of the correspondence between Weaver and Hyatt concerning the dispute over the computation of the fees were copies that Kanter had in his records. He claimed that

Pritzker gave him the copies in the course of Pritzker's consulting with him regarding the dispute with Weaver.

The letter acknowledging Weaver's prior understanding that he would sell all the stock in KWJ Corp. to Kanter's "client" (IRA) for $150,000 is dated March 10, 1976. Kanter admitted that he and Weaver had been discussing the sale for some time before March 10, 1976. At trial he testified that he did not know whether it was a few months before or a much longer period of time. Kanter testified that "J.D. [Weaver] needed money and was clearly unhappy with what might be the interpretation of the contract in light of his dispute with Abe [Pritzker], and it led to this letter."

We find Kanter's testimony to be implausible. We find it incredible that an attorney consulting with a very important client about a contract dispute would surreptitiously negotiate with the other party to the contract to purchase essentially the same contract that was the subject of the dispute and on which the attorney was giving advice.

We are not convinced that Kanter obtained the copies of Hyatt's correspondence with Weaver from Pritzker rather than from Weaver. Kanter was not Hyatt's attorney. He represented the Pritzker family, but Hyatt had its own attorneys, including members of the Pritzker family who themselves were attorneys. Kanter testified that he had very limited involvement with

respect to the Embarcadero Hotel project and that, although Hyatt Corp. had full-time tax counsel representing it, there were some isolated tax questions with which he was involved. He testified that, at that time, his office did not do anything but tax work and he had no involvement with any other part of the project or contract.

Kanter also claims that Weaver gave IRA 4 years to buy the stock for two reasons: First, because Weaver needed the money, and, second, because Hyatt was attempting to become privately owned and Hyatt would not want to disclose the agreement. Kanter claimed that the reason Hyatt would not want to disclose the agreement was because others might expect similar fee-splitting arrangements in negotiating for other projects.

Again, Kanter's explanation is implausible. If Weaver needed the money, we do not think he would agree to put the sale off for up to 4 years. Furthermore, Hyatt's contract with KWJ Corp. already existed. Hyatt either had to disclose its contract with KWJ Corp. in accordance with the securities laws or it did not. We fail to see how the sale of the stock to IRA would affect the disclosure requirement unless IRA was somehow considered an interested party or an insider with respect to Hyatt Corp. We think it more likely that Kanter did not want to disclose the purchase to Hyatt Corp. or the Pritzkers. In fact, Kanter did not disclose the purchase of the stock, the

liquidation of KWJ Corp., or the assignment of the contract rights to the KWJ Co. partnership until sometime around 1992.

Furthermore, there was no reasonable explanation for Weaver's selling the stock in KWJ Corp. to IRA for $150,000 plus an amount equal to 30 percent of all payments received by KWJ Corp. from Hyatt. Weaver was experienced enough to know that the contract was worth millions of dollars. By selling the stock, he effectively gave up 70 percent of the contract rights. It would have been less costly to hire another attorney to represent him in enforcing the agreement. Moreover, if Weaver had expected Hyatt to make the payments more readily because of Kanter's relationship to IRA and the Pritzkers, then Weaver would have notified Hyatt of the sale of the stock. That he did not do. Instead, he continued to receive the payments from Hyatt which he then forwarded to IRA. It is clear that Weaver and Kanter intentionally concealed the sale of the KWJ Corp. stock from Hyatt until Kanter's relationship with Weaver deteriorated around 1992.

Similarly, the Court also finds that the "consulting payments" Kanter arranged to have KWJ Corp., and later the KWJ Co. partnership, pay to Ballard's and Lisle's children from about 1983 through 1989 were part of the kickback scheme. Although referred to as "children", they were adults and were all engaged

in other employment, and no services were performed or expected of them for these payments.

We hold that the Hyatt payments, less Weaver's 30 percent, were attributable to services provided by Kanter, Ballard, and Lisle.

## 2. The Frey Arrangement

Frey was engaged in the business of converting apartment complexes into condominiums. Frey agreed to share fees with Kanter in any project for which Kanter provided investors.

Frey's agreement that he would share development and management fees with Kanter was formalized in two separate written agreements each dated October 12, 1981. One agreement was between Frey and IRA's subsidiary Zeus, and the other agreement was between Frey and Holding Co.

The written agreement with Zeus covered development fees and profits shares from all condominium conversions of property of or for Prudential, including all prior and future conversions. The agreement did not provide for termination by either party and did not require Zeus to provide any funds or services.

All of Zeus' income was attributable to the payments from the Frey corporation, interest income, and income from partnerships. The commission payments from Frey were unrelated to Zeus' investment in the partnerships. Zeus did not provide any capital or services for the commission payments. Frey agreed

to pay Zeus and made the payments because Kanter used his influence with Ballard and Lisle, who in turn used their positions of authority at Prudential to influence Prudential in using Frey as the developer in the conversion of Prudential properties into condominiums. The payments were accumulated in Zeus (or distributed as loans) until 1983. In 1983, Zeus distributed the funds to IRA. In 1984 IRA distributed the funds to Carlco, TMT, and BWK, Inc., effectively distributing the funds 45 percent each to Ballard and Lisle and 10 percent to Kanter. Frey paid Zeus $103,500 in 1984 and $128,763 in 1985 (totaling $232,263). Although the money was accumulated in Zeus until it purchased the preferred stock in Windy City in 1986, IRA distributed $249,870 to the KWJ Co. partnership as "loans" from 1984 to 1989.

It is clear that the payments made by Frey to Zeus were for services provided by Ballard, Lisle, and Kanter.

The second agreement (between Frey and Holding Co.) applied to "capital contribution, profits and losses and Developers' Fees" for all condominium conversions excluding the developers' fees from Prudential projects that were covered by the agreement with Zeus. The agreement could be terminated by either party with 45 days' prior notice with the termination effective only with respect to new condominium conversions. Although the second agreement required Holding Co. to make capital contributions with

respect to Holding Co's. investment as a partner, it did not require Holding Co. to make any contributions or provide any services in exchange for its share of the developer fees at issue in this case. Furthermore, Holding Co. did not pay for its partnership interest. Rather, Frey paid the capital contributions, and Holding Co.'s share of profits was reduced by a portion of the contributions as the profits were distributed.

Frey paid a portion of his development fees and profit interest to Holding Co. for Kanter's services of providing other investors in the projects. Holding Co. did not provide any services or capital with respect to those fees.

We hold that the payments from Frey to Zeus are attributable to services provided by Ballard, Lisle, and Kanter, and the payments to Holding Co. are attributable to services provided by Kanter.

## 3. The Schaffel Arrangement

The arrangement between Schaffel and Kanter originated at the dinner with Ballard and Lisle in New York. At the meeting, Kanter offered his and "his associates'" help in obtaining deals from which Schaffel could earn fees as a broker, provided Schaffel would agree to pay Kanter half of any broker's fees Schaffel received from the deals. Schaffel agreed, and Kanter helped Schaffel negotiate agreements with Torcivia and Walters. Pursuant to those agreements, Torcivia and Walters agreed to pay

Schaffel 1 percent of the gross amount of the contract price of any construction contract that Schaffel helped obtain for their companies. Schaffel then executed a letter agreement to pay 50 percent of the fees he received for construction jobs in which Kanter or his "associates" had been instrumental or helpful in obtaining for Torcivia or Walters. Although the letter agreement is addressed to IRA, it is clear that the agreement was with Kanter and the reference to associates was to Ballard and Lisle.

As a result of the introduction to Ballard and Lisle, Schaffel began doing millions of dollars of business with Prudential, including construction contracts and financing for Torcivia and Walters, as well as others. From 1979 to 1983, Schaffel paid IRA $1,184,876 from these Prudential transactions.

After Ballard and Lisle left Prudential, Schaffel stopped negotiating contracts with Prudential. Instead, he began negotiating contracts for Torcivia and Walters with Lisle at Travelers. Schaffel paid IRA $213,750 from the first Travelers transaction. After that payment, however, Schaffel stopped paying IRA a share of the fees he earned on Travelers transactions. When Kanter contacted Schaffel and inquired as to why Schaffel was not remitting half the fees from Travelers transactions to IRA, Schaffel claimed that the prior agreement related to Prudential transactions did not apply to Travelers transactions. In the August 28, 1984, letter to Schaffel, Kanter

asserted that the arrangement should continue because, in his view, Travelers had replaced Prudential as the principal source of the transactions because of the "very personnel" to whom Schaffel had been introduced. It is clear that the reference to personnel was to Ballard and Lisle.

After discussing the situation with Lisle, Schaffel agreed to resume payments for fees earned on Travelers transactions. Instead of paying IRA, however, Kanter had Schaffel send the payments from Travelers transactions to Holding Co.

Ballard and Lisle knew that Kanter had an arrangement with Schaffel to share in the fees Schaffel earned on certain business deals, because they were present at the dinner meeting when Kanter initially proposed and discussed the arrangement with Schaffel. When Kanter and Schaffel had their dispute over whether IRA was entitled to a share of Schaffel's fees on business deals with Travelers, Lisle was concerned that a lawsuit between the two might cause problems for Lisle with Travelers. Lisle was concerned because he was involved with the arrangement and benefited from it.

The payments from Schaffel for the Prudential transactions were accumulated in IRA until the formation of Carlco, TMT, and BWK, Inc. In 1984, IRA transferred funds to the three new corporations in a 45-45-10 ratio, effectively transferring 45 percent to Lisle, 45 percent to Ballard, and 10 percent to

Kanter.  It is clear that payments Schaffel made to IRA were in part for Kanter's service of introducing Schaffel to Ballard and Lisle, and that Kanter agreed to share the payments with Ballard and Lisle in a 45-45-10 split.

Although it is also clear that the payments Schaffel made to Holding Co. were for Kanter's prior service in introducing Schaffel to Lisle, the record does not show that the funds flowed through from Holding Co. to Lisle.  The payments at issue do not include the payments Schaffel made through FPC Subventure.  Lisle included 90 percent of the FPC Subventure payments in the income reported on his returns.  There is no evidence in the record that Kanter otherwise agreed to share or did share the fees from the Travelers transactions at issue here with Lisle.  Thus, we find that none of the payments were paid to Lisle for his services.

4.   The Schnitzer Arrangement

In 1974, Schnitzer's holding company, Century, purchased Schnitzer-PMS (Fletcher Emerson at the time) for $1.3 million. The purchase price was based roughly on five times Fletcher Emerson's pretax earnings of approximately $250,000.[44]  At the time of the purchase, Schnitzer-PMS had been managing a relatively small number of Prudential's commercial properties.

_____

[44]   Walter Ross was senior vice president of finance of Century Development Corp. at the time of Schnitzer's purchase of Fletcher Emerson.  Ross testified that it was customary in the industry to base the purchase price of a service corporation such as Fletcher Emerson on the pretax income of the company.

Schnitzer wanted to expand Schnitzer-PMS' business, including its business with Prudential. Schnitzer approached Ballard and offered to give Prudential a 50-percent interest in Schnitzer-PMS. Prudential declined the offer.

Although the record shows that Ballard introduced Schnitzer to Kanter sometime between 1971 and 1976, it is not clear whether the introduction was made before or after Schnitzer proposed to give Prudential 50 percent of the Schnitzer-PMS stock. After Prudential declined Schnitzer's offer and prior to September 1976, Schnitzer and Kanter began discussing Kanter's purchasing 50 percent of Schnitzer-PMS. Kanter indicated that he could obtain additional business for Schnitzer-PMS through his business contacts, including his contacts with the Pritzkers. Before agreeing to the sale of the stock, Schnitzer confirmed with Ballard that Kanter could bring in business for Schnitzer-PMS.

Kanter and Schnitzer agreed that Schnitzer-PMS would be recapitalized to provide for preferred stock to be issued to Century. The preferred stock was entitled to a preferred dividend equal to the amount of Century's bank loan outstanding on its original purchase of Fletcher Emerson. Century would receive the preferred stock and 52.5 percent of the common stock, and Kanter's client (IRA) would purchase 47.5-percent (51.3 shares) of the common stock for $150,000. Although closing was originally set for October 1976, because of difficulties in

finalizing the agreement, closing did not take place until January 1978. IRA paid $50,000 at closing and issued a promissory note for the $100,000 balance.

Schnitzer's primary objective in selling the 47.5-percent Schnitzer-PMS interest to IRA was to acquire business from the Pritzkers and/or Hyatt which he felt could be obtained through Kanter's influence. By early 1978, although Schnitzer-PMS' business, in particular its business with Prudential, had greatly increased, it had not received any business from Hyatt. When such business was not forthcoming, Schnitzer decided that IRA should sell back the Schnitzer-PMS stock. Kanter offered to either sell IRA's stock in Schnitzer-PMS to Century or purchase from Century Development Corp. its stock in Schnitzer-PMS for $3.1 million. In November 1979, Century repurchased the 47.5 percent owned by IRA in July 1979 for $3.1 million, payable over a 10-year period with interest. At the time of the repurchase, approximately $700,000 remained outstanding on the loan for the original purchase of Fletcher Emerson.

The payments for the repurchase of the Schnitzer-PMS stock were accumulated in IRA until the formation of Carlco, TMT, and BWK, Inc. In 1984, IRA transferred the funds to the three new corporations in a 45-45-10 ratio, effectively transferring 45 percent to Lisle, 45 percent to Ballard, and 10 percent to

Kanter.  After 1984, IRA continued to distribute the installment payments to Carlco, TMT, and BWK, Inc. in the 45-45-10 ratio.

Respondent asserts that Schnitzer used the sale and repurchase of the stock as a means of paying a kickback to Ballard and Lisle for their influence in obtaining business with Prudential.  It is argued that the kickback is evidenced by a bargain sale price and an excessive repurchase price.

Petitioners argue that the purchase price was not a bargain purchase because at the time of the purchase, Schnitzer-PMS had assets with net book value of approximately $200,000 and 47.5 percent of that amount would be $95,000.

We do not think, however, that net book value of the corporation's assets is an appropriate measure of the value of a service corporation.  We note that when the stock was repurchased in 1979 for $3.1 million, the corporation had net assets of $255,581.  Additionally, Schnitzer's purchase price of $1.3 million for the Fletcher Emerson stock was based on five times the pretax income of approximately $250,000.  Schnitzer-PMS' 1977 pretax income was $451,347.  Five times Schnitzer-PMS' 1977 pretax income of $451,347 is approximately $2.2 million.  Allowing for the value of the preferred stock liquidation dividend preferences equal to the $1.1 million debt outstanding on Century's original purchase of Fletcher Emerson, the value of Schnitzer-PMS common stock at the time IRA acquired the stock was

approximately $1.1 million.  IRA acquired 47.5 percent of the common stock with a value of at least $522,500 for $150,000.[45] Furthermore, IRA paid $50,000 at closing and issued a promissory note for the $100,000 balance.  IRA did not pay the $100,000 until after Schnitzer told Kanter that he wanted to repurchase IRA's Schnitzer-PMS stock.  Clearly, IRA's purchase of the Schnitzer-PMS stock was a bargain.

Schnitzer sold the stock to IRA at the bargain price in exchange for Kanter's promise to use his influence with his clients, particularly the Pritzkers, to direct business to Schnitzer-PMS.  Schott's and Weisgal's relationships to IRA, as well as their contacts, were irrelevant. Schnitzer would have sold the stock directly to Kanter or to any entity that Kanter wanted to use for the transaction.  Moreover, Schnitzer testified that he would have sold the stock for less than $150,000.

With respect to the repurchase price, Schnitzer-PMS' 1978 pretax income was $832,000.  When IRA sold the stock back to Schnitzer, approximately $700,000 remained outstanding on the loan for the original purchase of Fletcher Emerson.  Based on five times earnings, at the time of repurchase the entire

---

[45]   Under the stock agreement entered into by Century and IRA when IRA purchase the Schnitzer-PMS stock, upon the death of the last to die of Kanter, Weisgal, and Schott, Century had the option to purchase IRA's stock.  The purchase price for IRA's stock under the agreement was an amount in excess of 8 times Schnitzer-PMS's average pretax income. Eight times Schnitzer-PMS pretax income for 1977 is over $3.6 million.

business was worth approximately $4.2 million ($832,000 x 5);
allowing for the liquidation and dividend preferences of the
preferred stocks the common stock had a value of roughly $3.5
million ($4.2 million - $700,000), and IRA's 51.3 shares of
common stock had a value of roughly $1.6 million ($3.1 million x
47.5 percent).[46] The Court notes, however, that around the end of
1979 or early 1980, Schnitzer discussed the sale of Schnitzer-PMS
to Minneapolis Honeywell for a price between $12 million and $13
million.[47] Although Honeywell decided not to purchase Schnitzer-
PMS, we think that when Schnitzer agreed to repurchase the
Schnitzer-PMS stock from IRA, he thought the stock was worth $3.1
million. Otherwise, he would have sold Century's stock to IRA.

Schnitzer's primary objective in selling the 47.5-percent
Schnitzer-PMS interest to IRA was to acquire business from Hyatt
which he felt could be obtained through Kanter's influence.
Apparently, when Schnitzer negotiated the reacquisition of the
stock, he was unaware of the assistance from Ballard or Lisle for

[46] Roland Burrows, chief office and president of Schnitzer-PMS
during the years at issue, testified that the business of the
corporation grew at about 25 percent each year until about 1976.
The rate of growth slowed substantially after that time because
of the size of the corporation.

[47] Under the stock agreement entered into by Century and IRA
when IRA purchased the Schnitzer-PMS stock, the purchase price
for IRA's stock was an amount in excess of 8 times Schnitzer-
PMS's average pretax income. Eight times Schnitzer-PMS pretax
income from 1976 to 1978 ($533,500) is more than $4.2 million.
Based on that value all of the stock in the corporation was worth
more than $8 million.

additional property management business with Prudential.  Thus, although we find that Schnitzer sold the stock to IRA at a bargain price for Kanter's influence, we cannot say that Schnitzer intended the payments to repurchase the stock as kickbacks to Ballard and Lisle.

The flow of the money, however, makes it clear that Kanter agreed to share the money received from the transaction with Ballard and Lisle in exchange for their assistance in giving more Prudential business to Schnitzer-PMS.  The increase in the Prudential business greatly increased the pretax income and, thus, the value of the Schnitzer-PMS stock.  IRA, as with the other transactions involving the Five, held for the benefit of Ballard, Lisle, and Kanter the funds received from the repurchase of its stock in Schnittzer-PMS, and distributed the funds to the individuals through Carlco, TMT, and BWK, Inc.

5.   The Eulich/Essex Arrangement

The final arrangement involved petitioners, Eulich, and Connolly.  Eulich was a real estate developer and had known Ballard and Lisle since at least 1965.  Eulich dealt with Ballard and Lisle in connection with Prudential's financing his development of real estate.  Eulich and Kanter had also known each other since the late 1960's or early 1970's and had had many business dealings with each other.   Eulich owned a hotel management company called Eulich-Management.  Connolly was an

employee of another management company that managed Prudential's Gateway Hotel. Connolly was employed as the in-house manager of Prudential's Gateway Hotel. In 1981, Connolly threatened to quit because he wanted an increase in his compensation. Prudential began discussing giving the management contract to Connolly.

Ballard introduced Connolly to Eulich. Kanter, Eulich, and Connolly then organized two corporations, a hotel management company called Gateway Corp. and Essex Corp. (incorporated in 1981). Eulich provided $10,000 for the initial capitalization of Gateway Corp. Connolly was issued all of the stock of Gateway Corp., but granted Essex Corp. a 10-year option to purchase 80 percent of the stock.

By February 1, 1982, Gateway Corp. entered into management contracts with Prudential to operate the Gateway Hotel and the Midland Hotel (another hotel owned by Prudential). Gateway Corp. was required by Prudential to provide financial reports on the Gateway Hotel's operations. The full-time employment of personnel to perform these and other required services would have been uneconomical, since Gateway Corp. would be managing only one or two hotels. Therefore, Eulich agreed that employees of Eulich-Management would provide these services for Gateway Corp.

Eulich, Kanter, and Connolly also formed the Essex partnership (organized effective January 1, 1982). Eulich-Management held a 47.5-percent interest in Essex, Connolly a 5-

percent interest, and Kanter's entities IRA and Holding Co. held the remaining 47.5 percent (26.125 percent and 21.375 percent, respectively).

The Essex partnership entered into "Representation and Marketing" agreements with Eulich-Management and Gateway Corp., effective January 1, 1982. The Eulich-Management/Essex agreement required Eulich-Management to pay to Essex 30 percent of its management fees from its operation of the Madison Hotel and 43 percent of the fees from its operation of the Allentown Hilton. The Gateway Corp./Essex agreement required Gateway Corp. to pay to Essex 75 percent of Gateway Corp.'s management fees from the operations of the Gateway Hotel and the Midland Hotel.

The Essex partners agreed that Gateway Corp. and Eulich Management generally would pay the same amount of fees to the Essex partnership. The partnership's specified percentage of fees under each consulting and fee participation agreement could be adjusted and modified if a significant change occurred with respect to the compensation that Gateway Corp. or Eulich-Management received under a particular hotel management contract. Substantially all of Essex's income came from Gateway Corp. and Eulich-Management.

From 1982 to 1988, Essex received $1,334,601 in commission fee payments from Gateway Corp. and $1,563,412 from Eulich-Management. In 1989, Essex received a total of $293,261 from

Eulich-Management and Gateway Corp. From 1982 to 1989, Essex distributed $788,452 to IRA, $645,028 to Holding Co., $150,899 to Connolly, and $1,433,551 to Eulich-Management.

IRA accumulated the money paid to it by Essex until 1983. In 1983, IRA began distributing the money to Ballard, Lisle, and Kanter through Carlco, TMT, and BWK, Inc., in the 45-45-10 ratio. On December 31, 1984, IRA transferred its partnership interest in Essex to Carlco, TMT, and BWK, Inc., in the 45-45-10 ratio. IRA did not inform the Essex partnership of the transfer and continued to receive the payments from Essex and then transferred the payments to Carlco, TMT, and BWK, Inc.

Essex had no real business purpose. It had no office, equipment, or employees and did not perform any services under the "Representation and Marketing" agreements with Eulich-Management and Gateway Corp.

Eulich's relationship with Ballard, Lisle, and Kanter was longstanding. Lisle's son was employed by one of Eulich's Vantage companies. The Court is convinced that Eulich agreed that Eulich-Management would participate in the Essex arrangement and provide services to Gateway Corp. as payment to Kanter, Lisle, and Ballard for their influence with respect to other business directed to Eulich and his corporations. Eulich testified at trial that he caused Eulich-Management to participate in the Essex partnership because he expected that

Kanter might eventually help Eulich-Management obtain management contracts for larger hotels.

Although Connolly was an excellent hands-on hotel manager, he had no experience with the financial or reporting aspects of managing a hotel.  He participated in the formation of Gateway Corp. and Essex and the financial arrangement because he wanted more money than he had been receiving from the company managing the Gateway Hotel.  His participation in this activity was solely at the direction of Ballard, Lisle, and Kanter.  Connolly was nothing more than a pawn of Kanter, Ballard, and Lisle.

Employees of Eulich-Management performed record-keeping and reporting services for Gateway Corp., but Eulich-Management did not charge Gateway Corp. for these services.  At least 50 percent of the money received by the Essex partnership came from Eulich-Management, which in turn received only 47.5 percent of the distributions.  Under the arrangement, there was no way Eulich-Management could ever make a profit by participating in the Essex arrangement.  IRA and Holding Co., on the other hand, never contributed any money to the Essex partnership and never provided any services to Gateway Corp. or the Essex partnership, yet together IRA and Holding Co. received 47.5 percent of the distributions from Essex.

Eulich-Management received back in the form of partnership distributions most of the payments it made to Essex.  The net

effect was that 75 percent of the management fees Prudential paid to Gateway Corp. was distributed through Essex to Holding Co. and IRA, and finally to Kanter, Ballard, and Lisle. The "Representation and Marketing" agreements thus merely served to disguise payments from the operation of the Gateway and Midland hotels to Kanter, Ballard, and Lisle.

The income to IRA was offset with losses reported on its consolidated return. The entire convoluted arrangement served to conceal Kanter, Ballard, and Lisle's interest in the operations of the hotels from Prudential and to avoid tax.

As with payments made by other members of the Five to IRA, the payments were accumulated in IRA until the formation of Carlco, TMT, and BWK Inc. The funds accumulated in IRA were distributed in the 45-45-10 ratio to Carlco, TMT, and BWK, Inc., and thus, distributed to Lisle, Ballard, and Kanter. The record does not show that the payments made to Holding Co. were distributed to anyone other than Kanter. On the basis of the evidence clearly established in the record, we conclude that Kanter, Ballard, and Lisle agreed that Kanter would receive for his services 100 percent of the Essex payments made to Holding Co. and 10 percent of the Essex payments made to IRA and that Ballard and Lisle each would receive for their services 45 percent of the Essex payments made to IRA.

6.  Conclusion

At trial, all the witnesses associated with the Five explicitly denied that the payments described were "kickbacks" or "payoffs" for Ballard and/or Lisle's help in steering business to them. Those witness did confirm, however, that they entered into these arrangements in exchange for Kanter's influence in obtaining business. Furthermore, it is clear from the record that Kanter, Ballard, and Lisle agreed to share and did share the money from the Prudential transactions in a 45-45-10 split.

Although some of the Prudential payments and transactions were finalized after Ballard and Lisle left Prudential, the transactions began long before Ballard and Lisle left Prudential. The payments had their genesis in transactions with which Ballard and Lisle were both familiar and in which they were directly or indirectly involved while they held executive positions with Prudential. The transactions, even if occurring after Ballard and Lisle left Prudential, were simply a continuation of what was laid out and planned in earlier years.

Thus, we find that 70 percent of the payments from Hyatt to KWJ Corp., all of the payments by Frey to Zeus, all of the payments from Schaffel connected with Prudential transactions and made to IRA, the bargain element in the sale of the Schnitzer-PMS stock to IRA, and all of the Essex distributions to IRA are attributable to services provided by Ballard, Lisle, and Kanter.

We further find that the payments made by Frey to Holding Co., the payments made by Schaffel to IRA and Holding Co. from transactions not involving Prudential, and the distributions from Essex to Holding Co. are attributable solely to services provided by Kanter.

B.    Overview of the Law

Gross income includes all income from whatever source derived.  See sec. 61(a).  The principle that income is taxed to the person who earned it is basic to our income tax system.  See United States v. Basye, 410 U.S. 441, 450 (1973); Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949); Lucas v. Earl, 281 U.S. 111, 115 (1930).  In United States v. Basye, supra at 450, the Supreme Court stated: "The principle of Lucas v. Earl, that he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands today as a cornerstone of our graduated income tax system".  (Emphasis supplied.)

No device or arrangement, no matter how shrewdly or cunningly contrived, can make earnings from personal services taxable to anyone other than the real earner.  This principle has been applied to various income-splitting devices, e.g., anticipatory assignments of income to family members (Lucas v. Earl, supra); family trusts (Helvering v. Clifford, 309 U.S. 331 (1940)); family partnerships (Commissioner v. Tower, 327 U.S. 280

(1946); <u>Lusthaus v. Commissioner</u>, 327 U.S. 293 (1946);

<u>Commissioner v. Culbertson</u>, <u>supra</u>; <u>Alexander v. Commissioner</u>, 194

F.2d 921 (5th Cir. 1952)); and shareholder-corporation

arrangements (<u>Gregory v. Helvering</u>, 293 U.S. 465 (1935);

<u>Griffiths v. Commissioner</u>, 308 U.S. 355 (1939); <u>Higgins v. Smith</u>,

308 U.S. 473 (1940); <u>Moline Properties, Inc. v. Commissioner</u>, 319

U.S. 436 (1943); <u>Commissioner v. Court Holding Co.</u>, 324 U.S. 331

(1945)).

If, as in these cases, the issue involves income paid to

corporations, we encounter the important policy of the law

favoring recognition of a corporation as a legal person and

economic actor.  If corporations are formed for substantial

business purposes, or are actually engaged in substantial

business activities, the corporate forms must be recognized for

tax purposes.  See <u>Moline Properties, Inc. v. Commissioner</u>,

<u>supra</u>.  On the other hand, if the subject entities are unreal or

shams, the corporate form must be disregarded for tax purposes.

See <u>Higgins v. Smith</u>, <u>supra</u>.

A finding that a corporation is a sham allows the

Commissioner to disregard the corporation altogether for tax

purposes.  See <u>Haberman Farms, Inc. v. United States</u>, 305 F.2d

787 (8th Cir. 1962); <u>James Realty Co. v. United States</u>, 280 F.2d

394 (8th Cir. 1960).  A finding that a corporation is not a sham,

however, does not preclude reallocation under the assignment of

income doctrine.  It is still possible that a taxpayer could assign the receipt of income earned to a viable corporation in an attempt to avoid the tax liability for that income.  This would violate the general principle that income is taxable to the person who earns it.  See United States v. Basye, supra at 449-450; Helvering v. Horst, 311 U.S. 112, 119 (1940); Lucas v. Earl, supra at 114-115.  Additionally, section 482 authorizes the Secretary to apportion or allocate income between organizations controlled by the same interests if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations.

1.   Sham Corporations

Respondent asserts that IRA, its subsidiaries Carlco, TMT, and BWK, Inc., and Holding Co. were sham or dummy corporations that should not be recognized as separate taxable entities.  We agree.

Although taxpayers have the right to mold their business transactions in such a manner as to minimize the incidence of taxation, United States v. Cumberland Pub. Serv. Co., 338 U.S. 451 (1950), the Government is not required to acquiesce in the form chosen by taxpayers for doing business.  If the form is unreal and a sham, the fiction may be disregarded for purposes of the tax statutes.  See Higgins v. Smith, supra; Gregory v.

Helvering, supra.  The question whether a corporation is genuine

or a sham is one of fact.  See Noonan v. Commissioner, 451 F.2d

992, 993 (9th Cir. 1971), Shaw Constr. Co. v. Commissioner, 323

F.2d 316, 321 (9th Cir. 1963).

In Moline Properties, Inc. v. Commissioner, supra at 438-

439, the Supreme Court established the following test for

determining whether a corporation will be recognized as a

separate taxable entity:

> The doctrine of "corporate entity" fills a useful
> purpose in business life.  Whether the purpose be to
> gain an advantage under the law of the state of
> incorporation or to avoid, or to comply with the
> demands of creditors or to serve the creator's personal
> or undisclosed convenience so long as that purpose is
> the equivalent of business activity or is followed by
> the carrying on of business by the corporation, the
> corporation remains a "separate taxable entity".  *  *
> *  [Fn. refs. omitted.]

Thus, if the corporations were organized for substantial business

purposes, or actually engaged in substantial business activities,

their corporate forms must be recognized for tax purposes.

To be recognized, a corporation must be organized for a

substantial "business" purpose in the ordinary meaning.  See

National Investors Corp. v. Hoey, 144 F.2d 466, 468 (2d Cir.

1944).  "[E]scaping taxation is not 'business' in the ordinary

meaning".  Id.  Thus, a corporation organized for the purpose of

avoiding tax is not organized for substantial business purposes.

It is clear from the evidence in these cases that the

multiple corporations, as well as the trusts and partnerships,

organized by Kanter were not organized for any substantial business purpose but were organized primarily to obtain tax benefits.

Kanter routinely created "shelf" corporations that remained inactive until he needed a vehicle to channel payments from his various schemes. At trial, Kanter admitted that Carlco, TMT, and BWK, Inc., were "shelf" corporations. Thus, any business purposes set forth in the articles of incorporation were merely gestures without substance.

Furthermore, Kanter routinely created various corporations, partnerships, and trusts with similar names; for example, Cedilla Co., Cedilla Investment Co., Investment Research Associates, Ltd. (formerly Cedilla Co.), Cedilla Co. (formerly Arba Investments Inc.), and Cedilla Trust; KWJ Corp. and KWJ Co. partnership; Essex Corp. and Essex Partnership. As a result of the intended confusion created by similar names, Kanter could substitute one entity for another. For example, after KWJ Corp. was liquidated, the payments from Hyatt to KWJ Corp. were simply treated as payments to the KWJ Co. partnership. Hyatt never knew about the change until about 1992.

Moreover, assuming IRA's predecessor Cedilla Co. (Old Cedilla Co.) had been incorporated for the purpose of brokering

real estate (a valid business purpose[48]), we cannot attribute the purpose for the formation of Old Cedilla Co. to IRA. Originally, Keating owned the common stock of Old Cedilla Co., and Schott owned the preferred class A preferred stock.

In 1975, the same year Weaver agreed to sell KWJ Corp. to Kanter, Keating's 1,000 shares of common stock of Old Cedilla Co. were exchanged for 500 shares of class B preferred stock,[49] and Weisgal as trustee of the Bea Ritch trusts acquired 1,000 shares of the common stock. Schott continued to hold the class A preferred stock in Old Cedilla Co. to enable Old Cedilla Co. to qualify for a corporate broker's license.

In 1978, Old Cedilla Co.'s name was changed to IRA. When Old Cedilla Co.'s name changed, IRA acquired 1,000 shares of Arba and changed the name of Arba to Cedilla Co (New Cedilla Co.). IRA's end of year balance sheet indicates that IRA's 1,000 shares of Cedilla Co. were the only shares outstanding.

In 1983, IRA made a journal entry to show that IRA redeemed Schott's 500 shares of IRA class B preferred stock in exchange for IRA's 1,000 shares of its Cedilla Co. stock.

Schott thought that, when Cedilla Co.'s name was changed to IRA, she acquired another company and the name of that

---

[48]    The Court, however, is not convinced that Cedilla Co. was organized for any purpose other than to serve as a vehicle for Kanter's various tax avoidance schemes.

[49]    Keating's preferred stock was redeemed in 1977.

corporation was changed to Cedilla Co.  She did not know that she had owned any of the stock of IRA after the name change.  She testified that she owned New Cedilla Co. and that she conducted her real estate brokerage business individually as well as through IRA and New Cedilla Co.

The name change occurred in 1978, the same year IRA purchased the stock of Schnitzer-PMS and the payments to IRA related to the Prudential transactions began.  In 1979, when IRA acquired the stock of KWJ Corp., Schaffel began splitting commissions with Kanter, and Century repurchased IRA's Schnitzer-PMS stock.  When Cedilla Co.'s name was changed to IRA, whatever the purpose Cedilla Co. was originally formed to pursue, it is evident that purpose went along with the name to a new Cedilla Co.

We find that the corporations and entities were not organized for any valid business purposes.

A corporation is not treated as carrying on a business merely because it engages in certain corporate formalities, such as holding corporate meetings, adopting bylaws, electing officers and directors, issuing securities and keeping separate books. See Aldon Homes, Inc. v. Commissioner, 33 T.C. 582, 600-601 (1959).  In order to be treated as carrying on a business, in addition to engaging in corporate formalities, the corporation must hold itself out to unrelated third parties and engage in

substantial business activities.  See <u>Skarda v. Commissioner</u>, 250 F.2d 429, 434-435 (10th Cir. 1957), affg. 27 T.C. 137 (1956). Further, a corporation is not treated as carrying on a business if its activities, such as executing contracts and filing tax returns, are merely "empty gestures" rather than substantial transactions.  <u>Kimbrell v. Commissioner</u>, 371 F.2d 897, 901-902 (5th Cir. 1967), affg. T.C. Memo. 1965-115.

The following factors lead us to the conclusion that IRA did not carry on any business.

We first observe that the original Cedilla Co. paid minimal salaries or wages in 1977 ($986) and 1978 ($5,051).  After the name change in 1979, IRA paid minimal salaries or wages only in 1981 ($9,969), and 1982 ($26,079) and paid no salaries or wages in any other year.  In fact, there is no evidence that IRA had any employees other than bookkeepers who also performed bookkeeping services for the multitude of other Kanter entities. Although the original Cedilla Co. paid substantial commissions and consulting fees from 1976 to 1979, after the name change, IRA paid commissions only in 1981 ($115,400) and in 1985 ($4,000) and paid consulting fees only in 1982 ($29,000).

The original Cedilla Co. paid officer's fees in 1977 ($19,300) and 1978 ($15,000).  After the name change, IRA did not pay any officer's or director's fees (except the $12,500 payment made to Ballard).

Furthermore, there is no evidence that the commissions, consulting fees, officer's fees, or director's fees were properly characterized as such payments or paid for services provided to the corporations. For example, petitioners assert that Ballard was never a director of IRA and that the $12,500 payment to Ballard was not in fact a director's fee. KWJ Corp. and KWJ Co. partnership paid Ballard's and Lisle's children consulting fees, yet the children never provided any services for the payments.

Additionally, there is no evidence that any of IRA's income was attributable to Schott's real estate activity. Schott could not remember exactly what she did for IRA. She merely signed documents without any real knowledge of the transactions involved. When IRA redeemed Schott's 500 shares of IRA class B preferred stock in 1983, IRA no longer qualified to hold a corporate broker license.

The payments of development fees from Frey and the BJF partnership were not related to any investment IRA and Holding Co. may have made in any of Frey's condominium conversion projects.

We conclude that the corporations did not carry on substantial business activity in the ordinary meaning.

Finally, even if we were able to find some modicum of business activity, petitioners and other parties to the various transactions did not recognize any of the corporations or

entities as valid separate entities or true parties in interest to the various transactions. Some of the individuals involved in the transactions with Kanter had never heard of IRA, and those that had, considered IRA to be Kanter.

Around 1992, Kanter attempted to have Hyatt send the payments to the KWJ Co. partnership instead of to Weaver. While Kanter provided Hyatt with documents showing that KWJ Corp. had been sold to IRA, liquidated, and the contract rights assigned to KWJ Co. partnership, Hyatt refused to do so without Weaver's consent, which had not been attained at the time of trial. Hyatt continued to send the payments to Weaver.

After Lisle began working for Travelers, although Schaffel's agreement was purportedly with IRA, he sent payments from Travelers deals to Holding Co. If IRA, rather than Kanter, had been the true party in interest and had been Kanter's client, the payments for the Travelers deals would have been paid to IRA.

A comparison of the business records of IRA, Administration Co., Int'l Films, Holding Co., and HELO illustrates the sham nature of the entities. Kanter completely controlled IRA, Holding Co., Administration Co., HELO, Int'l Films, and the various trusts. He had unrestricted power over the commingled funds and was in a position to determine and direct the payments from outside sources to the various entities. He routinely used the funds for his own benefit. He routinely shifted accounts

between entities with no documentation to establish a rationale for such transfers. He created phony loans that were eventually written off, and then he or the corporations took bad debt deductions to offset additional income.

Similarly, Lisle, Ballard, and Kanter failed to recognize any separate identity of Carlco, TMT, and BWK, Inc. Petitioners assert that Lisle, Ballard, and Kanter were only the respective managers of the assets of Carlco, TMT, and BWK, Inc., and claim that the preferred stock issued to their family trusts had minimal value. The record clearly shows, however, that petitioners' control over the assets of the corporations went far beyond that of a manager.

Petitioners used the funds for their personal benefit. From 1984 to 1986, Ballard transferred $16,599 to himself that was recorded as a receivable on TMT's books. In 1987, Ballard transferred the St. Francis Arkansas land owned by TMT to himself and recorded the transfer as a sale. He did not pay for the land but recorded a receivable of $100,000 as owed by him on TMT's books. In 1987, TMT funds also were used to pay $20,344 to the Fairfield Plantation Company, Ballard's S corporation. The payment was recorded as a receivable owed by Ballard. In 1989, Ballard distributed $10,000 to himself from TMT and increased his receivable to $146,943. In addition, Ballard distributed $160,000 of TMT's funds to his wife, $122,900 to the Seabright

Trust, $10,080 to the Seabright Corp., all recorded as receivables. Ballard distributed $19,000 to Ficom (Melinda Ballard's sole proprietorship) that TMT later wrote off as a worthless investment. Ballard and his wife referred to farms owned by TMT as their farms.

Kanter took $400,000 out of BWK, Inc. and recorded the distribution as a receivable. Lisle used $3,000 of Carlco's funds to pay a receivable on the books of Administration Co. The payment did not create a receivable on Carlco's books.

When receivables were recorded for funds taken out of the corporations, there was no intention or expectation that the funds would be repaid, and there was never any attempt to collect the receivables until the IRS began auditing petitioners' returns.

Petitioners used the corporations' partnership, KWJ Co., to distribute money to the Ballard and Lisle children in the guise of consulting fees. The children never performed any services for the payments.

Petitioners maintained possession of the corporations' assets and records. The addresses given for Carlco and TMT were the addresses of Lisle's and Ballard's residences. When Lisle lived in Connecticut, the records were maintained in Connecticut; when he moved to Texas, the records and accounts were maintained in Texas.

Ballard and Lisle gave family members signatory authority over the corporate accounts. Mary Ballard had signatory authority over TMT's Wells Fargo Bank account. Donna Lisle and Lisle's brother had signatory authority over Carlco's Goldman Sachs account. Donna Lisle had signatory authority over Carlco's North Dallas bank account.

Petitioners assert that the only interest they had in Carlco, TMT, and BWK, Inc., was the preferred stock issued to the family trusts and that the stock had minimal value. The certificates of incorporation of Carlco, TMT, and BWK, Inc. authorized each corporation to issue 1,000 shares of 10-cent par value common stock. Certificates of amendment, filed in December 1983, authorized the corporations to issue 11,000 shares of stock comprised of 10,000 shares of 1-cent par value preferred stock and 1,000 shares of 10-cent par value common stock. The amended certificates granted each corporation's board of directors authority to fix the preferences of the preferred shares. The record does not contain any evidence of resolutions by the board of directors of any of the three corporations setting preferences or limitations on the preferred stock.

Petitioners point to the following preferences and other characteristics printed on the back of the stock certificates to support their assertion that the preferred stock of Carlco, TMT, and BWK, Inc. issued to the family trusts had minimal value:

1.  One vote per share.

2.  Dividends payable only when, if, and as declared at a maximum rate of 10 percent per annum after 1990. Dividends are non-cumulative.

3.  Redemption by company at any time upon 10 days notice at 105 percent.

4.  Priority on liquidation equal to original purchase price per share.

5.  Shares are not convertible into common stock.

Petitioners claim that the certificates prove that the preferred shares could not be worth more than approximately $1,650, which could only be realized upon liquidation or upon redemption of the shares.  We disagree.  First, in their briefs, petitioners inserted "of par" into the redemption rights to read "Redemption by company at any time upon 10 days notice at 105 percent of par."  The preferred stock could instead be redeemable for 105 percent of, e.g., the retained earnings.  Similarly, with respect to liquidation rights, "priority on liquidation equal to original purchase price per share" is also subject to multiple interpretations.  The shares could be entitled to the original purchase price first but also allowed to share with the common stock in the remaining assets.  Original purchase price could include a value set for the uncompensated services of the manager (Ballard, Lisle, and Kanter).  That value could be tied to the retained earnings of the corporations or at an annual amount. Without a resolution by the board of directors setting forth

preferences, we find the preferences reflected on the certificates to be ambiguous. Petitioners failed to produce any corporate resolution. We can only infer that the resolutions contradict petitioners' assertions. Finally, the record establishes that Kanter was not restrained by corporate formalities including preferences, stock ownership, asset ownership, etc.

Kanter claims that Carlco's preferred stock was issued to Lisle's family trust to give Lisle more control and discretion with respect to Carlco's investments. We fail to see how stock that does not have voting control could provide such control or discretion with respect to the assets of the corporations. Lisle, Ballard, and Kanter, respectively, had unrestricted control of the assets of Carlco, TMT, and BWK, Inc. We think that fact is a strong indicator of the true owners of the assets.

On the basis of the record before us, we conclude that Kanter personally diverted payments of compensation, including those made by the Five for his, Ballard's, and Lisle's services and influence, through IRA, Holding Co., and their subsidiaries. Petitioners formed and utilized all the corporations as a way to conceal their true income for the years at issue. The record is clear that petitioners used all of these accounts as parts of incorporated or unincorporated pocketbooks. The corporations

whose names were on the various accounts did not earn the taxable amounts attributed to those accounts.

A taxpayer cannot expect the Commissioner to recognize the separate identity of an entity where the taxpayer himself so blatantly ignores any separate existence. Nor should the courts require the Commissioner to do so.

On the record presented to us, we find that IRA, Holding Co., their subsidiaries, including Zeus, Zion, Carlco, TMT, and BWK, Inc. did not carry on any business and were only the alter egos of Kanter, Lisle, and Ballard. We find the various entities to be pure tax avoidance vehicles. The corporations were nothing more than a few incorporating papers of no significance except when a tax return was due. Petitioners diverted millions of dollars of income. The make-believe corporations were shams and too transparent to accept for tax purposes.

2. Assignment of Income

Even if the corporations that received the payments from the Five had been viable entities, that would not preclude application of the assignment of income doctrine, as a taxpayer could assign income to a corporation that conducts real and substantial business in an attempt to avoid tax. See Haag v. Commissioner, 88 T.C. 604, 611 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988).

Gross income means all income from whatever source derived, including compensation for services, including fees, commissions, and similar items. See sec. 61(a)(1). Compensation for services is an item of gross income that cannot be effectively assigned to escape the burden of taxation. See Lucas v. Earl, 281 U.S. at 114-115. This Court has upheld reallocations of income from a validly organized and operated corporation to its shareholder/employee under the assignment of income doctrine. See Bagley v. Commissioner, 85 T.C. 663 (1985), affd. 806 F.2d 169 (8th Cir. 1986); Askew v. Commissioner, T.C. Memo. 1985-100, affd. 805 F.2d 830 (8th Cir. 1986). Respondent cites DeVaughn v. Commissioner, T.C. Memo. 1983-712, as an example of a similar situation in which the assignment of income doctrine was applied to tax kickback payments to an individual taxpayer who had earned the payments but sought to redirect them to that taxpayer's corporation.

In cases involving viable corporations, we consider all the facts and circumstances to determine the actual earner of income. See Schuster v. Commissioner, 800 F.2d 672 (7th Cir. 1986), affg. 84 T.C. 764 (1985); Fogarty v. Commissioner, 780 F.2d 1005 (Fed. Cir. 1986), affg. 6 Cl. Ct. 612 (1984); Leavell v. Commissioner, 104 T.C. 140, 155 (1995). In determining the proper taxpayer, we consider which person or entity controls the earning of the income, such as:

(1) Whether the individual rather than the corporation or entity that received the income, in fact, controlled the earning of the income, see <u>Vercio v. Commissioner</u>, 73 T.C. 1246 (1980);

(2) whether the individual performed the services as an agent or employee of the corporation, see <u>Rubin v. Commissioner</u>, 51 T.C. 251 (1968);

(3) whether the corporate form and the status of the corporation as an actual operating enterprise have been recognized by petitioners;

(4) whether the corporate form and the status of the corporation as an actual operating enterprise have been recognized by the other parties to the transactions giving rise to the income;

(5) whether the form of the transaction served an economic purpose, see <u>Rubin v. Commissioner</u>, <u>supra</u>; and

(6) whether the corporations were formed for the purpose of taking advantage of losses incurred by a separate trade or business.

The record shows that Kanter was in control of negotiations concerning the amount of commissions and that he earned those commissions by performing the work for them. He directed members of the Five where to make payments. The various entities were entirely subject to Kanter's control: he set up the entities, and he managed the entities in that Meyers, Schott, Weisgal, and

Freeman were subject to his control.  There is no evidence that IRA, Holding Co., or any of the other entities earned these funds.  Petitioners handled the accounts as if they were their own, moving funds around from location to location and using the funds for their personal benefit.  This is hardly the behavior that petitioners would exhibit if the funds in the accounts were subject to the control of Weisgal or the various entities.

Kanter did virtually all of the planning and implementing of the transactions.  The officers, directors, and trustees signed documents and entered transactions as Kanter directed including issuing and redeeming stock, liquidating corporations, purchasing and selling stock, distributing funds, and executing contracts and agreements.  There is very little evidence that IRA or the other entities had anything to do with these transactions other than to be the named recipients of the checks.

Lastly, we note that payments to IRA were distributed to the accounts of Carlco, TMT, and BWK, Inc. of which petitioners and their family members were authorized signatories.  If, as petitioners contend, the funds of the corporations did not belong to them, they would have been misappropriating the funds through phony loans. Therefore, we conclude that petitioners were simply using the corporations to receive the funds they had earned. Regardless of where the funds actually went, they were earned

primarily through the efforts of petitioners via their contacts with Prudential, Travelers, and the Pritzker family.

In Rubin v. Commissioner, supra, we found that the income was properly taxable to the individual who performed the services for which payment was made where the individual was not contractually bound to (and in fact did not) render services exclusively to a personal service corporation. In these cases, petitioners were not contractually bound to, nor did they render services for, the corporations.

Ballard, Lisle, and Kanter were not employees of any of the corporations or entities involved in the transactions at issue. Ballard and Lisle were full-time employees of Prudential, Travelers, or Goldman-Sachs. Kanter was a self-employed attorney.

Kanter was not an agent of the corporations. In fact, there is evidence that Kanter in some instances held himself out to members of the Five (in particular Schaffel) as Ballard's and Lisle's agent, referring to them as his "associates". Ballard and Lisle did not claim that they were agents of IRA or any other entity (except to justify the payment Ballard received as a director's fee from IRA while denying he was ever a director).

We have previously discussed the failure of petitioners and other parties to the transactions to recognize the separate existence of the corporations. None of the Five recognized any

of the corporate entities as controlling petitioners' performance of services. Even though the payments were made to various corporations, it is clear that the other parties to the transactions viewed IRA, Holding Co., their subsidiaries, and Kanter as one and the same. Although the various agreements at issue were between members of the Five and IRA, Holding Co., or one of their subsidiaries, the record shows that there was virtually no involvement in these arrangements by those corporations; rather, they were agreements with the corporations in name only.

Additionally, assuming IRA was not a sham corporation, the purchase of the KWJ Corp. stock was merely a device to hide the stream of income and accumulate the funds. The transaction itself was a sham. Similarly with the purchase of the Schnitzer-PMS stock, Schnitzer would have sold the stock directly to Kanter. He sold it at a bargain price for Kanter's services, not for any services from IRA, Weisgal, or Schott. It is also clear from the flow of the installment payments on Schnitzer's repurchase of the stock that IRA either held the stock merely as a nominee for Kanter, Ballard, and Lisle, or agreed to pay the money it received from the Schnitzer-PMS transaction to Ballard, Lisle, and Kanter in exchange for their assistance in giving more Prudential business to Schnitzer-PMS. The increase in the Prudential business greatly increased the pretax income and,

thus, the value of the Schnitzer-PMS stock. Hence the gain was attributable to their services. IRA held the profits for the benefit of Ballard, Lisle, and Kanter until it distributed the funds to them through Carlco, TMT, and BWK, Inc. The record is replete with examples of interests that were owned initially by Kanter or an entity and then later declared to have been held by Kanter or the entity as "nominee" for someone else. Thus, we hold that the gain on the sale of the stock is properly taxable to Kanter, Ballard, and Lisle.

The use of numerous corporations was to facilitate the concealment of the payments, and such use was further motivated by the tax benefits to be derived therefrom and for no sound business purpose.

We conclude that the transactions at issue are classic situations for the application of the assignment of income doctrine articulated in Lucas v. Earl, 281 U.S. 111, 115 (1930), and its progeny. The amounts received by the corporations were for services rendered by petitioners to the Five and should be includable in their income under section 61. See United States v. Basye, 410 U.S. 441, 450 (1973).

3. Section 482

Finally, even if the corporations had been viable entities, we do not think respondent's reallocation under section 482 was unreasonable, arbitrary, or capricious.

Section 482 authorizes the Secretary to apportion or allocate income between organizations controlled by the same interests if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations. The relevant regulation explains that the purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, and to ensure that controlling entities conduct their subsidiaries' transactions in such a way as to reflect the "true taxable income" of each controlled taxpayer. Sec. 1.482-1A(b)(1), Income Tax Regs.[50]

---

[50]    Sec. 1.482-1A(b)(1), Income Tax Regs provides:

The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

In order to justify a reallocation under section 482, the Commissioner must find (1) that there are two or more trades, businesses, or organizations, (2) that such enterprises are owned or controlled by the same interests, and (3) that the reallocation is necessary to allocate income among the two or more enterprises in order to prevent evasion of taxes or to properly reflect each enterprise's income. See B. Forman Co. v. Commissioner, 453 F.2d 1144, 1152 (2d Cir. 1972), affg. in part, revg. in part 54 T.C. 912 (1970).

Section 482 was intended to apply and has been applied to cases where the profits of one business have been offset against the losses of another to reduce or escape tax liability. See Ach v. Commissioner, 42 T.C. 114 (1964), affd. 358 F.2d 342 (6th Cir. 1966).

In these cases, there was shifting of profits from one business to another (from petitioners to the various Kanter entities); thus the primary evil that section 482 was designed to prohibit is present. We hold that respondent's reallocation under section 482 was not unreasonable.

4.  Conclusion

We have found that 70 percent of the payments from Hyatt to KWJ Corp., all of the payments by Frey to Zeus, all of the payments from Schaffel to IRA, the bargain element in the sale of the Schnitzer-PMS stock to IRA, and all of the Essex

distributions to IRA are attributable to services provided by Ballard, Lisle, and Kanter. We further have found that the gain on the sale of the Schnitzer-PMS stock was properly taxable to Ballard, Lisle, and Kanter. Additionally, the interest income earned on the payments is also properly taxable to Ballard, Lisle, and Kanter. Finally, we have found that the payments by Frey to Zion, the payments by Schaffel to Holding Co, and the distributions from Essex to Holding Co. are attributable to services provided by Kanter.

In addition, we have found that the corporations were shams, and, even if the corporations had been viable entities, petitioners were the true earners of the income, and respondent's allocation under section 482 was not unreasonable, arbitrary, or capricious.

With respect to 70 percent of the payments from Hyatt to KWJ Corp., all of the payments by Frey to Zeus, all of the payments from Schaffel to IRA, the bargain element in the sale of the Schnitzer-PMS stock to IRA, as well as the gain and interest on the repurchase of the stock, and all of the Essex distributions to IRA, we think the 45-45-10 split is clearly evident. Thus, we hold that the payments, bargain element, gain, and interest are taxable 45 percent to each of Ballard and Lisle and 10 percent to Kanter.

IRA acquired 47.5 percent of the common stock of Schnitzer-PMS Corp. with a value of roughly $522,500 for $150,000.  We hold that the bargain element is $372,500 ($522,500 - $150,000) and the gain on the sale is $2,577,500 ($3.1 million - $522,500). The gross profit ratio is 83.15 percent ($2,577,500 divided by $3.1 million).

IRA received the following payments of principal and interest on the installment sale of the Schnitzer-PMS Corp. stock:

| Year | Payment | Principal | Interest |
|------|---------|-----------|----------|
| 1979 | $150,000 | $150,000 | -- |
| 1980 | 533,425 | 211,468 | $321,957 |
| 1981 | 534,696 | 309,308 | 225,388 |
| 1982 | 361,692 | 172,441 | 189,251 |
| 1983 | 361,692 | 186,655 | 175,037 |
| 1984 | 361,692 | 202,042 | 159,650 |
| 1985 | 361,692 | 218,696 | 142,996 |
| 1986 | 361,692 | 236,724 | 124,968 |
| 1987 | 361,692 | 256,217 | 105,475 |
| 1988 | 361,692 | 277,360 | 84,332 |
| 1989 | 840,423 | 822,841 | 17,582 |
| Total | 4,590,388 | 3,043,752 | 1,546,636 |

The gain on the sale is computed as follows:

| Year | Principal | Profit Ratio | Gain |
|------|-----------|--------------|------|
| 1979 | $150,000 | .8315 | $124,725 |
| 1980 | 211,468 | .8315 | 175,836 |
| 1981 | 309,308 | .8315 | 257,190 |
| 1982 | 172,441 | .8315 | 143,385 |
| 1983 | 186,655 | .8315 | 155,204 |
| 1984 | 202,042 | .8315 | 167,998 |
| 1985 | 218,696 | .8315 | 181,846 |
| 1986 | 236,724 | .8315 | 196,836 |
| 1987 | 256,217 | .8315 | 213,044 |
| 1988 | 277,360 | .8315 | 230,625 |
| Total | | | 1,846,689 |

In 1989, IRA accepted $822,841 as the final principal payment, reducing the selling price to the total principal payments of $3,043,752. For purposes of computing the 1989 gain, adjusted gross profit on the sale is reduced to $2,521,252 ($3,043,752 - $522,500). Thus, the gain recognized in 1989 is $674,563 (the adjusted gross profit $2,521,252 less the $1,846,689 gain recognizable in prior years).

The payments related to these transactions paid by the Five to IRA and its subsidiaries during the years 1978 through 1989 were as follows:

| Year | Hyatt | Schaffel | Frey | Essex | Bargain | Schnitzer-PMS Gain | Interest | Total |
|------|-------|----------|------|-------|---------|------|----------|-------|
| 1977 | $38,394 | -- | -- | -- | -- | -- | -- | $38,394 |
| 1978 | 42,517 | -- | -- | -- | $372,500 | -- | -- | 415,017 |
| 1979 | 119,719 | $100,000 | -- | -- | -- | $124,725 | -- | 344,444 |
| 1980 | -- | 244,920 | $127,372 | -- | -- | 175,836 | $321,957 | 870,085 |
| 1981 | 90,070 | 361,525 | 105,764 | -- | -- | 257,190 | 225,388 | 1,039,937 |
| 1982 | 172,702 | 447,450 | 538,781 | $86,212 | -- | 143,385 | 189,251 | 1,577,781 |
| 1983 | 172,090 | 30,981 | 110,125 | 78,375 | -- | 155,204 | 175,037 | 721,812 |
| 1984 | 186,092 | -- | 103,500 | 133,238 | -- | 167,998 | 159,650 | 750,478 |
| 1985 | 206,790 | -- | 128,763 | 120,175 | -- | 181,846 | 142,996 | 780,570 |
| 1986 | 231,263 | -- | -- | 80,465 | -- | 196,836 | 124,968 | 633,532 |
| 1987 | 229,449 | -- | -- | 120,698 | -- | 213,044 | 105,475 | 668,666 |
| 1988 | 197,348 | -- | -- | 117,562 | -- | 230,625 | 84,332 | 629,867 |
| 1989 | 52,777 | -- | -- | 51,727 | -- | 674,563 | 17,582 | 796,649 |

The payments related to the Prudential transactions are allocable to Ballard, Lisle, and Kanter in the following amounts for each of the years 1978 through 1989:

| Year | Total | Ballard (45%) | Lisle (45%) | Kanter (10%) |
|------|-------|---------------|-------------|--------------|
| 1978 | $38,394 | $17,277 | $17,277 | $3,839 |
| 1979 | 415,017 | 186,758 | 186,758 | 41,502 |
| 1980 | 870,085 | 391,538 | 391,538 | 87,009 |
| 1981 | 1,039,937 | 467,972 | 467,972 | 103,994 |
| 1982 | 1,577,781 | 710,001 | 710,001 | 157,778 |
| 1983 | 721,812 | 324,815 | 324,815 | 72,181 |
| 1984 | 750,478 | 337,715 | 337,715 | 75,048 |
| 1985 | 780,570 | 351,257 | 351,257 | 78,057 |
| 1986 | 633,532 | 285,089 | 285,089 | 63,353 |
| 1987 | 668,666 | 300,900 | 300,900 | 66,867 |
| 1988 | 629,867 | 283,440 | 283,440 | 62,987 |
| 1989 | 796,649 | 358,492 | 358,492 | 79,665 |

With regard to the $213,750 paid by Schaffel to IRA in 1983 related to a Travelers' financing transaction, as well as all payments by the Five to Holding Co, the record does not show that any of these payments were ever distributed to Lisle. We hold that Kanter realized all of the income.

Schaffel, Frey, and Essex made the following payments to IRA and Holding Co. during the years 1981 through 1989 that are taxable to Kanter, as follows:

| Year | Schaffel | Frey | Essex | Total |
|------|----------|------|-------|-------|
| 1981 | -- | $80,616 | -- | $80,616 |
| 1982 | -- | -- | $70,538 | 70,538 |
| 1983 | $213,750 | 16,200 | 64,125 | 294,075 |
| 1984 | 600,000 | 113,827 | 109,013 | 822,840 |
| 1985 | 1,160,000 | 256,557 | 98,325 | 1,514,882 |
| 1986 | 1,003,500 | -- | 65,835 | 1,069,335 |
| 1987 | -- | 33,570 | 98,752 | 132,322 |
| 1988 | -- | -- | 96,188 | 96,188 |
| 1989 | -- | -- | 42,332 | 42,332 |

We hold that Ballard's omitted income from the Five for the years before the Court is as follows:

| Year | Omitted Income |
|------|----------------|
| 1978 | $17,277 |
| 1979 | 186,758 |
| 1980 | 391,538 |
| 1981 | 467,972 |
| 1982 | 710,001 |
| 1984 | 337,715 |
| 1987 | 300,900 |
| 1988 | 283,440 |
| 1989 | 358,492 |

We hold that Lisle's omitted income from the Five for the years before the Court is follows:

| Year | Omitted Income |
|------|----------------|
| 1984 | $337,715 |
| 1987 | 300,900 |
| 1988 | 283,440 |
| 1989 | 358,492 |

We hold that Kanter's omitted income from the Five for each of the years before the Court is as follows:

| Year | Prudential | Other | Omitted Income |
|------|-----------|-------|----------------|
| 1978 | $3,839 | -- | $3,839 |
| 1979 | 41,502 | -- | 41,502 |
| 1980 | 87,009 | -- | 87,009 |
| 1981 | 103,994 | $80,616 | 184,610 |
| 1982 | 157,778 | 70,538 | 228,316 |
| 1983 | 72,181 | 294,075 | 366,256 |
| 1984 | 75,048 | 822,840 | 897,888 |
| 1986 | 63,353 | 1,069,335 | 1,132,688 |
| 1987 | 66,867 | 132,322 | 199,189 |
| 1988 | 62,987 | 96,188 | 159,175 |
| 1989 | 79,665 | 42,332 | 121,997 |

III. <u>Fraud Additions to Tax and Penalties</u>

A.    <u>Positions of the Parties</u>

None of the notices of deficiency issued to Ballard, Lisle, and Kanter determined fraud.  At some point in time, respondent saw the need to amend the answers in these cases to assert that petitioners were liable for the fraud additions to tax and penalties and to increase the deficiencies in tax over those determined in the notices of deficiency.  The parties and the Court agreed that the amendments to answers would not be filed in each of these cases until the trial commenced on June 13, 1994. Similarly, it was agreed that replies would be filed at that time.  Kanter filed a motion to strike portions of respondent's amendments to answer that alleged increases in deficiencies and fraud with respect to transactions unrelated to payments from the Five.

The Court granted Kanter's motion as follows:

> ORDERED that petitioners' motion to strike is granted to the extent of all adjustments in respondent's Amendment to Answer for an increased deficiency in tax and additions to tax as to transactions or events which are not related to or constitute part of the transactions which have been commonly referred to and identified by the parties as the "Prudential Issues" and/or "the Five" and, accordingly, such adjustments and the allegations of such adjustments are hereby stricken from the record of this case and will be excluded from consideration by the Court.

Respondent filed a motion for reconsideration.  After a hearing on respondent's motion for reconsideration was held on

July 25, 1994, that motion was denied. Ballard and Lisle also filed, and the Court granted, motions to strike portions of respondent's amendments to answer that asserted increases in deficiencies and fraud with respect to transactions unrelated to payments from the Five in their cases. Thus, the issue to be decided is whether Kanter, Ballard, and Lisle are liable for the additions to tax and penalties for fraud related to income from transactions with the Five.

Respondent contends that Kanter, Ballard, and Lisle are liable for the additions to tax and penalties for fraud for the years at issue because they received the income from kickback payments involved in a complex scheme intended to conceal, mislead, or otherwise prevent the collection of taxes.

To the contrary, petitioners contend that they did not receive such income and that respondent has failed to prove by clear and convincing evidence that they are liable for the asserted fraud additions to tax and penalties.

B.  Applicable Statutory Provisions

For taxable years 1978 through 1981, section 6653(b) provides for an addition to tax in an amount equal to 50 percent of the underpayment of tax if any part of the underpayment is due to fraud.

For taxable years 1982 through 1985, section 6653(b)(1) provides for an addition to tax in an amount equal to 50 percent

of the underpayment of tax if any part of the underpayment is attributable to fraud.  Section 6653(b)(2) provides for an addition to tax (in addition to the addition under section 6653(b)(1)) in an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment that is attributable to fraud.  For purposes of section 6653(b)(2), interest is computed for the period beginning on the last day prescribed for payment of the underpayment (without regard to extensions) and ending on the earlier of the date of assessment or payment of the tax (the statutory period).

For taxable years 1986 and 1987, section 6653(b)(1)(A) provides for an addition to tax in an amount equal to 75 percent of the portion of the underpayment that is attributable to fraud. Section 6653(b)(1)(B) provides for an addition to tax (in addition to the addition under section 6653(b)(1)(A)) in an amount equal to 50 percent of the interest payable under section 6601 for the statutory period with respect to the portion of the underpayment that is attributable to fraud.

For taxable year 1988, section 6653(b)(1) provides for an addition to tax in an amount equal to 75 percent of the portion of the underpayment that is attributable to fraud.  Section 6653(b)(2) provides that, if the Secretary (Commissioner) establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to

fraud, except for any portion that the taxpayer establishes is not attributable to fraud.

For taxable year 1989, section 6663(a) provides for the imposition of a fraud penalty in an amount equal to 75 percent of the portion of the underpayment that is attributable to fraud. Section 6663(b) provides further that, if the Secretary (Commissioner) establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud, except for any portion that the taxpayer establishes is not attributable to fraud.

C.    General Legal Principles Relating to Civil Fraud

The Commissioner bears the burden of proof with respect to the additions to tax and penalties for fraud, and that burden must be carried by clear and convincing evidence.  See sec. 7454(a); Rule 142(b); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

Respondent must establish each element of fraud by clear and convincing evidence in each of the years at issue.  See sec. 7454(a); Rule 142(b); Smith v. Commissioner, 926 F.2d 1470, 1475 (6th Cir. 1991), affg. T.C. Memo. 1989-171; Traficant v. Commissioner, 884 F.2d 258, 263 (6th Cir. 1989), affg. 89 T.C. 501 (1987).  In view of our order granting petitioners' motions to strike portions of respondent's amendments to answers, respondent must prove by clear and convincing evidence for each

of the years in issue (1) the existence of an underpayment of tax each year attributable to transactions related to the Five, and (2) that the underpayment of that tax is due to fraud.

However, if respondent establishes that there are underpayments of tax from transactions related to the Five that are attributable to fraud, the amount of the addition under section 6653(b) for 1978 through 1981 and under section 6653(b)(1) for 1982 through 1985 is equal to 50 percent of the entire underpayment of tax, including any portion of the underpayment not related to transactions related to the Five. Additionally, if respondent satisfies his burden for 1988 and 1989, the amount of the addition or penalty is equal to 75 percent of the entire underpayment, unless petitioners establish that any portion of an underpayment (resulting from the other issues decided in these cases) is not attributable to fraud.

D.   Underpayments of Tax

Respondent must first prove by clear and convincing evidence that Ballard, Lisle, and Kanter each underpaid their taxes for each of the years at issue on income attributable to transactions related to the Five.

Section 61(a) defines gross income to include "all income from whatever source derived".  In addition, the Supreme Court has determined that gross income includes all "'accessions to wealth, clearly realized, and over which the taxpayers have

complete dominion'", including illegal earnings.  James v. United States, 366 U.S. 213, 219 (1961) (quoting Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955)); accord Rutkin v. United States, 343 U.S. 130, 137-138 (1952); Ianniello v. Commissioner, 98 T.C. 165, 173 (1992).

We have held that the payments made by the Five to IRA related to the Prudential transactions are taxable 45 percent each to Ballard and Lisle and 10 percent to Kanter and the remaining payments made to IRA and Holding Co. are taxable 100 percent to Kanter.  Our holding is supported by clear and convincing evidence in the record.

Kanter entered into arrangements pursuant to which he would use his business and professional contacts, including his relationship with Ballard and Lisle, to assist members of the Five in obtaining business opportunities or in raising capital for business ventures.  In exchange for his services, Kanter received or shared in certain fees.  Kanter established a complex organization of corporations, partnerships, and trusts to receive, distribute, disguise, and launder the payments from these arrangements.  The payments were made to entities controlled by Kanter and then distributed through various means to Ballard, Lisle, and Kanter, their family members, or to entities established for the benefit of their families.

Eulich, Frey, Schnitzer, and Schaffel (members of the Five who were involved in the transactions and who testified as witnesses in these cases) each confirmed that they entered into the arrangements in exchange for Kanter's using his business connections and influence to direct business to them. There is no doubt that the payments were made for Kanter's services and, therefore, are income to him. The record clearly shows that out of the payments made to IRA, Kanter agreed to pay (and did pay) to each of Ballard and Lisle 45 percent of the payments related to the Prudential transactions, and that he did not share any of the payments unrelated to the Prudential transactions with Ballard and Lisle or anyone else.

Furthermore, the record establishes beyond any doubt that Ballard and Lisle received the benefit of the payments related to the Prudential transactions. Some of those payments were distributed to them directly or indirectly through their family members and their family trusts. Some of the payments were distributed to Ballard and Lisle through various Kanter-created "sham" entities and were recorded as loan receivables. Others were payments characterized as consulting fees made to their adult children by KWJ Corp. and KWJ Co. partnership.

Kanter entities made the following "loans" to Ballard, his family members, and entities established for the benefit of Ballard's family members:

### Ballard Loans

| Lender | Year | Distributee | Amount |
|---|---|---|---|
| Int'l Films | 1974 | CMB Cinema Trust | $10,000 |
| Int'l Films | 1975 | CMB Cinema Trust | 21,500 |
| Int'l Films | 1975 | CMB Cinema Trust II | 12,500 |
| Int'l Films | 1976 | CMB Cinema Trust | 8,200 |
| Int'l Films | 1976 | CMB Cinema Trust | 19,000 |
| Int'l Films | 1976 | CMB Cinema Trust II | 1,100 |
| Int'l Films | 1977 | CMB Cinema Trust | 2,200 |
| Int'l Films | 1977 | CMB Cinema Trust II | 3,400 |
| Int'l Films | 1978 | CMB Cinema Trust | 3,000 |
| Int'l Films | 1978 | Ballard | 9,500 |
| Int'l Films | 1979 | Ballard | 8,784 |
| HELO | 1980 | Summit Trust | 85,000 |
| HELO | 1981 | Summit Trust | 20,700 |
| Int'l Films | 1981 | CMB Cinema Trust | 4,000 |
| IRA | 1982 | Ballard | 160,400 |
| IRA | 1983 | Ballard | 500 |
| Administration Co. | 1983 | Seabright Trust | 11,300 |
| Administration Co. | 1984 | Ballard | 10,000 |
| Administration Co. | 1984 | Seabright Corp. | 25,840 |
| TMT | 1985 | Mary Ballard | 160,000 |
| Administration Co. | 1988 | Seabright Corp. | 5,000 |

Kanter entities made the following "loans" to Lisle, his family members, and entities established for the benefit of Lisle's family members:

Lisle Loans

| Lender | Year | Distributee | Amount |
|--------|------|-------------|--------|
| Int'l Films | 1974 | RWL Cinema Trust | $15,000 |
| Int'l Films | 1975 | RWL Cinema Trust II | 20,000 |
| Int'l Films | 1975 | Lisle | 10,000 |
| Int'l Films | 1976 | RWL Cinema Trust | 5,000 |
| Int'l Films | 1976 | RWL Cinema Trust II | 18,000 |
| Int'l Films | 1977 | RWL Cinema Trust II | 5,000 |
| Int'l Films | 1978 | Lisle | 9,500 |
| Int'l Films | 1978 | RWL Cinema Trust II | 3,750 |
| Int'l Films | 1978 | RWL Cinema Trust II | 4,469 |
| Int'l Films | 1979 | Lisle | 8,784 |
| Int'l Films | 1979 | RWL Cinema Trust II | 3,000 |
| Int'l Films | 1980 | RWL Cinema Trust II | 250 |
| Int'l Films | 1981 | RWL Cinema Trust II | 2,750 |
| Int'l Films | 1982 | RWL Cinema Trust II | 2,320 |
| Int'l Films | 1983 | RWL Cinema Trust II | 3,000 |
| HELO | 1983 | Basking Ridge Trust | 95,000 |
| IRA/Int'l Films | 1983 | Lisle | 3,000 |
| Int'l Films | 1984 | RWL Cinema Trust II | 3,000 |
| Administration Co. | 1985 | RWL Cinema Trust II | 3,000 |
| Int'l Films | 1986 | RWL Cinema Trust II | 3,000 |
| Administration Co. | 1987 | RWL Cinema Trust II | 2,463 |
| IRA | 1988 | RWL Cinema Trust II | 6,000 |
| BWK | 1989 | RWL Cinema Trust II | 3,000 |
| BWK | 1990 | RWL Cinema Trust II | 2,969 |

Generally, borrowed funds are not included in a taxpayer's gross income "because the taxpayer's obligation to repay the funds offsets any increase in the taxpayer's assets". United States v. Centennial Sav. Bank FSB, 499 U.S. 573, 582 (1991); accord Moore v. United States, 412 F.2d 974, 978 (5th Cir. 1969); United States v. Rochelle, 384 F.2d 748, 751 (5th Cir. 1967). The hallmarks of a loan are: (1) Consensual recognition between the borrower and the lender of the existence of the loan, i.e., the obligation to repay; and (2) bona fide intent on the part of

the borrower to repay the funds advanced.  See <u>Collins v.
Commissioner</u>, 3 F.3d 625, 631 (2d Cir. 1993), affg. T.C. Memo.
1992-478.

There was no loan agreement between the various Kanter
entities and Ballard or Lisle.  There was never any attempt to
collect on the receivables until after the IRS began questioning
the bona fides of the loans.  By that time the loans had already
been written off as worthless.  Even then Ballard and Lisle
denied that they had any obligation to repay.  There is no doubt
that the distribution payments to Ballard and Lisle were not
loans.

Similarly, there is no doubt that the payments made by KWJ
Corp. and the KWJ partnership to Ballard and Lisle's adult
children were not for services rendered by the children.

From 1982, KWJ Corp. and the KWJ Co. partnership paid the
Lisle and Ballard children the following amounts as consulting
fees:

|  | Lisle Children | | Ballard Children | |
| Year | Thomas Lisle | Amy Albrecht | Melinda Ballard | Karen Hart |
|------|--------------|--------------|-----------------|------------|
| 1982 | $7,000 | $7,000 | $7,000 | -- |
| 1983 | 12,000 | 12,000 | 12,000 | -- |
| 1984 | 12,000 | 12,000 | 12,000 | $2,000 |
| 1985 | 12,000 | 11,000 | 12,000 | 12,000 |
| 1986 | 12,000 | 13,000 | 12,000 | 12,000 |
| 1987 | 12,000 | 12,000 | 12,000 | 12,000 |
| 1988 | 12,000 | 12,000 | 12,000 | 12,000 |

During 1989, KWJ Co. paid the Lisle and the Ballard children
$36,000.  Of the $36,000 paid to the children in 1989, Lisle's

children received at least $18,000 and Ballard's children received at least $12,000.

Petitioners claim that Thomas Lisle and Melinda Ballard were paid the consulting fees for various services they provided to KWJ Corp. or KWJ Co. (KWJ). During the timeframe that Thomas Lisle was receiving $1,000 a month, he was employed elsewhere full time. During part of this time, Thomas Lisle was employed with the Vantage Company (Eulich's company).

Melinda Ballard received $1,000 a month from KWJ from 1983 through parts of 1989. She did not know the nature of KWJ's business. Neither Thomas Lisle nor Melinda Ballard ever met or spoke to Freeman.

Karen Ballard Hart (Hart) also received $1,000 a month. During the time that Hart was receiving $1,000 a month from KWJ, she was employed elsewhere.

Hart testified that the "service" she performed was to attend Urban Land Institute and Hotel Industry meetings. After she attended these meetings, she would sometimes tell Kanter what she had heard at the meetings, and sometimes she would not tell him what she had heard. Half of the time, Kanter was at the same meetings she attended. Hart described her role as "more of a general hotel industry trend thing" that she would tell Kanter about whenever she was asked. She did not know that she supposedly worked for KWJ. The $1,000 a month that Hart received

was paid to her by checks from Administration Co., and she testified that she worked for Administration Co.

Amy Albrecht (Albrecht) described her role as looking at "deals". Albrecht's testimony that she submitted on the average anywhere from 20 to 40 deals a year to Freeman greatly exceeds the 5 or 6 deals a year she had previously claimed during an interview with IRS agents. The $1,000 a month that Albrecht received did not depend on what she did or how many "deals" she looked at. She received $1,000 a month even if she did nothing. The checks issued to Albrecht were from either KWJ or Administration Co. During the time that Albrecht was receiving $1,000 a month from KWJ or Administration Co., she was employed by the Vantage company.

The testimony of Thomas Lisle, Melinda Ballard, Hart, and Albrecht is not credible. They performed no services for KWJ. The payments to them were from funds Ballard and Lisle earned from the Prudential transactions.

The record clearly shows that Kanter, Ballard, and Lisle agreed to share the payments made by the Five related to the Prudential transactions that were paid to IRA, Zeus, and KWJ Corp. in the ratio of 45 percent each to Ballard and Lisle and 10 percent to Kanter. Most of the funds were accumulated in IRA or a subsidiary until after Ballard and Lisle left Prudential. It was then that 45 percent of the accumulated funds were

distributed to each of Lisle and Ballard, respectively, through Carlco and TMT, and 10 percent to Kanter through BWK, Inc.

Respondent has established by clear and convincing evidence that Ballard failed to report income from the Five in the following amounts for each of the years at issue:

| Year | Omitted Income |
|------|---------------|
| 1978 | $17,277 |
| 1979 | 186,758 |
| 1980 | 391,538 |
| 1981 | 467,972 |
| 1982 | 710,001 |
| 1984 | 337,715 |
| 1987 | 300,900 |
| 1988 | 283,440 |
| 1989 | 358,492 |

Respondent has established by clear and convincing evidence that Lisle failed to report income from the Five in the following amounts for each of the years at issue:

| Year | Omitted Income |
|------|---------------|
| 1984 | 337,715 |
| 1987 | 300,900 |
| 1988 | 283,440 |
| 1989 | 358,492 |

Respondent has established by clear and convincing evidence that Kanter omitted income from the Five in the following amounts for each year at issue:

| Year | Prudential | Other | Omitted Income |
|------|-----------|-------|----------------|
| 1978 | $3,839 | -- | $3,839 |
| 1979 | 41,502 | -- | 41,502 |
| 1980 | 87,009 | -- | 87,009 |
| 1981 | 103,994 | $80,616 | 184,610 |
| 1982 | 157,778 | 70,538 | 228,316 |
| 1983 | 72,181 | 294,075 | 366,256 |
| 1984 | 75,048 | 822,840 | 897,888 |
| 1986 | 63,353 | 1,069,335 | 1,132,688 |
| 1987 | 66,867 | 132,322 | 199,189 |
| 1988 | 62,987 | 96,188 | 159,175 |
| 1989 | 79,665 | 42,332 | 121,997 |

For each of the years 1979 through 1989, Kanter filed Federal income tax returns which reported adjusted gross income and income tax paid as follows:

| Year | Adjusted Gross Income (Loss) | Income Tax Paid |
|------|------------------------------|-----------------|
| 1978 | ($44,386) | $1,671 |
| 1979 | (105,084) | -- |
| 1980 | (155,026) | -- |
| 1981 | (53,614) | -- |
| 1982 | (287,536) | -- |
| 1983 | (819,449) | -- |
| 1984 | (804,482) | -- |
| 1985 | (954,695) | -- |
| 1986 | (1,529,213) | -- |
| 1987 | (2,004,257) | -- |
| 1988 | (1,340,459) | -- |
| 1989 | (1,331,576) | -- |

Kanter paid no Federal income taxes during an 11-year period, and only minimum tax in 1978 of $1,671. However, he did pay self-employment tax for the years 1978 ($1,434), 1979 ($1,855), 1980 ($2,098), and 1983 ($3,338).

Because respondent has shown by clear and convincing evidence that Kanter, Ballard, and Lisle omitted income on their Federal income tax returns for each of the years at issue,

respondent has clearly proven the underpayments of income tax attributable to such omitted income for those years.

E.    Intent to Evade Tax

Next, respondent must show by clear and convincing evidence that Ballard, Lisle, and Kanter intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes.  See Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  See Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud is not presumed or imputed; it must be established by independent evidence that establishes a fraudulent intent on the taxpayer's part.  See Otsuki v. Commissioner, 53 T.C. 96, 106 (1969).  Because direct proof of a taxpayer's intent is rarely available, fraud may be proved by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts.  See Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).  For example, an intent to conceal or mislead may be inferred from a pattern of conduct, see Spies v. United States, supra at 499, or from a taxpayer's entire course of conduct, see Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).  Likewise, a pattern

showing a consistent underreporting of income, when accompanied by circumstances evidencing an intent to conceal, may justify a strong inference of fraud.  See Parks v. Commissioner, 94 T.C. 654, 664, (1990).

Additions to tax for fraud have been upheld where taxpayers received income from illegal kickback schemes.  See Tregre v. Commissioner, T.C. Memo. 1996-243, affd. without published opinion 129 F.3d 609 (5th Cir. 1997); DeVaughn v. Commissioner, T.C. Memo. 1983-712; Hanhauser v. Commissioner, T.C. 1978-504. These cases bear some factual similarities to the instant cases.

Factors Indicative of Fraudulent Intent

Courts have relied on a number of indicia of fraud in deciding fraud cases.  The existence of several indicia is persuasive circumstantial evidence of fraud.  See Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.  A non-exclusive list of circumstantial evidence which gives rise to a finding of fraudulent intent includes: (1) a pattern of understating income over an extended period of time; see Foster v. Commissioner, 391 F.2d 727, 733 (4th Cir. 1968), affg. in part, revg. in part T.C. Memo. 1965-246); (2) implausible or inconsistent explanations of behavior; see Bahoric v. Commissioner, 363 F.2d 151, 153 (9th Cir. 1966); Factor v. Commissioner, 281 F.2d 100 (9th Cir. 1960), affg. T.C. Memo. 1958-94; (3) failure to cooperate with tax

authorities; see McCullough v. Commissioner, T.C. Memo. 1993-70;
(4) failure to produce records during discovery, see Scallen v.
Commissioner, 877  F.2d 1364, 1370 (8th Cir. 1989), affg. T.C.
Memo. 1987-412; (5) destruction of records, see Estate of Beck v.
Commissioner, 56 T.C. 297 (1971); (6) misleading statements or
actions, see McManus v. Commissioner, T.C. Memo. 1972-200, affd.
without published opinion 486 F.2d 1399 (4th Cir. 1973), (7)
commingling of personal assets with those of the taxpayer's
corporation in an attempt to avoid tax, see United States v.
Walton, 909 F.2d 915 (6th Cir 1990); (8) diversion of income to
third parties, see Lewis v. Commissioner, T.C. Memo. 1983-547;
(9) reporting income from property beneficially owned by the
taxpayer on the returns of family members, see Lang v.
Commissioner, T.C. Memo. 1961-134; (10) structuring of a business
and use of cash management techniques which made difficult the
tracing of income, see Scallen v. Commissioner, supra at 1370-
1371; (11) banking devices used to conceal earnings, see Maddas
v. Commissioner, 114 F.2d 548 (3d Cir. 1940), affg. 40 B.T.A. 572
(1939); (12) concealing income under the names of other persons
who reported such income, see Hecht v. Commissioner, 16 T.C. 981
(1951); and (13) omission of income from the taxpayer's property,
title to which was held in names of others who reported the
income therefrom, see Furnish v. Commissioner, 262 F.2d 727 (9th
Cir. 1958).  In addition, the taxpayer's educational background

and experience are relevant.  See <u>Scallen v. Commissioner</u>, <u>supra</u> at 1371; <u>United States v. Stein</u>, 437 F.2d 775 (7th Cir. 1971).

1.  <u>Lisle's Fraud</u>

Respondent has proven by clear and convincing evidence that Lisle underpaid his taxes for each of the years at issue attributable to omitted income from transactions related to the Five.

Respondent has also proven by clear and convincing evidence that Lisle intended to evade taxes known to be owing on that income by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes.  The record contains several indicia of Lisle's fraud with intent to evade tax.

In determining the presence or absence of fraud, we consider the training and experience of the taxpayer.  See <u>Iley v. Commissioner</u>, 19 T.C. 631, 635 (1952).  Lisle graduated from the University of Missouri with a B.S. degree in public administration.  He attended law school at the University of Missouri, graduate schools of management and business at Columbia University, and the graduate school of management at Princeton University.  Lisle was an experienced and sophisticated businessman who held high executive positions at Prudential and later at Travelers.  As such, he obviously understood and fully appreciated his obligation to report income correctly and to pay taxes on that income.  Nevertheless, he disregarded this

obligation by participating in various schemes to collect kickbacks from the Five and misdirect income through Kanter's maze of entities.

Consistent and substantial understatements of income are strong evidence of fraud. See Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Moreover, a pattern of consistent underreporting of income, when accompanied by other circumstances indicating an intent to conceal income justifies the inference of fraud. See Holland v. United States, 348 U.S. 121, 137 (1954). Lisle omitted income received from transactions with the Five during the years 1984 and 1987 through 1989 in the total amount of $1,280,547. Additionally, for the years 1978 through 1983, 1984, and 1985, years not before us here, he omitted $2,734,707.

Lisle allowed Kanter to commingle his share of the kickback moneys in the laundering mechanism Kanter created to conceal the true nature of the income and the identity of the earner of the income. Lisle's use of the various Kanter sham entities (including among others, IRA, Carlco, KWJ Corp., KWJ Co., Essex, Zeus, Holding Co., Int'l Films, HELO, Administration Co., and Principal Services) made it difficult and sometimes impossible to trace the cash-flow and is substantial evidence of Lisle's intent to evade tax. See Scallen v. Commissioner, supra at 1371. Commingling by laundering is an indication of fraudulent intent.

See <u>United States v. Jackson</u>, 983 F.2d 757 (7th Cir. 1993).

Commingling of the kickbacks in the accounts of the conduit

entities, together with other unrelated income, was a device to

hide the kickbacks from Prudential and the IRS, and is evidence

of fraud.  See <u>Maddas v. Commissioner</u>, 114 F.2d 548 (3d Cir.

1940).

There is fraud where there is a scheme to "thwart the

effective functioning of the IRS" and where there is an attempt

to disguise the source of income.  See <u>United States v. Browning</u>,

723 F.2d 1544, 1547 (11th Cir. 1984).  Lisle plainly attempted to

disguise the source of the kickback funds by the manner employed

in sending the moneys through a roundabout method over a period

of many years through Kanter's conduit entities.  To be sure, the

movement of the moneys had no legitimate business purpose, as

demonstrated by the evidence.

The use of nominees, placing money or property in the name

of another, is indicative of fraud.  See <u>United States v.</u>

<u>Peterson</u>, 338 F.2d 595 (7th Cir. 1964); <u>Furnish v. Commissioner</u>,

<u>supra</u>, where the Court of Appeals stated that "Concealment by

itself is indicative of a willful intent to evade income taxes."

Lisle used IRA and later Carlco as a nominee to receive and hold

and conceal the kickback payments he received for his services.

Failure to cooperate with revenue agents during an audit

examination is indicative of fraud.  See <u>Bradford v.</u>

Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601.  As reflected in our findings of fact, Lisle did not cooperate with respondent's agents at various stages of their investigation of his tax returns.  He withheld relevant documents and information involving transactions with the Five.

Destruction of records and attempts to place records beyond the reach of the revenue agents are evidence of fraud.  See Prokop v. Commissioner, 254 F.2d 544 (7th Cir. 1958), affg. T.C. Memo. 1957-75; Estate of Beck v. Commissioner, 56 T.C. 297 (1971).  We find that Lisle discarded and permitted others, including Kanter, Gallenberger, and Weisgal, to discard supporting income documentation, which was an intentional act designed to conceal and evade the reporting and payment of Federal income tax.

Misleading statements or actions are evidence of fraud.  See McManus v. Commissioner, T.C. Memo. 1972-200, affd. without published opinion 486 F.2d 1399 (4th Cir. 1973).  Lisle made the following misleading statements to the IRS agents who interviewed him during their examination of Kanter's returns:

(1)  Lisle told the agents that Schaffel had transacted business with Prudential prior to Kanter's introduction of Schaffel to Lisle;

(2)  he told the agents that he was not aware of the dispute between Kanter and Schaffel regarding kickbacks for Travelers' deals;

(3)  he told the agents that he was not aware of any agreement between Schaffel and Kanter to share commissions Schaffel earned from the introduction to Ballard and Lisle.

(4)  he told the agents that Kanter mainly dealt with the field offices when introducing people to Prudential for business;

(5)  he denied any knowledge of the Christie Trust established for the benefit of his children;

(6)  he denied any knowledge of the Christie Trust's ownership of Carlco stock; and

(7)  he claimed that he had only recently learned about loans made by the Kanter entities to his family trusts and denied that any loans had been made to him.

Lisle's pattern of consistent and substantial underreporting of income, along with other indicia indicating an intent to conceal income, justifies our finding that Lisle's underpayment of tax attributable to the income he omitted from transactions involving the Five is attributable to fraud.

2.  Ballard's Fraud

Respondent has proven by clear and convincing evidence that Ballard underpaid his taxes for each of the years at issue attributable to omitted income from transactions related to the

Five.  Respondent has also proven by clear and convincing evidence that Ballard intended to evade taxes known to be owing on that income by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes.  There are several indicia of Ballard's fraud with intent to evade tax.

Although Ballard's educational background is not in the record, he was a sophisticated and experienced businessman who held high executive positions at Prudential, and later at Goldman Sachs.  As such, he obviously understood and fully appreciated his obligation to report income correctly and to pay taxes on that income.  Nevertheless, he disregarded this obligation by participating in various schemes to collect kickbacks from the Five and misdirect income through Kanter's maze of entities.

As our findings show, Ballard omitted income received from transactions with the Five during the years 1978 through 1982, 1984, and 1987 through 1989 in the total amount of $3,054,093. Additionally, for the years 1983, 1985, and 1986, years not before us here, he omitted $961,161.

Ballard used IRA and later TMT as a nominee to receive and hold the kickback payments he received for his services.

Ballard did not cooperate with respondent's agents at various stages of their investigation of his tax returns.  He withheld relevant documents and information involving transactions with the Five.

Ballard discarded and permitted others, including Kanter, Gallenberger, and Weisgal, to discard supporting income documentation, an intentional act designed to conceal and evade the reporting and payment of Federal income tax.

Ballard allowed Kanter to commingle his share of the kickback moneys in the laundering mechanism Kanter used to conceal its identity.  Ballard's use of the various Kanter sham entities (including among others, IRA, TMT, KWJ Corp., KWJ Co., Essex, Zeus, Holding Co., Int'l Films, HELO, Administration Co., and Principal Services) made it difficult and sometimes impossible to trace the cash-flow and is substantial evidence of Ballard's intent to evade tax.  Commingling the kickbacks in the accounts of the conduit entities, together with other unrelated income, was a device to hide the kickbacks from Prudential and the IRS, and is evidence of Ballard's fraud.

Ballard plainly attempted to disguise the source of the kickback funds by funneling money in the roundabout method through the conduit entities over a period of many years.

Ballard made the following misleading and false statements:

(1)  He testified that at the dinner meeting where Kanter introduced Schaffel to Ballard and Lisle, they only discussed politics, football, and religion, and that no business was discussed;

(2) he testified that he did not know whether Walters had transacted any business with Prudential when Ballard was at Prudential and that he was not involved with the Ramada Renaissance property; yet he met with Schaffel and Walters to finalize the financing of the Cherry Creek Place II and the Ramada Renaissance properties;

(3) he testified that Prudential did not purchase the Schnitzer-PMS stock because, apart from the potential conflict of interest, Prudential did not have any business to give to Schnitzer-PMS; yet Prudential started giving Schnitzer-PMS substantial business;

(4) he testified that he had no involvement and no meetings with Connolly other than seeing him at the Gateway hotel; yet he is the person who introduced Connolly to Eulich for purposes of setting up the Essex arrangement.

Finally, we find Ballard's testimony vague, evasive, and unreliable as to the kickback payments in the face of overwhelming evidence to the contrary.

Ballard's pattern of consistent and substantial underreporting of income, when accompanied by the other indicia indicating an intent to conceal income, justifies our finding that Ballard's underpayment of tax attributable to income he omitted from transactions involving the Five is attributable to fraud.

3.  Kanter's Fraud

Kanter was the architect who planned and executed the elaborate scheme with respect to the kickback income payments received from the transactions involving the Five. Ballard and Lisle participated with him, shared in the payments, and cooperated in the diversions. In our view, what we have here, purely and simply, is a concerted effort by an experienced tax lawyer and two corporate executives to defeat and evade the payment of taxes and to cover up their illegal acts so that the corporations, Prudential and Travelers, and the Federal Government would be unable to discover them.

Respondent has proven by clear and convincing evidence that Kanter underpaid his taxes for each of the years at issue attributable to transactions related to the Five. Respondent has also proven by clear and convincing evidence that Kanter intended to evade taxes known to be owing on that income by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes.

The record is replete with several indicia of Kanter's fraud. They are:

First, Kanter has a legal education. He has been a practicing tax attorney since 1956. He has taught courses in estate and gift taxation and estate planning at the University of Chicago Law School. He has lectured and written extensively in

the area of Federal tax law.  For a number of years, he has been a writer and contributor to the Journal of Taxation, a national monthly publication devoted exclusively to Federal taxation. Kanter, as an experienced tax attorney, obviously understood and fully appreciated his legal obligations to report income correctly and to pay taxes on that income.  Nevertheless, he disregarded these obligations by conceiving and carrying out various schemes to misdirect income.  Furthermore, he was or should have been aware that his Federal income tax liabilities were substantially underreported for each of the years in issue.

Second, as we have previously found, Kanter reported adjusted gross losses on his Federal income tax returns for every year from 1978 through 1989.  For 11 of those years he paid no Federal income taxes, and only minimum tax of $1,671 in 1978. Kanter omitted income received from transactions with the Five during the years 1978 through 1989 (except for 1985) in the total amount of $3,422,469.  Even for 1985, a year not before us here, he omitted $1,592,939.

Third, Kanter created a complex laundering mechanism made up of sham corporations and entities (including among others, IRA, Carlco, TMT, BWK, Inc., KWJ Corp., KWJ Co., Essex, Zeus, Holding Co., Int'l Films, HELO, Administration Co., and Principal Services) to receive, distribute, and conceal his income, as well as Ballard's and Lisle's income.  Payments made for their

services were paid to IRA and Holding Co. or one of their subsidiaries. The payments were commingled with funds from other entities in Administration Co.'s accounts and later Principal Service's accounts. Large amounts of money were distributed to various entities and individuals, including Kanter, Ballard, and Lisle, through IRA, Holding Co., HELO, Int'l Films, and the Bea Ritch trusts. The distributions were disguised as loans and recorded as receivables. The receivables were shuffled (through book entries) between the various entities and eventually written off. Kanter's use of the various sham entities made it difficult and sometimes impossible to trace the flow of the money and is substantial evidence of his intent to evade tax. See Scallen v. Commissioner, 877 F.2d 1364, 1370-1271 (8th Cir. 1989).

Fourth, as reflected in our findings of fact, Kanter did not cooperate with respondent's agents at various stages of their investigation of his tax returns. He withheld relevant documents and information involving transactions with the Five and the movement of moneys through the conduit entities such as Administration Co., IRA, Holding Co., and others.

Kanter caused some records to be destroyed and attempted to place other records beyond the reach of the revenue agents conducting the investigation. We find in particular that destruction of records that were the subject of the IRS summonses after the issuance of the summonses to be a strong indication of

fraud. "The summons had no time limit, was never withdrawn, and * * * required the recipient to retain--indefinitely--the documents within its scope." United States v. Administrative Enters., Inc., 46 F.3d at 673.

Gallenberger and Weisgal claim that records had been discarded pursuant to a 3-year retention policy based on the normal 3-year statute of limitations for assessing tax deficiencies. Yet the records they destroyed related to returns that were being audited and were the subject of IRS administrative summonses. We think that such a 3-year retention policy could not justify the destruction of corporate minutes, stock ownership records, or resolutions by the boards of directors. Moreover, some of the entities involved were trusts or corporations owned by trusts. Corporate officers and directors, as well as trustees of trusts, are often required to account to shareholders and beneficiaries for periods greater than 3 years. None of the individuals involved with the various entities (Gallenberger, Weisgal, Meyers, and Schott) acted in any independent manner. They all acted as directed by Kanter. It is clear that they destroyed the records at Kanter's direction.

Kanter, a tax professional who represents clients before the IRS and this Court, is aware of the need for documentation and records to support the items reported on tax returns. In light of that knowledge, coupled with other evidence, we find that his

discarding of his supporting income documentation was an intentional act designed to conceal and evade the reporting and payment of Federal income tax.

Fifth, Kanter's commingling of his income with the moneys of others is an indication of fraud in an attempt to avoid tax. United States v. Walton, 909 F.2d 915 (6th Cir. 1990).  The use of IRA and the other entities by Kanter and the commingling of the kickback moneys were part of the laundering mechanism designed by Kanter.  All of the commingling of Kanter's income, as well as that of Ballard and Lisle, was done at his direction. Commingling of the kickbacks in Administration Co.'s accounts, together with other unrelated income, was designed to conceal the kickbacks.  The commingling and laundering are evidence of fraud. Maddas v. Commissioner, 114 F.2d 548 (3d Cir. 1940); United States v. Jackson, supra.

Sixth, Kanter's scheme was intended to "thwart the effective functioning of the IRS" and was an attempt to disguise the source of income.  Kanter plainly attempted to disguise the source of the kickback funds by the manner employed in sending the moneys through conduit entities in a roundabout method over a period of many years.  Obviously, he, as well as Ballard and Lisle, did not want Prudential and Travelers to know about the kickback payments.  Certainly, the movement of the moneys had no legitimate business purpose.

Seventh, Kanter's reporting of the kickback moneys on the returns of IRA and Holding Co. was designed to conceal the scheme, and is another strong indication of Kanter's fraud.  See Lang v. Commissioner, T.C. Memo. 1961-134, where the reporting of income from property beneficially owned by the taxpayer on the returns of family members was held to be fraudulent.  It is clear that Kanter used the sham corporations to give the appearance that the kickback income was earned by them, rather than Ballard, Lisle, and himself, and that there was no tax due by the corporations because there were claimed losses sufficient to offset the income.  Moneys were distributed from IRA and Holding Co. at Kanter's direction to other entities that were created to conceal further the true nature of the payments.  Three of those entities, TMT, Carlco, and BWK Inc., were controlled respectively by Ballard, Lisle, and Kanter, and were the repositories of the kickback moneys distributed from IRA.

Eighth, Kanter routinely used the various conduit entities as nominees, placing money and property in the names of the entities to conceal the transactions.  In fact, when it was convenient, he would assert that the entity held an asset merely as nominee.

Ninth, Kanter created phony loans to disguise the distributions of the income to himself and others and to evade the income tax due on the income.  He later arranged for sales of

the receivables for nominal amounts in order to claim false bad debt deduction losses and offset additional income reported on his returns and the returns of the conduit entities.

Tenth, as discussed previously, Kanter's testimony at trial was implausible, unreliable, and sometimes contradictory. We did not find it credible.

Finally, other factors that support a finding of Kanter's fraud include, but are not limited to, manipulations of deductions and income between various corporate, partnership, and trust entities to conceal not only his income but the income of others; failure to account for payments for services; and the use of the various artifices to divert the payments to his children and trusts benefiting his family.

Kanter's substantial understatements of income over an 11-year period, his intentional misdirection of income, and his deliberate mischaracterizations of the transactions are clear and convincing evidence of his fraudulent intent to evade taxes, particularly in light of his legal education and experience and overall tax sophistication. See Scallen v. Commissioner, 877 F.2d 1364, 1370-1371 (8th Cir. 1989); Sisson v. Commissioner, T.C. Memo. 1994-545, affd. without published opinion 108 F.3d 339 (9th Cir. 1996); Wheadon v. Commissioner, T.C. Memo. 1992-633.

The transactions involved here were masquerades, concealing the true character of the payments. In reality, an attorney and

two highly successful businessmen conspired to conceal millions of dollars of kickbacks, using a multitude of entities with friends and employees serving as officers of convenience, in an attempt to defraud the employers of Ballard and Lisle and evade taxes properly owed to the Government.

As each layer of Kanter's complex organization is removed, and the flow of the money is followed, the magnitude of the fraud is revealed. Kanter's explanations are mere platitudes and rationalized rhetoric intended to obfuscate the true character of the transactions and his wrongdoing.

F.   Summary and Conclusions as to Fraud

The addition to tax or penalty in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). The facts, as we have found in detail, clearly show that Kanter, Ballard, and Lisle, through the use of various conduit entities, devised a multifaceted scheme to shield kickback payments they received from transactions involving the Five. Their fraud resulted in the Federal Government not being paid several millions in income taxes due and owing. Clearly, the Government incurred great expense investigating petitioners'

returns. The investigation took years and involved the efforts of dozens of IRS agents and several Government attorneys.

Petitioners created profitable business deals between the Five and Prudential and Travelers. The large sums of money they received as kickbacks were diverted at Kanter's direction to their controlled conduit entities. To effectuate the part of the scheme involving the Prudential transactions, Kanter through his related entities (IRA and its subsidiaries), retained the moneys for a period of time until they were distributed directly or indirectly to Ballard, Lisle, and himself in a 45-45-10 percent split. To effectuate the remaining part of the scheme involving the payments for Kanter's services, including payments from the Schaffel/Travelers transactions, Kanter caused the moneys to be paid to Holding Co., which he controlled.

As a result of the overall scheme, over $13 million of kickback and other income was omitted by petitioners collectively. The evidence is clear and convincing that they intended to evade the payment of their taxes on such omitted income. Accordingly, after considering all the facts and circumstances contained in the massive record of these cases, we hold that Kanter, Ballard, and Lisle are liable for the fraud additions to tax and penalties for each of the years at issue.

Issue 2.  Whether Certain Commitment Fees Paid to Century Industries, Ltd., Are Includable in Kanter's Income for 1981, 1982, 1983, 1984, and 1986

FINDINGS OF FACT

Century Industries, a partnership, was organized in 1979. Its partners were the Bea Ritch trusts, Weisgal individually (rather than as trustee of the Bea Ritch trusts), and a third individual.  The 25 trusts (collectively), Weisgal, and the other individual each held one-third interests in the partnership.  The partnership's objective was to engage in highly leveraged investments in which the partners would contribute relatively minimal amounts of their own capital.  The partnership was ultimately unsuccessful in such investments.

In early 1980, the partnership was reconstituted.  The third individual referred to above withdrew from the partnership, new partners were admitted, and the partnership's investment focus was changed.  The new partners included Kanter, four family trusts for the benefit of Weisgal's family members (the James Children's Trust, the Lawrence Children's Trust, the Lee Children's Trust, and the Richard Children's Trust), and another investment partnership composed of irrevocable trusts for the benefit of Weisgal's family called Atlay Valley Investments General Partnership (Atlay partnership).

During 1980 and 1981, the partners in Century Industries, their capital interests, and their initial capital contributions were as follows:

| Partners | Partnership Int. | Capital Contrib. |
|---|---|---|
| Atlay partnership | 29 percent | $290 |
| Bea Ritch trusts | 49 percent | 490 |
| James Children's trust | 5 percent | 50 |
| Lawrence Children's trust | 5 percent | 50 |
| Lee Children's trust | 5 percent | 50 |
| Richard Children's trust | 5 percent | 50 |
| Kanter | 1 percent | 10 |
| Weisgal | 1 percent | 10 |

In 1984, Cypress Lane Investment (a general partnership consisted of 30 irrevocable trusts for the benefit of Weisgal's family) replaced Atlay partnership as a 29-percent partner in Century Industries.

Century Industries had no office or employees of its own and operated out of the accounting firm offices of Weisgal. Although Century Industries considered and evaluated a number of potential investments from 1981 through about 1988, it made only a relatively small number of investments until about 1987. After 1981, its partners were not required to make additional capital contributions until 1986. During 1986 and 1987, its partners made the following additional capital contributions:

| Partner | 1986 Capital Contrib. | 1987 Capital Contrib. |
|---|---|---|
| Bea Ritch trusts | $29,900 | $53,400 |
| Cypress Lane Inv. | 17,900 | 31,900 |
| James Children's trust | 3,000 | 5,500 |
| Lawrence Children's trust | 3,000 | 5,500 |
| Lee Children's trust | 3,000 | 5,500 |
| Richard Children's trust | 3,000 | 5,500 |
| Kanter | 6,100 | 3,600 |
| Weisgal Revocable trust | 6,100 | 3,600 |

From 1981 through 1986, Century Industries received "standby commitment fees" from the following entities in the amounts indicated:

| Payer | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|
| Bayshore Marina | -- | -- | -- | -- | -- | $50,000 |
| Century Capital | -- | $3,000 | -- | -- | -- | -- |
| City & Suburban Dist. | -- | -- | -- | -- | $3,000 | -- |
| Computer Placement Services | $13,500 | 7,000 | -- | -- | -- | -- |
| CPS Inv. | -- | -- | $500 | $2,000 | 3,500 | -- |
| Delphi Indus. | -- | -- | -- | -- | 3,000 | -- |
| IRA | 4,000 | 3,000 | -- | -- | 4,000 | -- |
| James Ins. Tr. | -- | -- | 5,000 | -- | -- | -- |
| Ry. Placement Services | -- | -- | 4,500 | -- | -- | -- |
| Satcorp | -- | -- | -- | 75,000 | -- | -- |
| SiLite, Inc. | 17,500 | 7,000 | 18,000 | 13,000 | 11,000 | 12,000 |
| Stockholder | -- | -- | -- | 3,000 | -- | -- |
| TAC | -- | -- | -- | -- | 4,500 | -- |
| Holding Co. | -- | -- | 1,000 | -- | -- | -- |
| Waco Capital | -- | -- | -- | -- | 1,000 | -- |
| Zion | -- | -- | 4,000 | -- | -- | -- |
| | 35,500 | 20,000 | 33,000 | 93,000 | 30,000 | 62,000 |

One of the entities paying commitment fees, SiLite, Inc. (SiLite), had a history of acquiring other companies. During the years at issue, SiLite paid a monthly retainer of $1,000 to Century Industries for evaluation of investment opportunities. In addition to the monthly retainer, SiLite occasionally paid additional amounts for the analysis of investment opportunities.

Kanter and Weisgal performed the analyses for which payments were made to Century Industries.

On February 1, 1984, Century Industries billed Satcorp $100,000 for consultation, analysis, and recommendations regarding the financing and structuring of investment opportunities, specifically the structuring of a limited partnership and the sale of units in the partnership. A letter agreement dated September 12, 1984, sets forth the purpose of the payments made by Satcorp to Century Industries. The letter agreement provides:

> This letter will briefly outline the relationship between [sic] Satcorp, Inc. ("Satcorp") and Century Industries, Ltd. ("Century") so as to encompass Burton Kanter and Solomon Weisgal serving as so-called "financial engineers" for Satcorp and its existing operating companies and other projects it may undertake. The scope of involvement will be principally planning and structuring of transactions for financings for Satcorp, its operating companies and its future projects. It is intended that Century will consider participating in the actual process of raising financings, subject to fee arrangements to be agreed upon in connection therewith, but will not be routinely responsible for any such activities.
>
> To accommodate the foregoing and the overall relationship as it has been discussed, Century will bill fees in addition to those outlined below for services performed in connection with specific ventures, provided all conflicts are disclosed and the decision with respect to building in such fees has carefully and conscientiously [sic] taken into account any impact on successful fund raising.
>
> The specific current engagement will be compensated as follows:

1.  Fees

a)  Century will be guaranteed payment of $100,000 to be paid over a period of 18 months from January 1, 1984; specifically, $25,000 to initiate the engagement (already received), $25,000 90 days thereafter (already received), and the balance to be paid in equal monthly increments over the 12 months commencing July 1, 1984.

b)  In addition, Century will maintain records of the billings and time allocated so that if it "runs over" within the first 12 months, based on usual hourly rates, Century will be paid the difference as billed.

Whenever possible Century will apply its fees to individual offerings of finance, so as to spread the burden to various projects.

2.  Equity

a)  Century will vest to an amount of share equivalent to 7.5% of the outstanding common stock of Satcorp as computed on December 8, 1983 to be issued * * * [during 1984 and 1985].

b)  It is to be understood that in the event of death or permanent disability of either Burton Kanter or Solomon Weisgal, at Satcorps [sic] option it may request that the aforementioned shares be redelivered and exchanged for non-voting shares representing in all other respects the same equity interest as represented prior to the exchange. The purpose of this option is to accommodate Century's desire to maintain a continuing equity interest without being subject to redemption or other call, but at the same time to be certain that Satcorp is completely comfortable with those persons or entities who may succeed to the stockholdings in those circumstances mentioned.

In a letter dated November 20, 1984, to John Geocaris, City & Suburban Distributors, Inc., written by Weisgal on Century Industries letterhead, Weisgal stated:

> Burt [Kanter] and I have gotten our thoughts together
> and reviewed all of our records regarding the time that
> we have spent from inception of our conversations
> through October 31, 1984.
>
> The enclosed bill for $6,000 represents the dollar
> reflection of the time involved.  We have addressed
> this bill to City & Suburban Distributors, Inc. and I
> presume that this is the correct entity.
>
> If for some reason you would prefer this charge billed
> to a different company, please let me know.

The referenced bill indicates that the $6,000 charge was for special tax and consulting services.  A second letter to Geocaris, dated December 26, 1984, describes the work performed as overall financial planning, consideration of leveraged debt financing, considerations and evaluation of debt financing coupled with additional equity, review and identification of sources of bank financing, conference with lenders, review identification of potential equity sources, and various meetings and updates with Angelo and John Geocaris.

Century Industries issued an invoice dated February 24, 1986, to Bayshore Marina, Ltd., for $50,000 for various consulting services rendered from 1983 through 1985.

From 1983 through 1986, Kanter and Weisgal received the following guaranteed payments from Century Industries:

| Year | Kanter | Weisgal |
| --- | --- | --- |
| 1983 | $2,000 | $2,000 |
| 1984 | 12,000 | -- |
| 1985 | 7,500 | -- |
| 1986 | 6,000 | 6,000 |

Beginning in about 1987, Century Industries made certain investments that required additional capital contributions from its partners.  Some of these investments proved to be unsuccessful.  Ultimately, in 1988 or 1989, the partnership was dissolved.  Its affairs were wound up, and its remaining investments with any value were distributed to the partners.

During the years at issue, Century Industries reported its income on the calendar year and filed Forms 1065 U.S. Partnership Returns, for each of its taxable years.

In notices of deficiency issued to the Kanters for 1981, 1982, 1983, 1984, and 1986, respondent determined that the commitment fees paid to Century Industries constituted Kanter's income for those years.  Respondent issued a notice of final partnership administrative adjustment (FPAA) to Century Industries reallocating some of the partnership's 1986 income to Kanter.[51]  No FPAA was issued to Century Industries for 1983 and 1984.

                              OPINION

The issue we decide is whether the commitment fees paid to Century Industries are includable in Kanter's income for taxable years 1981, 1982, 1983, 1984, and 1986.  Respondent determined

---

[51]  A petition has been filed with this Court challenging the FPAA with respect to Century Industries' 1986 tax year.  Century Indus. Ltd., Solomon A. Weisgal Revocable Trust, Solomon A. Weisgal, Co-Trustee, Tax Matters Partner v. Commissioner, docket No. 11559-90.

that the commitment fees paid to Century Industries were actually earned by Kanter and assigned by him to Century Industries. Respondent now concedes that half the fees were for services provided by Weisgal. Kanter contends that before Century Industries would consider investing in a proposed venture, Century Industries charged commitment fees for evaluating the proposed investment, and, thus, the fees are income of the partnership. Additionally, for the 1983, 1984, and 1986 taxable years, Kanter maintains that the Court does not have subject-matter jurisdiction to decide the deficiencies related to the commitment fees determined in the notices of deficiencies because he contends for those years Century Industries is subject to the partnership audit and litigation provisions found in subchapter C of chapter 63 of subtitle F of the Internal Revenue Code. These provisions, sections 6221 through 6233 (collectively referred to for convenience as the TEFRA partnership provisions), are generally applicable to specified partnerships and other entities filing partnership returns for taxable years beginning after September 4, 1982. Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 407(a)(1), (3), 96 Stat. 324, 648.

Under the TEFRA partnership provisions, the tax treatment of partnership items must be determined at the partnership level. Sec. 6221. A partnership item must be considered solely in the

partnership proceeding and cannot be considered in the partner's personal or individual case.  Disputes relating to "nonpartnership items", however, continue to be resolved at the individual partner level.

Section 6231(a)(3) provides that a "partnership item" means any item required to be taken into account for the partnership's taxable year to the extent prescribed by regulations as an item that "is more appropriately determined at the partnership level than at the partner level."  The regulations provide that partnership items include the partnership's aggregate and each partner's share of items of income.

If the commitment fees were Kanter's income that he assigned to the partnership, then the asserted deficiency against him from the adjustment would not be attributable to a partnership item, and consideration of the adjustment in the instant cases will not be enjoinable pursuant to section 6225(b).  See sec. 6225(a) and (b).  The adjustment to Kanter's income further would not be an "affected item".  Sec. 6231(a)(5); NCF Energy Partners v. Commissioner, 89 T.C. 741, 743-746 (1987); Maxwell v. Commissioner, 87 T.C. 783, 792-793 (1986).  Conversely, if the fees are the partnership's income, the determination of a partner's share of the income is a partnership item and must be made at the partnership level.  See sec. 6231(a)(1), (3); Rule 240(b)(2); see also Maxwell v. Commissioner, supra at 787-788.

Thus, we must first determine whether the fees are Kanter's income. We must consider all the facts and circumstances to determine the actual earner of income. See Leavell v. Commissioner, 104 T.C. 140, 155 (1995). From 1981 through 1986, a number of entities paid substantial commitment fees to Century Industries. The Kanters contend that Century Industries required the entities to pay the partnership the commitment fees for the partnership to consider investing in a proposed transaction. The evidence, however, shows that the payments made by the entities were for services provided by Kanter and Weisgal to the entities and that the services were unrelated to any investments made by Century Industries. For example, Satcorp agreed to pay Century Industries $100,000 plus stock in Satcorp to acquire Kanter's and Weisgal's services as "so-called financial engineers" to assist in the structuring of a limited partnership and the sale of the units in the partnership.

The evidence shows that the commitment fees were paid for professional and promotional services rendered by Kanter and Weisgal to the entities that paid the fees. The November 20, 1984, letter from Weisgal to John Geocaris requests that the fees were for special tax and consulting services. The letter states that "Burt and I have gotten our thoughts together and reviewed all of our records regarding the time that we have spent from inception of our conversations through October 31, 1984." Kanter

and Weisgal were required to account for their time and the $6,000 fee was based on that time. Although some of the commitment fees were paid by entities related to Kanter or Weisgal, the Kanters have provided no documents to show that the commitment fees paid by those entities were for Century Industries' consideration whether to purchase investments offered by those entities.

Century Industries was not a partnership formed by a group of professionals, such as doctors, lawyers, or accountants, through which the professionals practice together. Kanter (an attorney) and Weisgal (an accountant) were the only partners in Century Industries who were professionals. Each individually owned only 1 percent of the partnership interests. Their family trusts owned the remaining 98 percent. Kanter and Weisgal used Century Industries to assign to the family trusts the fees they received for professional and promotional services.

We find that the commitment fees were for professional and promotional services provided by Kanter and Weisgal and that they are the true earners of the income. Therefore, the income is not the income of Century Industries, and this Court has jurisdiction over the adjustments made in the notices of deficiencies.

Respondent concedes that only half of the fees are Kanter's income. Kanter has not provided time records or any other evidence to establish that he may have provided less than half of

the services or that less than half of the fees is his income.
We hold, therefore, that one half of the commitment fees received
by Century Industries for the taxable years 1981, 1982, 1983,
1984, and 1986 are includable in Kanter's income for those years.

Issue 3.  Whether Kanter Received Unreported Income From Hi-Chicago Trust for 1981, 1982, and 1983

FINDINGS OF FACT

In notices of deficiency for 1981, 1982, and 1983,
respondent determined that Kanter failed to report income
received from the Hi-Chicago Trust (HCT) in the amounts of
$42,720, $19,247, and $109,399, respectively.

At trial and in a stipulation of settled issues, Kanter
conceded the unreported income adjustment for 1981 but did not
concede the adjustments for 1982 and 1983 or the additions to tax
for 1981, 1982, and 1983 relating thereto.

HCT was established on March 6, 1972, by and between
Benjamin Markowe, as grantor, and Kanter, as trustee.  The
beneficiaries of HCT were Sylvia Federman (the wife of Hyman L.
Federman (Federman)) and the children of Federman and Sylvia
Federman; namely Miles Federman, Ruth Silverstone, and Joan
Priver.  The HCT agreement conferred broad powers upon the
trustee, including, but not limited to, the power to buy and sell
property and pay any reasonable compensation to the trustees.
Kanter served as trustee from the inception of the HCT through at

least 1989.  By its terms, HCT was governed by the laws of the State of Illinois.

Neither Kanter nor members of his family were beneficiaries of HCT.  Kanter is not related to Federman but is a friend of Federman and the trustee of HCT.

At the inception of HCT, Federman and the beneficiaries of HCT orally agreed with Kanter that Kanter (or his designee) would at all times during the continuance of HCT be entitled to participate in the investments of HCT by way of a so-called carried interest to the extent of 10 percent of any and all profits realized from time to time by HCT on its individual investments.  Such profits were to be payable upon disposition of any specific investment, whether an investment was in the form of a note, stock, securities, partnership interest, or other forms of property but excluding any interest income realized on deposits, such as savings accounts, certificates of deposit, time deposits or debt instruments.  Kanter had the option to exercise his right to the carried interest by electing a distribution in kind of any investment held by the trust to which the carried interest applied.  If Kanter elected a distribution in kind, HCT made a distribution to Kanter or his designee of a 10-percent interest in the investment in consideration for a payment by Kanter or his designee to HCT of 10 percent of HCT's cost of the

investment.  Kanter did not otherwise pay a fee to HCT for this carried interest.

During the years in question, Kanter, as trustee, performed various services for HCT.  He determined whether investments by HCT would be made and whether and when they would be sold.  His decisions on these matters were final.  Kanter made the decisions as to whether or not distributions would be made to the beneficiaries; he directed people who worked for him at his law firm and then later at Administration Co. and Principal Services to perform various administrative services for HCT; he supervised them in the performance of these services and, as trustee, he was responsible for the performance or non performance of these services.  Kanter signed the tax returns of HCT; he hired the accounting firm of Oppenheim, Appel & Dixson to prepare some of the tax returns of HCT; and he subjected himself to liability under VIII, paragraph 8.3 of the HCT agreement for any willful default, wrongdoing, or gross negligence in connection with his duties as trustee of HCT.

On December 22, 1980, Kanter sent a letter to Federman enclosing a document entitled "Agreement and Indemnification".  As stated in the letter, the enclosed Agreement and Indemnification reflected the agreement concerning the carried interest.  The Agreement and Indemnification document was not executed at that time.

In order to induce Kanter to continue to serve as trustee
and to reduce to writing the agreement concerning the carried
interest, the Agreement and Indemnification was entered into on
July 26, 1984, by and among (1) Kanter, as trustee of HCT, (2)
the beneficiaries of HCT, and (3) Hyman L. Federman.  The
Agreement and Indemnification stated, in pertinent part, as
follows:

> WHEREAS, BWK is currently acting as Trustee of the
> Hi-Chicago Trust and so acted from its inception at the
> time of creation; and

> WHEREAS, the Beneficiaries of the Trust desire
> that BWK continue to serve as Trustee of the Trust; and

> WHEREAS, BWK is willing to so serve, upon receipt
> of a satisfactory release and indemnification as
> contained herein from the Beneficiaries and from HLF,
> with respect to any and all claims and liabilities
> which might be asserted concerning prior conduct by BWK
> as Trustee in the operations of the Trust, and for
> acting or choosing not to act upon advice provided by
> HLF; and

> WHEREAS, all of the undersigned have expressed a
> willingness to execute this Agreement and
> Indemnification in order to induce BWK to continue to
> serve as Trustee of the Trust without seeking prior
> judicial approval for his past or future acts or
> failure to act as Trustee; and

> WHEREAS, to provide the beneficiaries of the Trust
> a current financial account there is attached hereto as
> "Exhibit A" a balance sheet and profit and loss
> statement as of the Trust year ended February 29, 1984,
> and a further such balance sheet and profits and loss
> statement as of June 30, 1984, attached as Exhibit B.

> NOW, THEREFORE, the parties hereto agree as
> follows:

1.   BWK shall hereafter continue to act as the sole Trustee of the Hi-Chicago Trust.

2.   The Trustee may, at his option, at any time, and from time to time, seek professional investment advice from HLF and, to the extent the Trustee may act upon such advice, or shall choose not to act upon such advice, he shall be exculpated from and held harmless from and otherwise indemnified with respect to any and all claims, demands, suits, actions, liabilities and responsibilities arising out of or connected with following or failing to follow such advice.

3.   It is understood that at the inception of the Trust an agreement was reached that BWK, individually, or his designee, would at all times during the continuance of the trust be entitled to participate in the investments thereof by way of a so-called "carried" interest to the extent of ten percent (10%) of any and all profits realized from time to time by the Trust on its individual investments, said profits interest to be payable upon the disposition of any specific investment, whether said investment was in the form of a note, stock, securities, partnership interest, or other form of property, excluding participation in any interest realized upon deposits of the trust held for interest only, such as savings accounts, certificates of deposits, time deposits, or debt instruments, but excluding any related equity property interest, subject to the right of BWK, or his designee, at his election with respect to any specific investment of the Trust to which the aforesaid carried interest applies, to obtain a distribution of a ten percent (10%) interest in said investment in kind by payment to the Trust of ten (10%) of the Trust's cost thereof; it is further understood that the aforesaid agreement has heretofore, and does presently, represent an integral part of the investment program of the Trust; accordingly, the undersigned do hereby ratify and consent to said agreement as heretofore implemented and applied, and as will hereafter be implemented and applied, in such manner as the Trustee shall determine in accordance with generally accepted accounting concepts of realization of profit from each specific investment upon its disposition for cash or other property.

4.   There is attached hereto as "Exhibit A" and "Exhibit B" a financial statement for the Trust for the

period ending February 29, 1984, and June 30, 1984 including therein a balance sheet and profit and loss statement.  The undersigned hereby acknowledge that each of them has received a copy of said Exhibits A and B, has examined same, and is satisfied that it represents a substantially true and correct statement of the financial condition of the trust, and do hereby accept and approve the contents of said Exhibits A and B.

5.  The undersigned, jointly and severally, each for himself or herself, his or her heirs, devisees, legatees, appointees, executors, administrators and assigns, in consideration of Burton W. Kanter continuing to serve as Trustee of the Hi-Chicago Trust, without seeking judicial approval for his actions or failures to act as Trustee, and in consideration of Burton W. Kanter making certain investments and undertaking commitments hereinbefore referred to, and otherwise acting upon or choosing not to act upon the advice of Hyman L. Federman, currently and prospectively, for and on behalf of the Trust, and other good and valuable consideration, receipt of which is hereby acknowledged, do hereby irrevocably indemnify, release, discharge and hold harmless Burton W. Kanter, both individually and as Trustee aforesaid, and his heirs, devisees, legatees, appointees, executors, administrators and assigns, of and from any and all claims, demands, suits, actions, liabilities and responsibilities for any act or failure to act as Trustee of the Trust, since the inception of the Trust, and without limiting the generality of the preceding, do hereby specifically ratify, approve and confirm all actions of said Trustee relating to investment advice from Hyman L. Federman, previously, currently and prospectively with respect to the administration of the Trust * * *

Kanter designated Holding Co. to receive the payments of the carried interest.  Pursuant to the agreement between Kanter and the beneficiaries of HCT, HCT paid to Holding Co. the following amounts on the following dates:

| Date of Payment | Amount of Payment |
|---|---|
| 12/16/80 | $80,000 |
| 1980 total | 80,000 |
| | |
| 08/11/81 | 33,925 |
| 10/23/81 | 8,795 |
| 1981 total | 42,720 |
| | |
| 10/13/82 | 19,247 |
| 1982 total | 19,247 |
| | |
| 02/18/83 | 50,000 |
| 03/15/83 | 22,224 |
| 05/11/83 | 6,199 |
| 09/14/83 | 1,227 |
| 09/14/83 | 29,749 |
| 1983 total | 109,399 |

HCT, Kanter as Trustee, filed Forms 1041, U.S. Fiduciary Income Tax Returns, for its taxable years ended February 28, 1981, 1982, 1983, and 1984.  Each of these returns was signed by Kanter.  On its returns for the taxable years ended February 28, 1981 through 1984, HCT claimed the following deductions for its payments to Holding Co. pursuant to the carried interest:

| Description of Deduction | Taxable Year Ended | Amount of Deduction |
|---|---|---|
| Fiduciary fees | 2/28/81 | $80,000 |
| Participation fees | 2/28/82 | 42,720 |
| Commissions | 2/28/83 | 88,203 |
| Commission expense | 2/28/84 | 56,921 |

On its return for the taxable years ended February 28, 1982, 1983, and 1984, HCT did not claim any deduction for fiduciary fees.  Each of the returns of HCT for the taxable years ended

February 28, 1981 through 1984 was handwritten and not computer prepared.

On his Federal income tax return for 1988, Kanter reported as miscellaneous income trustee fees from HCT in the amount of $29,000. At the time Kanter reported income from HCT as trustee fees on his 1988 return, Kanter knew that respondent had determined in notices of deficiency for 1981 and 1982 that the amounts paid by HCT to Holding Co. during those years, pursuant to the carried interest, were taxable to him. On his Federal income tax returns for 1980 through 1987, Kanter did not report any income from trustee fees from HCT.

For the taxable years ended August 31, 1978 through 1987, Holding Co. had negative taxable income and paid no Federal income taxes. During the taxable years in question, Holding Co. was owned by Kanter and/or trusts for the benefit of Kanter's family.

## OPINION

Under section 61, gross income includes all income from whatever source derived, including (but not limited to) compensation for services, including fees, commissions, and similar items.

During the years 1981, 1982, and 1983, HCT paid to Holding Co. $42,720, $19,247, and $109,399, respectively. The amounts paid by HCT to Holding Co. for 1981, 1982, and 1983 equal the

unreported income adjustments in the notices of deficiency mailed to Kanter for those years. The amounts paid by HCT to Holding Co. for 1981, 1982, and 1983 were paid pursuant to an oral agreement between Kanter, Hyman L. Federman, and the beneficiaries of HCT by which Kanter or his designee was entitled to receive 10 percent of the profits from the sale of assets of HCT (the carried interest). Kanter does not dispute that the amounts set forth in the notices of deficiency for 1981, 1982, and 1983 were paid by HCT to Holding Co. pursuant to the carried interest. Kanter claims that the amounts are not taxable to him because, prior to the years in question, he allegedly assigned the carried interest to Holding Co.

To the contrary, respondent contends that the evidence shows that the payments from HCT to Holding Co. were in substance compensation to Kanter for his services as trustee of HCT. Kanter became trustee of HCT in 1972. He served as trustee of HCT from 1972 through at least 1989. During the years in question, Kanter, as trustee, performed substantial services for HCT, as set forth in our findings of fact.

Because Kanter was not related to the Federmans and Kanter's family members were not beneficiaries of HCT, we think it is unlikely that Kanter would have performed the various services on behalf of the trust without compensation. Kanter could not establish that he received any trustee fees from HCT (other than

the carried interest) during the years 1982 and 1983, and/or whether he reported any such fees on his returns for those years. The fact that Kanter did not receive any trustee fees from HCT (other than the carried interest) is affirmatively shown by the HCT fiduciary income tax returns for the taxable years ended February 28, 1982, and 1983.  On those HCT returns, other than the deduction for the carried interest payments to Holding Co., HCT deducted no other payments as fiduciary fees.  Had HCT made any other payment for fiduciary fees, HCT presumably would have deducted them on its returns.  Therefore, the fact that HCT deducted no other payments as fiduciary fees for those taxable years indicates that HCT paid no other fiduciary fees to Kanter during those years.  Except for trustee fees of $29,000 for 1988 and $3,000 for 1989, Kanter did not establish that he received or reported on his tax returns any trustee fees from HCT (other than the carried interest) from the inception of HCT in 1972 through 1989.  In our opinion the evidence shows that the carried interest payments were in fact compensation for Kanter's services as trustee of HCT.

With respect to the trustee fees from HCT that Kanter reported as income on his 1988 and 1989 returns, at the time Kanter received those fees, he knew that respondent had previously determined in notices of deficiency for the taxable years 1981 and 1982 that the amounts paid by HCT to Holding Co.

during those years, pursuant to the carried interest, were taxable to him. Respondent contends that Kanter reported trustee fees in 1988 and 1989 in a belated attempt to lend credence to his position that the carried interest payments were independent of any trustee fees in order to counter respondent's determination for prior years that the carried interest payments from HCT to Holding Co. were in substance compensation for his services as trustee. We agree.

On the HCT fiduciary returns for the taxable years ended February 28, 1981, 1982, 1983, and 1984, the deductions for the carried interest payments from HCT to Holding Co. are labeled "Fiduciary Fees", "Participation Fee", "Commissions", and "Commission Expense", respectively. These HCT fiduciary returns are all signed by Kanter in his capacity as trustee of HCT. The fact that the deduction for the payment from HCT to Holding Co. for the taxable year ended February 28, 1981, was labeled "Fiduciary Fees" and that the deductions labeled "Participation Fee", "Commissions", and "Commission Expense" for the subsequent 3 years were also for the carried interest payments from HCT to Holding Co. is further evidence that the carried interest payments from HCT to Holding Co. were in fact fiduciary fees for services rendered by Kanter. The fact that the payments are labeled "Participation Fee", "Commissions", and "Commissioner Expense", is, in any event, evidence that the payments were made

for services rendered by Kanter. Kanter's signature on these returns indicates that, under penalties of perjury, he believed that these characterizations were true and correct.

Concerning his acquisition of the carried interest, Kanter testified that he had invested moneys with Hyman Federman and sustained a number of losses, and that he negotiated to receive the carried interest as "a way to allow recoupment of losses that I had sustained in earlier years from other investments" and that an understanding was reached that he would receive that carried interest "at some point in time after this trust was created and not in conjunction with its initial creation." Kanter's testimony pertaining to his acquisition of the carried interest was not corroborated by any other witness. He introduced no evidence to establish the losses he allegedly sustained. His testimony is specifically contradicted by the Agreement and Indemnification Agreement, which states on page 2 that "It is understood that at the inception of the Trust an agreement was reached that Kanter" would receive the carried interest.

Kanter testified that he always considered the carried interest as "something independent of any trustee fee." This statement is contradicted by the HCT fiduciary income tax return for the taxable year ended February 28, 1980. On that return, the deduction claimed for the carried interest payment from HCT to Holding Co. was labeled "Fiduciary Fees". The return was

signed by Kanter as trustee of HCT.  His signature on the return indicates that, under penalties of perjury, he believed that the characterization of the carried interest payment as a fiduciary fee was true and correct.  Therefore, his statement at trial that he considered the carried interest to be "something independent of any trustee fee" was not credible.

Kanter's testimony that the carried interest was "something independent of any trustee fee" is further contradicted by the fact that the agreement entitling Kanter to receive the carried interest was embodied in the Agreement and Indemnification Agreement to induce Kanter to continue as trustee.  The fact that the carried interest was embodied in the Agreement and Indemnification Agreement shows that the carried interest was part of the consideration received by Kanter to serve as trustee.

Kanter's testimony that the carried interest was not compensation for his services as trustee is also inconsistent with his response to the Court's questioning concerning about how often he was paid a trustee fee.  When Kanter was asked about how often he was paid a trustee fee, he responded as to how often the carried interest was paid.  That response indicates that Kanter believed that the carried interest payments were made as compensation to him for his services as trustee.

Kanter failed to establish that he validly assigned the carried interest to Holding Co.  He could not specifically

identify when he assigned the interest to Holding Co. except to say that it was "sometime in the 1970's." He provided no written assignment document, and no other witness corroborated his testimony. He also could not remember whether Holding Co. paid anything for the interest or how much it paid, if any. Other than Kanter's vague and uncorroborated testimony, the only evidence of a possible assignment is the fact that the payments were in fact made to Holding Co. rather than Kanter. The fact that the payments were made to Holding Co. does not establish that the underlying contractual right to the carried interest was assigned by Kanter to Holding Co. but only establishes that payments were made to Holding Co. rather than to Kanter. The Agreement and Indemnification Agreement that was executed on July 26, 1984, recites that Kanter individually or his designee was entitled to receive the carried interest payments. If Kanter had assigned the contractual right to the carried interest payments to Holding Co. in the 1970's, that fact should have been acknowledged in the Agreement and Indemnification Agreement that was executed in 1984, long after the purported assignment to Holding Co. In addition, Kanter admitted that he controlled when the carried interest payments would be made when he stated that he would not always pay the amounts due at the time a gain was realized as called for by the agreement but would sometimes delay the payment. Such control by Kanter is inconsistent with a valid

assignment to Holding Co.  He failed to show a clear manifestation of an intention to assign the underlying contractual right, as opposed to the payments, to Holding Co. and also failed to show that Holding Co. paid any valuable consideration for the claimed assignment.  Moreover, even if there had been a valid assignment of the carried interest, it was Kanter who was the "tree" (not the carried interest) and the payments to Holding Co. were the "fruit" of Kanter's services to the trust.  Thus, the alleged assignment by Kanter of the "fruit" of the "tree" to Holding Co. would have been ineffective to shift from him to Holding Co. the income tax liability on the payments. Lucas v. Earl, 281 U.S. 111 (1930).

We conclude that Kanter failed to establish that respondent erred in determining that he was taxable on the carried interest payments made by HCT to Holding Co. during the years 1981, 1982, and 1983.  The facts clearly establish that the payments were made as compensation for his services rendered to HCT.  Kanter's treatment of the carried interest is merely another attempt by Kanter to disguise and shift his income.

Issue 4.  Whether Kanter is Taxable on the Income of the Bea Ritch Trusts for 1986 and 1987

FINDINGS OF FACT

In the notice of deficiency for 1987, respondent determined that Kanter failed to report certain income, deductions, and losses of the Bea Ritch Trusts (sometimes BRT) which were reportable by him as the owner of BRT.  Included in the income of BRT was 1986 net long-term capital gain from the partnerships Hempstead-Babylon (HB), Bergen-Westchester (BW), and Yorkshire Partners (YP) in the amounts of $1,143,248, $274,660 and $615,460, respectively, that had been reported on BRT returns for the fiscal year ended September 30, 1987.  The capital gains of HB, BW, and YP were attributable to the sale by those partnerships of their interests in Long Island Cable Communications Development Co. (LICCDC), subsequently known as Cablevision Systems Development Co. (Cablevision).  BRT originally became a partner of HB, BW, and YP through Oyster Bay Associates (OBA).  OBA eventually distributed its interest in HB, BW, and YP to its partners, including BRT.

The trust agreement dated January 1, 1969, established the Bea Ritch Trusts, Beatrice K. Ritch, Grantor, as a group of 25 trusts for the benefit of members of Kanter's family.  Beatrice K. Ritch is Kanter's mother.  Joel Kanter, Janis Kanter, and Joshua Kanter are the Kanters' children.  Solomon Weisgal (Weisgal), was named trustee of each trust.

Each of the 25 Bea Ritch Trusts had an employer identification number and filed tax returns.  There is no single or individual trust or partnership named "Bea Ritch".  Bea Ritch Trusts or BRT is a reference name used to refer collectively to the 25 trusts created by the trust agreement.

Kanter was originally a beneficiary of each of the 25 BRT trusts.  He partially renounced and disclaimed his interest in BRT on January 6, 1971, and renounced the remainder of his beneficial interest in BRT on January 20, 1977.  He further signed a renunciation and disclaimer of his beneficial interests in BRT on September 15, 1978.

The original beneficiaries of BRT also included Kanter's wife, Naomi, and their children.  The original beneficiaries were all individuals.  Kanter's wife was originally a beneficiary in nine of the trusts.

Article III of the trust agreement establishing Bea Ritch Trusts, Beatrice K. Ritch, Grantor, provides in pertinent part as follows:

> 3.1  Income and Principal.  The Trustee is hereby authorized to distribute all or as much of the net income or principal or both of a separate trust to the beneficiary or to any one or more of the beneficiaries of such trust as the Trustee deems to be in the best interests of said beneficiary or beneficiaries.

> 3.2  Limited Powers of Appointment.  The Grantor's son may, during his lifetime and upon his death, appoint all or any part of the trust estate of each separate trust of which he shall be a beneficiary to or for the

benefit of any person, persons or charitable organization[.]

Sometime prior to 1987, 60 trust beneficiaries (the various JSK Trusts) were added to each of the 25 trusts of BRT.  The original and additional beneficiaries of each of the 25 trusts of BRT are as follows:

| Trust Name | Original Beneficiaries | Additional Beneficiaries |
|---|---|---|
| BWK | Burton Kanter | JSK 1st Trust #5<br>JSK 2d Trust #5<br>JSK 3d Trust #5 |
| Naomi Trust | Naomi Kanter | JSK 3d Trust #19<br>JSK 1st Trust #20 |
| BN Trust | Burton & Naomi | JSK 1st Trust #4<br>JSK 2d Trust #4<br>JSK 3d Trust #4 |
| Joel Trust | Burton & Joel Kanter | JSK 1st Trust #17<br>JSK 2d Trust #17 |
| Janis Trust | Burton & Janis Kanter | JSK 3d Trust #15<br>JSK 1st Trust #16 |
| Joshua Trust | Burton & Joshua Kanter | JSK 2d Trust #18<br>JSK 3d Trust #18 |
| Joel Children's Trust | Burton, Naomi Joel & Joel's Children living from time to time | JSK 3d Trust #17<br>JSK 1st Trust #18 |
| Janis Children's Trust | Burton, Naomi Janis & Janis's Children living from time to time | JSK 2d Trust #16<br>JSK 3d Trust #16 |
| Joshua Children's Trust | Burton, Naomi Joshua & Joshua's Children living from time to time | JSK 1st Trust #19<br>JSK 2d Trust #19 |

| Trust Name | Original Beneficiaries | Additional Beneficiaries |
|---|---|---|
| JL-1 Trust | Burton, Joel Harriet Blum & Joel's 1st child | JSK 3d Trust #11 JSK 1st Trust #12 |
| JL-2 Trust | Burton, Joel Debbie Blum & Joel's 2nd child | JSK 2d Trust #12 JSK 3d Trust #12 |
| JL-3 Trust | Burton, Joel Jeff Blum & Joel's 3d child | JSK 1st Trust #13 JSK 2d Trust #13 |
| JA-1 Trust | Burton, Janis Henry Krakow & Janis' 1st child | JSK 1st Trust #9 JSK 2d Trust #9 JSK 3d Trust #9 |
| JA-2 Trust | Burton, Janis Helen Krakow & Janis' 3d child | JSK 1st Trust #10 JSK 2d Trust #10 JSK 3d Trust #10 |
| JA-3 Trust | Burton, Janis Evelyn Krakow & Janis' 3d child | JSK 1st Trust #11 JSK 2d Trust #11 |
| JS-1 Trust | Burton, Joshua Gerald L. Kanter & Joshua's 1st child | JSK 3d Trust #13 JSK 1st Trust #14 |
| JS-2 Trust | Burton, Joshua Ruth Kanter & Joshua's 2nd child | JSK 2d Trust #14 JSK 3d Trust #14 |
| JS-3 Trust | Burton, Joshua Joshua's 3d child & all of the children of Gerald L. Kanter living from time to time | JSK 1st Trust #15 JSK 2d Trust #15 |
| BK Children's Trust | Burton, Naomi and all of the children of Grantor's son living from time to time | JSK 1st Trust #1 JSK 2d Trust #1 JSK 3d Trust #1 |

| Trust Name | Original Beneficiaries | Additional Beneficiaries |
|---|---|---|
| BK Descendant's Trust | Burton, Naomi and all of the descendants of Grantor's son living from time to time | JSK 1st Trust #2<br>JSK 2d Trust #2<br>JSK 3d Trust #2 |
| BK Grand Children's Trust | Burton, Naomi and Burton's Grand children living from time to time | JSK 1st Trust #3<br>JSK 2d Trust #3<br>JSK 3d Trust #3 |
| Lillian Trust | Burton, Naomi and Lillian Wilsker | JSK 2d Trust #20<br>JSK 3d Trust #20 |
| J-1 Wife's Trust | Burton, Joel's Wife and the children of Carl I. Kanter living from time to time | JSK 1st Trust #6<br>JSK 2d Trust #6<br>JSK 3d Trust #6 |
| J-2 Husband's Trust | Burton, Janis' husband and the children of Aloysius B. and Helen M. Osowski | JSK 1st Trust #7<br>JSK 2d Trust #7<br>JSK 3d Trust #7 |
| J-3 Wife's Trust | Burton, Joshua's wife and Ruth & Philip Loshin | JSK 1st Trust #8<br>JSK 2d Trust #8<br>JSK 3d Trust #8 |

Kanter was the trustee for all of the 60 additional trusts which became the beneficiaries of the 25 trusts of BRT. No evidence was introduced as to terms of, or the identity of the beneficiaries of, the 60 additional trusts that became beneficiaries of the 25 trusts of BRT.

The address of the original 25 trusts of BRT was Solomon A. Weisgal, Trustee, C/O CMB & CO., P.O. Box 560068, Miami, FL 33156. The address for each of the 60 additional Trust

beneficiaries was Burton W. Kanter, Trustee, P.O. Box 560068, Miami, FL 33156.

During the entire existence of BRT, the named trustee has been Weisgal. He has been a close friend and business associate of Kanter for 30 years. He is a certified public accountant. Weisgal has never had any beneficial interest in BRT.

The BRT agreement recites that the grantor, Bea Ritch, contributed $100 to each of the 25 trusts. Kanter introduced no evidence that the amount recited as having been contributed by Bea Ritch was actually contributed by her. Kanter presented no evidence of any other contributions by Bea Ritch.

Prior to 1987, Kanter borrowed money from BRT. As of January 1, 1987, Kanter owed $287,030 to BRT. As of October 31, 1987, Kanter still owed $287,030 to BRT. As of January 1, 1989, Kanter owed $1,311,430 to BRT. As of December 31, 1989, Kanter owed $34,971 to BRT. The amount Kanter owed to BRT was not repaid by Kanter, but his debt to BRT was transferred to Northern Fin. Assoc. and Astor Holding Co. As of December 31, 1989, Kanter owed $523,030 to North Fin. Assoc. and owed $750,000 to Astor Holding Co.

Prior to 1987, Kanter also borrowed money from Holding Co. As of January 1 and October 31, 1987, Kanter owed $300,000 to Holding Co. As of January 1 and December 31, 1989, Kanter owed

$500,841 and $549,841 to Holding Co., respectively.  As of December 31, 1989, Kanter owed $600,000 to IRA.

BRT contributed its interests in Ever Ritch Partners and Broadway Properties to Northern Financial Corp. pursuant to a section 351 transfer.  Kanter acted as agent or nominee for BRT.

Respondent subpoenaed both Weisgal, as trustee of BRT, and Kanter for the books and records of BRT.  Other than tax returns of BRT, neither Weisgal nor Kanter produced the documents requested by the subpoenas.

In the early days of the law firm of Levenfeld and Kanter or Levenfeld, Kanter, Baskes, and Lippitz (LK), Kanter began a practice within LK that, to the extent there were "investment opportunities", the partners of the law firm would be advised of them and would be offered the opportunity to participate to the extent of their then existent partnership interests in the law firm.  The partners could choose to participate on behalf of themselves, their family members, extended family, and/or through entities such as trusts, partnerships, or corporations for the benefit of their family.  Under this policy, if a partner did not participate, his percentage was offered to the other partners.

In 1973, Charles F. Dolan (Dolan) was negotiating to purchase franchises for cable television from Time, Inc.  He had met Kanter in the late 1960's.  At the direction of Kanter, Roger S. Baskes (Baskes) attended a meeting with Dolan and Time, Inc.

Baskes was there for the purpose of explaining the process involved in raising funds for the sale of limited partnerships. From January of 1965 to May of 1978, Baskes was a partner in LK.

On September 1, 1973, LK formed a partnership known as Oyster Bay Associates (OBA). The partners of OBA included members of LK, or entities owned by themselves or members of their families. Each LK partner or his family entity that became a partner of OBA shared in the profits and losses of OBA in the same percentage that such partner shared in the profits and losses of LK. The partners of OBA contributed total capital to OBA of $100,000. The partners of OBA received back distributions in excess of their capital contributions during 1974.

Kanter chose to participate in OBA. He could have participated personally in OBA but designated BRT to participate in OBA up to his 18 percent interest in LK.

On the same day that OBA was formed, September 1, 1973, an Illinois general partnership, Long Island Cable Communications Development Co. (Long Island Cable), was formed. The partners of Long Island Cable included "class A" partners and one "class B" partner, OBA.

The Long Island Cable partnership agreement recited that the purpose of Long Island Cable was to negotiate for the purchase of certain existing franchise rights and equipment collectively constituting a cable television system in Nassau County, New

York, and thereafter to operate such franchise rights by the construction of additional cable communication facilities and marketing such facilities in New York or Illinois.

The class A partners, their percentage interests in Long Island Cable, and their capital contributed were as follows:

| Partner | Percentage | Capital Contributed |
|---|---|---|
| Charles F. Dolan | 60 | $100,000 |
| Steven Miller | 25 | 40,000 |
| Peter Strauss | 15 | 25,000 |
| Total | 100 | 165,000 |

The Long Island Cable partnership agreement provided that the class B partner, OBA, agreed to contribute or secure additional partners to contribute all additional cash required by way of capital to advance the business of Long Island Cable.

The Long Island Cable partnership agreement provided that the profits and losses of Long Island Cable were to be shared by the class A Partners in their percentage capital interests until January 1, 1977, or the first date the class B partner, OBA, was called upon to contribute capital to Long Island Cable, whichever date occurred earlier and, thereafter, the profits and losses were to be shared 7/8 by the class A partners and 1/8 by the class B partner, OBA.

On January 25, 1974, a New York limited partnership, also called Long Island Cable Communications Development Co. (LICCDC) was formed by and among Communications Development Long Island Corp. a New York corporation (CDLIC), Communications Management

Corp. a Delaware corporation (CMC), and Charles F. Dolan and Limited Partners (Limited Partners).

All of the stock of CMC was owned by OBA. Kanter was the president of CMC, and Baskes was the vice president of CMC.

The LICCDC partnership agreement provided that the purpose of LICCDC was to carry on the business of constructing, owning, altering, repairing, financing, operating, promoting, and otherwise exploiting one or more cable television systems in Nassau and Suffolk Counties in the State of New York.

The Limited Partners of LICCDC included two classes, "class A participants" and "class B participants". The class A participants consisted of various persons that contributed cash of $1,015,000 and $485,000 in 1974 and 1975, respectively.

The class B participants consisted of OBA and Eagle Ventures, Inc. (EV). The LICCDC partnership agreement provided: "Any additional cash required to complete the equity portion of the 450 mile addition of the Oyster Bay system which cannot now be borrowed by the Partnership shall be contributed half by the General Partners and half by the class B Participants, provided, however, that neither the General Partner nor the class B Participants shall be required to make capital contributions after June 30, 1976."

Article 6.4 of the LICCDC partnership agreement provided that "payment from the General Partner or from the class B

participants is due and payable within forty-five (45) days of any call therefor by the General Partner". The general partner, as defined in the agreement, included Dolan, CDLIC, and CMC, a corporation owned by OBA.

The LICCDC partnership agreement provided that profits and losses would be shared as follows: 99 percent by the class A participants and 1 percent by Dolan until January 1, 1977; if Payout had not occurred by January 1, 1977, 5.5 percent, 83.5 percent, and 11 percent by Dolan and CDLIC, the class A Participants and the class B Participants, respectively; and 64 percent, 1 percent, 22.5 percent, and 12.5 percent by Dolan and CDLIC, CMC, the class A Participants, and the class B Participants, respectively after Payout or January 1, 1977, whichever occurred later. Payout was defined to refer to the date on which the aggregate cumulative cash-flow distributed to the partners after the inception of the partnership equaled or exceeded $1,500,000.

Class C and class D interests in LICCDC were created by amendment to the LICCDC partnership agreement on January 1, 1975. On the same day, Dolan and OBA formed the Hempstead Babylon partnership to acquire the class C and class D interests. Within 10 days, on January 10, 1975, the C interests were sold to Nassau/Suffolk Cablevision Investors for $4,500,000.

In addition to providing legal services, Kanter's law firm, LK, raised capital for investments from clients of the firm. Kanter and other partners of LK that participated in OBA solicited and obtained from various investors the funds that were provided to LICCDC that had been purportedly promised to LICCDC by OBA. Kanter and other partners of LK solicited and obtained from various partners, as investors, the funds that were provided to LICCDC that had been purportedly promised by OBA. As noted earlier, BRT was an indirect partner in OBA through the HB, BW, and YP partnerships. Kanter personally solicited investors for LICCDC including, but not limited to, Genesis Ventures and Hugh Hefner. As a result of the funds raised by Kanter and other partners of LK for LICCDC, OBA never contributed cash or property to LICCDC in excess of $200.

In exchange for the funds raised by Kanter and other partners of LK for LICCDC, OBA received its interest in LICCDC and additional interests in LICCDC through the partnerships HB, BW, and YP for which OBA paid no cash or other property other than $200.

By an amendment to its partnership agreement, as of June 13, 1978, LICCDC changed its name to Cablevision Systems Development Co. (Cablevision).

Kanter was the owner of the interests of BRT in LICCDC (or Cablevision), including, but not limited to, BRT's interests in OBA, HB, BW, and YP.

During the years 1981 to 1986, certain income that Kanter earned was credited to BRT's capital account with Century Industries. (See Century Industries Findings of Fact). Century Industries distributed $4,900 to BRT in each of the years 1982, 1983, and 1984.

Kanter earned half the income distributed by Century Industries to BRT. (See Century Industries Findings of Fact).

IRA, Holding Co., and Windy City were three of Kanter's sham corporations used by Kanter to conceal and shift his income. BRT was the sole shareholder of IRA and Windy City and was a substantial shareholder of Holding Co.

Kanter assigned substantial amounts of his income to IRA and Holding Co. Kanter transferred assets to Windy City for less than adequate consideration, thereby increasing the value of BRT's stock in Windy City. Kanter sold "notes receivable" or stock to Windy City for nominal consideration and claimed a loss on the transfer. The receivables, however, had value. The transfers of stock and receivables increased the value of BRT's stock in Windy City to the extent the value of the notes receivable or stock exceeded the nominal consideration paid by Windy City.

OPINION

At the outset we reject Kanter's contention that respondent had raised "new matter" on which respondent bore the burden of proof in asserting that the income from the various partnerships was Kanter's income in 1986 rather than 1987. A notice of deficiency was issued to Kanter for 1986, and a petition was filed. That year is before the Court. Therefore, a reallocation of the partnerships' income between 1986 and 1987 is permissible for the reasons stated in our findings of fact.

The pivotal question here is whether the Bea Ritch Trusts should be recognized in 1986 and 1987 as separate taxable entities, apart from Kanter, or whether Kanter should be treated as the true owner of the trusts and thus taxable on BRT's income for those years.

Kanter contends that the Bea Ritch Trusts were valid grantor trusts that correctly reported income, deductions, and losses in 1986 and 1987. He asserts that his mother, not himself, was both the nominal and true grantor of BRT, and that Weisgal, as trustee, made the decisions to invest or not to invest for the trusts. To the contrary, respondent contends that Kanter was the true owner of the Bea Ritch Trusts, and the trusts' income for 1986 and 1987 is taxable to him.

We agree with respondent. Although a trust may be valid under State law, the trust will not necessarily be recognized for

tax purposes. See Furman v. Commissioner, 45 T.C. 360, 364 (1966). Trusts lacking in economic substance created to avoid taxes have been disregarded by the Court. See Zmuda v. Commissioner, 79 T.C. 714 (1982); Markosian v. Commissioner, 73 T.C. 1235 (1980); Furman v. Commissioner, supra at 366; Sandvall v. Commissioner, T.C. Memo. 1989-189.

In considering and weighing the facts with respect to this issue, we note that the principle of substance over form is peculiarly applicable to trusts because they are easily manipulated so as to create illusion. See Lazarus v. Commissioner, 58 T.C. 854, 864 (1972), affd. 513 F.2d 824 (9th Cir. 1975), where we stated (citing Helvering v. Clifford, 309 U.S. 331, 334 (1940)): "Technical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct must not frustrate an examination of the facts in the light of the economic realities."

While the named grantor of BRT was Kanter's mother, the evidence shows that Kanter funded all or substantially all of BRT by assigning his earned income or assets earned by his personal services to BRT. In this manner, Kanter attempted to circumvent the progressive rate structure of the Federal income tax system and eliminate or substantially reduce his income tax by diverting his income to 25 trusts (eventually 85) for the benefit of his family. At the same time he attempted to transfer his personal

service income or assets earned by his personal services out of his estate to BRT, thereby avoiding potential gift and estate taxes.

The evidence shows that Kanter funded all or a substantial portion of BRT. Kanter and his law partners acquired interests in Cablevision by soliciting investors to finance the purchase of franchise rights and to finance the construction and expansion of the cable system. Kanter funded BRT by transferring those partnership interests to BRT for no consideration. He earned income for providing investment counseling services that he credited to the Century Industries capital account of BRT, thereby funding BRT's interest in Century Industries as well as funding the income distributions from Century Industries to BRT. He funded BRT's stock interests in IRA and Holding Co. by assigning his personal service income to those entities. He also funded BRT's stock interest in Windy City by transferring assets to Windy City for less than adequate consideration.

Section 671 provides that the grantor is taxable on the income attributable to any portion of the trusts for which he is treated as the owner under subpart E of the Code. The grantor is not necessarily the grantor named in the trust instrument. For income tax purposes, the grantor may be the person who funds the trust. Bixby v. Commissioner, 58 T.C. 757, 791 (1972). This Court has held that the true grantor is not the one named in the

trust instrument where the named grantor made only nominal contributions, another person funds the trust and the named beneficiaries reflect the true grantor's (the person who funds the trust) desires as to lifetime and testamentary dispositions of their property. In such case, the nominal contributions of the named grantor are disregarded, and the person who funded the trust is treated as the true grantor. Bixby v. Commissioner, supra; Smith v. Commissioner, 56 T.C. 263, 290 (1971).

Kanter failed to establish that he did not fund BRT. Other than the BRT agreement, which recites that Bea Ritch, Kanter's mother, contributed $100 to each of the 25 trusts, Kanter introduced no evidence (such as canceled checks, balance sheets, or other books and records of BRT) to substantiate that Ritch actually contributed to BRT the amounts recited in the agreement or that she made any other contributions to BRT. Despite the fact that respondent subpoenaed both Weisgal, the named trustee of BRT, and Kanter for the books and records of BRT, with the exception of tax returns and certain records related to BRT's interest in Cablevision, the books and records of BRT were not produced. The inference we draw from this is that if the records had been produced and introduced into evidence, they would have revealed evidence unfavorable to Kanter; namely, that he made substantial contributions directly or indirectly to BRT.

In any event, Kanter failed to prove that he was not the true grantor of BRT in 1986 and 1987. As indicated by the 1987, 1988, and 1989 BRT returns and other evidence, BRT had substantial assets that generated millions of dollars of gross income. These assets were not generated solely from the $2,500 allegedly contributed by Ritch at the inception of BRT. Rather, the evidence shows that Kanter funded BRT with his personal service income or assets earned by his personal services.

We think Kanter, not the named trustee, Weisgal, controlled the administration of the Bea Ritch Trusts. Weisgal was an officer of convenience for various Kanter-related entities. He signed transactional documents without knowledge of the underlying transactions. In our view, Weisgal was also a trustee of convenience with respect to BRT. He was not an independent trustee but was subservient to the wishes, control, and domination of Kanter.

Although Weisgal testified that Kanter did not have the final say on investments of BRT, the fact that BRT primarily invested in entities, such as OBA, Century Industries, Holding Co., IRA, and Windy City, which enabled Kanter to assign his income or assets for the benefit of BRT, shows that Kanter did more than recommend investments.

Furthermore, IRA and Holding Co. (and their subsidiaries) distributed millions of dollars of their funds to various

entities and individuals that were recorded as loans receivable. There were never any notes evidencing the loans, the loans were never secured, and substantial amounts were written off as worthless. We do not think that an independent trustee would have permitted corporations in which the trust was either the sole shareholder or the majority shareholder to have made such "loans". A truly independent trustee of a valid trust (who often also served as an officer or director of the corporations) could not permit such transactions without breaching his fiduciary duties to the trust and the corporations. If Weisgal had been an independent trustee, we do not think that he would have risked being held liable for such breach. The "loans" were made and written off as part of Kanter's income diversion and laundering scheme at Kanter's behest. The corporations and trusts merely served as part of the scheme.

Kanter's control over the administration of BRT is also shown by the fact that BRT was a client of Administration Co., Administrative Enterprises, and Principal Services, which were all entities controlled by Kanter.

Weisgal did not maintain the books and records of BRT. They were maintained by Kanter, Administration Co., Administrative Enterprises, or Principal Services. When respondent served a subpoena on Weisgal for the books and records of BRT, no records were produced. Although he was the named BRT trustee, Weisgal

did not know who possessed the books and records. When respondent served a subpoena on Kanter for records of BRT, Kanter produced various tax returns but did not produce requested records related to the basis of assets. Weisgal testified that he had a 3-year retention policy except that records related to basis were kept until the applicable asset was sold. However, neither Kanter nor Weisgal produced records related to basis that were sought by respondent even though, under Weisgal's stated policy, such records should have been available. The fact that Weisgal did not maintain the books and records of BRT and the fact that Kanter, rather than Weisgal, produced records is also indicative of Kanter's control over BRT.

Kanter received loans from BRT. He owed $287,030 and $1,311,430 to BRT in 1987 and 1989, respectively. Kanter did not establish that these loans were for adequate consideration, that the loans were adequately secured or that the loans were ever repaid. He also indirectly borrowed money from BRT by borrowing money from IRA and Holding Co., the stock of which corporations was in whole or in part owned by BRT.

Section 674(a) provides that the grantor of a trust will be treated as the owner of any portion of the trust whose income, without the approval of an adverse party, is subject to a power of disposition, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party.

Section 674(b) provides that subsection (a) does not apply to certain powers. A power held by any person to add to the beneficiaries or to a class of beneficiaries designated to receive the income or corpus, except where such action is to provide for after-born or after-adopted children, does not fall within the powers excepted from the application of section 674(a). Section 672 provides that an adverse party is a party that has a substantial beneficial interest that could be adversely affected by the exercise or nonexercise of a power he possesses respecting the trust.

Section 1.674(a)-1, Income Tax Regs., defines the scope of the power of disposition which will require taxation of trust income to the grantor. In general a power that can affect beneficial enjoyment of a trust or a portion of a trust is a power to dispose of the beneficial enjoyment, even if it is held in a fiduciary capacity. Section 1.674(a)-1(a), Income Tax Regs., provides:

> Under section 674, the grantor is treated as the owner of a portion of a trust if the grantor or a nonadverse party has a power, beyond specified limits, to dispose of the beneficial enjoyment of the income or corpus, whether the power is a fiduciary power, a power of appointment, or any other power.

Section 3.2 of article III of the trust agreement gives Kanter a power of appointment over all but one of the original trusts. That power could be exercised during his lifetime or as a testamentary power.

The BRT originally consisted of 25 trusts, the beneficiaries of which were all individuals. Most of the beneficiaries of BRT were members of Kanter's family. As shown by the BRT agreement, Kanter's 1978 renunciation, and the Forms K-1 attached to the 1988, 1987, and 1988 BRT returns, sometime after Kanter purportedly renounced his interest in BRT and during or before 1987, 60 new trust beneficiaries (the JSK trusts) were added to the 25 trusts of BRT. Although Kanter purportedly renounced his interest in BRT in 1978, including his power of appointment, he nonetheless added 60 new trust beneficiaries to BRT. According to the BRT agreement, only Kanter, through exercise of his power of appointment, could have created these new trust beneficiaries. Because the power of appointment vested in him the power to add new beneficiaries other than after-born children, the power of appointment was a power of disposition. See sec. 1.674(a)-1, Income Tax Regs. Because we regard Kanter as the true grantor, his possession of the power of appointment (a power of disposition) makes the trust income taxable to him in 1986 and 1987.

Weisgal, the named trustee, had no beneficial interest in BRT. Since Weisgal had no beneficial interest in BRT, he is a nonadverse party. See sec. 672. Thus, even if the 60 new trust beneficiaries were added pursuant to a power held by Weisgal, a

nonadverse trustee, Kanter, as the true grantor, would also be taxable on the income of BRT.

We think Kanter failed to establish that he was not the true grantor of BRT in 1986 and 1987. Because of this and his failure to establish that the beneficial enjoyment of any portion of BRT was not subject to a power of disposition, within the meaning of section 674, we agree with respondent that he should be treated as the owner of BRT and taxable on the income of the trusts in those years. See Schulz v. Commissioner, 686 F.2d 490 (7th Cir. 1982).

Moreover, under section 3.1 of the trust agreement, Weisgal, a nonadverse trustee, had the power to distribute the income or principal among the trust beneficiaries as he deemed in their best interests. The power to dispose of income is the equivalent of ownership of it. The power to allocate income among trust beneficiaries is a power of disposition over beneficial enjoyment. The power to determine which beneficiary will receive trust income is the power to affect beneficial enjoyment. A power exercisable by the grantor or by a nonadverse party to vary or "sprinkle" income between beneficiaries will result in taxation of the trust income to the grantor unless one of the exceptions provided in section 674(b), (c), or (d) applies.

Section 675(3) provides that the grantor is treated as the owner of any portion of a trust in respect of which the grantor

has directly or indirectly borrowed the corpus or income of the trust and has not completely repaid the loan, including any interest, before the beginning of the taxable year. However, this section does not apply to a loan which provides for adequate interest and adequate security if such loan is made by a trustee other than the grantor and other than a related or subordinate trustee subservient to the grantor.

Prior to 1987, Kanter borrowed money from BRT. As of January 1, 1987, he owed $287,030 to BRT. As of October 21, 1987, he still owed $287,030 to BRT. As of January 1, 1989, he owed $1,311,430 to BRT. Kanter introduced no evidence that this loan provided for adequate interest and adequate security.

Because we conclude that Kanter was the true grantor of BRT and that sections 674 and 675(3) apply, we hold that he is taxable on the income of the trusts in 1986 and 1987. To the extent that the income, set forth in the notice of deficiency for 1987, was earned by partnerships in 1986, such income is taxable to Kanter for 1986. With respect to the years involved in this issue which coincide with or involve the same year or years that are involved with Century Industries (Issue 2), to the extent certain payments to Century Industries have been determined to constitute Kanter's income, such income should not be considered in determining BRT's allocable share of income as a partner in

Century Industries to avoid the double inclusion of such income
to Kanter.

Issue 5.  Whether Kanter Had Unreported Income for 1982, 1983,
1984, 1987, 1988, and 1989 From the CMS Investors Partnership

FINDINGS OF FACT

Certain "bonus payments" were made by two partnerships,
Shelburne and Century, to Delta and Alpha Partnerships.  CMS
Investors, a partnership, was a partner in both Delta and Alpha
partnerships, and, therefore, CMS Investors received from Delta
and Alpha the distributable share of the bonus payments that
originated from Shelburne and Century.  Holding Co. was one of
the partners in CMS Investors, and Holding Co. received its
distributable share of these bonus payments as a partner in CMS
Investors.  Holding Co. reported these payments as income on its
Federal income tax returns.

In notices of deficiency, respondent determined that Kanter
failed to report income earned by him in the amounts of $191,461,
$232,900, $290,785, $29,998, $127,249, and $279,596 for the years
1982, 1983, 1984, 1987, 1988, and 1989, respectively, that was
reported by Holding Co. as its share of the ordinary income of
the CMS Investors partnership.

OPINION

This Court, in Durkin v. Commissioner, 87 T.C. 1329 (1986),
affd. 872 F.2d 1271 (7th Cir. 1989), made certain factual
conclusions regarding the loan by Delta to Shelburne and the loan

by Alpha to Century under which loans these bonus payments were made.  Under the terms of both loans, Shelburne and Century, as the debtors, were required not only to pay principal and interest to Delta and Alpha, but Shelburne and Century were also required, under certain conditions, to pay Delta and Alpha certain amounts referred to as "bonus payments".  These bonus payments were in fact paid, and both Shelburne and Century treated the bonus payments as interest and claimed deductions of such payments for income tax purposes.  In Durkin v. Commissioner, supra, this Court held that the bonus payments did not constitute compensation for the use of money and, therefore, were not deductible as interest.  We further found that the bonus payments essentially were nothing more than a "mechanism" to divert funds from Shelburne and Century to the partnerships, "thereby increasing the income of the partnership and trust associated with or established for the benefit of the members of the law firm or their immediate families."  Id. at 1400.  Our holding that the bonus payments were not deductible as interest was affirmed by the Seventh Circuit. See Durkin v. Commissioner, 872 F.2d at 1278-1279.

The parties here do not dispute the factual findings or the holding in Durkin v. Commissioner, supra.  Nor do they deny that the bonus payments constitute income to the recipient partnerships.  Respondent, however, on the basis of the language

of the Court in <u>Durkin</u> that the bonus payments were used by Shelburne and Century as a mechanism to divert funds "for the benefit of the members of the law firm or their immediate families", determined that Kanter realized income from these bonus payments as a member of the law firm of Levenfeld and Kanter.

On brief, respondent acknowledges that <u>Durkin</u> did not address the question of whether the family entities or the LK partners (the partners of the Levenfeld and Kanter law firm), individually, were taxable on the bonus payments paid by Shelburne to Delta. Respondent, nevertheless, argues that Kanter is taxable on his share of the bonus payments paid by Shelburne and Century to Alpha and Delta. As noted earlier, CMS Investors was a partner in Alpha and Delta. Respondent determined that Kanter, and not Holding Co., was the partner in CMS Investors, and, accordingly, the bonus payments that were allocable to Holding Co. as a partner in CMS Investors were, instead, allocable to Kanter individually.

Kanter contends that this Court lacks subject matter jurisdiction because the Levenfeld and Kanter law firm was a TEFRA partnership during each of the years at issue, and, in fact, respondent issued an FPAA to the law partnership, which included the subject adjustment for the year 1994. He also contends that respondent is collaterally estopped from

attributing the income at issue to him by virtue of the opinion in Durkin v. Commissioner, supra.  Finally, he contends that the loans, upon which the bonus payments were made, constituted income to the partnership that made the loans, and, therefore, such income from the bonus payments should be attributable to the partnerships involved, Delta and Alpha, and would flow through to CMS Investors, in which latter partnership Holding Co. was a partner, and that he was never a partner in either CMS Investors, Delta, or Alpha.

Respondent argues that, with respect to the bonus payments flowing through to CMS Investors, such income was earned individually by Kanter and not by Holding Co. under the assignment of income principle.  See Lucas v. Earl, 281 U.S. 111 (1930).  Respondent argues that the loans by Delta and Alpha were not by these entities, and, therefore, Delta and Alpha were not the "trees" that bore the fruit; i.e., the bonus payments. Respondent appears to base this contention on the Court's finding in Durkin v. Commissioner, supra, that the bonus payments were not made for the "use" of money but were used as a mechanism to divert funds to the various entities that were "established for the benefit of the LK partners and/or their immediate families". Respondent further contends that there was no need for the loans to Shelburne and Century because Shelburne and Century would, in due course, realize funds from movie revenues that would have

alleviated the need for such financing.  Consequently, respondent argues that the loans were structured to create purported payments of interest which were, in effect, payments to Kanter and his law firm for legal services the Levenfeld and Kanter law firm provided in connection with the movie syndications.

On brief, respondent argued:

> Under the practice of LK (Levenfeld/Kanter) that was established by Kanter, the opportunity to participate in Delta and Alpha through CMS was offered solely to the partners of LK to the extent of their then existent partnership interests.  In the case of CMS, none of the LK partners took their interest individually, but instead designated various entities for the benefit of their families to take interest in CMS that they themselves were otherwise entitled to. Kanter made the decision to participate in CMS. Although Kanter could have taken his interest in CMS individually, Kanter directed that THC [Holding Co.] take his interest in CMS.

Respondent further points out that the purpose of diverting the bonus payments to CMS Investors, which flowed through to Holding Co. and other entities, was the "improper avoidance of income, gift and estate taxes" because Holding Co. had large operating losses and, therefore, paid no income taxes on the bonus payments received.  It is also argued that, with respect to all of the partners in Levenfeld and Kanter who participated in the investment, 147 trusts were used as partners in CMS, all of which, for one reason or another, avoided taxes the partners individually would have been required to pay.

I.  <u>Subject Matter Jurisdiction</u>  This Court has jurisdiction to determine its own jurisdiction.  See <u>Normac, Inc. v. Commissioner</u>, 90 T.C. 142, 146 (1988).  The jurisdictional question presented here turns on whether the bonus payments, in fact, were income of Kanter's law firm partnership.

Kanter and his law partner, Calvin Eisenberg, testified that, pursuant to a longstanding practice existing at their law firm, investments in Delta and Alpha were voluntary and were made by a law firm member, a member's immediate family, and/or the members' entities on an entirely non-law-firm-partnership basis. They stated that not all of the law firm members participated in Delta and Alpha.  They further stated that the law firm partnership did not have any interest or rights to the income Delta and Alpha would earn from their respective loans to Shelburne and Century.

Delta's and Alpha's respective interim loans to Shelburne and Century were not investment activities of Kanter's law firm partnership.  The law firm members who participated in these ventures had no intention to invest on their law firm's behalf. More importantly, the alleged diversions of funds from Shelburne and Century were not joint business endeavors of the law firm partnership's partners, as only those members of the law firm and/or their families who invested in Delta and Alpha would benefit from the "bonus payments".  We conclude that the "bonus"

funds allegedly diverted to Delta and Alpha were not income of Kanter's law firm partnership.  As a result, we further conclude that we have subject matter jurisdiction over the CMS Investors income adjustments at issue here because the adjustments are not partnership items of a TEFRA partnership.  We therefore reject Kanter's contention that the Court lacks subject matter jurisdiction over this issue.

The Court finds that it is not necessary to address Kanter's claim that respondent is collaterally estopped as to this issue by virtue of Durkin v. Commissioner, 87 T.C. 1329 (1986).

II.  Whether the CMS Income Constitutes Kanter's Income

The Shelburne and Century movie partnerships made "bonus payments" to Delta and Alpha pursuant to interim loans that had been made by Delta to Shelburne and by Alpha to Century. Respondent does not dispute that, under these loan arrangements, Delta and Alpha lent millions of dollars that this Court, in Durkin, stated were debts recognizable for tax purposes.  Rather, respondent contends that the portion of these "bonus payments" otherwise allocable to Holding Co. is taxable income to Kanter because he and other members of his law firm were the true investors and the true lenders.  The Court rejects that argument. Respondent goes well beyond the holding of Durkin v. Commissioner, supra.  Based on the Court's statement in Durkin that the bonus payments were a "diversion" of funds for the

benefit of the Levenfeld and Kanter law firm, respondent asserts that the loans giving rise to the bonus payments were, in effect, loans made by Kanter and his law partners. The Court, in <u>Durkin</u>, made no such finding and, moreover, that was not a question for us to decide in that case. In <u>Durkin</u>, the Court held that the bonus payments did not constitute interest and, therefore, were not deductible. The bonus payments were in the amount of 10 percent of the borrowers' worldwide nontheatrical gross receipts. They were not "compensation for the use or forbearance of money". The bonus payments were not deductible because they were distributions of profits disguised as interest. Distributions of profits are not deductible. To conclude from such holding that the loans were made by Kanter and his law firm partners (and not Holding Co. and the other partners in CMS Investors) is a misinterpretation of <u>Durkin</u>. Similarly, the payments were not made for Kanter's services. If they had been, they would have been deductible. There is no evidence to support respondent's contention, as to this issue, that the true party at interest was Kanter and not Holding Co. Therefore, we sustain Kanter on this issue.

<u>Issue 6. Whether Kanter had Unreported Income in 1983 From Equitable Leasing Co., Inc.</u>

FINDINGS OF FACT

In the notice of deficiency issued to the Kanters for 1983, respondent determined that Kanter did not report income of

$635,250 from Equitable Leasing Co., Inc. (Equitable Leasing).
The notice stated that the income "represents fee income which
was assigned to a related entity or the true nature otherwise
disguised".

Equitable Leasing made the following payments to Holding Co.
and Zion, a subsidiary of Holding Co.:

| Date | Form of Payment | Payee | Amount |
|------|------|------|------|
| 1-8-83 | Bank transfer | Zion | $317,250 |
| 1-24-83 | Check | Holding Co. | 9,500 |
| 6-1-83 | Check | Zion | 6,500 |
| 6-30-83 | Bank transfer | Holding Co. | 302,000 |
| Total | | | 635,250 |

The check dated January 24, 1983, to Holding Co. bore the
notation "commission".  Holding Co.'s adjusting journal entries
identify the bank transfer of January 8, 1983, to Zion as
"commission income" for "commiss. from Eq Leasing".  The record
does not show what the other two payments were for.

Equitable Leasing was the wholly owned company of Joel
Mallin (Mallin), who was a tax attorney, a former partner, and a
friend of Kanter.  He was engaged in the business of selling and
promoting equipment leasing deals.

Kanter introduced investors to Mallin so that Mallin could
complete or close certain transactions.  Kanter permitted Mallin
to use Zion as an investor and to make payments to Zion or
Holding Co.

The transfers of funds by Equitable Leasing to Holding Co. and Zion were not done as an accommodation to Equitable Leasing to allow Equitable Leasing to complete investment offerings and to close transactions in compliance with Federal and State securities laws.

OPINION

Kanter has the burden of proving that he did not receive commission or fee income from Equitable Leasing in 1983 as determined by respondent in the notice of deficiency. He has failed to do so. We conclude that the funds paid by Equitable Leasing to Holding Co. and Zion in 1983 were generated by Kanter's activity in providing investors. That these funds were paid for services personally rendered by Kanter is supported by Mallin's testimony that he paid Kanter through Equitable Leasing commission fees to find investors for his deals. The earned income was simply directed by Kanter to be paid by Equitable Leasing to Holding Co. and Zion, both being Kanter's controlled entities. Such anticipatory assignments of income were ineffective to divest Kanter of income he earned in the transactions.

We reject Kanter's uncorroborated, self-serving testimony that Holding Co. and Zion were only providing an "accommodation" to Equitable Leasing by accepting the funds in question.

It is noted that the arrangements pertaining to Equitable Leasing are similar to Kanter's method of operations for many other investments involved in these cases, such as Prudential and Century Industries.  Payments were made to different affiliated entities of Kanter.  Often the records were confusing.  However, the only individual performing substantial services was Kanter. Accounting records sometimes showed that another entity reported the transaction for tax purposes.  In other instances, accounting records were destroyed, purportedly pursuant to a 3-year records destruction policy.  The records destruction policy was an intentional means of preventing detection of Kanter's planning devices.  There was frequently a lack of supporting documentation which we think must be held against Kanter and in favor of respondent.  This is especially true in view of Kanter's background, training, experience, knowledge, and his failure to explain the accounting for the services he rendered.

Accordingly, we sustain respondent's determination on this issue.

Issue 7.  Whether Kanter Had Unreported Income in 1982 Based on the Bank Deposit Analysis Method

FINDINGS OF FACT

In the notice of deficiency for 1982, respondent determined that $2,800,410 in deposits to Kanter's financial accounts with American National Bank of Chicago during 1982 constituted unreported gross income for the reason that Kanter did not

maintain and did not provide books and records that would explain the nature of these deposits. On brief, respondent conceded a portion of the adjustment, but maintained that $1,303,207, identified by payor or source in the following table, constituted unreported gross income:

| Payor or Source | Deposit Amount |
|---|---|
| Holding Co. | $787,129.17 |
| Computer Placement Services | 40,000.00 |
| Administration Co. Special E | 190,077.83 |
| Administration Co. Special | 286,000.00 |
| Total | 1,303,207.00 |

Other than notations in his check register that these deposits were loan proceeds, Kanter provided no documentation such as promissory notes or evidence of repayments of loans to support his contention. Kanter's accountant, Gallenberger, provided no corroborating testimony to show that the deposits in question constituted loans or that the loans were ever repaid.

OPINION

Where a taxpayer fails to maintain or produce adequate books and records, the Commissioner is authorized under section 446 to compute the taxpayer's taxable income by any method which, in the Commissioner's opinion, clearly reflects income. See Holland v. United States, 348 U.S. 121, 130-132 (1954); Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965); Sutherland v. Commissioner, 32 T.C. 862 (1959). The Commissioner has latitude in selecting a method for reconstructing a taxpayer's income, and

the method need only be reasonable in light of all the surrounding circumstances.

This Court has long accepted the bank deposits method of income reconstruction. See Nicholas v. Commissioner, 70 T.C. 1057, 1065 (1978); Estate of Mason v. Commissioner, 64 T.C. 651, 653 (1975), affd. 566 F.2d 2 (6th Cir. 1977). While not conclusive, bank deposits are prima facie evidence of income. See Boyett v. Commissioner, 204 F.2d 205 (5th Cir. 1953), affg. T.C. Memo. 1951-67; Haque Estate v. Commissioner, 132 F.2d 775 (2d Cir. 1943), affg. 45 B.T.A. 104 (1941).

Kanter contends that respondent's determination and reconstruction of his 1982 income under the bank deposits method was arbitrary and excessive. He claims that he maintained adequate records (i.e., his check register) identifying the taxable and nontaxable deposits to his bank accounts. He argues that respondent's determination should not be accorded its normal presumption of correctness, and that respondent should either (1) have the burden of proving that he, in fact, had taxable deposits, or (2) have the burden of going forward with the evidence.

Respondent, on the other hand, contends that Kanter did not meet his burden of proof in establishing that the disputed deposits had a nontaxable source. Respondent argues that the evidence Kanter offered is insufficient. Besides the check

register, respondent asserts, Kanter offered no other documentation showing the nontaxable nature of the $1,303,207 of the deposits at issue. Respondent notes that a substantial portion of the disputed deposits was attributable to funds Kanter received from the Administration Co. accounts which were controlled by him.

We agree with respondent. Unlike Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), respondent here provided direct evidence linking Kanter to an income producing activity. This was not a naked determination. Kanter engaged in many activities and received significant remunerations. Unlike Weimerskirch, there are uncontradicted deposits to Kanter's bank account. It was Kanter's burden to prove that the deposits did not constitute income. It was he who had to show the true nature of the deposits. He failed to do so.

Moreover, we view Kanter's conduct on this issue in the context of all of his business and financial dealings, as portrayed in these cases. The accounting for the transactions was done by the same accounting entity (Administration Co.) that provided services for the controlled Kanter entities.

Respondent's bank deposits determination clearly comports with the opinion in United States v. Esser, 520 F.2d 213, 217 (7th Cir. 1975). In Esser, the Court of Appeals stated that the Government has the burden of proving that the taxpayer was (1)

engaged in an income-producing business, and (2) that regular deposits of funds having the appearance of income were made to bank accounts during the course of business. After the Government has made this showing and given the taxpayer credit in the income computation for any clearly identified nontaxable sources, the taxpayer has the burden to explain "as far as possible" the nature of the deposits.

No credible evidence was introduced to support Kanter's assertion that the deposits were loans. The bank deposit slips did not indicate the source and nature of the payments. Although Kanter produced a summary analysis regarding the deposits and his check register containing notations that certain deposits were loans, the underlying documents pertaining to the purported loans were not provided. No promissory notes and no journals or ledgers with respect to interest payments are extant. Kanter's self-serving testimony is not persuasive in view of the dubious accounting techniques used by Administration Co. and Kanter's failure to produce the necessary documents to establish that there were loans. We find the testimony of the accountant, Gallenberger, unreliable and her analysis fatally flawed because she did not rely on the source documents for the purported loans. She did not review the records of any entities to or by which the purported loans were made. Moreover, the use of schedules and a summary analysis prepared for trial further lacked credibility in

light of Gallenberger's regular practice of record destruction,
and the failure to respond to summonses issued by respondent.
See United States v. Administrative Enterprises, Inc., 46 F.3d
670 (7th Cir. 1995).

As to the funds Kanter received from Computer Placement
Services, one of the sources listed above, Mallin testified that
Kanter consulted with him and his company and Kanter was paid for
those services. Kanter's summary analysis relating to his
purported repayment of a loan from Computer Placement Services is
not supported by any underlying documentation.

Likewise, there is no convincing evidence that the funds
received by Kanter from the Administration Co. accounts were
loans. Again there is insufficient underlying documentation.

Accordingly, we hold that Kanter failed to prove that the
deposits in question were from nontaxable sources. Thus we
sustain respondent on this issue.

Issue 8. Whether Kanter Received Barter Income From Principal
Services in 1988 and 1989

FINDINGS OF FACT

In a notice of deficiency, respondent determined that Kanter
received and failed to report barter income from Principal
Services of $453,656 in 1988 and $581,530 in 1989. This
determination was made "in order to protect the revenue". There
was little or no evidence to support the determination at the
time the deficiency notice was issued. The determination was

made as a protective measure "just in case" the agent subsequently discovered evidence to support it.

Principal Services provided administrative and accounting services to clients of Administrative Co. following Administration Co.'s financial difficulties and bankruptcy in February 1988.

Sometime in 1987, prior to Administration Co.'s filing for bankruptcy, Administration Co. transferred to Principal Services (which at that time had the name Administrative Enterprises) funds held in Administration Co.'s accounts, which contained funds of its clients. Principal Services then established accounts similar to the Administration Co. special E and special accounts. The funds held in these accounts were considered to be owned by clients of Principal Services.

Kanter performed minimal legal services for Principal Services in 1988 and 1989. He did represent Principal Services in litigation before this Court, but that did not begin until 1991. There is no proof that the funds constituted barter income to Kanter in 1988 and 1989.

OPINION

Kanter contends that he received no barter income from Principal Services during 1988 and 1989. He asserts that he did not render any substantial services to Principal Services in those years and did not receive income from Principal Services.

To the contrary, respondent argues that Kanter received barter income from Principal Services's payments of expenses out of Kanter's special accounts because the expenses were paid in exchange for substantial legal services performed for Principal Services.

We agree with Kanter on this issue. There is no proof that he realized barter income from Principal Services. Any legal services performed by Kanter for Principal Services in 1988 and 1989 were minimal at best. Respondent's determination with respect to this income adjustment was erroneous on its face and lacking in a rational evidentiary foundation. Respondent offered no evidence to support this income adjustment but relied on the presumption of correctness of the deficiency notice. We reject respondent's position and hold that Kanter did not realize barter income from Principal Services during 1988 and 1989.

Issue 9. Whether the Kanters Are Entitled to Certain Deductions Claimed on Schedule A and Schedule C for 1986 Through 1989

FINDINGS OF FACT

For 1986, 1987, 1988, and 1989, almost all of the expenses claimed on Schedules A and C of the Kanters' Federal income tax returns were paid through funds from the Administration Co. special E, Administration Co. special, Principal Services special E, and Principal Services special accounts, which funds belonged to Kanter.

During those years the Kanters' personal residence was titled in the Egondale Trust, a grantor trust of Kanter. Through the Egondale Trust, Kanter paid the home mortgage interest and real estate taxes on the personal residence, using funds from his Administration Co. special E and the Principal Services special accounts.

On Schedule A of the Kanters' 1986 Federal income tax return, a deduction of $368,227 was claimed for other interest expenses.

On the Schedules A and the Schedules C of their respective 1987, 1988, and 1989 Federal income tax returns, the following deductions were claimed:

| Schedule A | 1987 | 1988 | 1989 |
|---|---|---|---|
| Charitable contributions | -- | $61,555 | $23,747 |
| Home mortgage interest | $123,936 | 135,596 | 173,587 |
| Investment interest | 6,500 | 170,993 | 309,880 |
| Medical expenses | -- | 994 | -- |
| Miscellaneous expenses | 7,805 | 36,837 | 30,378 |
| Real estate taxes | 53,031 | 66,646 | 57,384 |
| State & local income taxes | -- | 29 | 1 |
| Total | 191,272 | 472,650 | 594,977 |

| Schedule C | 1987 | 1988 | 1989 |
|---|---|---|---|
| Bank charges | -- | -- | $48 |
| Dues & publication expenses | -- | $2,328 | 2,878 |
| Legal & professional expenses | $44,476 | -- | -- |
| Office expenses | -- | 26,892 | -- |
| Utility & telephone expenses | -- | 4,252 | 3,343 |
| Total | 44,476 | 33,472 | 6,269 |

In the notice of deficiency for 1986, respondent determined that no deduction was allowable to Kanter for the $368,227

claimed interest expense.  The notice stated, in part, as follows:

It is determined that the claimed interest expense deduction of $368,227 in 1986 is not allowed because you have not established:

(1) that there was a valid indebtedness;

(2) if there was a valid indebtedness, that the indebtedness was yours; or

(3) that you actually paid any interest.

During the course of the trial, petitioners began offering evidence with respect to the claimed deductions and expenses. Counsel for the parties then requested and received a recess in order to meet and discuss off the record the various evidentiary and legal matters pertaining to the deductions and expenses.  The Court did not participate in counsel's deliberations.

Immediately following their conference, counsel for the parties advised the Court on the record that the Schedule A and Schedule C claimed deductions and expenses had been substantiated, except that respondent disputed that the expenses paid out of funds from the Administration Co. and Principal Services accounts had been paid by Kanter and questioned whether the Kanters were entitled to deduct expenses with respect to property held in trust.  Counsel did not specifically mention whether their agreement included the 1986 interest deduction. However, counsel for petitioners expressed to the Court their belief that the parties had narrowed the issues on all of the

adjustments that were then being heard by the Court. Counsel for respondent expressed no disagreement with that assertion. Following the colloquy between counsel for the parties and the Court, the trial resumed with respect to the remaining issues as to which the parties were unable to agree: (1) Whether payment of the subject expenses out of the Administration Co. special E and Principal Services special accounts represented payment by Kanter, and (2) whether the Kanters were entitled to a deduction for mortgage interest payments made with respect to property (the Kanters' personal residence) that was titled in a grantor trust of which Kanter was the deemed owner.

Respondent also conceded that Kanter's Schedule C expenses were ordinary and necessary to his business.

The Kanters claimed that the Schedule A and Schedule C deductions and expenses disallowed by respondent for the years 1986 through 1989 were paid with Kanter's funds.

The Kanters are entitled to mortgage interest and real estate taxes paid on their personal residence titled in Egondale Trust, which was Kanter's grantor trust.

### OPINION

On brief, respondent attempted to retract oral stipulations made on the record that, for purposes of deciding respondent's disallowed Schedule A and C deductions and expenses for the years involved, this Court need only decide whether the funds used to

pay them were paid by or on behalf of Kanter. We reject

respondent's attempt to raise additional grounds for

disallowance. Unfortunately for respondent, any additional

grounds were abandoned by the oral stipulations at trial and

cannot be resurrected on brief. See CSI Hydrostatic Testers,

Inc. v. Commissioner, 103 T.C. 398, 399 n.1 (1994), affd. 62 F.3d

136 (5th Cir. 1995); Church of Scientology v. Commissioner, 83

T.C. 381 (1984), affd. 823 F.2d 1310 (9th Cir. 1987).

As reflected in our findings of fact, we hold that the

expenditures paid from the Administration Co. and Principal

Services special E accounts were Kanter's funds, and therefore

the Kanters are entitled to the disallowed Schedule A and C

deductions and expenses claimed for the years 1986 through 1989.

Issue 10. Whether Kanter, in 1983, Realized Capital Gains Under
Section 357(b) and (c) From the Assumption by Cashmere Investment
Associates, Inc., of Partnership Interests Having Negative
Capital Accounts and Whether, Under Section 453, the Installment
Method was Available for the Reporting of Such Gains

FINDINGS OF FACT

In the notice of deficiency for 1983, respondent made the

following determinations:

Income From Assumption by Cashmere Investment
Associates, Inc. of Liabilities in Excess of Basis

It is determined that you received directly or
indirectly additional capital gain income of $476,889
on the transfer of property to a corporation in 1983.
It is determined that your grantor trusts had a zero
basis and a negative capital account of $476,889 in the
partnership interests transferred. The transfer of
other assets to the corporation by the trusts has no

bona fide business purpose, was made only to avoid income tax, and, thus, is ignored for Federal income tax purposes.  Your net capital gain income is, therefore, increased by $190,756.

| | |
|---|---|
| capital gain income | $476,889 |
| capital gain deduction | (286,133) |
| net long-term capital gain | $190,756 |

Income From Sale of Cashmere Investment Associates, Inc. Stock.

It is determined that you received additional capital gain income in the amount of $947,000 from the sale of stock by grantor trusts whose income is reportable on your Federal income tax return in 1983. The installment sale by the trusts was a sale of property to a related party (the first disposition.) The related-party purchaser disposed of the property (the second disposition) before the grantor trusts received any payments under the first disposition.  It is determined, therefore, that the total contract price for the first disposition is treated as received by the grantor trusts at the time of the second disposition. It is further determined that the basis of the grantor trusts in the stock sold was zero.  Accordingly, your taxable income for 1983 is increased by $378,800 - the amount of the net long-term capital gain.

| | |
|---|---|
| capital gain | $947,000 |
| capital gain deduction | (568,200) |
| net long-term capital gain | $378,800 |
| | |
| Assumption of liabilities | $190,756 |
| Sale of stock | 378,800 |
| | $569,556 |
| | |
| Total increase in long-term capital gain | $569,556 |

During the 1970's, Kanter was involved in a number of real estate developments with a developer named Sam Zell (Zell).  One of Zell's business associates was Robert Lurie (Lurie).

The properties in question were owned by various partnerships (collectively known as the Equity Financial Group), and Kanter's interests were held through the BWK Revocable Trust, the Everglades Trusts 1-5, the BWK Family Trusts, and Holding Co. Other interests in the real estate partnerships were held by members of Kanter's former law firm or their family trusts.

The designated beneficiaries of the BWK Revocable Trust, the BWK Family Trusts, and the Everglades Trusts 1-5 were members of Kanter's family. Kanter was the trustee of the BWK Revocable Trusts, and Roger Baskes was the trustee of Everglades Trusts 1-5. The BWK Revocable Trust and the Everglades Trusts 1-5 were grantor trusts for Federal tax purposes whose income was generally reportable on Kanter's individual Federal income tax returns, since Kanter was the "deemed owner" of the trusts.

The shareholders of Holding Co. were Kanter family trusts (i.e., trusts with respect to which the designated beneficiaries were members of Kanter's family). Weisgal was the president of Holding Co.

Kanter's 28 real estate partnership interests, the entity which held each interest, and the percentage of each such interest at the beginning of 1983 are set forth below:

| Entity | Partnership Interest | Percentage |
|--------|---------------------|------------|
| BWK Revocable Trust | Diversified River Bend Partnership | 18.60 |
| BWK Revocable Trust | Bajomonte Associates | 27.33 |

| Entity | Partnership Interest | Percentage |
|--------|---------------------|------------|
| Everglades Trusts 1-5 | Wayside Partners | 5.01 |
| Everglades Trusts 1-5 | Manderville Partners | 3.86 |
| Everglades Trusts 1-5 | Shady Crest Investors | 8.43 |
| Everglades Trusts 1-5 | Palo Alto Partners | 8.90 |
| Everglades Trusts 1-5 | Diversified Raintree Partners | 8.269 |
| Everglades Trusts 1-5 | Cedar Cove Partners | 8.71 |
| Everglades Trusts 1-5 | Diversified Boot Lake Partners | 8.706 |
| Everglades Trusts 1-5 | Edgewater Partners | 3.53 |
| Everglades Trusts 1-5 | Kentucky Holdings | 9.296 |
| Everglades Trusts 1-5 | Walnut Creek Group | 4.03 |
| Everglades Trusts 1-5 | Candlelite Apartments | 8.8255 |
| Everglades Trusts 1-5 | Village Square - Lexington | 12.51 |
| Everglades Trusts 1-5 | Worthman Office Mall | 23.75 |
| Everglades Trusts 1-5 | Kon Tiki Apartments | 16.667 |
| Everglades Trusts 1-5 | J.S. Investors | 7.50 |
| Everglades Trusts 1-5 | Cove Realty Co. | 8.00 |
| Everglades Trusts 1-5 | Diversified Hillsborough Partners | 8.27 |
| Everglades Trusts 1-5 | Midwest Properties Group | 8.44 |
| Everglades Trusts 1-5 | Washtenew Management Co. | 8.17 |
| Everglades Trust 1-5 | Tradewinds Shopping Center | 5.88 |
| BWK Family Trusts | Centennial Investors | 17.02 |
| Holding Co. | River Bend Investors | 3.40 |
| Holding Co. | C & W Investors | 30.00 |
| Holding Co. | First Commitment & Dev. | 42.50 |
| Holding Co. | 332 Equity Partnership | 18.75 |
| Holding Co. | Katy Land Co. | 16.67 |

The River Bend Investors partnership interest owned by Holding Co. was previously held by the Bea Ritch Trusts and was transferred to Holding Co. on or about January 1, 1983.

Some time during the spring of 1982, Zell approached Kanter about Zell's purchasing all the other partners' interests in the real estate. Kanter was willing to sell his interests but was concerned about the tax consequences. Kanter's major concern was

that most of the partnership interests held by his grantor trusts
had negative capital accounts, and an outright sale would have
realized significant gains (assumption of liabilities in excess
of the partners' bases).  Specifically, the aggregate negative
capital accounts for the interests held by the grantor trusts as
of May 15, 1983, was $476,888.60, as follows:

| Entity | Partnership Interest | Cap. Acct. |
|--------|---------------------|-----------|
| BWK Rev Trust | Bajomonte Associates | ($180,270.00) |
| BWK Rev Trust | Diversified River Bend Partners | (37,622.05) |
| BWK Rev Trust | Diversified Stephenson's Lake Partners | (30,364.70) |
| Everglades Trusts | Wayside Partners | (4,806.00) |
| Everglades Trusts | Shady Crest Investors | (36,425.79) |
| Everglades Trusts | Diversified Raintree Partners | (15,942.00) |
| Everglades Trusts | Edgewater Partners | (24,798.38) |
| Everglades Trusts | Kentucky Holdings | (4,703.19) |
| Everglades Trusts | Walnut Creek Group | (2,095.05) |
| Everglades Trusts | Candlelite Apartments | (77,401.56) |
| Everglades Trusts | Village Square Lexington | (15,032.32) |
| Everglades Trusts | Wortham Office Mall | (12,751.50) |
| Everglades Trusts | Kon-Tiki Apartments | (25,606.66) |
| Everglades Trusts | Diversified Hillsborough Partners | 3,979.00 |
| Everglades Trusts | Manderville Partners | 10,353.65 |
| Everglades Trusts | Palo Alto Partners | 1,219.11 |
| Everglades Trusts | J.S. Investors | 9,305.00 |
| Everglades Trusts | Cove Realty | 14,098.00 |
| Everglades Trusts | Midwest Realty | 13,834.56 |
| Everglades Trusts | Washtenew Management | 2,766.09 |
| Everglades Trusts | Tradewinds Shopping Center | 3,107.00 |
| | Net capital accounts | (476,888.60) |

The price (fair market value) allocated to each entity was
as follows:

| Entity | Partnership Interest | Price (FMV) |
|--------|---------------------|-------------|
| BWK Rev Trust | Bajomonte Associates | -- |
| BWK Rev Trust | Diversified River Bend Partners | -- |
| BWK Rev Trust | Diversified Stephenson's Lake Partners | -- |
| Total FMV-BWK Revocable Trust | | $12,321.64 |

| Entity | Partnership Interest | Price (FMV) |
|--------|---------------------|-------------|
| Everglades Trusts | Wayside Partners | -- |
| Everglades Trusts | Shady Crest Investors | -- |
| Everglades Trusts | Diversified Raintree Partners | -- |
| Everglades Trusts | Cedar Cove Partners | -- |
| Everglades Trusts | Diversified Boot Lake Partners | -- |
| Everglades Trusts | Edgewater Partners | -- |
| Everglades Trusts | Kentucky Holdings | -- |
| Everglades Trusts | Walnut Creek Group | -- |
| Everglades Trusts | Candlelite Apartments | -- |
| Everglades Trusts | Village Square Lexington | -- |
| Everglades Trusts | Wortham Office Mall | -- |
| Everglades Trusts | Kon-Tiki Apartments | -- |
| Everglades Trusts | Diversified Hillsborough Partners | -- |
| Everglades Trusts | Manderville Partners | -- |
| Everglades Trusts | Palo Alto Partners | -- |
| Everglades Trusts | J.S. Investors | -- |
| Everglades Trusts | Cove Realty | -- |
| Everglades Trusts | Midwest Realty | -- |
| Everglades Trusts | Washtenew Management | -- |
| Everglades Trusts | Tradewinds Shopping Center | -- |
| Total FMV-Everglades Trusts | | 657,000 |
| BWK Family Trusts | Centennial Investors | 30,000 |
| Holding Co. | River Bend Investors | -- |
| Holding Co. | C & W Investors | -- |
| Holding Co. | First Commitment & Dev. | -- |
| Holding Co. | 332 Equity Partnership | -- |
| Holding Co. | Katy Land Co. | - |
| Total FMV-Holding Co. | | 520,000 |

1.  The I.R.C. Section 351 Exchange and Related Transactions

In order to avoid the realization (or recapture) of gains resulting from the sale of the real estate partnership interests, Kanter utilized Cashmere Investment Associates, Inc. (Cashmere), a shell corporation and, on or about May 15, 1983, directed the trusts to transfer their partnership interests into Cashmere in a section 351 nontaxable exchange for stock.

Cashmere was incorporated on February 2, 1982, in Delaware but had never been activated until the aforesaid transaction. Cashmere's board of directors consisted of Meyers and Weisgal. Cashmere's president was Weisgal, its secretary was Sharon Bayers, and its treasurer was Meyers.

The number of shares and classes of Cashmere's stock received by the trusts in exchange for their partnership interests were as follows:

|                         | Shares of Stock | |
| Shareholder             | Common Stock | Class A Preferred |
|-------------------------|--------------|-------------------|
| BWK Revocable Trust     | 50           | 241.274           |
| Everglades Trusts 1-5   | 400          | 257.226           |
| BWK Family Trusts       | 30           | --                |
| Holding Co.             | 520          | --                |

In order to offset the negative capital accounts of the partnership interests and to avoid the realization of taxable gains that would result from Cashmere assuming liabilities (the negative capital accounts), Kanter caused the trusts to transfer to Cashmere on May 15, 1983, eight notes receivable (assets) held

by the trusts or recently transferred to them by or at the direction of Kanter.

The specific notes receivable transferred to Cashmere along with the partnership interests were as follows:

| Maker | Payee | Amount |
|---|---|---|
| Holding Co. | Everglades Trusts 1-5 | $90,000 |
| Burton W. Kanter | Everglades Trusts 1-5 | 34,230 |
| Beach Trust | Burton W. Kanter | 128,725 |
| HELO | Everglades Trusts 1-5 | 94,800 |
| GO's Associates | Everglades Trusts 1-5 | 38,000 |
| ARO Trusts | Burton W. Kanter | 25,045 |
| Baroque Trusts | Burton W. Kanter | 66,000 |
| BWK Children's Trust | Burton W. Kanter | 21,700 |
| Total | | 498,500 |

Each note was dated May 1, 1983, and was, by its terms, due and payable on August 31, 1983.  Each of the notes from the Beach Trust ($128,725), Baroque Trusts ($66,000), BWK Children's Trusts ($21,700), and ARO Trusts ($25,045) stated that they were transferred, sold, and assigned to the BWK Revocable Trust as of May 1, 1983.  However, the Beach Trust note was not actually "transferred sold and assigned to the BWK Revocable Trust" prior to August 31, 1983.

The trustee of the Beach Trust was Albert Morrison (Morrison), the grantor was Kanter, and the beneficiaries were members of Kanter's family.  The trustee of the Baroque Trusts was Grogan, the grantor was Kanter, and the beneficiaries were members of Kanter's family.  For Federal tax purposes, Kanter was the "deemed owner" of the Baroque Trusts, and income of these

trusts was generally reportable on Kanter's individual Federal income tax returns.

Kanter did not present any evidence to establish the genuineness of the alleged indebtedness represented by the notes. No true debtor-creditor relationship existed; there was no intention to repay, and there was no business purpose for any of the notes.

2. Sale of Cashmere Stock to Waco

On July 12, 1983, the BWK Revocable Trust and the Everglades Trusts 1-5 sold all of their respective stock (common and preferred shares) in Cashmere to Waco Capital Corp. (Waco). Waco was a corporation organized under the laws of Delaware, and Meyers was its president. The sole shareholder of Waco was the Bea Ritch Trusts. Waco later changed its name to Windy City, Inc., and continued to be owned (in whole or in part) by the Bea Ritch Trusts.

The BWK Revocable Trust entered into an agreement with Waco whereby the trust agreed to sell its 50 shares of common and 241.274 shares of class A preferred stock of Cashmere for a promissory installment note in the amount of $290,000. Similarly, the Everglades Trusts 1-5 entered into an agreement with Waco whereby the trusts agreed to sell their 400 shares of common and 257.226 shares of class A preferred stock of Cashmere for a promissory installment note in the amount of $657,000.

Pursuant to the parties' agreements, the promissory installment notes had payment terms as follows:

| Due Date | BWK Revocable Trust | Everglades Trusts 1-5 |
|----------|--------------------|-----------------------|
| 1/15/84 | $50,000 | -- |
| 2/15/84 | -- | $100,000 |
| 1/15/86 | 50,000 | -- |
| 7/11/93 | 190,000 | 557,000 |
| Total | 290,000 | 657,000 |

In addition, and on the same day, Holding Co. and the BWK Family Trusts sold their shares of Cashmere common stock to WACO for promissory installment notes in the amounts of $520,000 and $30,000 respectively.

The promissory installment notes given to the trusts by WACO were secured by the Cashmere stock, subject to Waco's option to substitute as collateral the guaranties of the sole shareholder of Waco and pledges of various partnership interests (known in the aggregate as Cablevision). This option to substitute collateral was subsequently exercised by Meyers, on behalf of WACO's sole shareholder, The Bea Ritch Trusts.

Kanter did not present any evidence to establish that WACO made any payments on the installment promissory notes, including the balloon installment payments due on July 11, 1993. Kanter's records reflect an inconsistent reporting of the installment sale to Waco.

Kanter then negotiated the sale of the Cashmere stock held by Waco to Equity Financial Management Co. (Equity Financial),

which was owned and operated by Zell and Lurie. Zell and Lurie, however, did not want, and would not accept, the notes receivable held by Cashmere along with the partnership interests. Therefore, the notes were paid off by checks drafted on Administration Co. Inc.'s Special E Account, purportedly on behalf of the Bea Ritch Trusts, on August 31, 1983, prior to the sale of the Cashmere stock to Equity Financial. After the notes were paid off, Cashmere had assets consisting of the partnership interests and $498,500 in cash.

The checks written on August 31, 1983, by Administration Co. in payment of the notes are as follows:

| Ck No. | Payee | Amount |
|--------|-------|--------|
| 1315 | Holding Co. "For BRT" | $90,000 |
| 1316 | BWK Revocable Trust "For BRT" | 34,230 |
| 1317 | Beach Trust "For Trust (BRT)" | 128,725 |
| 1318 | Cashmere "For HELO" | 94,800 |
| 1319 | Cashmere "For GLS Assoc" | 38,000 |
| 1320 | Cashmere "For ARO" | 25,045 |
| 1321 | Cashmere "For Baroque Tr." | 66,000 |
| 1322 | Cashmere | 21,700 |
| Total | | 498,500 |

Each check was signed on behalf of Administration Co. by Meyers. None of the checks written by Administration Co. in payment of the notes was reflected on Administrative Co.'s general ledger for the period ending June 30, 1984.

Kanter presented no evidence as to whether the funds for payment of the notes were in fact the funds of the Bea Ritch Trusts and, if so, why the payments were made by the Bea Ritch Trusts since the Bea Ritch Trusts were not the makers of the notes.

With respect to those checks that were not specifically made out to Cashmere for payment of the notes, the debtors on the notes (the Beach Trust, the BWK Revocable Trust, and Holding Co.) were instructed to transmit checks themselves drafted on their own accounts to Cashmere. Administration Co., in turn, provided these entities with the funds for payment of the notes, which funds are represented by three checks.

There is no documentary evidence (promissory notes, payment schedules, canceled checks representing interest or principal payments, or other records) in the record to substantiate that the amounts provided to the Beach Trust, the BWK Revocable Trust, and Holding Co. by Administration Co. for the payment of the notes held by Cashmere were "loans" from the Bea Ritch Trusts, or that such "loans" were paid back. No interest or principal was ever paid in connection with any of the so-called "loans" made by the Bea Ritch Trusts in exchange for payment of the notes held by Cashmere.

3.  Sale of Cashmere Stock by WACO to Equity Financial

Kanter provided a legal opinion, dated September 1, 1983, to Equity Financial regarding "certain matters in conjunction with the purchase * * * of Cashmere Investments Associates, Inc."

On September 2, 1983, Waco sold the Cashmere stock to Equity Financial for $1,647,500, which was paid by check.  Cashmere had, as assets, cash of $498,500, consequently the remainder of the consideration, $1,149,000 related to the acquisition costs of the partnership interests.  Zell and Lurie were not interested in the Cashmere stock.  Their sole interest was to buy the partnership interests outright, but this was the only way that Kanter would permit the sale.

Immediately after the sale, Zell and Lurie liquidated Cashmere because its limited purpose was fulfilled.

4.  How Sale of Cashmere Stock Was Reported on Tax Returns

Kanter did not report any income from, nor in any way reflect, the installment sale of Cashmere stock on his 1983 and 1986 Federal tax returns.

Kanter reported installment sale income on Forms 6252 attached to his 1984 and 1985 Federal tax returns, as follows:

### 1984

Description of property: "via BWK Revocable Trust, 50 shs common, 241.274 shs Class A Pfd. - Cashmere Investment Associates, Inc."

Date Acquired: "5/15/83"     Date sold: "7/11/83"

Was property sold to a related party after May 14, 1980? "no"

Gross profit ratio: "104.25"

Payments received during year: "50,000"

Taxable part of installment sale: "52,125"

### 1984

Description of property: "via Everglades Trusts, 400 shs common, 257.266 shs Class A Pfd. - Cashmere Investment Associates, Inc."

Date Acquired: "5/15/83"     Date sold: "7/12/83"

Was property sold to a related party after May 14, 1980? "no"

Gross profit ratio: "95.6776"

Payments received during year: "100,000"

Taxable part of installment sale: "95,680"

### 1985

Description of property: "via BWK Revocable Trust, 50 shs common, 241.274 shs Class A Pfd. - Cashmere Investment Associates, Inc."

Date Acquired: "5/15/83"     Date sold: "7/11/83"

Was property sold to a related party after May 14, 1980? "no"

Gross profit ratio: "104.25"

Payments received during year: "50,000"

Taxable part of installment sale: "52,125"

Kanter's use of Cashmere and his manipulation and transfer of promissory notes to Cashmere for the purpose of offsetting the negative capital accounts of the trusts' partnership interests served no bona fide business purpose. His attempt to structure a nontaxable section 351 transaction was done only to avoid the realization of taxable capital gains.

Similarly, the utilization of WACO as an intermediary in the sale of the trusts' real estate partnership interests to Equity Financial served no bona fide business purpose. It was done only to avoid taxation.

Waco was a related party to both the BWK Revocable Trust and Everglades Trusts 1-5.

## OPINION

Although the parties disagree as to whether or not the transfer of the promissory notes and the partnership interests by Kanter's grantor trusts to Cashmere constituted a valid transfer under section 351, we find it unnecessary to decide the issue on that basis. However, we reject Kanter's contention that the issue was not challenged by respondent under section 357(b). The language in the notice of deficiency quoted above clearly shows that respondent challenged the series of transactions under section 357(b) even though section 357(b) is not cited.

It is our view that Kanter's transfer of his grantor trusts' real estate partnership interests to Cashmere and the series of transactions which followed thereafter constituted a tax avoidance purpose under section 357(b).

The parties agree that the trusts were grantor trusts with respect to which Kanter was the "deemed owner". The grantor trust rules generally provide that any taxpayer treated as the deemed owner of any portion of a trust will include in the computation of his own taxable income those items of income, deductions and credits against tax of the trust which are attributable to the taxpayer's portion of the trust. See secs. 671-679.

Section 1001 provides the general rules regarding the computation and recognition of gain or loss from the sale or other disposition of property. Section 1001(c) provides that "except as otherwise provided in this subtitle, the entire amount of the gain or loss on the sale or exchange of property * * * shall be recognized."

Section 351 sets forth a significant exception to the recognition provisions. It provides that no gain or loss is recognized when a taxpayer transfers property to a controlled corporation solely in exchange for the corporation's stock. See Sec. 351(a). Property, for the purposes of section 351, includes partnership interests. The purpose for the nonrecognition

exception for transfers to controlled corporations is to encourage the capitalization of businesses by granting beneficial tax treatment to the transfer of appreciated property to corporations controlled by the transferor.

Section 357(a) provides generally that if the taxpayer receives property which would be permitted under section 351 without the recognition of gain, and another party, as part of the consideration, assumes a liability of the taxpayer or acquires from the taxpayer property subject to a liability, then such assumption shall not be treated as money or other property and the exchange of property is valid under section 351. However, section 357(b)(1) provides generally that if, considering the nature of the liability and the circumstances in which the arrangement for assumption or acquisition of the liability was made, it appears that the principal purpose of the taxpayer with respect to the assumption was to avoid Federal income tax on the exchange or was not for a bona fide business purpose, then such assumption shall, for purposes of section 351, be considered as money received by the taxpayer on the exchange.

The clear objective desired by the real parties in interest (Kanter, Zell, and Lurie) was to sell the real estate partnership interests held by the trusts for cash. Hence, viewing the transactions as a whole, and in the context of the parties' motivations, it is clear that there was no business purpose for

the convoluted series of exchanges in which these entities participated and in particular, the purported transfer of notes receivables to the grantor trusts prior to the section 351 exchange with Cashmere. The primary reason for activating Cashmere and utilizing its stock was to avoid the taxation of capital gains realized by a purchaser's assumption of partnership interests which had negative capital accounts (representing money owed to the partnerships by the partners). Additional tax motivations are also apparent, namely, in Kanter's attempted deferral of the recognition of gain by applying the installment sale provisions, while at the same time receiving immediate cash payment for the interests (in excess of $1 million paid to his controlled entity, Waco).

The entire plan for selling the partnership interests to Zell and Lurie took place between May 15 and September 2, 1983. In that "3½-month period," the Cashmere stock was transferred three times (to Kanter's grantor trusts, to Waco, and to Equity Financial). With the exception of Equity Financial, each of the entities involved was controlled by Kanter. Cashmere engaged in no other activities before, during, or after that limited period of time.

Equity Financial purchased the stock of Cashmere from Waco. Cashmere's assets consisted of $498,000 cash which Cashmere acquired from the purported payments of the notes by

Administration Co. and the Bea Ritch Trusts. The only other assets of Cashmere were the partnership interests--which were the only assets Zell and Lurie wanted.

With respect to the notes transferred by the trusts to Cashmere, Kanter was acting in some instances as both the debtor and the creditor (i.e., notes from the Beach Trust, the BWK Family Trust and the Baroque Trusts, with respect to which entities Kanter was the grantor and deemed owner as well as the original payee on the note and on one note in which Kanter was the maker). There was an absence of regular business records maintained or presented in connection with all of the alleged notes, and at least one of the notes (GO's Associates) related to indebtedness incurred in connection with a bogus computer leasing transaction.

The makers of each of these notes were Kanter individually or his controlled entities. Four of the notes were transferred, sold, and assigned to the BWK Revocable Trust as of May 1, 1983, although it is clear that, in at least one case, the assignment did not take place before August 31, 1983. The total principal amount of the notes transferred to Cashmere almost exactly offset the aggregate negative capital accounts of the partnership interests. The notes were all payable on August 31, 1983, and were purportedly paid by checks drafted on Administration Co.'s special E account.

The checks written by Administration Co. (purportedly on behalf of the Bea Ritch Trusts) in payment of the notes were not reflected on Administrative Co's. general ledger for the period ending June 30, 1984.  No evidence was presented to establish that the Bea Ritch Trusts used their own funds to pay off the notes.

In short, no evidence of any business purposes for any of the notes was presented by Kanter or that the notes represented valid debts.  Rather, the notes and cash transferred constituted a circular flow between and among Kanter-controlled entities with the purpose being to avoid immediate taxable gains.  Given the complex series of transactions employed to achieve a simple sale of partnership real estate interests for cash, we think that the integral aspect of the plan was to avoid Federal income tax on the exchange and the inclusion of promissory notes purportedly held by the trusts and made part of the section 351 exchange lacked a bona fide business purpose.

The policy behind section 351 is to encourage the formation and/or capitalization of corporations by providing tax relief in those instances where individuals would be hesitant to transfer appreciated property because of the taxable gains that otherwise would be realized and recognized.  The tax-free exchange rules are not intended to provide a loophole; i.e., the transfer of

fictitious assets for avoiding the taxation of such gains.  Such
policy is borne out by the provisions of section 357(b).

We conclude that Cashmere's assumption of the partnership
interests subject to liabilities (the aggregate of the negative
capital accounts) was principally for a tax avoidance purpose.
Consequently, gain equal to the liabilities is recognized by the
trusts, and thus by Kanter as their grantor, under section
357(b).  The burden was on Kanter to prove by a clear
preponderance of the evidence that tax avoidance was not his
principal purpose or that he had a valid business purpose.  See
sec. 357(b)(2).  He has not done so.  As we have previously
indicated, we believe the entire series of transactions was
structured by Kanter to avoid taxation on otherwise recognizable
gains.  We find that his principal purpose in having Cashmere
acquire the partnership interests subject to the liabilities was
to avoid tax; it served no business purpose, and it thus
generated gain to him equal to the amount of the liabilities to
which the partnership interests were subject at the time of the
exchange; i.e., the amounts of their negative capital accounts.
See sec. 357(b)(1).

Alternatively, section 357(c) provides that, in the case of
a section 351 exchange to which section 357(b) does not apply, if
the total liabilities assumed together with the total liabilities
to which the property transferred is subject to exceed the

adjusted basis of all the property transferred, the excess is treated as gain from the sale or exchange of the property transferred. Kanter admittedly was attempting to avoid section 357(c) by transferring eight artificial notes receivable in a total amount to offset exactly the aggregate negative capital accounts of the partnership interests. These artificial receivables do not constitute bona fide assets in which the trusts had any basis. Accordingly, the amount of the liabilities assumed ($476,889) is treated as gain on the sale or exchange of the property transferred and therefore is taxable to Kanter as the deemed owner of the trusts.

The second part of respondent's adjustment ($378,800) relates to Kanter's use of the installment sale method to report gain from his grantor trusts' sale of stock.

The Cashmere stock was sold to Waco in an installment sale on July 12, 1983. The terms of the sale provided for the payments to be made to the trusts from January 15, 1984, through July 11, 1993. Waco subsequently resold the stock to Equity Financial on September 2, 1983, clearly within 2 years of its purchase from the trusts and almost 10 years prior to the date the final balloon payments were scheduled to be made in connection with the initial installment sale.

Section 453(e)(1) provides that if a person sells property to a related party (the first disposition) under the installment

method and the related party purchaser then resells the property (the second disposition) within 2 years after the first disposition and before the original seller has received all payments due with respect to the first disposition, the amount realized by the related party on the second disposition is treated as a payment received at that time by the original seller. Thus, the installment method of reporting the sale of Cashmere stock to Waco was not available because Waco was a related party under the attribution rules of sections 318(a) and 267(b). Waco's stock was owned by BRT, the beneficiaries of which were members of Kanter's family who were also beneficiaries of the trusts selling the stock. The subsequent disposition of the stock by Waco took place within 2 years of the original sale when all payments under the installment sale had not been made to the grantor trusts. Therefore, the entire price of $947,000 for which the grantor trusts sold their Cashmere stock to Waco was deemed realized in 1983, the year of the sale.

It is noted that Kanter did not correctly report the installment sale on his Federal income tax returns. Although he was not to receive any payments until 1984, he did not disclose the existence of the sale, as required, on his 1983 tax return, that being the tax year in which the sale occurred. Furthermore, when he did report the sale on Form 6252 attached to his 1984 tax return, he answered "no" to the question on line D ("Was property

sold to a related party after May 14, 1980?). And there is no evidence as to whether the balloon payments due on July 11, 1993 (representing $747,000 of the total $947,000 sales price), were ever made, received or reported.

Accordingly, we sustain respondent's determination that Kanter had an additional net long-term capital gain of $378,800 in 1983 resulting from the installment sale of stock by the grantor trusts.

Issue 11. Whether Kanter Is Entitled to Research and Development and Business Expense Deductions From Immunological Research Corporation for 1979

FINDINGS OF FACT

On their Federal income tax returns for 1979 through 1982, the Kanters claimed $311,478, $10,962, $711, and $1,590 as Kanter's distributive share of losses from Immunological Research Corp. (IRC), an S corporation, allocable to three grantor trusts, for which Kanter was the deemed owner; namely, Tablet Trust, Capsule Trust, and Liquid Trust.

Although respondent issued notices of deficiency to Kanter for the years 1979 through 1982, respondent did not disallow the losses claimed by Kanter from IRC in the notices of deficiency. However, in an Amendment to Answer in docket No. 3456-88, respondent affirmatively alleged that Kanter's claimed loss in the amount of $311,478 for 1979 was not allowable. Respondent also asserted that any underpayment from the claimed loss from

IRC was a substantial underpayment due to tax-motivated transactions under section 6621(c). Leave to file respondent's Amendment to Answer was granted by the Court.

The facts relating to this issue were considered and found by this Court in Estate of Cook v. Commissioner, T.C. Memo. 1993-581, which involved another shareholder in IRC. In that case, we sustained respondent's disallowance of such expenses as research and experimentation expenses under section 174(a), as well as respondent's disallowance of similar expenses claimed by two other S corporations that were engaged in the same activity, Antiviral Research Corp. (ARC) and Biological Research Corp. (BRC). Kanter was not a stockholder in the other two corporations. The parties herein stipulated to the record of Estate of Cook v. Commissioner, supra, except as to those portions of the record relating only to the other two S corporations.

During 1979, Kanter and three other individuals (including George B. Cook, whose estate was the taxpayer in Estate of Cook v. Commissioner, supra), invested in IRC, an S corporation that they had organized. None of the stockholders in IRC, including Kanter, had any formal educational background or experience in the field of pharmaceutical compounds, which was the business IRC was ostensibly to engage in. Shortly after IRC was organized, IRC entered into a Research, Development, and License Agreement

(the research or licensing agreement) with Newport Pharmaceutical International, Inc. (Newport).  Newport was then engaged in the manufacture, marketing, research, and development of pharmaceutical compounds.  One of the compounds owned by Newport was identified as the NPT-15000 series, in which Newport owned an undivided one-half interest that it had acquired from the discoverer of the compound, the Sloan-Kettering Memorial Institute for Cancer Research (Sloan-Kettering), in 1978.  At that time, this particular compound was still in the experimental stage of development.  In the 1978 transaction, the transfer of the one-half interest in the subject compound to Newport included the transfer of one-half of the "Patent Rights [of the compound], and the inventions and improvements covered thereby, throughout the world."  The term "Patent Rights" was comprehensively defined elsewhere in the 1978 sale agreement.  In the 1978 sale agreement, Newport was given the exclusive right to exploit the patent rights to the subject compound on a worldwide basis, as to which Newport agreed to use its best efforts to exploit the patent rights for the mutual benefit of itself and Sloan-Kettering.  The agreement further allowed Newport to license third parties in connection with the exploitation of the subject compound; however, such licensing agreements, among other things, had to be agreed to by Sloan-Kettering.

The ostensible purpose in organizing IRC was for IRC to enter into a licensing agreement with Newport for exploitation of the NPT-15000 series compound in which Newport held a one-half interest.  IRC and Newport entered into such an agreement in 1979 for the compound identified as NPT-15392, which was within the NPT-15000 series.  However, the licensing agreement IRC entered into was only with Newport.  Sloan-Kettering was not a party to the agreement and did not sign the agreement, and there is no evidence that Sloan-Kettering ever acquiesced in the agreement. Newport and IRC were cognizant of Sloan-Kettering's reservation of patent rights, and, accordingly, the licensing agreement between IRC and Newport was structured with the intent that exploitation of the subject compound by IRC or its licensees would not violate Sloan-Kettering's rights.  With that in mind, the research agreement between IRC and Newport contained the following provisions:

> 2.  Ownership of Project Results.
> Any and all products, processes, compounds, inventions, ideas, patents, patent rights, technical information, data and other proprietary know-how resulting or deriving from the Project, including all improvements thereto, and any other rights to commercially exploit the Project and the products and results thereof, including but not limited to, licensing and distribution rights, shall be the sole and exclusive property of the corporation [i.e., IRC]; provided, however, the Corporation shall have no ownership rights or   rights which may be deemed to be a sub-license to the extent that any of the foregoing constitutes a "Patent Right" or an invention or improvement covered thereby as defined in the agreement

dated March 28, 1978 between Newport and Sloan-Kettering Institute * * *. [Emphasis added.]

Pursuant to this licensing agreement, IRC paid Newport, during 1979, $980,000 for Newport's services for the research, experimentation, and further development of the compound NPT-15392. On his 1979 Federal income tax returns, Kanter claimed a deduction for his portion of the $980,000 research and experimentation expense. In amended pleadings, respondent affirmatively alleged that the $311,478 loss claimed by Kanter from this activity should be disallowed.

OPINION

In Estate of Cook v. Commissioner, T.C. Memo. 1993-581, this Court sustained respondent's disallowance for the portion of the $980,000 expense that George Cook had claimed as a section 174(a) deduction. The parties agreed in Estate of Cook that IRC was not engaged in a trade or business within the meaning of section 162(a). Kanter here does not contend otherwise. However, he argues that the expense nevertheless qualified as a deduction under section 174(a) as a research or experimentation expense.

This Court held in Estate of Cook that the expense was not a research or experimentation expense within the meaning of section 174(a) based on the premise that, to qualify under section 174(a), two requirements must be satisfied: (1) The taxpayer must be legally entitled to enter into a trade or business exploiting research and (2) the taxpayer must demonstrate a

realistic prospect that it would do so.  It was decided that IRC failed to meet both of these tests.  Significant was the fact that the taxpayers had not established that IRC had obtained any ownership rights in any technology to be developed by Newport because Sloan-Kettering was not a party to and had not consented to the licensing agreement (as required in the 1978 sale by Sloan-Kettering to Newport).  Moreover, the license agreement between Newport and IRC expressly provided that no ownership rights in the technology to be developed by Newport would inure to IRC to the extent that such technology or rights envisioned by the agreement came within the definition of "Patent Rights" as reserved by Sloan-Kettering in the 1978 sale to Newport.

This Court held in Estate of Cook that the reservation in the agreement between IRC and Newport, taken together with the broad definition of "Patent Rights" in the agreement between Newport and Sloan-Kettering, left very little, if anything, to be acquired by IRC in the 1979 licensing agreement between Newport and IRC.  The Court stated:  "In light of this definition, it is hard to visualize that [IRC] obtained ownership of anything that could be commercially exploited in a trade or business."  The Court surmised that virtually anything Newport developed would constitute a "Patent Right", and, if so, the ownership of such improvement or technology would not belong to IRC.

There were other facts of the case that the Court discussed to support the conclusion that IRC was not engaged in a trade or business and did not have the capacity to engage in a trade or business. The other findings were not seriously challenged by Kanter in the instant cases, and the Court does not consider it necessary to discuss those facts here.

Kanter was the only witness to testify in the present case with respect to this issue. No documentary evidence was presented to corroborate his testimony, which was directed toward establishing that there were certain rights to ownership of technology that IRC could acquire from the licensing agreement with Newport that would not fall within the umbrella of the "Patent Rights" exception existing in favor of Sloan-Kettering.

Section 174(a)(1) generally provides:

> A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable period in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

Section 174(a)(1) applies to expenditures paid or incurred by a taxpayer for research or experimentation undertaken directly by a taxpayer or to expenditures paid or incurred by a taxpayer for research or experimentation carried on by another person or entity on the taxpayer's behalf. See sec. 1.174-2(a)(8), Income Tax Regs.

To be entitled to deductions for research and experimental expenditures, a taxpayer is not required currently to produce or sell any product.  Moreover, a taxpayer need not be currently engaged in a trade or business in order to qualify for such deductions.  See Snow v. Commissioner, 416 U.S. 500, 503-504 (1974).  Nevertheless, in Green v. Commissioner, 83 T.C. 667, 686-687 (1984), this Court stated:

> For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and * * * [the Court] must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section.  [Fn. ref. and citations omitted.]

A taxpayer must be more than a mere investor to be entitled to deductions for research and experimental expenditures under section 174.  See id. at 688-689, see also Levin v. Commissioner, 87 T.C. 698, 725-726 (1986), affd. 832 F.2d 403 (7th Cir. 1987).

In the case of an entity that claims deductions under section 174, the relevant inquiry is whether the entity has any realistic prospect of entering into a trade or business involving the technology under development.  See Spellman v. Commissioner, 845 F.2d 148, 151 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Diamond v. Commissioner, 92 T.C. 423, 439 (1989), affd. 930 F.2d 372 (4th Cir. 1991).

As these cases demonstrate, when an entity contracts out the performance of the research and development in which it intends

to engage, all of the surrounding facts and circumstances are relevant to the inquiry into whether such entity has any realistic prospect of entering into a trade or business with respect to the technology under development. The inquiry includes consideration of the intentions of the parties to the contract for the performance of the research and development, the amount of capitalization retained by the entity during the research and development contract period, the exercise of control by the entity over the person or organization doing the research, the existence of an option to acquire the technology developed by the organization conducting the research and the likelihood of its exercise, the business activities of the entity during the period in question, and the experience of the investors in the entity. Absent a realistic prospect that the entity will enter a trade or business with respect to the technology, the entity will be treated as a passive investor, not eligible for deductions under section 174.

As indicated previously, in Estate of Cook v. Commissioner, T.C. Memo. 1993-581, the Court dealt with, among other things, the entitlement of another IRC shareholder (namely, George Cook) to a deduction for IRC's claimed 1979 research and development expense. The Court rejected the taxpayers' contention that a realistic prospect existed of IRC's entering into a trade or

business to exploit the results of the research and experimentation undertaken by Newport.

Respondent has the burden of proof on this issue. Respondent points out that the identical 1979 IRC research and development and business expense issues were previously presented to and decided by this Court in Estate of Cook and contends that the Court's reasoning and conclusions in that case are equally applicable here.

Kanter, on the other hand, contends that the issues are purely factual, and that the following distinctions from Estate of Cook are present in the instant cases: (1) Respondent, not Kanter, bears the burden of proof; (2) Kanter's testimony was entered in evidence here, unlike in Estate of Cook; and (3) the Court's conclusions here with respect to IRC should not be based upon certain "irrelevant" facts concerning ARC and BRC, as Kanter implies happened in Estate of Cook. Kanter maintains that almost all of the facts concerning ARC and BRC that were discussed in the Estate of Cook opinion are irrelevant here because (1) he was not a shareholder of either ARC or BRC, and (2) all events relating to ARC and BRC occurred after 1979. In particular, he asserts that much of the documentation cited and relied upon by respondent in respondent's proposed findings of fact is not actually in evidence in the instant cases, in light of the

specific exclusion in the parties' written stipulation of those portions of the Estate of Cook record regarding only ARC and BRC.

Preliminarily, we note that the parties, for purposes of the instant cases, generally stipulated in evidence the Estate of Cook record, except for such evidence that related only to ARC and BRC. Thus, as we interpret the parties' stipulation, the evidence presented in Estate of Cook that would be relevant to ARC, BRC and IRC alike (not including perhaps the testimony of Dr. Charles Altschuler, on which the Court does not rely) would be considered as evidence in the instant cases and could be considered in resolving the IRC issues for 1979. We do not construe the parties' stipulation to limit the evidence here to only those portions of the Estate of Cook case's evidentiary record that Kanter considers "relevant" to IRC and himself.

On this record, we conclude that respondent has established that Kanter was not entitled to deduct the claimed 1979 IRC research and development expenses under section 174(a). The evidence shows that there was no realistic prospect of IRC's entering into a trade or business to exploit the technology relating to the NPT-15392 compound being developed under the IRC-Newport R&D and License Agreement because there was essentially nothing that IRC could acquire. Virtually anything that Newport developed would almost certainly be a patentable property right that ipso facto could not be owned by IRC. In Estate of Cook

this Court previously noted:  (1) In view of the broad definition of the term "Patent Rights", as defined in the March 28, 1978, agreement between Newport and Sloan-Kettering, it is difficult to see that IRC acquired ownership of anything that could be commercially exploited in a trade or business; (2) the existence of the IRC Shareholders-Newport Put/Call Agreement made it extremely unlikely IRC would ever exploit the research Newport conducted in a trade or business because (a) if the research were sufficiently successful to require the payment of royalties, then Newport likely would exercise its call option and, (b) if the research were not sufficiently successful to require the payment of royalties, then IRC's shareholders would be motivated to put their IRC shares to Newport in return for Newport common stock; (3) after its initial capital was expended, IRC had no further capital to conduct or finance further research, and the existence of the put and call agreements gave IRC's shareholders no incentive to contribute additional capital to IRC; and (4) some of IRC's shareholders apparently had always wanted to acquire Newport stock and such investment was structured as a research and development activity in the hope of allowing the investors a deduction for their investment.

Although Kanter testified in the instant cases, we find his testimony unconvincing and view it as more in the nature of advocacy than the presentation of substantive evidence.  It does

not show that our conclusions in <u>Estate of Cook</u> were in error,
nor does it warrant a different result.  Essentially, Kanter
misunderstands this Court's reasoning in <u>Estate of Cook</u>.  He
argues that we incorrectly assumed that IRC held no ownership
rights in any research developed under the research project.
Kanter contends that IRC did hold "other valuable rights" outside
of any existing and derivative future "Patent Rights" in the NPT-
1500 series of compounds retained by Newport and Sloan-Kettering.
However, Kanter was unable to explain or describe what those
rights might be, nor was any other evidence presented that would
establish or support his contention.  Kanter testified:

> [Kanter]:  * * * But it was my understanding and
> my belief that there is a body of rights that, unless
> encompassed by a specific patent that would be issued *
> * * to Sloan-Kettering and Newport, under which they
> could theoretically preclude the exploitation of that
> limited right, all other rights that might result from
> this particular research project did belong to IRC and
> that they were broad enough in--as we understood it to
> allow for exploitation of a profitable product or to
> move to the next stage of possible licensing, if in
> fact there was something developed.

> The Court:  So this body of rights that you are
> referring to--would these be rights that would be
> considered research and development.

> [Kanter]:  Well, actually my recollection is--and
> the [Cook] record will disclose it more accurately--Dr.
> Glasky tried to point out to the Court at that time
> that there is in this pharmaceutical field not the
> necessity at any given time for a research and
> development project that you develop a marketable
> product that can go on the shelf in a drugstore, but
> that in this field it is common to bring research to a
> point where you can license what you have developed to
> a large pharmaceutical manufacturer, who will take it

to another stage to bring it to a commercial product that will be put on the shelf.

And I can't tell you now what might have conceivably been developed were this product research and development to have been successful or gone far enough, but it was our impression and understanding at this time that it either would--or could produce something significant and allow for future research and licensing or something significant enough to be an actual product that could be commercial manufactured. [Emphasis added.]

The Court: But there have been no developments of these other rights that you are talking about?

[Kanter]: Well, those rights existed. There was no preclusion of the rights as far as I know, that nobody took them away in the form of defined patent rights.

It remains unclear to the Court just what those "rights" might be. The Court is skeptical that, in the everyday world, an investor would pay $980,000 for a bundle of ambiguous property rights, as to which there is no persuasive indication that such rights could be exploited or developed.

Moreover, this Court's holding in Estate of Cook was not premised upon IRC's holding no ownership rights whatsoever in the research, as Kanter implies. Rather in Estate of Cook, this Court concluded, after considering the totality of the facts and circumstances, including certain highly relevant factors, that there was no realistic prospect of IRC's entering into a trade or business to exploit the technology being developed under the IRC-Newport R&D and License Agreement.

Indeed, in his testimony, Kanter could not elaborate or describe what realistic prospects IRC would have of exploiting commercially the technology being developed.  In view of the broad scope of the existing and potential patent rights Newport and Sloan-Kettering held, it is difficult to believe that a third party, such as a major pharmaceutical company, would risk a license from IRC on technology that Newport and Sloan-Kettering might have rights to.

Accordingly, we hold that Kanter is not entitled to a deduction under section 174 for 1979 with respect to IRC's claimed research and development expense.  See Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Diamond v. Commissioner, 92 T.C. 423 (1989); Estate of Cook v. Commissioner, T.C. Memo. 1993-581.

We further hold that Kanter is not entitled to deductions under section 162 for 1979 with respect to IRC's claimed business deductions.  IRC was not engaged in an active trade or business during 1979 because its activities fail to satisfy even the "in connection with" a trade or business standard of section 174. See Estate of Cook v. Commissioner, supra.

Issue 12.  Whether Kanter had Unreported Partnership Income for 1978

OPINION

In the notice of deficiency for 1978, respondent determined that the Kanters failed to report partnership income (loss) in the net amount of $4,953 from the following sources:

| | |
|---|---|
| T.C. Family Trust | ($512) |
| Everglades Trust No. 1 | 1,093 |
| Everglades Trust No. 2 | 1,093 |
| Everglades Trust No. 3 | 1,093 |
| Everglades Trust No. 4 | 1,093 |
| Everglades Trust No. 5 | 1,093 |
| Total | 4,953 |

Kanter did not introduce any evidence on this issue. Therefore, respondent's determination is sustained.

Issue 13.  Whether the Kanters Are Entitled to a Loss From GLS Associates for 1981

OPINION

On their Federal income tax return for 1981, the Kanters claimed a loss of $4,283 on Schedule E relating to an entity referred to as GLS Associates.  Respondent disallowed the claimed loss because the Kanters did not prove that GLS Associates was engaged in an activity entered into for profit and that deductible expenses were incurred by it in excess of income.  The Kanters introduced no evidence on the issue.  Therefore, respondent's determination is sustained.

Issue 14.  Whether the Kanters Are Entitled to a Loss From Computer Leasing Transactions Involving Equitec for 1983 and 1984

OPINION

The Kanters claimed on their Federal income tax returns for 1983 and 1984 losses of $83,333 and $161,727, respectively, from computer leasing transactions involving Equitec.

In notices of deficiency for 1983 and 1984, respondent disallowed the losses.  The Kanters introduced no evidence at trial on this issue.  They failed to carry their burden of proof.  Accordingly, we sustain respondent's determination.

Issue 15.  Whether the Kanters Are Entitled to Investment Interest Expense Deductions for 1981

OPINION

In the notice of deficiency for 1981, respondent determined that the Kanters were not entitled to deduct claimed investment interest expenses from K&D Associates, SLG Partners, and GLS Associates in the amounts of $21,521, $23,292, and $45,095, respectively.  SLG Partners, GLS Associates, and K&D Associates were purportedly engaged in the business of purchasing and leasing computer equipment.  The Kanters claimed deductions for investment interest expenses from those entities in 1981.  The Kanters introduced no evidence on this issue.  Therefore, respondent's determination is sustained.

Issue 16.  Whether the Kanters Are Entitled to an Investment Tax Credit Carryover for 1978

OPINION

On their 1978 income tax return, the Kanters claimed a $120,566 investment tax credit carryover, which respondent disallowed in the notice of deficiency.

The Kanters contend that their entitlement to the 1978 investment tax credit carryover is purely "computational" under Rule 155.  The Kanters assert, in pertinent part:

> The issue of whether Kanter is entitled to a carryover of investment tax credit from his 1977 year to his 1978 year is purely computational.  The resolution of this issue is entirely dependent upon the resolution of Kanter's Tax Court case involving his 1977 year (docket No. 12282-82), which was previously docketed and decided by this Court.  Although respondent * * * [in proposed findings] states that petitioners failed to address this issue, that is not the case.  Respondent's counsel stipulated on the record that petitioners had addressed all of the issues raised in respondent's notice of deficiency. * * * Since this issue is purely computational, and respondent is well aware of the terms of the resolution of Kanter's 1977 tax liability, the amount of the carryover from 1977 to 1978 will be addressed in the eventual Rule 155 proceeding in this matter, and need not be addressed by the Court at this time.

The "stipulation" referred to is the discussion that took place between the Court, petitioners' counsel, and the supervisor of respondent's counsel concerning the parties' settlement of a number of other adjustments from the years in issue.

Respondent, on the other hand, contends that Kanter failed to carry his burden of proof under Rule 142(a).

The Court agrees with Kanter on this issue. The Kanters'
1977 tax year was the subject of docket No. 12282-82 before this
Court, in which a stipulated decision was entered on March 12,
1991. That decision was based upon a Stipulation of Settled
Issues which was filed with the Court. The Stipulation of
Settled Issues provided as follows:

> Solely for the purpose of narrowing the issues in
> [docket no. 12282-82], the Petitioner * * * and the
> Respondent have settled issues relating to the
> Petitioner's direct or indirect investment in one or
> more of the following partnerships, namely, Ambassador
> Associates, Empire Properties, Shelburne Associates,
> Whitehall Associates, Balmoral Associates, Drake
> Associates, FF Associates, Park Lane Associates and
> Warwick Associates on the following basis to the extent
> applicable to the year(s) before the Court in this
> case:

> 1. Except as provided in this agreement, no item
> of income, gain, loss, deduction or credit arising from
> the Petitioner's interest in the partnership, shall be
> realized and recognized in any taxable year. It is
> understood by the parties that this agreement does not
> apply to items of income, gain, loss, deduction or
> credit from Empire Properties' investment in NST
> Investors.

> 2. The Petitioner's total cash investment
> actually or constructively paid shall be allowable as
> an ordinary deduction in three equal parts over three
> successive years starting with the initial year for
> which the Petitioner first claimed a partnership
> deduction, provided that the Petitioner includes in
> income any cash constructively received with respect to
> such contribution in the year of such constructive
> receipt.

> 3. All partnership distributions from the
> partnership to the Petitioner shall be includable as
> ordinary income in the year of receipt.

4.   In the event the Petitioner is contractually required, by the terms of the original Partnership Agreement, to make any additional cash contribution in a year ending subsequent to the date of this agreement, the Petitioner shall receive an ordinary deduction for any such cash contribution in the year paid.

5.   Tentative investment credit will be allowed with respect to the partnership, based on qualified investment equal to the Petitioner's partnership percentage times two-thirds times the qualified basis of the partnership as set forth in Exhibit A, which is attached hereto and incorporated herein by reference. No other investment credit from the partnership will be allowed.

6.   If any investment credit was claimed by the Petitioner which is not allowable under paragraph 5. for any year(s) which was not disallowed by the Internal Revenue Service and for which the statute of limitations would bar assessment, the amount of said credit will be added to the corrected tax in the first open year.

7.   The petitioner's allocable share of any income from the partnership attributable to the repayment of the partnership's recourse and non-recourse liabilities (non-cash income), shall not be includable in income. In addition, the Petitioner will not realize any income as a result of the forgiveness of, or other release of the related recourse and non-recourse liabilities.  If any such non-cash income was reported by the Petitioner in any year, then a deduction shall be allowed in that amount.  If such deduction is with respect to a year for which refunds are barred by reason of the statute of limitations, such deduction will be allowable in the first open year.

8.   If any losses or deductions attributable to the partnership were claimed by the Petitioner for any year(s) which were not disallowed by the Internal Revenue Service and for which the statute of limitations would bar assessment, the deduction allowable pursuant to paragraph 2. will be reduced, starting with the initial contribution year, by the amount of loss reported for years closed by the statute of limitations.

9.  The Petitioner will not be liable for additional interest under section 6621(c), formerly (d), penalties or additions to the tax attributable to the Petitioner's claimed partnership deductions.

10.  The parties agree that this stipulation of settled issues shall not constitute a settlement agreement for years that are not before the Court in this case.

Paragraphs 5 and 6 of the Stipulation of Settled Issues addressed an investment credit.  Although the decision and the Stipulation of Settled Issues did not specify the dollar amount of the credit to be carried forward to Kanter's 1978 return, the Court is satisfied that the provisions of the stipulated decision entered in docket No. 12282-82 permit Kanter to carry forward to his 1978 year any investment credit allowed for 1977 that was not utilized to offset 1977 taxes.  Accordingly, the Court holds that the Kanters' entitlement to an investment credit carryover for 1978 is to be taken into account in the Rule 155 computation to the extent of any carryover from the Kanters' 1977 tax year.

Issue 17.  Whether the Kanters Are Entitled to an Interest Deduction for 1986

OPINION

In the notice of deficiency for 1986, respondent determined that the Kanters were not entitled to deduct interest expenses claimed on their Federal income tax return in the amount of $50,380.  The Kanters introduced no evidence on this issue.  The burden of proof was on them and, since no evidence was presented, respondent's determination is sustained.

## Issue 18. Whether the Kanters Received Unreported Interest Income from a Bank in 1988

### OPINION

In the notice of deficiency for 1988, respondent determined that the Kanters failed to report $349 interest income from Merchants Bank and Trust Co.

Kanter's general ledger and audit file for 1988 do not show that he received interest income from the Merchants Bank and Trust Co. in 1988. He also testified that no interest was received from Merchants Bank. There is no evidence that a Form 1099 was issued by Merchants Bank to the Kanters. On this record we hold for the Kanters.

## Issue 19. Whether Kanter Is Entitled to a Business Loss Deduction in 1980 in Connection With the Sale of a Painting

### FINDINGS OF FACT

The Kanters claimed a deduction of $104,231 on Schedule C of their Federal income tax return for 1980. This deduction arose out of a transaction involving a painting of George Washington which was believed to be by the famous artist John Trumbull (the painting). The painting was located in England. One of the clients of Kanter's law practice, Richard Feigan (Feigan), was interested in purchasing the painting but did not have the resources to do so. Feigan contacted Kanter for Kanter's assistance in directing him, Feigan, to someone who might be interested in the painting and who could advance funds for its

purchase. Kanter directed Feigan to another of his clients, a Mr. Rappaport (Rappaport), who lived in Switzerland. Feigan and Rapport thereafter agreed to a joint venture between them and, through funds advanced by Rappaport, the painting was purchased. After the purchase, it was discovered that the painting was not by John Trumbull, and the seller agreed to a rescission of the sale. The seller paid back to the joint venture the amount of the selling price, but in British currency. That currency had substantially declined in value against the U.S. dollar. A dispute arose between Feigan and Rappaport. Rappaport insisted that he be returned the full value, in U.S. dollars, of the funds he had advanced, and Feigan, on the other hand, refused to do so. Kanter was drawn into the dispute ostensibly because of the role he had played in putting Feigan and Rappaport together. At Kanter's urging, Feigan agreed to make Rappaport whole, and Kanter contributed $104,231 toward the cause. Kanter claimed this amount as a trade or business expense on his 1980 income tax return, which respondent disallowed.

Kanter was not contacted by Feigan for legal services or legal advice, nor was it contemplated that Kanter would be paid for his services. Kanter was assisting two clients and friends in a matter unrelated to Kanter's law practice or his activities as a lawyer. There were no legal services provided by Kanter. Kanter was not a party to the joint venture between Feigan and

Rappaport and provided no financing to the venture. Kanter would not share economically in the exploitation of the painting.

OPINION

Section 162 allows a deduction for all ordinary and necessary expenses paid or incurred in carrying on a trade or business. Expenses paid for or on behalf of another are not deductible. A voluntary assumption of liability is nondeductible. Polak's Frutal Works, Inc. v. United States, 176 F. Supp. 521 (S.D.N.Y. 1959), affd. 281 F.2d 261 (2d Cir. 1960). Obligations which do not grow out of a taxpayer's own business but which are personal in nature are nondeductible. Family Group, Inc. v. Commissioner, 59 T.C. 660 (1973).

Although Kanter acknowledged that during 1980 he was practicing law on a full-time basis and was not in the business of buying and selling art, he contends that he was engaged in the business of assisting other individuals to locate financing for investments. He asserts that he "was in the trade or business of locating financing for investments, whether the investments be in real estate, securities, or works of art". Thus Kanter argued that the $104,231 was an ordinary and necessary expense of his investment financing business and was properly deductible by him. Alternatively, he contended that, even if the activity was not a trade or business, a deduction should be allowed under section 212.

Respondent, on the other hand, argued that the $104,231 was not an ordinary or necessary business expense but represented a voluntary expenditure by Kanter on behalf of a third party, which Kanter was under no legal obligation to make. In addition, respondent maintained the payment was not deductible under section 212 because the painting venture was not an activity Kanter undertook for profit.

We agree with respondent. Kanter was principally engaged in the practice of tax law. He acted as an intermediary between two clients in arranging the purchase and sale of a purported authentic painting of George Washington. He did not provide financing for the transaction. The purchase was rescinded after it was discovered the painting was not authentic. The amount paid by Kanter was to reimburse Rappaport on the loss Rappaport sustained on the amount that was refunded to him arising from the devalued British currency.

There is no evidence that Rappaport required Kanter to perform due diligence on this venture. Kanter testified that both Feigan and Rappaport were friends of his, and he merely introduced Rappaport to Feigan to consummate the transaction. There was no agreement or contract that Kanter was to be paid for his services either in the acquisition of the funds for the initial purchase of the painting, in the exploitation of the painting had the sale not been rescinded, or for Kanter's efforts

in resolving the dispute between Feigan and Rappaport when the deal failed.

The loss which Kanter sustained resulted from his desire to protect his personal relationship with his friends Feigan and Rappaport and was not an ordinary or necessary expense of his legal practice or to protect his business reputation because no business of his own was conducted or consummated by this transaction.

Respondent correctly contends that Kanter's payment of amounts to settle a putative dispute had no relation to his legal practice.  Kanter's involvement constituted personal rather than professional conduct, and, thus, the expenditure is nondeductible.  Kanter had no money invested in the deal.  He merely acted as a broker for his clients, who were also his friends.  He was clearly not engaged in a separate business of selling artwork.  See McDonald v. Commissioner, 592 F.2d 635 (2d Cir. 1978).

In Cochrane v. Commissioner, 23 B.T.A. 202 (1931), cited by Kanter, the attorney who reimbursed his clients had provided legal services to them.  By contrast, Kanter did not perform any legal services in connection with the Feigan venture.  The only proof that he made the payment to protect himself from a possible lawsuit and the exposure of litigation was his own self-serving and uncorroborated testimony.

Kanter did not testify that Rappaport would include him as a party in any litigation.  He failed to present any proof of damage to his business reputation.  If anything, Kanter was protecting his personal reputation, not his business reputation. He reimbursed Rappaport for a portion of the losses as an accommodation to two friends, after a deal he proffered failed.

Kanter argues that the cases of Milbank v. Commissioner, 51 T.C. 805 (1969), and Pepper v. Commissioner, 36 T.C. 886 (1961), support the deduction claimed by him.  Contrary to the facts here, the taxpayer in Milbank was in the investment banking business and consummated a loan transaction.  When the transaction failed, the taxpayer argued he was a guarantor of the loan, which payment had a proximate relationship to his trade or business as a financier or investment banker.  Kanter, in contrast, is not a banker or financier.  In any event, he did not show that he entered into this transaction with the intent of making a profit.  Kanter is a lawyer who was consulted on various business matters.  Kanter was not engaged in the business of selling valuable artwork.  He was not paid to find the investor but merely directed his friend to another friend.  Contrary to the holding in Milbank, Kanter was not protecting his reputation as a lawyer or investor but merely protecting his friendship with Feigan and Rappaport.

Unlike the taxpayer in Pepper v. Commissioner, supra, Kanter did not actively solicit financing for his friend Feigan, nor did he or his law firm receive fees for services rendered in the transaction. He merely served as an intermediary to introduce Feigan to another friend, Rappaport. There was no written contract between Feigan and Kanter for the sharing of profits.

Accordingly, respondent's determination with respect to this issue is sustained. We hold that Kanter is not entitled to the claimed business loss deduction. We also hold that, because Kanter received no fees and no contract existed therefor, the expenditure did not bear a reasonable and proximate relationship to the production of income. Thus, it is not deductible under section 212.

Issue 20. Whether the Kanters Are Entitled To Deduct a Claimed Charitable Contribution of $15,000 to the Jewish United Fund in 1982

FINDINGS OF FACT

On their income tax return for 1982, the Kanters listed $25,182 in charitable contributions, which they were unable to deduct on Schedule A as itemized deductions for the reason that the return showed negative gross income of $287,536. The limitation provisions of section 170(b) precluded any deduction for charitable contributions. In the notice of deficiency for 1982, the various adjustments by respondent resulted in the Kanter's having adjusted gross income for 1982 in such amount

that the limitation provision of section 170(b) was not applicable. Respondent allowed the Kanters a deduction for the charitable contributions listed on their return except a contribution of $15,000 to the Jewish United Fund (JUF).

On or about December 17, 1982, Holding Co., by Meyers, president, executed a promissory note dated December 17, 1982, payable to Kanter in the face amount of $15,000 due on March 1, 1983, with interest at 12 percent per annum. Respondent has not disputed that this indebtedness is bona fide.

On December 27, 1982, Holding Co., by Meyers, president, sent a letter to JUF enclosing the Holding Co. note and Kanter's pledge card to JUF for $15,000. This letter stated in pertinent part that Holding Co. "will pay its note to Kanter who will, in turn, see to providing these funds to JUF". In a letter to Kanter dated December 30, 1982, JUF acknowledged its receipt of the Holding Co. promissory note. The December 30, 1982, letter further stated that "This note has been assigned by you to * * * JUF as a charitable contribution, and we are pleased to accept it as such".

On February 28, 1983, Holding Co. paid to Kanter the $15,000 face amount due on the Holding Co. note plus interest of $370. Kanter reported the interest paid on the Holding Co. note on his income tax return for 1983.

On February 28, 1983, Kanter paid $15,000 to the JUF by a check on his personal bank account.  Neither Holding Co. nor Kanter paid any interest on the Holding Co. note to JUF.

Kanter did not establish that he endorsed the Holding Co. note over to JUF in 1982.  Kanter contends he is entitled to a 1982 charitable contribution deduction because the $15,000 note was delivered to JUF during 1982.

## OPINION

Section 170(a) generally provides that a deduction is allowed for charitable contributions, payment of which is made within the taxable year.  Charitable contributions can be made in the form of cash or property, including third party promissory notes.  See MacKay v. United States, 503 F.2d 591 (10th Cir. 1974), a case distinguishable from the facts herein.

The Kanters contend that they are entitled to a charitable contribution deduction for 1982 of at least $14,700, which they maintain was the Holding Co. promissory note's fair market value on the date of its contribution to JUF in December 1982.  They assert that "While a small discount for the fact that the note was not to be paid until several months after the date of contribution is perhaps required, there is no basis for disallowing the entire contribution".  The Kanters submit that, given the interest rates at the time (as reflected in the IRS's applicable Federal rates, as well as the 12-percent interest rate

set in the note itself), the 1982 deduction should be discounted no more than $300.

To the contrary, respondent contends that the Kanters are not entitled to the claimed charitable deduction for 1982 on alternative grounds because (1) there was no endorsement of the Holding Co. promissory note by Kanter to JUF, or (2) the Kanters failed to establish the note's fair market value on the date of its purported contribution to JUF in late 1982. On brief, respondent concedes that the Kanters are entitled to a charitable contribution deduction for 1983 for the $15,000 because Kanter paid that amount to JUF in 1983, subject to the adjusted gross income limitations of section 170(b) for 1983.

Ordinarily, a charitable contribution is made at the time delivery is effected. If a taxpayer unconditionally delivers or mails a properly endorsed stock certificate to a charitable donee or the donee's agent, the gift is completed on the date of delivery. See sec. 1.170A-1(b), Income Tax Regs. Respondent argues that, like a stock certificate, a promissory note is delivered to a donee only after it has been properly endorsed and unconditionally delivered to the donee. Here Kanter failed to establish that he endorsed the Holding Co. promissory note over to JUF. As evidence that he contributed the note to JUF, Kanter introduced a copy of only the front page of the note; a copy of his pledge card; a copy of a Holding Co. letter reciting delivery

of the note to JUF; a letter from JUF acknowledging receipt of the note as a charitable contribution; and his testimony that he "transferred" the note to JUF. At best, this evidence establishes that Kanter delivered during 1982 an unendorsed note to JUF and a promise to pay his 1982 pledge to JUF on March 1, 1983. As indicated in Holding Co.'s letter, dated December 27, 1982, direct payment of the Holding Co. note to JUF was never contemplated, which would have been the case if Kanter had properly endorsed the Holding Co. note over to JUF. Rather, payment of the note was to be made to Kanter who in turn would pay JUF. Kanter failed to produce the original promissory note or even a copy of the reverse side of the note that would indicate whether the note was properly endorsed over to JUF.

We believe respondent's contention that Kanter failed to contribute the note to JUF is supported by the evidence. When the note became due in 1983, Holding Co. paid Kanter, rather than JUF, the $15,000 face amount of the note plus $370 interest, and Kanter, in 1983, paid $15,000 and no interest to JUF. If a proper legal transfer of the note had been made so that JUF became the true owner of the note and Kanter retained no dominion or control, Holding Co. would have paid JUF directly. More importantly, if Kanter had legally transferred the note to JUF in December 1982, and no longer had any dominion or control over it thereafter, then JUF, not Kanter, would have been entitled to the

interest due on the note.  The fact that Holding Co. paid the principal and interest to Kanter, rather than JUF, is additional proof that Kanter never legally transferred the Holding Co. note to JUF.  Therefore, we hold that Kanter is not entitled to a deduction for the claimed contribution to JUF for 1982, but that he is entitled to a charitable contribution deduction for 1983 for the $15,000 paid to JUF that year, subject to the adjusted gross income limitations of section 170(b).  See Petty v. Commissioner, 40 T.C. 521, 524-525 (1963); compare Christensen v. Commissioner, 40 T.C. 563, 574-577 (1963).

Issue 21.  Whether the Kanters Are Entitled to Claimed Capital Gains and Losses for 1987

FINDINGS OF FACT

On their Federal income tax return for 1987, the Kanters reported the following capital gains and losses:

## Short-Term Capital Gains and Losses

| Description | Date Acquired | Date Sold | Gross Sale Price | Basis | Gain or Loss |
|---|---|---|---|---|---|
| SHS Brajdas Corp. | 4/02/87 | 5/29/87 | $1,780 | $1,304 | $476 |
| SHS Flex Comp. | 5/29/87 | 10/19/87 | 40,000 | 53,600 | (13,600) |
| Rooney Pace Bond | 5/29/87 | 12/29/87 | 10 | 5,000 | (4,990) |
| SHS Elec. Missile | 5/29/87 | 10/19/87 | 41,250 | 30,000 | 11,250 |
| Total | | | 83,040 | 89,904 | (6,864) |

## Long-Term Capital Gains and Losses

| Description | Date Acquired | Date Sold | Gross Sale Price | Basis | Gain or Loss |
|---|---|---|---|---|---|
| SHS Sun Resorts | 6/20/84 | 12/03/87 | $1,300 | $250 | $1,050 |
| SHS Newport Pharm. | 82 | 12/21/87 | 84,380 | 361,143 | (276,763) |
| SHS I.H.O.G. | 10/07/86 | 12/21/87 | 1 | 5,000 | (4,999) |
| SHS Lezak Group | 3/29/85 | 12/21/87 | -- | 1 | (1) |
| N/R Victorian Vill. | 85 | 12/22/87 | 27,949 | 311,878 | (283,929) |
| N/R S. Block | 1/19/87 | 12/22/87 | 1 | 23,356 | (23,355) |
| N/R Tanglewood | 12/15/86 | 12/22/87 | 100 | 10,000 | (9,900) |
| N/R R. Trust | 78 | 12/22/87 | 1 | 53,000 | (52,999) |
| N/R D. Anderson | 3/31/87 | 12/22/87 | 1 | 195 | (194) |
| N/R Arlington Corp. | 3/31/87 | 12/22/87 | 1 | 11,792 | (11,791) |
| N/R Pam Osowski | 3/31/87 | 12/22/87 | 1 | 16,625 | (16,624) |
| N/R Classic Cust. | 3/31/87 | 12/22/87 | 5,000 | 79,366 | (74,366) |
| Red Pond Beach | 1/02/69 | 12/31/87 | 1,896 | -- | 1,896 |
| BK Eagle Prtshp | 7/05/72 | 12/31/87 | -- | 1 | (1) |
| BK Freedom Prtshp | 9/01/73 | 12/31/87 | -- | 1 | (1) |
| BK Lioness Prtshp | 8/11/72 | 12/31/87 | -- | 1 | (1) |
| Total | | | 120,631 | 872,609 | (751,978) |

In the notice of deficiency for 1987, respondent disallowed the claimed basis in each of the assets reported sold. In addition, respondent disallowed the claimed losses on the grounds that the sales were to related taxpayers, the sales were not at arm's length, were not entered into for profit, and the sales prices were not at fair market value.[52] Some of the sales were to MAF, Inc. (MAF), and others were to Windy City, Inc. (Windy City), except for the Rooney Pace bond, which was sold to Mallin and the Brajdas Corp. stock, which was sold to an unrelated third party. The Eagle, Freedom, and Lioness Partnership interests were not sold to anyone. Kanter claimed a loss for these interests on the basis of abandonment.

MAF was a wholly owned subsidiary of Computer Placement Services, Inc. (CPS). The record does not show who legally or beneficially owned CPS. MAF had no offices of its own and operated out of the accounting firm office of Morrison, MAF's president. Morrison, a certified public accountant, was a longtime friend of Kanter and had accounting clients who were also clients of Kanter. Freeman, who was IRA's president until about 1988, had asked Morrison to serve as MAF's president. Morrison received no compensation as MAF's president. MAF

---

[52]    In a Stipulation of Settlement filed by the parties, respondent conceded adjustments relating to Sun Resorts and the Lezak Group adjustments. Respondent, on brief, further conceded the Newport Pharmaceutical and D. Anderson adjustments.

purchased the notes in question as a favor to Kanter.  Kanter
sold the notes to MAF to enable him to realize a loss for tax
purposes.  Kanter's testimony at trial as to the reason he "sold"
the notes (as well as the other securities at issue) is
paraphrased in his brief, as follows:

> Throughout trial, Kanter candidly admitted that the
> purpose of the asset sales was to "establish" a loss
> for tax purposes, because of the traditional practice
> of Respondent's agents to routinely propose to disallow
> Section 165 or Section 166 deductions claimed in IRA's
> or Kanter's tax returns.

Thus, by selling the various assets for a nominal amount, Kanter
was attempting to realize a loss by means of a sale or exchange
rather than as a bad debt or worthless security deduction.  MAF
neither inquired into nor independently ascertained the value of
the purchased promissory notes.  MAF did not look into or
consider a particular note's collectibility or the
creditworthiness of its maker or obligor.  Specifically, during
1987, MAF purchased the Victorian Village and S. Block notes from
Kanter for $27,949 and $1, respectively, as an accommodation to
Kanter.  After 1987 and up to the trial, Morrison continued as
president of MAF, although, since 1989, MAF has not been active
and has not conducted any business.

At all times relevant to this litigation, Windy City was a
corporation solely owned by the 25 Bea Ritch Trusts.  Joel
Kanter, Kanter's son, was the president of Windy City.  Weisgal,
a longtime friend and business associate of Kanter, was the

trustee of each of the Bea Ritch Trusts.  Specifically, the assets sold to Windy City were all of the other assets described in the table above except the Rooney Pace bond, which was sold to Mallin, and the Brajdas Corp. stock, which was sold to an unrelated third party.

Mallin was a former law partner of Kanter's who served on the board of directors of Cedilla.  Mallin was extensively involved in equipment sale/leaseback transactions involving IRA and Cedilla.  Those transactions are the subject of discussion in Issue 22.  As noted above, Mallin purchased the Rooney Pace bond.

For the most part, the assets at issue were reflected as acquisitions by Kanter that were paid for out of Kanter's special E account with Administration Co.  As of December 31, 1986, Kanter's special E account balance with Administration Co. was a negative $79,283.

The Brajdas Corp. stock was purchased on April 20, 1987, for $1,300 in the exercise of a warrant.  Kanter sold the stock to an unrelated party on May 29, 1987, for $1,780, realizing a gain of $476.  The record does not reflect the acquisition history of the Flexible Computer stock, the Rooney Pace bond, or the Electronic Missile stock.

The IHOG stock was held by the Nominee Corp., a corporation which apparently held assets for the equitable and beneficial interest of Kanter.  It appears from the record that IHOG was not

wholly owned by the Nominee Corp. The IHOG stock at issue was acquired on October 7, 1986, through a check issued by Administration Co. out of Kanter's account, payable to IHOG, in the amount of $10,000. On February 11, 1987, IHOG paid $5,000 to the Nominee Corp. as a "return of capital". Thus, Kanter claimed a basis of $5,000 in this stock. In a letter accompanying the payment of the $5,000 to the Nominee Corp. it was stated that efforts were continuing to pursue the further development and sales of IHOG's product, the nature of which was not indicated in the letter.

Funds were advanced to Victorian Village from the Administration Co. special E Account, and Victorian Village issued notes payable to Nominee Corp.

Kanter issued a check to S. Block dated February 14, 1984, in the amount of $5,000, bearing the notation "loan". Block executed a $16,130.53 note to Kanter, dated July 1, 1985. Administration Co. special E Account issued a check to Block in the amount of $3,000, dated December 12, 1984. Block executed a $10,000 note to Administrative Enterprises special E Account, dated January 21, 1987. Although the record is not at all clear, there is apparently no dispute that the balance due on the Block note or notes was $23,356 on the date of sale, December 22, 1987.

The Tanglewood note receivable is the same note receivable from Tanglewood to IRA in the amount of $350,000 that Kanter

purportedly bought from IRA on December 1, 1985 for $10,000.
Kanter paid no cash for this note.  His purchase of the note from
IRA was accomplished through an adjusting journal entry on the
books of IRA.

Weisgal was trustee of the R Trust.  The R Trust issued a
$1,000 note to Holding Co. dated August 29, 1978; a $20,000 note
to Holding Co. dated November 21, 1979; and a $31,500 note to
Kanter dated February 2, 1978.  Through Administration Co.
bookkeeping entries, Kanter acquired the notes receivable
totaling $21,000 due from the R Trust to Holding Co. on August
29, 1986.  Kanter paid no cash for this note, but his amount due
to Administration Co. was increased by $21,000.  In 1988, in
exchange for $10,000 of its $64,000 note payable to HELO, Zeus
acquired a $10,000 note receivable of the R Trust from HELO.

Administration Co. wire-transferred $15,000 to Virginia
Arlington F/C Arlington Carpentry, Inc. (Arlington), on November
27, 1985.  Administration Co. filed a financing statement that
covered Arlington's equipment and receivables.  Administration
Co. wired the funds to Arlington at Kanter's direction.  Kanter
did not know the individual at the head of Arlington.  However,
that individual was a friend of Kanter's son, Joel, who was
having some work done by Arlington.  Joel asked Kanter to send
the money to Arlington, and Kanter agreed.

Prior to the years in question, Pamela Osowski (Osowski) was Kanter's secretary. At some time, she also worked for Film Writers Corp. Administration Co. transferred money to Osowski during 1984 and 1985 by check and wire transfer. The checks contained the notation "loan". A document entitled "WIRE TRANSFER RECORD" also contained the notation "loan", but did not indicate from what account the alleged wire transfer was made. Kanter acquired the Osowski note from Administration Co. on March 31, 1987, for $16,625.

Classic Custom Furniture was owned by Meyers' husband. Administration Co. transferred funds by check and wire transfer to the account of Classic during 1984 and 1985, and Classic transferred funds by check to Administration Co. during 1984 through 1987.

OPINION

I. Legal Principles

A. Bona Fides of a Transaction for Tax Purposes

It is a well-settled principle of tax law that labels or classifications affixed by the parties to a transaction do not control for tax purposes. If the form of a transaction reflects its substance, and the sole purpose of the transaction is not tax avoidance, generally the transaction will be recognized for Federal tax purposes. See Gregory v. Helvering, 293 U.S. 465 (1935). A transaction that has genuine economic substance and

conforms with business realities will be respected for tax purposes. See <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 584-585 (1978).

B.  <u>Section 267</u>

Section 267 and its predecessors were enacted to correct what Congress considered the abusive and frequently employed practice of creating losses for purposes of avoiding income taxes through transactions between related persons and groups. Because of the identity of economic interests of such parties and the control taxpayers had over the persons or entities involved, the transfers were usually not thought to result in economically genuine realization of loss. See <u>McWilliams v. Commissioner</u>, 331 U.S. 694, 699 (1947); H. Rept. 704, 73d Cong., 2d Sess., 1939-1 C.B. (Part 2) 554, 571. To prevent tax avoidance, Congress, in section 267 and its statutory predecessors, denied deductions for losses on all sales or exchanges between specified related persons, regardless of such persons' subjective intent. Thus, where section 267 is applicable, it is immaterial whether the particular transaction involved is a bona fide, arm's-length transaction. See <u>McWilliams v. Commissioner</u>, <u>supra</u>.

Generally, section 267(a) provides that no deduction shall be allowed for any loss realized from the sale or exchange of property between related persons or entities. Included among the relationships are transactions between members of a family and

transactions between an individual and a corporation in which
such individual owns, directly or indirectly, more than 50
percent in value of the outstanding stock.  Other provisions of
the statute define "related persons", and other rules define what
constitutes direct and indirect ownership of corporate stock.

In Hickman v. Commissioner, T.C. Memo. 1972-208, this Court
stated that section 267(b)(2) and (c)(1) "contemplate valuing the
stock interest owned by or for an individual, whether outright or
in trust for his benefit, without detracting from the value of
the stock because it is indirectly owned rather than directly
owned.  If the section is to apply equally to indirect and direct
ownership, this must be the case."

C.  Abandonment Loss

To be entitled to an abandonment loss under section 165, a
taxpayer must show:  (1) An intention on the part of the owner to
abandon the asset, and (2) an affirmative act of abandonment.
See Citron v. Commissioner, 97 T.C. 200, 208-209 (1991), and
cases cited therein.  An affirmative act to abandon must be
ascertained from all the facts and circumstances, see United Cal.
Bank v. Commissioner, 41 T.C. 437, 451 (1964), affd. per curiam
340 F.2d 320 (9th Cir. 1965), and "the Tax Court [is] entitled to
look beyond the taxpayer's formal characterization", Laport v.
Commissioner, 671 F.2d 1028, 1032 (7th Cir. 1982), affg. T.C.
Memo. 1980-355.  "The mere intention alone to abandon is not, nor

is non-use alone, sufficient to accomplish abandonment."  Beus v. Commissioner, 261 F.2d 176, 180 (9th Cir. 1958), affg. 28 T.C. 1133 (1957).  Abandonment of a partnership interest should be accompanied by some express manifestation, and the need to manifestly express the intent to abandon is especially important. See Citron v. Commissioner, supra at 209-210.

II.  The Parties' Contentions

Kanter contends on brief:

respondent appeared to concede during trial that the sole remaining grounds supporting respondent's disallowance of the bad debt and loss deductions were:

    (i) Whether funds disbursed from the Administration Co. "Special E" account or from other nominee accounts in fact belonged to Kanter * * * (the "Special E Issue"); and

    (ii) Whether assets which were written-off or sold were in fact "worthless".

        *       *       *       *       *       *       *

Petitioners believe that respondent's concessions should be interpreted as follows:

    (i) where an asset with a substantial cost basis was sold for $1, $10, or for substantial consideration, the remaining issue is whether the asset was worth no more than the selling price; and

    (ii) where an asset was written-off as a bad debt or worthless security, the remaining issue is whether the asset was worthless.

Kanter argues further that he substantiated and is entitled to the basis and capital losses claimed on his 1987 Federal income tax return.  Alternatively, he argues that, if the Court holds

that either (1) some of the transactions are not bona fide transactions for tax purposes, or (2) no loss is allowable because the sales were to a related party, he is still entitled to deductions for worthlessness or partial worthlessness with respect to the assets involved.  He also asserts that he is entitled to deductions under section 165 for abandonment losses with respect to the BK Eagle, BK Freedom, and BK Lioness partnership interests.

To the contrary, respondent contends that, except for the conceded capital losses, Kanter failed to meet his burden of proof with respect to the determinations in the notice of deficiency.  Specifically, respondent argues that (1) Kanter did not substantiate the claimed bases in the assets sold; (2) the sales were to related buyers; (3) the sales were not arm's-length transactions; or (4) the transactions lacked substance.

III.  Analysis

To begin with, the Court disagrees with Kanter's contention that certain statements by respondent's counsel during the trial constituted "concessions" whereby respondent abandoned or waived some of the grounds in the notice of deficiency disallowing the losses the Kanters claimed.  In our view, Kanter is reading the statements of respondent's counsel out of their proper context. These statements were made during discussions between the Court and respondent's counsel as to some of the legal issues

pertaining to these and other similar adjustments in these cases. The Court did not understand respondent's counsel, during the trial, to have abandoned or conceded certain grounds in the notice of deficiency disallowing the Kanters' claimed loss deductions for 1987, including the grounds that the transactions involved (1) were not bona fide transactions, or (2) were sales made to related parties. Indeed, the Court finds the "concession" argument surprising considering questions the Court raised during Kanter's testimony. In its questioning, the Court indicated that neither respondent nor the Court was necessarily required for tax purposes to respect, as bona fide, transactions labeled as "sales" that Kanter had arranged in order to claim losses.

As to the adjusted bases the Kanters claimed, which respondent challenged particularly in those situations where a gain was reported, it was substantiated that Kanter had such basis in each of the individual assets. As indicated previously, funds from the Administration Co. special E and PSAC special E accounts were Kanter's funds. In some instances, Kanter testified that, although certain assets were acquired by him through various nominees, the funds expended in the assets' acquisition were payments that he made. In other instances, Kanter paid for acquired assets by reducing the amount of existing debts owed to him by the seller. Consequently, the

Court rejects the basis issue raised by respondent and holds that the Kanters realized short-term capital gains of $476 and $11,250 from Kanter's respective sales of Brajdas shares and Electronic Missile shares.

With respect to the Rooney Pace bond sale to Mallin and the two notes sold to MAF (the Victorian Village and Sam Block notes), we are not satisfied that these were bona fide sales. In our view, MAF was not acting at arm's length with Kanter in these two note transactions. We have similar doubts with respect to the arm's-length nature of the Rooney Pace bond sold to Mallin because Kanter originally acquired the bond for $5,000 on May 29, 1987, but later "sold" the bond to Mallin for $10 on December 29, 1987.

More importantly, the totality of the evidence, including Kanter's admission that he reported the transactions as sales solely for the purposes of avoiding the audit process and the generally more onerous task of establishing worthlessness satisfies the Court that the transactions were not bona fide sales and were not at arm's length.[53] Among other things, the Court doubts that MAF and other accommodating parties ultimately

---

[53] Besides the transactions at issue here, IRA also "sold" to MAF the promissory notes of Ballard and Lisle's respective grantor trusts, which trusts had invested in movie shelters. As of the time these trust note transactions took place, the trusts' movie investments had proved to be unsuccessful, so that for all practical purposes the trusts held no assets.

parted with and were actually out of pocket for the funds they purportedly expended in these "transactions"; it is inferable that the purported amounts, if paid for more than a nominal amount, were returned to them in a circular fashion.[54]  In these circumstances we conclude that Kanter failed to meet his burden of proving that the Rooney Pace bond transaction with Mallin and the two note transactions with MAF were bona fide transactions. Consequently, we sustain respondent's determinations that the Kanters are not entitled to loss deductions with respect to those transactions in 1987.  These transactions were not at arm's length and were not bona fide.  See, e.g., Estate of Miller v. Commissioner, T.C. Memo. 1968-230, affd. 421 F.2d 1405 (4th Cir. 1970).

On brief, Kanter argues that the Victorian Village note sale to MAF stands on a different footing, because the note was "sold"

---

[54]  As stated in the Court's findings, the record does not reflect who owned Computer Placement Services, the corporation that owned 100 percent of MAF's stock.  Although Kanter testified that he had no interest in Computer Placement Services (see, however, the discussion infra on petitioners' failure to establish the inapplicability of sec. 267 to the Victorian Village note transaction), he acknowledged performing some legal work for Computer Placement Services.  Moreover, Morrison stated that MAF had no offices of its own, operated out of his accounting firm's office, and that Freeman (IRA's president) had asked Morrison to be MAF's president.  Morrison further related that he is a longtime friend of Kanter, and that he was paid no compensation by MAF for being MAF's president.

for more than an insubstantial amount ($27,949).[55]  In this

regard, he testified how he determined the note's stated purchase

price:

> [Petitioner's counsel]:  * * *  With respect to [the] Victorian Village [note]  * * *, please tell the Court why that was sold for $27,949 and a loss of $283,929 was taken? Would you please tell the Court why you would have sold this note at such a substantial discount?

> [Kanter]:  Well, at the time, it was my judgment it was worth no more that the amount that was received.  This was a real estate timeshare project out West.  We thought that it could run very successfully and the units in it were sold on a timeshare basis effectively.

> That did not turn out to be the case, and despite a series of efforts at refinancing, one of which took place and the others which did not, the property was at a point--I

---

[55]  The Court finds Kanter's arguments with respect to the bona fides of this transaction and other transactions with MAF inconsistent and, at times, contradictory.  For instance, in proposed findings on the Victorian Village note transaction, Kanter, in his opening brief, acknowledges Morrison's (MAF's president) testimony that MAF purchased various assets from Kanter as "an accommodation".  Yet, on reply brief, he asserts somewhat differently that Morrison's testimony did not necessarily refer specifically to the Victorian Village note transaction.  His testimony, it is now asserted, pertained only to those notes for which MAF "paid" $1.  It is argued that "He did not testify that collectibility of the Victorian Village note was not a concern * * * [to him] or MAF.  Considering the size of MAF's investment, $27,949, it would be unreasonable to assume, in the absence of explicit testimony, that collectibility was not an issue to MAF when acquiring the Victorian Village note."  The Court notes that there was ample opportunity, during the trial, to clarify Morrison's testimony on this point.  No attempt was made to ask Morrison whether he had examined and inquired into the Victorian Village note's collectibility.  Considering the fact the Morrison received no compensation for being MAF's president, the Court does not believe that he did make such an examination or inquiry.  The Court has determined in its findings that Morrison and MAF failed to examine and consider the collectibility of the notes "purchased" from Kanter.

don't recall whether this exact year or when.  The property was in deep trouble.  However, I thought because we had a position with respect to this note, that there might be some recovery.  My judgment was based--as to value was based on information that I received from the people running the property, as to what they thought might be the recovery in the event of a foreclosure sale, or might be earned within a period of time, and it clearly was my judgment it was worth no more than that, and that was the price at which it was sold.

The Court:  Now, you don't have any documentary evidence about bankruptcy or inability of these people to pay their debts?

[Kanter]:  Ultimately the property did get foreclosed. I don't have any handy, and I don't have extensive cumulation of documents, because there was no filing that would offer an opportunity for reorganization.  But it was foreclosed in the end.

Essentially, Kanter is asking the Court to credit his testimony, accept his judgment as to the note's asserted fair market value, and hold the note's "sale" to MAF was a bona fide transaction. We decline to do so in view of Kanter's unreliable testimony and other credible evidence of record indicating that a number of Kanter's transactions with MAF were not bona fide transactions. It appears to us that documentary evidence should have been and could have been provided by Kanter to corroborate his testimony in this regard.  Thus, we conclude that Kanter failed to meet his burden of proving that the Victorian Village note transaction was bona fide.  We also conclude that Kanter failed to show that MAF was not a related party under section 267(b)(2) and (c). Although Kanter testified that he had no interest in MAF's parent company, Computer Placement Services, he offered no evidence

establishing whether he or his family "indirectly" held less than a 50-percent interest in the parent company. Accordingly, we sustain respondent's determination that the Kanters are not entitled to a loss deduction for the Victorian Village note sold to MAF in 1987.

Similarly, with respect to the Windy City transactions, involving sales to Windy City of stock in Flexible Computer, IHOG, and notes owing by Arlington Carpentry, Classic Custom Furniture, Pam Osowski, R Trust, and Tanglewood, we conclude that Kanter failed to meet his burden of proof to establish deductible losses. As a threshold matter, Kanter failed to prove that Windy City was not a related party under section 267(b)(2) and (c)(2). We note that some of these transactions were for nominal amounts, and that the Bea Ritch Trusts (which trusts were established by Kanter's family) owned all of Windy City's shares. Earlier, in this opinion, we held that Kanter was the deemed grantor of the Bea Ritch Trusts during 1987, and the beneficiaries were members of his family. Therefore, Windy City was clearly a related party to Kanter. Moreover, Kanter failed to prove that each of the transactions was bona fide. The named trustee of the 25 BRT trusts was Weisgal, a longtime friend and business associate of Kanter. Windy City's president was Joel Kanter, Kanter's son. For the foregoing reasons, we sustain respondent's determination that the Kanters are not entitled to loss deductions on these

transactions in 1987.  See also <u>Scully v. United States</u>, 840 F.2d 478 (7th Cir. 1988).

The Court further concludes that Kanter failed to meet his burden of proving that the Kanters are entitled to abandonment losses with respect to the BK Eagle, BK Freedom, and BK Lioness partnership interests.  Kanter generally testified that a number of assets on which the Kanters had claimed capital losses for 1987 were essentially worthless.  In our view that is not sufficient to establish abandonment.  Kanter failed to show (1) an intention on his part to abandon each partnership interest, and (2) an affirmative act of abandonment with respect to each partnership interest.  See <u>Citron v. Commissioner</u>, 97 T.C. at 209-213.  Consequently, we sustain respondent's determination that the Kanters are not entitled to loss deductions on these partnership interests for 1987.

The Court also rejects the alternative contention that the Kanters are entitled to deductions for partial worthlessness of the promissory notes under section 166(a)(2).[56]  They made no

---

[56]    Although sec. 166(a)(2) provides that a bad debt deduction for partial worthlessness of a debt may be allowed, certain requirements must be met.  The taxpayer claiming such a deduction for partial worthlessness generally must have (1) charged off such portion of the debt for that year, and (2) demonstrated to the District Director's satisfaction that such portion of the debt is worthless.  See sec. 1.166-3(a), Income Tax Regs.; <u>Austin Co., Inc. v. Commissioner</u>, 71 T.C. 955, 971 (1979); <u>Findley v. Commissioner</u>, 25 T.C. 311, 318-319 (1955), affd. per curiam 236 F.2d 959 (3d Cir. 1956); see also <u>Mayer Tank Manufacturing Co.,</u>
                                                    (continued...)

claim for partial worthlessness in their pleadings, nor did they
seek leave to amend their pleadings to raise the issue.  The
parties never consented to try such issue during the trial.  This
alternative argument, therefore, is not properly before the
Court.

Issue 22.  Whether Respondent Correctly Made Adjustments to the
Rental Income, Depreciation, Interest Expense, and Investment Tax
Credits Claimed by Investment Research Associates, Ltd. (IRA) in
Connection with Equipment Leasing Transactions for 1979, 1980,
and 1982 Through 1989

FINDINGS OF FACT

I.    Background and Adjustments Made in Deficiency Notices

A.    IRA and Cedilla Investment

IRA and its subsidiary Cedilla Invest. (hereinafter
sometimes referred to collectively as IRA) engaged in various
equipment leasing transactions involving the sale and leaseback
of computer and related equipment beginning in 1976 and
continuing through 1987.  Although the parties disagree on who
owned the various classes of stock in Cedilla Invest., and it
appears the stock ownership in Cedilla Invest. varied over the
years, the parties agree that for the years at issue, IRA held
directly or indirectly at least 80 percent of Cedilla Invest.'s

_____

(...continued)
Inc. v. Commissioner, 126 F.2d 588 (2d Cir. 1942), affg. a
Memorandum Opinion of this Court.  On their 1987 return, the
Kanters claimed no bad debt deductions under sec. 166(a)(2) for
partial worthlessness of these various promissory notes.  Rather,
they claimed loss deductions under sec. 165 from their sales of
the notes to other parties.

voting stock and that Cedilla Invest. was included in IRA's consolidated tax returns for those years.

Kanter was the attorney for IRA and investment adviser with respect to its computer leasing transactions. No one employed by IRA was responsible for negotiating the equipment leasing deals except Kanter, who assumed responsibility for them. IRA did not utilize the services of experts in computer equipment in connection with any of the computer equipment leasing transactions that were consummated during the years in question.

In notices of deficiency to IRA, respondent determined that IRA was not entitled to deductions and credits with respect to various computer equipment leasing transactions during the years at issue.

Respondent made the following adjustments to IRA's Federal income tax returns in connection with its equipment leasing transactions:

| Year | Rent Income | Depreciation | Interest Expense |
|------|-------------|--------------|------------------|
| 1980 | ($830,964) | $2,353,776 | $1,027,510 |
| 1983 | (2,581,652) | 1,632,456 | 1,732,404 |
| 1984 | (2,689,177) | 1,743,556 | 1,628,589 |
| 1985 | (2,689,177) | 1,219,280 | 1,495,916 |
| 1986 | 2,151,377 | 1,850,912 | 701,824 |
| 1987 | 2,587,958 | -- | -- |
| 1988 | 1,633,794 | -- | -- |
| 1989 | 1,406,784 | -- | - |

Respondent disallowed the following investment tax credits claimed by IRA relating to the equipment leasing transactions:

| Year | Amount |
|------|--------|
| 1979 | $46,049 |
| 1980 | 13,778 |
| 1983 | 56,280 |

Respondent disallowed in full the investment tax credit carryovers claimed by IRA for 1982 through 1987.

1. Schott

Schott was an officer and director of IRA in 1979. Despite the fact that IRA's Federal income tax returns indicate that Schott was a 50-percent owner of IRA, she had no knowledge regarding her participation in that entity as an equity owner.

Previously, Schott had been an officer of Cedilla Invest. starting in 1974 or 1975. She served as president of Cedilla Invest., yet did not know what she did for the company.

Schott executed documents on behalf of Cedilla Invest. with respect to equipment leasing transactions without knowing who prepared the documents or the purpose of the documents. She did not recall negotiating any leasing transactions on behalf of Cedilla Invest.

2. Mallin

Mallin was asked to be a director of Cedilla Invest. by Kanter, a friend and former law partner, at a time when Mallin did not know who owned Cedilla Invest. Mallin was generally not familiar with IRA or Cedilla Invest. or their officers and directors.

Mallin negotiated, promoted, and brokered computer leasing transactions during the years at issue. His duties in negotiating, promoting, and brokering leasing transactions did not include making specific determinations of the values of the underlying equipment but were limited to personal beliefs of general values for the purpose of his desire to "comfortably represent" transactions. These personal beliefs were based primarily on his review of some industry publications.

Mallin was not an expert on the value of computer equipment, and did not testify as such at the trial of these cases. In general, Mallin used and relied upon third party appraisals which indicated that computer equipment would have no residual value after 96 months. He did not make any specific valuations of the underlying equipment represented in any deals he negotiated, promoted, and brokered. Mallin's commission for brokering an equipment leasing transaction principally depended on the amount of cash (including short-term notes) that was involved in the transaction. The selling price in a sale/leaseback transaction was set by Mallin as a broker, and generally included the sale price of the equipment, plus 3 percent, which represented commissions earned by him on the transaction. With respect to the computer equipment leasing deals Mallin brokered on behalf of IRA, inflation played no factor in the economic analysis as to whether or not a profit could be made.

Mallin was a director of Chicago Holdings, Inc., at the time of trial.

B.  Richard Uhl, Funding Systems Corp., and Funding Systems Asset Management Corp.

Richard Uhl (Uhl) was an officer of Funding Systems Corp.(FSC), which was the parent company of a subsidiary, Funding Systems Asset Management Corp. (FSAM) and was involved in the equipment leasing business during the years at issue.

Uhl did not negotiate the computer leasing transactions involving the IRA deals on behalf of FSC/FSAM.

During 1981, FSC was involved in an involuntary bankruptcy of its subsidiary, FSAM. Leasing Services, Inc. (O.P.M.), an entity engaged in the business of brokering computer leasing deals, also filed a petition in bankruptcy about the same time FSAM filed its petition.

Uhl was the debtor-in-possession of FSAM, in which capacity he conducted the operations of FSC. While Uhl was reviewing leasing transactions as a debtor-in-possession, he discovered that some of the transactions had documents missing.

After FSAM emerged from bankruptcy in 1985, it split off from its parent, FSC. FSAM changed its name to Chicago Holdings, Inc. The directors of Chicago Holdings, Inc. included Mallin and Weisgal. Uhl was the president. One of the shareholders of Chicago Holdings, Inc., was a new partnership called FSAM Partnership.

C.   FSAM Partnership

FSAM Partnership (hereafter FSAM) was organized December 30, 1985.  Weisgal, BWK, Inc., and BRT/K Associates were partners. The Bea Ritch Trusts were partners in BRT/K Associates.

II.  Equipment Leasing

A.   Equipment Leasing Generally

An investor in computer leasing equipment generally looks to the residual value of the equipment at the end of the lease for his profit.  Because of the importance of residual value, an investor in a computer leasing transaction would normally use a qualified appraiser to ascertain the value of equipment involved in a leasing activity.

B.   General Facts Relative to Lack of Economic Substance, Profit Motive and Residual Value

To the extent there was economic substance to the IRA sale and leaseback transactions, it would principally depend on the residual value of the equipment at the end of the lease period between the investor and the leasing company.  For the equipment leasing transactions, the equipment owner could benefit if he retained valuable rights to equipment after the end user's lease and the leasing company's leasehold rights were extinguished. The residual value, if any, of the equipment after the 96 or 108-month lease period was the largest element of what an owner could look for in terms of economic profit.  With respect to each of the IRA leasing transactions, IRA would make a profit on the

transaction if the value of its rights to the equipment at the end of the leaseback or leasehold right of the leasing company (96 or 108 months) had a value in excess of IRA's financial investment, e.g., cash, short-term notes and long-term notes.

No individuals other than Mallin provided any substantive information regarding the equipment leasing transactions entered into by IRA throughout the years 1976 through 1986. Mallin determined that IRA, as an investor, could make a profit on the leasing transactions if the residual value of the equipment, on a date 96 or 108 months after the purchase thereof, was in excess of the cash originally invested by IRA.

Kanter had only general discussions with Mallin as to whether to go into a particular deal. He did not discuss in detail the economics of the equipment leasing transactions before the transactions were consummated. He did not get involved in detailed discussions regarding the residual value or economic prospects of the equipment leasing transactions of IRA and Cedilla Invest. Kanter never determined whether any computer leasing transactions of IRA resulted in or could result in a profit.

IRA did not obtain appraisals as to the values of equipment to be purchased for any of the equipment leasing deals at issue. There were no tax spreadsheets, forecasts, projections, accounting letters, or appraisals presented by IRA to support its

claim that the transactions had economic substance and were not shams for Federal tax purposes.

No evidence was introduced by IRA to corroborate the financial substance of the equipment leasing transactions, such as a record of rental payments received by IRA, payments made by IRA on the long-term notes, payments received by IRA on succeeding leases, and final disposition of the equipment.

In none of the equipment leasing deals entered into by IRA did the cash-flow enable it to make a profit, absent residual value in the equipment at the time the original leases expired. For each of the equipment leasing deals which are at issue, there was no residual value for the equipment at the end of each leaseback arrangement.

C.   Underline{General Facts Relating to Invalid Indebtedness and Financing Circularity}

The equipment involved in the sale and leaseback transactions was subject at the time of such transactions to liens held by various lending institutions which had financed the purchase of the equipment by the relevant entity and was subject to the lease of such equipment to various end users.  The transactions generally took the form of a sale of equipment by the leasing company to IRA, or to an intermediary company, subject to the preexisting liens and leases, after which the investor or IRA then leased the equipment back to the seller, the leasing company, for a period of 96 or 108 months.

The computer leasing transactions were generally structured with the use of an intermediary company between FSC, the leasing company, and IRA, the investor/owner/purchaser. The intermediary company would purportedly buy the equipment from FSC and sell it to IRA, and IRA would then lease it back to FSC. O.P.M., Horizon Leasing Corp. (Horizon), Pluto Leasing Corp. (Pluto), and Knight were corporations purportedly engaged in the buying, selling, and leasing of computer equipment, both new and used, and served as intermediaries in some of the subject transactions.

The provisions of the Agreement of Lease between the leasing entity and any intermediary generally coincide with the provisions of the Agreement of Lease between IRA and the leasing company, or IRA and an intermediary, except for minor variations in the amounts of rent specified in the schedule thereto. With respect to the equipment leasing transactions entered into by FSC/FSAM and IRA, the payments made by the leasing company (FSC) to the owner/purchaser, IRA, and the payments from the owner/purchaser, e.g., IRA to the leasing company (FSC), coincide or may be only slightly different for the 96- or 108-month duration of the lease obligation between the owner and the lessee.

The long-term notes in each of the leasing transactions contained provisions with respect to the manner and amounts of interest prepayments and amounts of the monthly installments

which were identical to those contained in IRA's long-term note to the leasing entity in each instance. IRA did not, generally, assume the leasing companies' obligations under long-term notes signed by the leasing companies to lending institutions. The long-term promissory notes (also known as nonrecourse or limited recourse notes) executed by IRA as the purported owner/investor of the equipment in the transactions contained deferral provisions triggered by the other party's defaults.

The Agreements of Lease, e.g., the leaseback by the owner/purchaser to the leasing company, contained no provisions that permitted the leasing company to terminate or defer the payment of rent due to the owner/purchaser, if the leasing company did not receive payments on the long-term notes of the owner/purchaser. In each instance the leasing company retained the right to receive all rentals from the end user lessees, subject to any assignment of such rentals to the lending institutions that had financed the purchase of the equipment and subject to the Agreements of Lease with any intermediary. The terms of the end user leases were always shorter than the 96- or 108-month term of the Agreements of Lease.

The lending institutions that financed the purchase of the equipment looked solely to the rent from the end user lessees for the repayment of their loans. These loans were to be paid off in full at the end of the end user leases. There is no evidence

that the long-term promissory notes executed by IRA in favor of the leasing companies were fully satisfied. The failure of IRA to make a payment due on any of its long-term notes used for the purported purchases of the equipment did not permit the respective lessees to stop paying rent for the equipment being leased.

IRA, as owner/investor, could not transfer the equipment without the prior consent of O.P.M., the leasing company. Additionally, IRA could not take any action which would result in the imposition of a lien on the equipment without first securing the consent of the senior lienholder.

The sale and leaseback transactions entered into by IRA were simultaneous, prearranged, and interrelated. IRA's required out-of-pocket cash investment in its purchase and leaseback transactions was more than the rents to be received from the lessees. IRA did not have a bona fide expectation that the equipment, in which it purportedly acquired an interest, would have any significant residual value on the relevant deferral date.

The transactions between IRA, O.P.M., and FSC, including the intermediaries and IRA, were simultaneous and interrelated. The intermediaries served no valid business purpose in IRA's transactions with FSC and O.P.M. Horizon, Pluto, Knight, and any other intermediary were inserted into the transactions for the

sole purpose of enabling IRA to claim tax deductions. IRA made use of intermediary companies in an attempt to avoid the at-risk rules of section 465.

D. Miscellaneous Additional Facts Generally Applicable to the Transactions

Neither IRA nor its advisers attempted to obtain an opinion of the fair market value, the residual value, or the useful life of the equipment from a party unrelated to the proposed transactions.

Due to the large number of equity participation transactions previously arranged by Mallin for O.P.M., the transactional documents were essentially reduced to form documents whose terms were the subject of little or no negotiation. All of the transactions at issue fit the same pattern.

There were no third-party records which referred to IRA as the owner or purchaser of the equipment. By the beginning of the taxable year ended December 31, 1987, IRA no longer possessed the right, title, and interest to the equipment for which it claimed deductions and credits for computer leasing transactions for the years 1977 through 1986.

III. The Specific Leasing Transactions

A. Cedilla Invest.-1976 Domestic (O.P.M. Transaction)

Cedilla Invest. purportedly purchased computer leasing equipment from O.P.M. and leased the equipment back to O.P.M. in a "bill of sale" dated October 14, 1976, and a Purchase Agreement

dated December 1976 by and between Cedilla Invest. and O.P.M. O.P.M. had purchased the subject equipment on October 14, 1976, from Pioneer Computer Corp. for $600,000.

The purchase price stated in the Purchase Agreement between O.P.M. and Cedilla Invest. for the computer equipment was $1 million of which $40,000 was paid at closing in cash along with a $970,000 nonrecourse installment promissory note in favor of O.P.M. Of the $40,000 cash paid, it appears that $10,000 represented prepaid interest. In addition, another promissory note in the amount of $86,000 was issued, apparently also relating to interest.

The nonrecourse installment promissory note contained provisions for deferral and setoff of payments due O.P.M. from Cedilla Invest. to the extent any amount of rent due Cedilla Invest. was not paid by O.P.M. The principal sum deferred was payable on January 1, 1986, only to the extent that O.P.M. had paid past sums due.

The commissions paid by Cedilla Invest. totaled $55,000. They were made payable to O.P.M. Leasing Services, Inc., and Mallin.

With respect to the purported purchase of the equipment by Cedilla Invest., O.P.M. entered into a collateral assignment of leases. Mallin signed some of the documents in the Cedilla Invest./O.P.M. leasing transactions on behalf of Cedilla Invest.

as a director.  Cedilla Invest. and O.P.M. executed a substitution agreement dated January 23, 1978, which permitted O.P.M. to substitute and exchange certain equipment for the original leased equipment.

B.    Cedilla Invest.-1977 Domestic Transaction Master Lease Transaction)

Cedilla Invest. entered into a purported master purchase agreement with FSC on November 27, 1977, wherein Cedilla Invest. purchased certain computer equipment.  Some of the equipment was acquired in 1978.  Cedilla Invest. then leased the equipment back to FSC for a term of 108 months for each piece of equipment. Included in this master lease agreement was a master remarketing agreement.

During the term of the lease, the lessee was responsible for maintenance of the equipment and the risk of loss from damage thereto.  The lessee had the right to sublet the equipment.

With respect to the purchase of each item of equipment under the master agreement, Cedilla Invest. executed a limited recourse promissory note.  The limited recourse promissory note included a deferral provision which permitted, in the event the lease was terminated prior to the expiration thereof on account of default, deferral of payment of the balance due on the note and any accrued interest until December 31, 1991.  The limited recourse promissory note also included a provision authorizing Cedilla Invest. to defer payment on its obligation under the note if the

lessee failed to pay the rent due to Cedilla Invest. for a particular piece of equipment.  Under the limited recourse promissory note, the payee agreed to look solely to the collateral for the payment of any of the obligations of the payor under the note.  There was no right of the payee to pursue the payor independently of the collateral.  The note further provided that the secured interest of the payee was subject to the lien interests of senior lienholders and end users.

Checks issued by Cedilla Invest. to pay FSC provide no evidence that FSC ever negotiated the checks.

C.   Cedilla Invest.-1979 Foreign Transaction (British Aerospace Transaction)

On October 31, 1979, a sale and purchase agreement was effected between Atlantic Computer Leasing, Ltd. (Atlantic), European Leasing, Ltd. (European), Carena Computers B.V. (Carena), and Funding Systems International Corp. (Funding International).  Under this agreement, Funding International, as purchaser, executed and delivered to Carena a nonnegotiable, nonrecourse promissory note dated October 31, 1979, in the amount of $2,820,501.

The computer equipment, referred to as the British Aerospace transaction, consisted of IBM computers located in England and was subject to various leases.  The equipment was identified as follows:  (1) British Aerospace 5-year lease for an I.B.M. model 3032 and other equipment; (2) Unichem, Ltd. 6-year lease for an

I.B.M. model 3031 and other equipment; and (3) Cheshire County Council 6½-year lease for an I.B.M. model 3031, and other equipment. The entities named were the end users of the computer equipment which had been purchased on or about October 10, 1979.

Under the agreements between Atlantic, European, Carena, and Funding International, Atlantic transferred to Carena, and Carena to Funding International, the interests of Atlantic in the computers used by the end users. With respect to this transaction, Funding International executed, in favor of Carena, a nonnegotiable, nonrecourse promissory note in the amount of $1,403,601 dated October 31, 1979.

On October 31, 1979, an agreement of lease was executed by and between Funding International and Carena, leasing the property back to Carena.

The sale and purchase agreement between Atlantic, European, Carena, and Funding International allowed European to sell, transfer, and assign to Carena all of Atlantic's interest in the equipment. Atlantic would own the equipment subject to the lease only upon repayment of the repurchase price specified in the residual agreement. Atlantic, therefore, did not have legal title to the property as of October 31, 1979, but agreed to obtain legal title after the original end user lease expired.

Under the sale and purchase agreements, Atlantic and European agreed to deliver to Carena the instruments Carena

needed to assure ownership of and legal title to the equipment free of any liens, except the lease, after the initial lease term expired. This was pursuant to the residual agreements.

On October 31, 1979, Funding International and Carena entered into a purchase agreement regarding other computer equipment involved as part of the British Aerospace Transaction. Under the residual agreement between Atlantic and Willowbrook International, a leasing company, made with respect to this transaction, the resale of the equipment to Atlantic had a repurchase price of one and one-half of its original cost and would occur 6½ years from the date of the original lease. The stated value of the equipment was $1,506,099. The equipment was to be used by the Cheshire County Council.

With respect to this equipment, Funding International executed a nonnegotiable, nonrecourse promissory note to Carena in the amount of $1,462,793 dated October 31, 1979. This promissory note contained deferral and offset provisions allowing the purchaser/owner of the equipment to defer any payments on the notes, if the leases were terminated prior to the expiration or there was default thereof, and then to offset the deferred amounts against any payment due under the notes.

On October 31, 1979, Funding International and Carena entered into an agreement of lease with respect to the Chesire equipment, leasing the property back to Carena.

On October 31, 1979, Atlantic, European, Carena, and Funding International executed a sale and purchase agreement regarding other equipment which was part of the British Aerospace transaction. The stated value of the equipment was $3,042,338. Under this agreement, Atlantic and European transferred Atlantic's interest in the equipment to Carena, subject to Atlantic's acquiring title to the equipment under the residual agreement.

Under the residual agreement, Atlantic agreed that upon the expiration of the initial term of the lease, it would make payment of the balance of the purchase price and agreed to deliver to Carena the instruments necessary to ensure ownership of, and legal title to, the equipment. The parties agreed that Atlantic would, upon the expiration of the initial term of the lease, undertake the necessary steps to have the equipment purchased at a price equal to 2 percent of its original cost.

On October 31, 1979, Carena and Funding International executed a purchase agreement relating to this equipment. Funding International, as purchaser/owner, issued a nonrecourse installment promissory note to Carena, dated October 31, 1979, in the principal sum of $1,462,793 and interest payments for the balance of $22,132.28 and $37,392.28. The parties entered into an agreement of lease dated October 31, 1979, leasing the equipment back to Carena.

Pluto, a New York corporation affiliated with Mallin, executed a purchase agreement dated December 30, 1979, by and between Pluto and Funding International pursuant to which Funding International delivered a bill of sale dated December 30, 1979, in favor of Pluto.

Under the purchase agreement, Pluto, the purchaser, obtained Funding's interest in and to all of the equipment, which was subject to prior leases made between Carena and others such as Delco Leasing, Ltd., Woolworth Leasing, Ltd., Willowbrook International, Ltd., various leasing companies, or Atlantic Computer Leasing, Ltd. Pursuant to this purchase, the purported price between the parties was $6,108,051, payable by delivery of a certified check in the amount of $180,000 and a recourse installment promissory note in the sum of $5,928,051. IRA claimed the equipment was worth $5,108,573 on its income tax returns. The computer equipment involved was located in England and consisted of the British Aerospace, Unichem, and Cheshire properties described above. The agreement was subject to the existing underlying leases and the residual agreements made with the end users.

With respect to this transaction, Pluto, as the purchaser, issued a check to Funding International in the amount of $185,000. There is no indication this check was negotiated.

On December 30, 1979, a purported purchase agreement was executed between Cedilla Invest. and Pluto pursuant to which Pluto sold to Cedilla Invest. the IBM equipment as to which British Aerospace, Unichem, and Cheshire County Council were end users. The selling price was $6,118,051, made payable by a check for $190,000 and a limited recourse promissory note for $5,928,051 executed by Cedilla Invest.

In connection with the Cedilla Invest./Pluto agreement, Cedilla Invest. additionally executed a promissory note in favor of Pluto in the amount of $260,000, dated December 30, 1979, and another promissory note dated December 30, 1979, in the amount of $95,625.

Under the security provision, the lien of Pluto was subordinate to the interests of underlying lessees, the rights of Atlantic under the residual agreement, and the proceeds from the rent of the equipment in excess of $475 per period received by Cedilla Invest. from Funding International.

The limited recourse promissory note contained a provision for deferral, which permitted the payor to defer any sums, principal and interest, due under the note, if any amount of rent or sum due under the lease was not received by the payor as the sum became due. The deferral allowed the payor, Cedilla Invest., to defer payment to December 31, 1994, without paying accrued interest on the amount so deferred. In addition, under the

limited recourse obligations, the payor was personally liable only for the interest and principal under the note due during the times, and only during the times, and in the amounts and only to the extent of such amounts, as set forth in schedule A thereto, without giving effect to the deferred payments, if any.

Under this provision, recourse obligations were determined as of the date and occurrence of default. Under schedule A, the maximum amount of recourse obligation as of January 1, 1988, was zero. The balance of the obligation was nonrecourse, and the payee looked only to the collateral for payment.

The purchase agreement between Pluto and Cedilla Invest. was made pursuant to a certificate of resolutions of the corporations' board of directors attested to by Meyers.

On December 30, 1979, Funding International purportedly agreed to a collateral assignment of the lease with respect to the computer leasing equipment to Cedilla Invest., subject to the leases of Funding International. The result of the assignment was that Cedilla Invest. received the payments under the existing leases from the end users. In December 1979, Cedilla Invest. and Funding International entered into an agreement of lease and a remarketing agreement regarding the computer leasing equipment.

The term of the lease between Cedilla Invest. and Funding International was through December 31, 1988. Under the lease, the lessee could replace equipment subject thereto.

Under the remarketing agreement, Funding International agreed to act as agent for Cedilla Invest. in remarketing the equipment, after the expiration of the original underlying leases.

As of January 1986, the equipment was not listed in the computer price guide, "The Blue Book of Used IBM Computer Prices".  Its residual value was zero.

Kanter received information regarding the Funding International/Cedilla Invest. transaction in December of 1979, in a letter from the attorneys for Funding International.  The information included with the letter consisted of title documents to the property, none of which documents was produced or provided for incorporation in the record in this litigation.

On January 17, 1980, a letter was sent from Attorney Alan Axelrod regarding the delivery of promissory notes of Cedilla Invest. for itself and its nominee, Kanter.

With respect to the British Aerospace transaction, the total cash investment of Cedilla Invest., including the downpayment and all interest to be paid on its notes was to be $11,982,686; the rent to be received from Funding International was a total of $11,483,360.38.  There was a net loss of $499,325.62 on the transaction.

D.   IRA-1980 Domestic Transaction ("Mini Computer Transaction")

On December 31, 1980, a bill of sale was executed by the FSAM partnership in which Kanter was involved, to F/S Computer Corp. (FS) for certain equipment.  On December 31, 1980, FS sold the equipment to Horizon for $870,025, payable with a cashier's check for $5,700 and a full recourse promissory note by Horizon in the amount of $864,325.  The recourse promissory note included a deferral provision allowing the payor to defer payment of principal and interest on the note, if any amount of principal or interest becoming due to Horizon under the limited recourse installment promissory note of even date issued by IRA to Horizon was not paid.  Under this provision, deferral could continue until December 31, 1995.  The amount deferred would not accrue interest.  Horizon then sold the equipment to IRA, and IRA then leased the equipment to FS.  As part of the purported sale of the equipment to IRA, IRA executed in favor of Horizon a limited recourse promissory note.  The sale to IRA by Horizon was on December 31, 1980, and was for $872,025.  The sale was subject to all underlying leases.

In a letter of direction from IRA, FS agreed to deduct from the rent FS owed to IRA, under the leasing agreement, an amount equal to the monthly payments owed by IRA to Horizon under the note from IRA.  The amounts for these payments were equal.  Accordingly, the payments on the notes were bookkeeping entries.

With respect to the purported purchase agreement, IRA executed a promissory note in the amount of $24,000 to Horizon, another promissory note to Horizon dated December 31, 1980, in the amount of $25,000; and a limited recourse promissory note-security agreement dated December 31, 1980, in the amount of $864,325.

Under the security provision of the note, IRA granted Horizon a security interest in the equipment subject to the interests of prior lienholders and the underlying lessee.

Under the limited recourse promissory note, the payor, IRA, had the right to defer payment of principal and interest to Horizon as it became due, if and to the extent any amounts of rent or other sum due to IRA under the lease with FS was not paid when due.  Under this provision, the payments could be deferred until December 31, 1995.  The deferred amount did not accrue interest.

The recourse obligation under the limited recourse promissory note between IRA and Horizon provided that Horizon had recourse against IRA with respect to failure to make proper payments on the note as of January 1, 1989, in the amount of zero dollars.  The recourse obligations of IRA under the note were determined only in accordance with the schedule attached thereto during the times and in the amounts set forth in that schedule.

The recourse provisions were determined without giving effect to the deferral provisions.

Under the limited recourse promissory note and security agreement, the leased equipment could be replaced with other equipment not initially secured by the note. Under the limited recourse provision of the long-term note, the seller looked solely to the collateral for payment by the buyer, other than the buyer's recourse obligation described earlier.

On December 31, 1980, IRA provided a letter to FS regarding the offsetting of payments made under the promissory notes and the leases. IRA directed FS to deduct from the monthly rent payments owed to IRA an amount equal to the note payments owed by IRA to Horizon and that FS pay the deducted amount directly to Horizon for the account of IRA.

With respect to the IRA/Horizon purported purchase agreement, FS delivered the collateral assignment of leases dated December 31, 1980, to IRA. An agreement of lease between IRA and FS was executed on December 31, 1980. In addition, a remarketing agreement by and between IRA and FS was consummated.

With respect to the IRA/Horizon leasing transaction, the total cash investment of IRA was to be $2,044,264. The total rent due FSC was $1,978,323.79, resulting in a loss of $65,940.21. As of January 1986, the residual value of the equipment subject to the sale and leaseback was zero.

E.    IRA-1980 Foreign/Domestic Transaction ("Alfred Teves Transaction")

A purported purchase agreement dated December 31, 1980, by and between Funding International and Funding Systems International GmBH (Funding GmBH) was consummated, pursuant to which Funding GmBH sold certain equipment to Funding International for $931,321, paid by a check in the amount of $18,721, and a nonrecourse note in the amount of $912,600.

The schedule attached to the bill of sale with respect to the property contained duplicate schedules of certain equipment located in Belgium at two locations:  One at Alfred-Teves Strasse, 3170 Gifhorn, and one at Muller Strasse, 4-14, 5275 Bergneustadt 1.  All of this equipment is referred to as the Alfred Teves transaction.

The $912,600 note executed by Funding International included a provision for deferral of payment by the payor, in the event amounts due for rent with respect to the lease between payor and payee were not made.  The amount deferred would become payable on December 31, 1995, and would not accrue interest.  The note was nonrecourse in that the payee looked solely to the collateral for payment of the obligation.

Consistent with the agreement of purchase, Funding International and Funding GmBH entered into an agreement wherein the equipment was leased back to Funding GmBH.

On December 31, 1980, a purported purchase agreement between Horizon and Funding International was executed wherein the Alfred Teves computer equipment was sold by Funding International to Horizon. The sale/purchase agreement between Funding International and Horizon included the Alfred Teves transaction equipment, along with certain other equipment located in Belgium. The price for this sale was $4,276,701, payable by a cashier's check for $20,000 and $4,256,701 by a full-recourse installment promissory note in favor of the seller, Funding International.

IRA and Horizon signed a purported purchase agreement dated December 31, 1980, in which Horizon sold the property to IRA for $4,281,701, payable by a certified check for $25,000 and a limited recourse promissory note issued by IRA in favor of Horizon in the amount of $4,256,701. The amount owed to Funding International from Horizon was equal to the amount of the payments to Horizon from IRA under the purported purchase and sale agreement. The limited recourse promissory note provided that IRA could defer payment of principal and interest as it became due if, and to the extent, any amount of rent or any other sum due to IRA under the lease between Funding International and Funding GmBH was not received timely by the payor. The sum could be deferred until December 31, 1995. The deferred sum did not accrue interest.

IRA also executed in favor of Horizon a promissory note dated December 31, 1980, in the amount of $120,000, and another promissory note dated December 31, 1980, in favor of Horizon in the amount of $111,900.[57]

Pursuant to the transaction for the sale and leaseback of the computer equipment, Funding International executed a collateral assignment of leases to IRA.

F.   Cedilla Invest. "Lexet Transactions"

On December 22, 1986, Cedilla Invest. purportedly purchased certain IBM-manufactured computer equipment from Lexet Leasing Corp. (Lexet) for a stated purchase price of $1,260,016.  This equipment had been previously or simultaneously acquired by Lexet from Beta Gamma Leasing Corp., which entity had previously or simultaneously acquired the equipment from O.P.M.  The equipment was subject to an end user lease with General Motors Corp., Cadillac Division, Detroit, Michigan.

The stated purchase price of $1,260,016 was, according to the terms of the purchase agreement, payable as follows:  $6,300 in cash on the date of the agreement; a short-term promissory note payable on May 15, 1987, in the amount of $69,300; and a long-term "limited recourse" promissory note in the amount of $1,184,416.  Under the terms of the "limited recourse promissory note", Cedilla Invest. was only personally liable during the

---

[57]   The record contains no explanation for these notes.

times and to the extent of the amounts referenced in schedule B annexed thereto. Schedule B specifically provided that the payor's (Cedilla Invest.'s) "maximum aggregate amount" of personal liability was zero. Further, and also under the terms of the note, Cedilla Invest.'s only obligation with respect to payment of the amounts due thereunder was expressly in the nature of "nonrecourse obligation", and the payee "shall look solely and only to the Collateral for the payment and performance" of Cedilla Invest.'s obligations under the note.

On December 22, 1986, Cedilla Invest. also purportedly purchased certain IBM-manufactured computer equipment from Lexet for a stated purchase price of $1,452,127. This equipment had been previously or simultaneously acquired by Lexet from Proz Leasing Associates, Inc., which entity had previously acquired the equipment from JAL Group, Inc. (in 1980), and previously or simultaneously from Sha-Li Leasing Corp. The equipment was transferred subject to an end user lease with Information Services Group, a division of Mars, Inc., Randolph, New Jersey.

The stated purchase price of $1,452,127 was, according to the terms of the purchase agreement, payable: $7,200 cash at the time of the execution of the agreement; a short-term promissory note payable on May 15, 1987 in the amount of $79,200; and a long-term "limited recourse" promissory note in the amount of $1,365,727. Under the terms of the "limited recourse promissory

note", Cedilla Invest. was only personally liable during the times and to the extent of the amounts referenced in schedule B annexed thereto. Schedule B specifically provided that the payor's (Cedilla Invest.'s) "maximum aggregate amount" of personal liability was zero. Further, and also under the terms of the note, Cedilla Invest.'s only obligation with respect to payment of the amounts due thereunder was expressly in the nature of a "nonrecourse obligation", and the payee "shall look solely and only to the Collateral for the payment and performance" of Cedilla Invest.'s obligations under the note.

Other than the purchase agreements, bills of sale, and promissory notes, IRA did not produce any other documents in connection with these equipment leasing transactions, such as equipment appraisals, economic forecasts, related correspondence, legal opinions, rent payment schedules, checks (negotiated or otherwise) evidencing payments of purchase price or rentals, or records establishing the existence or actual location of the equipment at any time during the subject leases.

The intermediary entities involved in these transactions (Beta Gamma Leasing Corp. and Proz Leasing Corp.) served no economic or business purpose, and were only part of the transactions for Federal tax purposes.

G.   Cedilla Invest. "Ben Energy Transactions"

On December 22, 1986, Cedilla Invest. purportedly purchased certain IBM-manufactured computer equipment and peripherals from Ben Energy Systems, Inc. (Ben Energy), for a stated purchase price of $1,325,068.  This equipment had been previously or simultaneously acquired by Ben Energy from Horizon Leasing Corp., which entity had previously acquired the equipment from New England Rare Coin Galleries, Inc. (in 1980), and previously or simultaneously from Funding Systems International Corp.  The equipment/peripherals were all transferred subject to several end user leases with various entities located in England.

The stated purchase price of $1,325,068 was, according to the terms of the purchase agreement, payable as follows:  $6,600 cash at the time of the execution of the agreement; a short-term promissory note payable on May 15, 1987, in the amount of $72,600; and a long-term, "limited recourse" promissory note in the amount of $1,245,868.

Under the terms of the "limited recourse promissory note", Cedilla Invest. was only personally liable during the times and to the extent of the amounts referenced in schedule B annexed thereto.  Schedule B specifically provided that the payor's (Cedilla Invest.'s) "maximum aggregate amount" of personal liability was zero.  Further, and also under the terms of the long-term note, Cedilla Invest.'s only obligation with respect to

payment of the amounts due thereunder was expressly in the nature of a "nonrecourse obligation", and the payee "shall look solely and only to the Collateral for the payment and performance" of Cedilla Invest.'s obligations under the note.

On December 22, 1986, Cedilla Invest. purportedly purchased certain IBM-manufactured computer equipment from Ben Energy for a stated purchase price of $2,418,244.  The transactional history of this equipment (aside from the end user lease on the property) is that on May 31, 1980, Continental Information Systems GmbH (Continental) sold the equipment to Neptune Leasing Corp. (Neptune).  On the same date, Neptune leased the equipment back to Continental.  Then, on May 31, 1980, Continental assigned its lease interest back to Neptune.  On June 19, 1980, Neptune sold the equipment and all its interests therein to New England Rare Coin Galleries, Inc. (NERC).  On June 30, 1982, NERC sold the equipment and all its interests therein to Ben Energy.  All of these transfers were made subject to the end user lease in favor of an entity located at the time in what was then West Germany.

The stated purchase price of $2,418,244 was, according to the terms of the purchase agreement, to be paid by Cedilla Invest. to Ben Energy as follows:  $12,000 cash at the time of the execution of the agreement; a short-term promissory note payable on May 15, 1987 in the amount of $132,000; and a long-

term, "limited recourse" promissory note in the amount of $2,274,244.

Under the terms of the "limited recourse promissory note", Cedilla Invest. was personally liable only during the times and to the extent of the amounts referenced in schedule B annexed thereto. Schedule B specifically provided that the payor's (Cedilla Invest.'s) "maximum aggregate amount" of personal liability was zero. Further, and also under the terms of the note, Cedilla Invest.'s only obligation with respect to payment of the amounts due thereunder was expressly in the nature of a "nonrecourse obligation", and the payee "shall look solely and only to the Collateral for the payment and performance" of Cedilla Invest.'s obligations under the note.

Other than the purchase agreements, bills of sale, and promissory notes, IRA did not produce any other documents in connection with these equipment leasing transactions, such as equipment appraisals, economic forecasts, related correspondence, legal opinions, rent payment schedules, checks (negotiated or otherwise) evidencing payments of purchase price or rentals, or records establishing the existence or actual location of the equipment at any time during the subject leases.

The intermediary entities inserted in these transactions (Horizon Leasing Corp., Neptune Leasing Corp.) served no economic

or business purpose and were only part of the transactions for Federal tax purposes.

H.   Cedilla Invest. "Dard Systems Transactions"

On December 22, 1986, Cedilla Invest. purportedly purchased certain IBM-manufactured computer equipment from Dard Systems, Inc. (Dard), for $3,615,100.  Prior thereto, on June 29, 1981, Funding Systems International had sold this equipment to Equitable Leasing Co., and on the same date, Equitable Leasing Co. had leased the equipment back to Funding Systems International.  Equitable Leasing Co., on September 30, 1981, sold the equipment to Dard, and thereafter Dard sold the equipment to Cedilla Invest. on December 22, 1986, subject to several end user leases with various entities in England as well as the lease encumbering the equipment in favor of Funding Systems International.

The stated purchase price of $3,615,100 was, according to the terms of the purchase agreement, to be paid by Cedilla Invest. to Dard as follows:  $18,000 cash payable at the time of the execution of the agreement; a short-term promissory note payable on May 15, 1987, in the amount of $198,000; and a long-term, "limited recourse" promissory note in the amount of $3,399,100.

Under the terms of the "limited recourse promissory note", Cedilla Invest. was personally liable only during the times and

to the extent of the amounts referenced in schedule B annexed thereto.  Schedule B specifically provided that the payor's (Cedilla Invest.'s) "maximum aggregate amount" of personal liability was zero.  Further, and also under the terms of the note, Cedilla Invest.'s only obligation with respect to payment of the amounts due thereunder was expressly in the nature of a "nonrecourse obligation", and the payee "shall look solely and only to the Collateral for the payment and performance" of Cedilla Invest.'s obligations under the note.

On December 22, 1986, Cedilla Invest. also purportedly purchased certain Wang-manufactured computer equipment and peripherals from Dard for a stated purchase price of $746,608. This equipment had the same transactional history as the property described above in the $3,615,100 transaction except that F/S Computer Corp. was involved instead of Funding Systems International as the intermediary lessee.  The equipment in this transaction was subject to several end user leases with various entities located in North America.

The stated purchase price of $746,608 was, according to the terms of the purchase agreement, payable as follows:  $3,700 cash at the time of the execution of the agreement; a short-term promissory note payable on May 15, 1987, in the amount of $40,700; and a long-term "limited recourse" promissory note in the amount of $702,208.

Under the terms of the "limited recourse promissory note", Cedilla Invest. was personally liable only during the times and to the extent of the amounts referenced in schedule B annexed thereto.  Schedule B specifically provided that the payor's (Cedilla Invest.'s) "maximum aggregate amount" of personal liability was zero.  Further, and also under the terms of the note, Cedilla Invest.'s only obligation with respect to payment of the amounts due thereunder was expressly in the nature of a "nonrecourse obligation", and the payee "shall look solely and only to the Collateral for the payment and performance" of Cedilla Invest.'s obligations under the note.

On December 22, 1986, Cedilla Invest. also purportedly purchased certain computer equipment and peripherals from Dard for a stated purchase price of $640,710.  This equipment also had the same transactional history as the equipment involved in the $746,608 transaction.  The equipment was transferred subject to several end user leases with various entities.

The stated purchase price of $640,710 was, according to the terms of the purchase agreement, payable as follows:  $3,200 cash payable at the time of the execution of the agreement; a short-term promissory note payable on May 15, 1987, in the amount of $35,200; and a long-term "limited recourse" promissory note in the amount of $602,310.

Under the terms of the "limited recourse promissory note", Cedilla Invest. was only personally liable during the times and to the extent of the amounts referenced in Schedule B annexed thereto.  Schedule B specifically provided that the payor's (Cedilla Invest.'s) "maximum aggregate amount" of personal liability was zero.  Further, and also under the terms of the note, Cedilla Invest.'s only obligation with respect to payment of the amounts due thereunder was expressly in the nature of a "nonrecourse obligation", and the payee "shall look solely and only to the Collateral for the payment and performance" of Cedilla Invest.'s obligations under the note.  Other than the purchase agreements, bills of sale, and promissory notes, IRA did not produce any other documents in connection with these equipment leasing transactions, such as equipment appraisals, economic forecasts, related correspondence, legal opinions, rent payment schedules, checks (negotiated or otherwise) evidencing payments of purchase price or rentals, and/or records establishing the existence or actual location of the equipment at any time during the subject leases.

OPINION

I.  Leasing Transactions Generally

To be entitled to the depreciation and interest deductions, tax credits, and losses claimed in connection with the computer equipment sale and leaseback transactions engaged in by IRA for

the years at issue, IRA must prove that it had ownership of the equipment in each transaction and that the long-term promissory notes executed to finance the equipment transactions constituted valid indebtedness. See Knetsch v. United States, 364 U.S. 361 (1960); Deegan v. Commissioner, 787 F.2d 825, 827 (2d Cir. 1986), affg. T.C. Memo. 1985-219. The essence of a bona fide debt is an unconditional and legally enforceable obligation for the payment of money. See Linder v. Commissioner, 68 T.C. 792, 796 (1977).

This Court has held that the circular financing of computer leasing transactions utilizing long-term promissory notes similar or identical to the financing used in these transactions constitutes invalid indebtedness. See Bussing v. Commissioner, 88 T.C. 449, supplemented by 89 T.C. 1050 (1987); HGA Cinema Trust v. Commissioner, T.C. Memo. 1989-370 (a case involving a Kanter-related computer leasing transaction with many of the same individuals and entities involved herein), affd. 950 F.2d 1357 (7th Cir. 1991).

In addition to establishing that the long-term promissory notes constituted bona fide indebtedness, IRA must prove that the transactions had a business purpose and economic substance apart from the claimed tax benefits. A transaction entered into solely for the purpose of tax avoidance and which has no independent economic substance to support it is a sham transaction and will not be recognized for Federal income tax purposes. See Frank

Lyon Co. v. United States, 435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 195 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985).

We have held for the Commissioner in connection with computer sale and leaseback transactions structured similarly to those involved in these cases relating to equipment similar to that purportedly underlying the transactions at issue herein. See Friendship Dairies, Inc. v. Commissioner, 90 T.C. 1054 (1988); HGA Cinema Trust v. Commissioner, supra. Present value analysis and the existence of positive cash-flow are significant elements in establishing economic substance. See Hilton v. Commissioner, 74 T.C. 305, 353 n.23 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). The financing of transactions with deferred indebtedness that is unlikely to be paid is a strong indication of a lack of economic substance. See Hudson v. Commissioner, 103 T.C. 90 (1994), affd. without published opinion 71 F.3d 877 (5th Cir. 1995).

In addition to establishing economic viability, IRA must establish that it had sufficient benefits and burdens of ownership with respect to the underlying equipment to be treated as the owner for tax purposes and thus allowed the interest and depreciation deductions and the tax credits in connection therewith. In making its factual determination, the Court has examined the substance of the transactions and the intention of

the parties, rather than merely the form they have taken.  See Grodt & McKay Realty Inc. v. Commissioner, 77 T.C. 1221 (1981); see also Torres v. Commissioner, 88 T.C. 702 (1987).

IRA contends that each of the leasing transactions had a business purpose and economic substance apart from potential tax benefits.  In advancing this contention, it relies on (1) Mallin's testimony regarding the residual value of the equipment in these transactions and (2) Uhl's testimony regarding Funding Systems' intent to enforce the long-term promissory notes that IRA and/or Cedilla Invest. issued.  Specifically, with respect to the question of whether these transactions had economic substance, it is acknowledged that the equipment's residual value is crucial because there was insufficient excess cash-flow from the equipment during the lease terms to enable IRA and/or Cedilla Invest. to make a profit.  IRA further asserts that the long-term notes issued in connection with these leasing transactions were valid indebtedness.

Respondent, on the other hand, contends that the transactions were shams that were entered into by IRA and/or Cedilla Invest. purely for tax benefits.  Respondent, citing HGA Trust v. Commissioner, supra, also maintains that the long-term notes IRA and/or Cedilla Invest. issued were not valid indebtedness because neither would likely ever be required to make payments in view of the deferral provisions in each note.

In addition, respondent argues that the testimony of Mallin and Uhl is suspect and not credible.

We agree with respondent. At the outset we observe, contrary to certain facts alleged by IRA, that this record clearly establishes that IRA was engaged in the practice of purchasing tax benefits, rather than buying and leasing computer equipment for economic, profit-oriented reasons.

To fully appreciate IRA's tax motivation for entering into these leasing transactions, we have considered them in the context of the schemes and other issues raised in these consolidated cases. There is no doubt that IRA was a vital cog in Kanter's sophisticated financial machinations. IRA, Holding Co., the "black box" represented by Administration Co. and Principal Services, and the other various investment entities created as alter egos of Kanter, constituted devices by which Kanter received and disguised fees for his personal services, including moneys received pursuant to the Prudential scheme. When these matters are viewed in context, we are persuaded that the leasing transactions were consummated for the sole purpose of producing deductions sufficient to offset the income reported on IRA's Federal income tax returns. Furthermore, to ensure that no net income would have to be reported by IRA, all of the equipment was effectively disposed of after the tax benefits were fully utilized.

In our view the equipment leasing investments constituted nothing more than paper transactions designed solely to shelter IRA's income.  This is established primarily by IRA's failure to produce any credible evidence that actual equipment purchases took place, that the underlying equipment was ever in existence or placed in service, or that there were ever any payments made on the purported long-term promissory notes.  The sham nature of these transactions is revealed by IRA's failure to prepare or produce a single equipment appraisal, residual or fair market value opinion, income projection, economic forecast, or any other type of financial analysis or similar supporting document in connection with the transactions.

There are several reasons why respondent prevails on this issue.  First, IRA's transactions with the leasing companies, and any intermediaries, lacked economic substance and business purpose, and therefore must be disregarded for Federal income tax purposes as sham transactions.

The analysis of IRA's transactions is essentially a two-pronged inquiry.  The first prong, the business purpose test, addresses IRA's motives for entering into the transaction.  See Rice's Toyota World Inc. v. Commissioner, 81 T.C. at 192.  The second prong, the economic substance test, involves an objective analysis of the transaction to determine whether or not it had any realistic prospect of economic profit, exclusive of tax

benefits. However, the presence of a business purpose does not necessarily confirm recognition for Federal tax purposes if objective indicia of economic substance indicating a realistic potential for economic profit are not manifest. See Larsen v. Commissioner, 89 T.C. 1229 (1987), affd. in part, revd. in part 909 F.2d 1360 (9th Cir. 1990). IRA's transactions will not constitute a sham, factual or legal, as long as IRA can demonstrate a legitimate nontax motive for entering into the transactions and a reasonable opportunity for profit, exclusive of tax benefits. This, of course, assumes the transactions were something other than merely the affixation of various signatures to forms, facts not demonstrated by IRA in view of all the circumstances.

We think IRA has failed in its burden of proof. Considering the economics of the transactions, we note that none of the transactions had the requisite economic substance, unless the transactions reasonably could be expected to return cash to IRA in an amount in excess of that invested. In this regard, the sale leaseback transaction could return cash to IRA from only two sources. First, the amount of rent due to IRA each month under its lease with the specific seller/lessee, e.g., O.P.M., could exceed the amount of the cash paid at closing, the payments made on the short term notes, plus the monthly payments required under its long-term notes to the payee thereunder by an amount

sufficient to provide a cash-flow in excess of IRA's investment. However, in the subject transactions, the rent payments to be received by IRA never equaled the payments made and due so as to allow IRA even to recover its total investment. Second, IRA was purportedly entitled to any proceeds from the sale or re-lease of the equipment, at the end of its leases with each lessee, less expenses of such sale or re-lease and less payment, generally, of a 10-percent remarketing fee. No expert testimony was presented by IRA regarding residual value. In fact, there was no specific evidence (such as appraisals or projections) of the value of the equipment presented by IRA at any time for any of the transactions at issue, other than the general statements made by IRA's witness Mallin regarding intent to profit.

In Friendship Dairies, Inc. v. Commissioner, 90 T.C. 1054 (1988), the Court discussed leasing transactions similar to those involved here. O.P.M., the taxpayer, and an intermediary were involved in the pro forma equipment transaction. Remarketing agreements, limited recourse promissory notes, and the circularity of payments with minimal cash-flow to the lessor were present. Mallin promoted the deal. Like the transactions at issue here, tax benefits were clearly the driving force of the deal. Residual value was a critical factor in determining that economic substance existed.

The expected return of an investor in equipment leasing transactions is rent and residual value at the end of the lease term with the lessee, here generally 108 months.  In contrast to Friendship Dairies, Inc., there were no tax spreadsheets, appraisals, or accounting letters presented by IRA to support a claim of expected residual value which could produce a profit. The Court has not been provided with any projections of residual value or useful life, which certainly would be present in an objective economic analysis.

As in Friendship Dairies, there is no persuasive evidence of any motivation for the transactions, other than obtaining tax benefits.  The benefits herein (enormous interest and depreciation deductions and credits) were primarily designed to "shelter" the money reported as income by IRA from Kanter's Prudential scheme.

Kanter testified he did not make a specific economic analysis of the transactions.  He relied on Mallin, his friend and the promoter/broker of the deals, without any independent evidence that the deals had economic substance.  Mallin's credibility is obviously tainted based on his relationship to Kanter and his affiliated entities.  He was not an independent outsider.

As in Friendship Dairies, the witnesses presented on behalf of IRA in this case were obviously biased, and their testimony

was not credible. Mallin presented no substantive evidence in the cases herein. He summarily stated that the transactions were intended to be profitable. His reasoning was based on the fact that Kanter was getting a "sweetheart deal".

Mallin did not state how favors given to Kanter would enable IRA to profit from the deals. Since any profit would result only if the rents, plus residual value, exceeded the amount of the cash invested (the downpayment plus note payments), it would not matter that Mallin permitted IRA to pay only 5 percent down, rather than 10 percent. If there was no residual value after the lease expired, the possibility of an economic profit was nil. See Friendship Dairies. Mallin's testimony is, accordingly, misleading and not supportive of a proper analysis of profitability.

Mallin implied, without specific delineation, that IRA could profit because he claimed the residual value would exceed the cash invested and that the deals involved leveraged financing. His analysis did not consider the discounted residual value of the equipment since inflation was admittedly not taken into account and thus the time value of money was not considered by him. This was at a time when inflation was occurring at high rates. A present value analysis is important to the determination of whether a transaction has economic substance, as discussed in Hilton v. Commissioner, 74 T.C. at 353 n.23, where

this Court said little weight should be placed on the speculative possibility that property will have substantial residual value. All IRA produced here was unfounded speculation. No mention of a specific piece of IBM equipment (or peripheral) is reflected in the testimony of IRA's witnesses.

In Hilton, positive cash-flow was indicative of profit. Otherwise, the taxpayer had no incentive to retain property subject to substantial debt, producing no such cash-flow. It would be prudent to abandon the property. Tax considerations aside, if the cash-flow was negligible, as it was here, the total projected return, if any, of IRA was too small for it to wait until the time the leases expired. This is certain even if only a minimal cash investment is made, and a long period of time (9 years) occurs before any property is available for profit. As in Hilton, there was no motivation for IRA's participating in the subject transactions, other than to obtain the tax benefits designed to shelter the Prudential income. IRA had no business purpose to wait 8 or 9 years to receive property at that time, with no reasonable prospect of substantial value, e.g. an amount in excess of its investment. This is supported by the fact that, by 1987, IRA no longer retained much of the property purportedly acquired as part of the sale and leaseback transactions. Its tax shelter incentives had expired.

As the Court has noted in its previous opinions in this area, the residual value of computer equipment at any given point in time depends in part on the rate of introduction of new, technically advanced equipment models.  See Estate of Thomas v. Commissioner, 84 T.C. at 426.  Based on all of the facts and circumstances involved, IRA's transactions resulted in net out-of-pocket losses.  Thus, the transactions lacked economic substance because they contained no reasonable possibility of profit exclusive of tax benefits.

No valid business purpose was served by the leasing transactions.  Kanter did not know whether any of the leasing deals made a profit.

No evidence was presented as to succeeding leases, payments made by IRA on the long-term notes, or payments received by IRA from the lessees or the sale of the equipment.  No corroborating financial records to support the substance of the transactions were provided.  No witnesses testified with respect to any business purpose.  Schott did not know about the transactions other than recognizing her signature.  Freeman and Meyers, other individuals prominently connected to IRA, did not testify.  Gallenberger, who was also associated with IRA and testified on various aspects of the Kanter business dealings, did not testify with respect to the Dard, Lexet, and Ben Energy transactions.

In light of this and the lack of evidence of residual value, we find that no business purpose could have existed, other than the creation of tax benefits. IRA presented no persuasive evidence that it evaluated the transactions in a businesslike fashion. IRA's decision makers had minimal knowledge of the computer industry. This is supported by the fact that by the time IRA would receive the title to equipment, in the late 1980's for most of the deals, it no longer listed the equipment on its returns as producing income. IRA never desired the residual values, only the tax benefits accompanying the purported agreements.

We agree with respondent that the various intermediaries used in the transactions (e.g., Horizon or Pluto) were inserted into IRA's transactions with the leasing companies, e.g., FSC/FSAM and O.P.M., purely for tax reasons, and that their presence served no valid business purpose. In fact, their presence reflects the tax-avoidance motivations of IRA and serves to support respondent's determinations that the transactions lacked substance and constituted nothing more than paper-shuffling.

In our opinion, IRA's transactions with O.P.M. and FSC/FSAM were entered into purely for tax purposes and were not supported by economic substance in the form of a realistic potential for profit. They must, therefore, be regarded as sham transactions.

Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Rice's
Toyota World, Inc. v. Commissioner, 81 T.C. 184, (1983).  IRA, in
effect, did not purchase computer equipment, but purchased a
package of tax benefits.  No evidence of fair market and residual
value or useful life was ever considered prior to consummating
the transactions.  The projected residual values at the time the
leases with the lessees or intermediaries terminated were not
established.

Accordingly, since IRA did not acquire an interest in
depreciable property, we hold that it is not entitled to deduct
depreciation on the cost of the equipment or to the claimed
investment tax credits.  We also hold that the sham nature of
IRA's transactions precludes any deduction for interest on the
promissory notes.

Second, IRA is not considered the owner of the computer
equipment for Federal income tax purposes because it did not
possess the burdens and benefits associated with ownership.  This
is a question of fact to be ascertained from the intention of the
parties as evidenced by written agreements, in view of the
surrounding facts and circumstances.  See Grodt & McKay Realty,
Inc. v. Commissioner, 77 T.C. 1221 (1981).

This Court has considered a number of factors having
particular relevance to the analysis of computer sale and
leaseback transactions:  (1) Whether legal title passed, (2)

whether an equity was acquired in the property, (3) whether the parties treated the transaction as a sale, (4) whether useful life in excess of the leaseback term and significant residual value were reasonably expected to exist, (5) whether the contract of sale created a present obligation on the purchaser to make payments, (6) whether any other party held a purchase option at less than fair market value, (7) whether renewal rental at the end of the leaseback term was set at fair market rent, and (8) whether the purported owner of the property had a reasonable possibility to recover his investment from the income-producing potential and residual value of the equipment. See Torres v. Commissioner, 88 T.C. 702 (1987). In addition, the presence of arm's-length dealing is appropriate to the determination of a sham. See Estate of Franklin v. Commissioner, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976).

Analysis of the transactional documents shows that IRA had few, if any, of the rights and privileges normally associated with legal title. For example, in one transaction, IRA could not transfer the equipment without first securing the consent of O.P.M. IRA could not pledge its interest in the equipment as security for a loan or do anything that would result in the imposition of a lien, either voluntarily or otherwise. IRA generally did not assume the obligations of the seller/lessee. IRA also agreed that O.P.M. could pay off its loan and refinance

the equipment, and that its interest in the equipment would be subordinate to that of the replacement lender. O.P.M. was not required to renegotiate the terms of IRA's note if it could replace another loan with more favorable financing.

II. Specific Leasing Transactions

The specific computer leasing deals at issue are further analyzed in connection with the foregoing discussion:

A. Cedilla Invest.-1976 Domestic (O.P.M. Transaction)

The purported equipment purchase, in December of 1976, by Cedilla Invest. (the predecessor of IRA) was for $1 million. This was at a time shortly after the property was purchased by the seller, Pioneer Computer Marketing Corp., on October 14, 1976, for $600,000. No contemporaneous appraisals supporting the purchase price paid by IRA were presented. The bill of sale is undated. This indicates a lack of economic substance. Moreover, since the purchase price is clearly inflated, it lends credence to respondent's position that this transaction was nothing more than a sham. See Soriano v. Commissioner, 90 T.C. 44 (1988); Falsetti v. Commissioner, 85 T.C. 332 (1985); see also Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). There was no valid explanation for IRA's agreement to pay the inflated amount, other than the acquisition of tax benefits.

The promissory note in the amount of $970,000 executed by Cedilla Invest. purportedly to purchase the equipment was a

"Nonrecourse Installment" promissory note in favor of O.P.M. Therefore, Cedilla Invest. had no recourse liability for the debt. See Rose v. Commissioner, supra. Moreover, the note contained a provision for deferral and set-off of payments to O.P.M. by Cedilla Invest. to the extent of and for the amount of rent that was not paid by O.P.M. This deferral extended to January 1, 1986. There was little likelihood Cedilla Invest. would be called upon to satisfy this obligation.

The agreement with O.P.M. included a substitution agreement permitting O.P.M. to substitute and exchange certain equipment for that currently being leased. This indicates a retention by the lessee of control over the property. This fact negates any claim that IRA obtained ownership of the property.

The sham nature of the transaction is shown by the manner in which it was purportedly negotiated. Schott was asked to be a director of IRA, yet knew little, if anything, about its operations. She executed documents on behalf of Cedilla Invest. without knowing who prepared the documents or the purpose for them. Schott did not have an equity interest in the company, despite the fact that IRA's records indicated at one time that she was an owner thereof. Mallin executed a document on behalf of Cedilla Invest. as a director after he had been asked to become a director by Kanter. Mallin received a commission for

brokering the transaction which suggests he wore two hats in the deal.

In view of the sham nature of the transaction, all deductions and credits associated with this transaction and claimed by IRA/Cedilla Invest. on its Federal income tax returns are disallowed.

B.   Cedilla Invest. - 1977 Domestic Transaction (Master Lease Transaction)

This transaction involved the purported purchase by Cedilla Invest. of various pieces of computer equipment under a master lease in November 1977.  The lease term for each piece of equipment subject thereto was 108 months.  During the term of the lease, the lessee was responsible for maintaining the equipment and insuring it for risk of loss or damage.  The lessee maintained the right to sublet the equipment.  The purchase was subject to the interests of lessees (end users) and lienholders.

The purported purchases were paid by cash and the delivery of "limited recourse" promissory notes.  The amount of the downpayment was 10 percent.  All of the promissory notes for the purchase of the various pieces of equipment were identical in nature.  The notes included a deferral provision which permitted, in the event the lease was terminated early on account of default, deferral of payment of the balance due on each of the notes and any accrued interest until December 31, 1991.  This

deferral was in excess of 13 years. The payment of the debt was not enforceable or unconditional.

The limited recourse promissory notes included a provision wherein the payee (the lessee) agreed to look solely and only to the collateral for the payment of any of the obligations of the payor under the note. There was no right of the payee to pursue the payor independently of the collateral.

In view of the lack of economic substance, all deductions and credits associated with this transaction and claimed by IRA on its Federal income tax returns are disallowed.

C.   Cedilla Invest.-1979 Foreign Transaction (British Aerospace Transaction)

This transaction involved the purported sale and leaseback of computer equipment located in England. There are several intermediary transactions that were involved here. In October 1979, a company named Atlantic Computer Leasing, Ltd., which had been involved in arranging the leasing transactions for the end users, consummated a deal with companies called European Leasing, Ltd., Carena Computers, and Funding Systems International Corp., a division of Funding Systems Asset Management. This is the company with which Uhl was affiliated. The original agreement provided for the purchase of equipment in the amount of $2,820,501. The additional equipment was purchased for a price of $3,042,338. The equipment included three mainframe IBM computers and associated equipment.

After Atlantic consummated its agreement with European by assigning its rights in the equipment, European sold its rights to Carena, which then transferred its interest in the equipment to Funding Systems International, which then entered into an agreement with Pluto Leasing Corporation, a Mallin entity, delivering the bill of sale in December 1979, to Pluto for the various computer equipment. Under the purchase, Pluto obtained FSAM's interest in all of the equipment which was subject to prior leases made between Carena and others. The price ostensibly to be paid by Pluto was $6,118,051.

On December 30, 1979, a purported purchase agreement was executed on behalf of Cedilla Invest. and Pluto, pursuant to which Pluto delivered a bill of sale in favor of Cedilla Invest. The purchase price therefor was $6,118,051. The payment provisions of this agreement included the execution by Cedilla Invest., in favor of Pluto, of a limited-recourse promissory note-security agreement in the amount of $5,928,051. Under this agreement, the interest of Cedilla Invest. in the equipment was subordinated to the interest of the underlying lessees (including Funding), the lienholders, and the rights of Atlantic under a residual agreement Cedilla Invest. entered into regarding the original purchase of the equipment.

The limited-recourse promissory note contained a provision for deferral which permitted the payor to defer any sums,

principal and interest, due under the note, if any amount of rent due under the lease was not received by the payor as the payments became due. The deferral allowed the payor, Cedilla Invest., to defer payment until December 31, 1994, without paying accrued interest on that deferred amount. Under paragraph 7 of the agreement, pertaining to the limited recourse obligations, Cedilla Invest. was personally liable only for the interest and principal on the note during the times and in the amounts set forth in schedule A. The amount of recourse obligation as of January 1, 1988, was zero. The balance of the obligation was nonrecourse, and the payee looked only to the collateral for payment.

IRA presented no evidence as to which entity had legal title to this equipment under the various agreements. The purchase agreements of Atlantic indicate that, as a part of each of the lease agreements with Carena, at the end of the lease term, which was either 5, 6, or 6½ years, depending on the equipment, Atlantic would make all efforts to obtain legal title to the equipment so that it could convey the right, title, and interest in the equipment to the lessee when the end user's lease terminated. The price to be paid by Atlantic to obtain the legal title to the equipment was 2 percent of the original value of the equipment. This indicates that Atlantic had no legal title to pass through the intermediaries to IRA, other than a future

interest it would eventually obtain at a price insignificant in comparison to the purported original purchase price.  Thus, no substantive residual value was extant.

IRA presented no evidence of fair market value, residual value, or useful life regarding this equipment, other than the original purchase prices.  The recourse obligations with respect to the liability of IRA were determined as of the date of occurrence of a default pursuant to attached schedules which stated that the maximum amount of personal liability was zero. Moreover, to the extent that any payments of IRA were deferred because a default in the lease rentals to IRA, such deferred amounts were not subject to recourse liability.  Thus, there was no real recourse against IRA.  The obligations of Funding to Carena were nonrecourse.  Cedilla Invest./IRA did not assume the obligations.  IRA's purported purchase was subject to the rights of prior lienholders, lessees, and the rights of Atlantic.

The lease between Cedilla Invest. and Funding International ended on December 31, 1988.  As of January 1986, the equipment used in this transaction, i.e., the IBM mainframe computers, model Nos. 3031 and 3032, was no longer listed in the computer price guide, which is the bluebook of used IBM computer prices. This would indicate that the residual value of the equipment as of that date was zero.

The rent to be received by Cedilla Invest. with respect to this transaction was less than the amount due on the note including principal and interest and the initial cash investment. Therefore, the only manner in which IRA could profit would be a residual value of the equipment that would exceed the cumulative negative cash-flow and since the expected residual value of the equipment would be minimal at the end of the end-user lease, there was little likelihood that IRA would ever recover its investment or realize a profit.

It is questionable whether IRA ever received the benefits and burdens of ownership when it consummated the agreement with Pluto, an entity of Mallin. At most, IRA obtained the future interest or right to participate in the residual value of the equipment, rather than a present depreciable interest therein. This was so because Atlantic had no legal title to the equipment, only the right to obtain title at a cost of 2 percent of the original purchase price. Future interests are not currently depreciable. See Coleman v. Commissioner, 87 T.C. 178 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987). That case involved Atlantic Computer Leasing and a lease similar to those herein. We held that the taxpayer did not have a depreciable interest in the equipment because the leasing company, Atlantic, did not have a depreciable interest.

In view of the foregoing, all deductions and credits associated with this transaction and claimed by IRA on its Federal income tax returns are disallowed.

D.   IRA-1980 Domestic Transaction (Mini Computer Transaction)

This transaction involved a purported sale of miscellaneous equipment by FSAM to F/S, an entity affiliated with FSC, to Horizon, and then from Horizon to IRA.  Payment of $870,025 by IRA was made primarily with a limited recourse promissory note in the amount of $864,325.  The amounts for the payments from IRA to Horizon were equal to the amounts of the payments owed under the lease agreement.  An agreement was reached between IRA, FSAM, and Horizon that these payments were to offset each other, so only bookkeeping entries were made.

The interests of IRA in and to the computer equipment were subject to the interests of prior lienholders and the underlying lessee.  The leases were assigned to IRA through the use of a collateral assignment by F/S.  The promissory note included a deferral provision allowing IRA to defer payments on the note, until December 31, 1995, without any interest accruing on the deferred amount if, and to the extent, amounts of rent were not paid to IRA.  The equipment could be replaced.  The recourse obligation under those provisions in the note provided that Horizon had recourse against IRA as of January 1, 1989, in the amount of zero dollars.

Under the IRA/Horizon leasing transaction, the total cash investment of IRA was less than the rent to be received therefrom. The loss was $65,940.21. There was no evidence of residual value or useful life presented. No business purpose was set forth. The transaction lacked economic substance. The long-term debt was not valid. Once again an intermediary was used for no good reason. The transaction was a sham.

In view of the foregoing, all deductions and credits associated with this transaction and claimed by IRA on its Federal income tax returns are disallowed.

E.    IRA-1980 Foreign/Domestic Transaction (Alfred Teves Transaction)

This transaction involved a purported purchase agreement between Funding International and Funding Systems International GmbH, pursuant to which Funding International purchased the equipment for $931,321. It is unclear what property was being sold because duplicate schedules of certain equipment contained two addresses. Thereafter, Funding International purportedly sold the property to Horizon. The purchase price in that agreement was $4,276,701 and included additional equipment located in Belgium. Thereafter, Horizon and IRA entered into an agreement for sale of the property to IRA on which the payments were identical to the amounts payable under the Funding/Horizon agreement. The payments were circular.

The purchase provisions of the IRA/Horizon agreement included a limited recourse promissory note issued by IRA in favor of Horizon. This promissory note included deferral provisions in favor of IRA. The sum could be deferred until December 31, 1995. Several intermediaries were used. At the time IRA would receive the equipment, it would have no residual value.

In view of the foregoing, all deductions and credits associated with this transaction and claimed by IRA on its Federal income tax returns are disallowed.

F. Cedilla Invest.-"Lexet Transactions", "Ben Energy Transactions", and "Dard Systems Transactions"

These transactions consist of seven (two Lexet, two Ben Energy, and three Dard Systems) purported purchases and leasebacks of computer equipment and peripherals manufactured by IBM, Wang, and others. All of these transactions took place on December 22, 1986.

The only documents presented by IRA in connection with these transactions were seven purchase agreements, seven bills of sale, seven short-term promissory notes, and seven long-term "limited recourse" promissory notes. No other transactional documents were produced by IRA, such as equipment appraisals, leases, economic forecasts, related correspondence, legal opinions, rent payment schedules, loan payment schedules, checks (negotiated or otherwise) evidencing payments of purchase price or rents or

loans, or records establishing the existence or actual location of the equipment at any time during the subject leases. The inference to be drawn from IRA's failure to produce or present these critical documents is that such materials never existed or, if they did exist at one time, their production would have provided evidence unfavorable to IRA's positions. See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Moreover, a review of the 28 exhibits related to these transactions indicates that they all followed the identical format and utilized the same form documents as the other transactions discussed at length.

As with the other computer leasing transactions at issue here, these seven transactions utilized invalid debt because the long-term "limited recourse" promissory notes effectively shielded IRA from ever having to make any payments on the notes. Although the specific deferral provisions were eliminated from these notes--presumably in response to challenges thereto by respondent in connection with earlier (i.e., 1976 through 1980) transactions--each of the long-term "limited recourse" promissory notes contained the same provisions with respect to the limited liability of IRA. Section 10 ("Limited Recourse") sets forth IRA's "Recourse Obligations" and basically states that IRA/Cedilla Invest. is only personally liable to the extent of

the outstanding amount of the note or the lesser of zero. Section 10 also sets out IRA's "Nonrecourse Obligations". Everything in excess of the recourse obligations--here the entire amount of the loan--was nonrecourse, and with respect to which amount "the payee shall look solely and only to the Collateral for the payment and performance."

These long-term "limited recourse" promissory notes contain provisions similar to those present in the other transactions, i.e., restrictions were imposed on the transfer of the equipment, and the interest of Cedilla Invest. in the equipment was subordinated to the interests of the underlying lessees. Accordingly, and as with the other transactions, IRA did not have the true benefits and burdens of an owner of the equipment for Federal tax purposes. IRA failed in its burden of proving that any amounts representing the purchase price were actually paid over, that legal title to the equipment never passed to IRA, that the underlying equipment really existed or was placed in service, and that any of the transactions were even consummated. Based on the totality of the evidence presented, all IRA established, with any certainty, is that it had a corporate representative execute some (minimal) transactional documents which provided a claim for substantial tax benefits.

In view of the foregoing, IRA is not entitled to any deductions, credits, or losses associated with these purported transactions.

G.   Equitable Leasing

This is another computer leasing transaction purportedly engaged in by IRA.  A reference is made to it in the summary schedules of a witness for IRA.  While respondent does not agree with the numbers delineated in the summary schedules, it appears that this transaction was considered in computing the tax liability of IRA for the taxable year ended December 31, 1980. No facts to support the basis for the income, deductions, credits, or losses, which apparently were claimed in connection with this transaction, were presented by IRA.  Since IRA had the burden of proof on this issue, we sustain respondent's determinations of disallowance with respect to this transaction.

Finally, the long-term promissory notes executed by IRA to finance the purported computer sale and leaseback transactions do not constitute valid indebtedness because there was little possibility that IRA would ever be required to make the payments due.

IRA's long-term promissory notes in these various transactions were neither unconditional nor enforceable.  They are not unconditional because the promise to pay in most of the notes was expressly contingent, by virtue of the deferral

provisions of the notes, on the payment of rent by the respective lessees.

Moreover, although the equipment was to serve as collateral, the equipment was likely to be worthless by the time the obligations were to be enforced (i.e., the deferral dates or the end of the leases between IRA and the lessees). The notes are not enforceable because there was no possibility that the payor, IRA, would ever be compelled to use its own funds or surrender valuable property in satisfaction of the obligations. Accordingly, the notes did not represent genuine debt obligations and are disregarded for Federal income tax purposes.

The Commissioner was successful in attacking the validity of a long-term purchase money note executed as part of a sale and leaseback of computer equipment in Bussing v. Commissioner, 88 T.C. 449, Supplemented by 89 T.C. 1050 (1987). The facts of that case reflect a transaction similar to those here involved. A.G. sold computer equipment through a middle company, Sutton, to five investors, including the taxpayer, and then leased the equipment back from the taxpayer's investment group. The investors' payments on their long-term note to Sutton were financed entirely by the rent due from A.G. In the event of a default by A.G. on the lease, the principal and interest payments on the note to Sutton were deferred to December 31, 1991, without the accrual of any additional interest. We found that Sutton had been inserted

into the transaction solely for tax purposes and that the real parties at interest were A.G. and the taxpayer. Since A.G.'s rent always equaled or exceeded the monthly payments on the long-term note, any claim by A.G. on the note would be fully offset by the investors' claim against A.G. for unpaid rent. Therefore, the taxpayer was effectively protected from ever having to make any payments on its debt obligation. Accordingly, we held that the note did not represent genuine indebtedness or represented that the debtor was not at risk. See id.; see also Levien v. Commissioner, 103 T.C. 120, 126 (1994) (circularity of payments means the debtor is not at risk), affd. 77 F.3d 497 (11th Cir. 1996).

Some of IRA's long-term notes contain several of the same features which this Court found objectionable in Bussing. These features were a deferral of the debt in the event of nonpayment of rent, a debt obligation effectively canceled by an offsetting liability for rent because of the limited recourse nature of the note, and creditors whose presence served no valid purpose and who had no demonstrable intention of enforcing the debt obligation. The real parties to the debt transactions here are IRA and FSC/FSAM and not Horizon, Pluto, or Knight. IRA's notes are invalid in form as well as in substance.

In HGA Cinema Trust v. Commissioner, T.C. Memo. 1989-370, this Court rejected the validity of indebtedness used to finance

equipment leasing transactions.  The long-term notes used in HGA
Cinema Trust contained deferral provisions similar to those
involved herein.  In fact, the only significant difference, in
most of the deals, is that instead of an indefinite offset
provision, the notes contain the following variation.  The
deferral provisions are to be read in light of a "limited"
recourse obligation provision, the amount of which declines over
the years.  However, by the time the deferred amounts are due--a
time which is well after the original lease--the scheduled
recourse obligation is zero.  In some instances the recourse
obligation is zero from the outset.  In another instance the
recourse is limited only to the value of the collateral.
Further, the residual value, regardless of the scheduled
obligation, and even under the most generous of estimates, is
also zero.

There is clearly a circularity of offsetting rent and debt
obligations in the provisions, and, generally, the only
difference from the notes in HGA Cinema Trust is the substitution
of a valueless recourse obligation provision for the offset and
discharge provision.  There was little likelihood IRA would ever
be called on to pay the liability set forth in each of the long-
term notes.  Further, there was no testimony or other evidence
presented at trial that it ever did.  The intent of the limited
recourse provision and the deferral provision was the same as the

deferral and offset provisions, i.e., to ensure that IRA would never be liable for the principal amount of the notes, along with any accrued interest.

In HGA Cinema Trust, the Court specifically rejected the taxpayers' allegations that the notes were valid because of the potential effects of FSC's and O.P.M.'s bankruptcies. Some of the leases herein were modified in connection with the bankruptcy proceedings, but, as in HGA Cinema Trust, the bankruptcy modification agreements present in this case have no legal significance to the validity of the indebtedness, and are therefore disregarded.

We realize that this Court has rejected the Commissioner's challenges to the validity of long-term purchase money notes in some cases involving equipment sales and leasebacks. What is notable about these cases, however, is not the result, but the Court's rationale for finding the notes therein to have been bona fide. For example, in Gefen v. Commissioner, 87 T.C. 1471, 1494 n.15 (1986), we found that the partnership's note was a genuine debt because the partnership was responsible for the monthly payments, regardless of whether or not its lessee paid the rent. In Cooper v. Commissioner, 88 T.C. 84 (1987), the Court, in upholding the validity of the note, observed that the terms of the note did not require payment solely out of rental income. IRA's long-term notes, unlike the notes in Gefen and Cooper,

contain an express term conditioning liability upon the payment of rent. Thus, this situation is distinguishable from other cases where we have upheld the validity of the long-term debt.

In our view, there was no possibility that IRA would ever pay the long-term notes without receipt of the prior payments of rent from the lessees. IRA's transactions were carefully structured in such a way so as to preclude the possibility of any additional financial exposure, while enabling it to claim sizeable tax deductions and credits at a minimum cost. We recognize that the payment of the full amount of 1 month's rent, followed by IRA's failure to make the required principal and/or interest payment on the note, could cause the entire unpaid principal, and accrued but unpaid interest, to become immediately due and payable. Failure to pay the debt, however, does not permit the lessee to stop paying the rent. If the lessee decided to withhold the next month's rental payment, such failure would trigger the deferral provisions of the notes, leaving the lessee or intermediary at that time, with at best a claim against IRA for 1 month's principal and/or interest, rather than the full amount of the debt. Therefore, the mere possibility that IRA's liability on the notes could be accelerated, which in fact never happened, does not validate the debt, considering all of the facts and circumstances. IRA has simply not carried its burden of proving that the long-term notes were valid.

IRA acquired the equipment subject to pre-existing liens and leases and the rights and interests of the lessees and intermediaries under their respective agreements.  Since the equipment was so heavily encumbered, the value of IRA's equity interest was not sufficient incentive for it to pay the notes in the absence of the payment of rent.  Estate of Franklin v. Commissioner, supra.  Furthermore, IRA would have no incentive for paying the notes on the respective deferral dates because the equipment would have had little, if any, value at that time.

A note which does not represent genuine indebtedness can neither be included in basis nor support a deduction for interest expense.  See Knetsch v. United States, 364 U.S. 361 (1960); Deegan v. Commissioner, 787 F.2d 825, 827 (2d Cir. 1986).  Therefore, the tax effect of our holding on this issue is twofold.  First, the principal amounts of the long-term notes must be eliminated from IRA's depreciable basis.  Second, all deductions for interest, including the interest prepayments represented by the short-term notes to the various entities, are disallowed.

Accordingly, we sustain respondent's determinations in all respects as to this issue.[58]

---

[58]    In view of our holding on this issue, sustaining respondent's determination that the computer leasing transactions IRA or Cedilla Invest. entered into lacked economic substance, the Court need not decide the issue of IRA's income adjustments
                                                          (continued...)

Issue 23.  Whether IRA is Entitled to a Claimed Loss on Form 4797 of $1,073,835 for 1988

FINDINGS OF FACT

IRA reported, on line 9 of its Federal income tax return, Form 1120 for 1988, a net loss "from Form 4797" in the amount of $1,073,835.[59]  No Form 4797 was attached to the original return filed with respondent, nor was a copy of the form subsequently presented to respondent or introduced into evidence at trial.

---

(...continued)
for 1986, 1987, 1988, and 1989 from its purported transfer of certain computer equipment to HICIP Partners.  On brief, respondent acknowledges that the HICIP Partners' income adjustments represent an alternative position respondent took in the event the Court found in favor of IRA on the sale/leaseback transactions.  As IRA or Cedilla Invest. acquired no ownership interest in the equipment for tax purposes, no gain or loss would be realized by them for 1986 through 1989 from their later "transfers" of some of the equipment to HICIP Partners.  Similarly, in view of our holding sustaining respondent's determination that the purportedly recourse long-term notes IRA or Cedilla Invest. issued in the leasing transactions were not valid debts, the Court need not decide the issue of whether IRA realized discharge of indebtedness income upon its and Cedilla Invest.'s contribution of certain computer equipment to the IRAUTO partnership.  On brief, respondent acknowledges that the discharge of indebtedness adjustment represented an alternative position respondent took in the event the Court sustained IRA.  Because IRA and Cedilla Invest. issued no valid long-term indebtedness in connection with the leasing transactions, no discharge of indebtedness income attributable to such "indebtedness" was realized by them on their contribution of the equipment to the IRAUTO partnership.

[59]    Form 4797 is entitled "Sales of Business Property" and, among other things, is the form used to report the sale or exchange of property used in a trade or business, depreciable and amortizable property, and the disposition of noncapital assets.

In the notice of deficiency, respondent disallowed the loss on the grounds that IRA did not establish a basis in the assets sold or disposed of, that IRA failed to prove that the transaction had economic substance, and that the sale was to one or more related parties and was, therefore, subject to the provisions of section 267 limiting the deduction of losses on such transactions. The claimed loss arises out of a sale by Decision Holdings Corp. (Decision Holdings), a subsidiary of IRA.[60]

Decision Holdings was incorporated under the laws of the State of Delaware on November 3, 1988. It initially was named Tokyo Stress Management Co., which was changed to Decision Holdings Corp. on November 30, 1988, prior to the issuance of any of the corporation's stock.

Before December 1, 1988, Decision Holdings was inactive and had never been capitalized. Its officers were Gallenberger, secretary, and Freeman, president.

In December 1988, Kanter devised and implemented a series of transactions to generate a $1,073,835 loss for IRA. On or about December 1, 1988, IRA transferred its 100 shares of the common stock of Zeus, its 1,200 shares of class A preferred stock of Cedilla Invest., and $60,000 cash to Decision Holdings in

---

[60] The income, expenses, and losses of Decision Holdings were reported on the consolidated Federal income tax return filed by IRA for the year at issue.

exchange for 850 shares (85 percent) of the corporation's common stock.  Also on December 1, 1988, TG Associates Limited Partnership (TG), a Connecticut limited partnership transferred to Decision Holdings a third-party installment promissory note of $3,389,592, its interests and obligations as lessee under a lease, and its rights (but not obligations) under a remarketing agreement.  In turn, Decision Holdings transferred $51,000 cash to TG and 150 shares (15 percent) of Decision Holdings common stock.

The lease transferred by TG to Decision Holdings is dated August 29, 1983, and was an agreement between Decisions Inc., a Florida corporation, as lessor, and TG, as lessee, for an 84-month term lease of certain computer equipment and peripherals. The specific equipment that is the subject of the lease was not used by TG but was subleased to various end users.

The installment promissory note was dated August 29, 1983 (the note).  The payor was Solutions, Inc. (Solutions), a Delaware corporation.  TG was the payee, the note was in the amount of $3,389,592 principal plus interest at the rate of 14 percent per annum and was payable over an 84-month period commencing September 1, 1983, and continuing through August 1, 1990.  The note states that Solutions and TG were parties to a purchase agreement of the same date, pursuant to which TG sold equipment to Solutions.  Unless the context of the note indicated

otherwise, terms defined in the purchase agreement had the same
meaning in the note.  The note provided:

> In the event * * * [Solutions] pays any of the Debts
> (which, upon the occurrence and continuation of an
> Event of Default under the Lease and upon notice * * *
> to [TG], * * * [Solutions] shall have the right, but
> not the obligation so to do) whether pursuant to the
> terms of Liens or otherwise, all amounts so paid shall
> be deemed to be prepayments under this Note in such
> manner as to principal and interest as * * *
> [Solutions] shall elect.

The lease referred to in that provision of the note is not
in the record.  Similarly, the remarketing agreement transferred
from TG to Decisions Holding is not in the record.

On December 30, 1988, Decision Holdings entered into a "Sale
and Assignment Agreement" whereby Decision Holdings ("seller")
transferred the installment promissory note, interests and
obligations as lessee under the lease, and rights under the
remarketing agreement, plus $3,000, cash to Autochthon
Associates, L.P., a Delaware limited partnership (as "buyer"), in
exchange for no consideration other than the assumption of
certain purported liabilities in connection with the lease.  As a
result of the transaction Decision Holdings claimed a $1,073,835
loss which respondent disallowed on the 1988 consolidated income
tax return filed by IRA.

The partners of Autochthon Associates, L.P., and their
contributions to the partnership, were as follows:

(1)  The general partner was Autochthon Administration, Inc.
--($10); and

(2)  the limited partners were the Penobscot Nation-($989);
and Autochthon Investment, Inc.--($1).  The president of
Autochthon Administration, Inc., was an associate of Mallin.

OPINION

IRA contends that it and the TG limited partnership's
transfer of assets to Decision Holdings qualifies for
nonrecognition treatment under section 351.  IRA claims that the
cost or basis of the interests transferred by TG to Decision
Holdings as of December 1, 1988, was $1,091,641.  Thus, it is
asserted that Decision Holdings, under section 362, had a
carryover of TG's basis in the assets the limited partnership
transferred to it, so that Decision Holdings realized a
$1,073,835 loss on the sale of those assets to Autochthon.  IRA
further maintains that (1) respondent's argument that section 351
is inapplicable to the transaction was not raised in the notice
of deficiency, and such issue is not properly before the Court;
(2) there was a business purpose for the transaction; and (3)
Decision Holdings' basis in the assets it subsequently sold was
substantiated.

Respondent contends that IRA engaged in the purported
section 351 transaction for tax avoidance purposes in order to
enable it to claim a loss in excess of $1 million from Decision

Holdings' sale of the assets a short time later.  Respondent argues that IRA was seeking only to obtain a large potential loss deduction for itself.  It is pointed out that IRA received 85 percent of Decision Holdings' shares in exchange for $60,000, whereas the TG limited partnership received $51,000 and 15 percent of Decision Holdings' shares in exchange for the assets. Respondent also contends that IRA failed to substantiate Decision Holdings' claimed basis in the assets.

We agree with respondent.  We view the two-step transaction involving Decision Holdings as an economic sham and disregard it for Federal income tax purposes.

The step transaction doctrine provides that, when separate steps are integrated parts of a single plan, the separate steps are disregarded, and the entire plan is viewed as a unit for purposes of determining the tax consequences.  See Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179 (1942); McDonald's Restaurants, Inc., v. Commissioner, 688 F.2d 520, 524-525 (7th Cir. 1982), revg. 76  T.C. 972 (1980).  In general, a series of steps will be integrated into a single plan if the steps are interdependent, which determination is made by reference to whether the legal relationships created by any one step would have been fruitless without the completion of the entire series, or whether the component parts of the transaction were part of a single transaction intended to reach the ultimate result.

Section 1011 provides that the adjusted basis for determining the gain or loss from the sale or other disposition of property is the basis determined under section 1012, adjusted as provided in section 1016. Section 1012 provides that the basis of property is the cost of the property and under section 362(a) such basis in a transferor carries over to a corporation where such property is contributed to the corporation for stock under section 351.

The transaction involved here is a classic example of loss-buying. It was a premeditated and abusive tax scheme structured by Kanter for the sole purpose of obtaining an enormous and unjustified loss deduction on behalf of his controlled corporation, IRA. IRA became involved in the matter at the direction of Kanter, who acknowledged that the transaction at issue was hurried and there had been no due diligence with respect thereto.

The entire scheme--a purported section 351 exchange and subsequent disposition (sale and assignment)--took less than 30 days. The reality of the transaction is that IRA paid $60,000 cash on December 1, 1988, for an ordinary loss supposedly realized on December 30, 1988, in the amount of $1,073,835 that was claimed on IRA's 1988 Federal income tax return.

IRA failed to present any evidence to support the legitimacy of the installment promissory note or that the note represented

bona fide indebtedness. The note was clearly tied to a sale/leaseback tax shelter transaction. No records were introduced to establish that principal or interest payments were made at any time, or that the principal had not been prepaid directly or through the "Event of Default" under the lease, nor was any testimony provided by either of the parties to the note (TG or Solutions). There is no evidence that the note had any value at the time of the transfer to Decision Holdings.

IRA also failed to present any evidence to support the legitimacy of the lease agreement, such as records establishing that lease payments were being made, or had ever been made, nor was any evidence introduced regarding the underlying computer equipment and end users, including any documents to establish that the equipment had any value at all at the time of the transfer to Decision Holdings.

There is no evidence that Autochthon ever made any payments in connection with the liabilities it purportedly assumed in connection with the sale and assignment entered into with Decision Holdings or received any payments in connection with the installment promissory note transferred to it.

In our opinion, Kanter simply activated a shelf corporation (Decision Holdings) for the limited purpose of utilizing the tax-free exchange rules set forth in section 351 and facilitating related transfers. No evidence was presented that Decision

Holdings engaged in any business activities.  Kanter orchestrated the series of transactions to create phony losses for IRA.

No one who had been an officer or director of Decision Holdings at the time of the transactions provided any testimony in connection with this issue at the trial.  IRA did not present a general ledger, cash receipts journal, or cash disbursements journal in connection with Decision Holdings for 1988.

Kanter's testimony regarding his "having to do the deal in a hurry" is ambiguous at best and provides no credible explanation as to why a seasoned investor would get into a supposedly profit-motivated deal on December 1, without "really doing any due diligence", and then dispose of the assets 29 days later at a loss without any significant intervening events.  It seems that the only hurry on Kanter's part was to finish the deal before the end of the tax year so that IRA could take advantage of a loss of more than $1 million.

Accordingly, we hold that the claimed loss deduction was correctly disallowed by respondent because the transactions giving rise to the loss had no independent economic substance and were entered into solely for tax reasons.  Therefore, IRA is not entitled to the claimed loss deduction.

Issue 24.  Whether IRA Is Entitled to a Charitable Contribution Carryover Deduction for 1983

OPINION

In the notice of deficiency for 1983, respondent determined that IRA was not entitled to a charitable contribution carryover in the amount of $203.  Because the charitable contribution deductions were allowed in prior years, there was no carryover from 1982 to 1983.  IRA did not introduce any evidence on this issue.  Therefore, we sustain respondent's determination.

Issue 25.  Whether IRA Is Entitled to Certain Claimed Capital Losses for 1985

FINDINGS OF FACT

On its Federal income tax return for 1985, IRA claimed capital losses of $766,566 on the purported sales or other dispositions of certain assets as follows:

| Description | Date Acquired | Date Sold | Gross Sale Price | Basis | Loss |
|---|---|---|---|---|---|
| Brajda's | 5/14/85 | 3/18/85 | $19,388 | $58,251 | ($38,863) |
| N/R Funding Sys. | 7/82 | 12/01/85 | 20,000 | 91,988 | (71,988) |
| N/R Tanglewood | 7/11/80 | 12/01/85 | 10,000 | 350,000 | (340,000) |
| N/R LBG | 9/83 | 12/01/85 | 10 | 39,500 | (39,490) |
| N/R Sherwood | 10/84 | 12/01/85 | 1,000 | 47,925 | (46,925) |
| U.S. Mineral | 7/13/81 | 12/01/85 | 500 | 87,700 | (87,200) |
| Comp. Container | 2/25/83 | 12/01/85 | 25,000 | 115,000 | (90,000) |
| Modular Power | 3/18/83 | 12/01/85 | 100 | 12,200 | (12,100) |
| Forenergy | 12/83 | 12/01/85 | 5,000 | 45,000 | (40,000) |
| Total | | | 80,998 | 847,564 | (766,566) |

In the notice of deficiency, respondent disallowed the claimed losses on the grounds that IRA did not establish its basis in the assets sold or disposed of and IRA did not

demonstrate that the transactions had any substance.  Respondent further determined that the sales were to a related party and were subject to section 267, which disallows losses between related parties.[61]

As of June 24, 1985, IRA's general ledger reflected a note receivable in the amount of $122,500 owing by Funding Systems. It further reflected that, on that same date, IRA received payments, leaving a $91,988 balance due on the receivable.

LBG Properties, Inc. (LBG), is a subsidiary of IRA.  IRA's general ledger reflected that IRA had had a note receivable of $39,500 owing by LBG.

Sherwood Associates (the Sherwood partnership) is a partnership in which IRA was a partner.  IRA's general ledger reflected that IRA had a note receivable of $47,925 owing by the Sherwood partnership.

Tanglewood Properties, Inc. (Tanglewood), is a subsidiary of Holding Co.  Prior to 1981, Holding Co. had paid or transferred $350,000 to Tanglewood.  On its books, Holding Co. recorded this transaction as a note receivable owing by Tanglewood.  On or before August 31, 1981, IRA acquired the Tanglewood receivable

---

[61]  Respondent conceded the adjustments relating to the capital losses claimed on the sales of stock of Brajda's, U.S. Mineral, Composite Container, Modular Power, and Forenergy.  The remaining adjustments are in dispute.

from Holding Co. in exchange for a receivable owing by IRA to Holding Co.

Pursuant to Kanter's instructions, on December 1, 1985, IRA sold the receivables due from Tanglewood, LBG, and Sherwood to Kanter for $10,000, $10, and $1,000, respectively, and sold the receivable due from Funding Systems to Holding Co. for $20,000. With respect to each of the sales, Kanter determined the sales price. The sale prices were not determined by arm's-length negotiations.

Neither Kanter nor Holding Co. paid cash to IRA for the receivables. Instead, receivables due from Kanter and Holding Co., in the amounts of the respective sale prices of the receivable, were recorded through adjusting journal entries on the books of IRA. The sole purpose of the sales was an attempt by Kanter to provide a basis for IRA to claim a deduction for Federal income tax purposes.

According to IRA's general ledger, on February 19, 1986, the $39,500 lent to LBG by IRA and the $47,925 lent to Sherwood by IRA was repaid to IRA in full. On February 28, 1986, Tanglewood repaid $6,000 of its loan from IRA, and on June 24, 1986, IRA received repayments on the Funding Systems note in the amounts of $10,000, $4,500, and $10,000. The payments from Funding Systems were credited to Holding Co. by an adjusting journal entry on IRA's general ledger. The payments from Sherwood and LBG were

paid to Kanter.   On his 1986 return, Kanter reported $46,925

($47,925 - $1,000) as income from loan proceeds from the Sherwood

payment and $39,480 ($39,500 - $20) as miscellaneous income from

the LBG payment.

A foreclosure action was filed against LBG.  The litigation

of the foreclosure was not completed until at least 1988.  During

1988, LBG was still in existence and was receiving bills from at

least one creditor, Payton and Rachlin.

Tanglewood filed a voluntary petition in bankruptcy under

chapter 11 during May 1990.

### OPINION

With respect to IRA's claimed "sales" of the notes

receivable from Funding Systems, Tanglewood, LBG, and Sherwood to

Holding Co. and Kanter, evidence that the "sales" took place

primarily consists of adjusting journal entries on the books of

IRA that credited these receivables and debited "notes

receivable" owing by Holding Co. and Kanter.  As the adjusting

journal entries show, neither Holding Co. nor Kanter paid cash

for these notes at the time of "sale".  In 1986, repayments of

the notes were made to IRA rather than Kanter, who allegedly had

bought the notes on December 1, 1985.  Thus, we think IRA failed

to establish that sales of the notes actually took place, as

evidenced by these bookkeeping entries.  See J.G. Boswell Co. v.

<u>Commissioner</u>, 34 T.C. 539, 545 (1960), affd. 302 F.2d 682 (9th Cir. 1962).

Moreover, the transactions did not establish bona fide losses for Federal income tax purposes. Kanter testified that the purpose of IRA's purported sale of the Funding Systems note to Holding Co. was to "establish the loss in the manner I have described before." He testified earlier that he had problems getting the Internal Revenue Service to allow deductions for items that he thought were worthless, so he decided the best way was to sell a note to establish a loss.

IRA was owned by BRT, the beneficiaries of which were members of Kanter's family. Holding Co. was partially owned by Kanter and BRT. Kanter was counsel to IRA and Holding Co. and, at various times, was also an officer or director. There is no evidence that anyone, other than Kanter, had a role in establishing the sale prices for the notes. Kanter acknowledged that he "largely determined" the sale prices for the notes. Hence, the sale prices were not determined by arm's-length negotiations.

Kanter's testimony regarding the "sales" further indicates their lack of economic substance. With respect to the Funding Systems note receivable, he testified, on direct examination, that Funding Systems had filed for bankruptcy, that he did not remember the exact date, but thought it was in the early 1980's,

and that, at some point, Funding Systems came out of bankruptcy and the note was worthless. On cross-examination, Kanter testified that the note was thought to have a value of $20,000 at the time it was "sold" to Holding Co. In fact, IRA received repayments on the Funding Systems note totaling $24,500 on June 24, 1986. Kanter admitted that the sale price of the Funding Systems note was not based on an appraisal, a legal opinion of those involved in the proceedings, balance sheets of Funding Systems, or any type of bona fide analysis. He stated that the purpose of the "sale" was to establish a loss for tax purposes. This testimony does not establish the value of the note at the time of "sale".

With respect to the Tanglewood note, Kanter testified that, by the time IRA wrote off the Tanglewood loan, "it was clear that there would be no assets available to pay this particular obligation," yet he purportedly paid $10,000 for the note. If, in 1985, it appeared that there would be no assets from which to collect the note, it was not explained why Kanter was willing to pay $10,000 for the note. Moreover, Kanter's testimony that there were no assets to repay this obligation is contradicted by Tanglewood's repayment of $6,000 to IRA in February 1986. This evidence indicates that the $10,000 sale price was an arbitrary figure determined by Kanter that had no relationship to the fair market value of the note in 1985. We also note that this is the

same note that Kanter subsequently "sold" to Windy City for $100 on December 22, 1987.

Contrary to Kanter's testimony that there was no chance of recovery on the LBG note, IRA's 1986 general ledger shows that the $39,500 lent to LBG was repaid in full to IRA on February 19, 1986. This evidence indicates that the $10 sale price was an arbitrary figure determined by Kanter that had no relationship to the fair market value of the note in 1985 and that the sale to Kanter was not entered into for profit by IRA but was an attempt to establish a basis to claim a loss for tax purposes.

With respect to the Sherwood note, Kanter testified that the "note was written off because there was no opportunity and no chance of recovery", but he purportedly paid $1,000 for it. If, in 1985, it appeared that there would be no assets from which to collect the note, Kanter should not have been willing to pay $1,000 for the note. In fact, the evidence shows that the note was not worthless. Contrary to Kanter's testimony that there was no chance of recovery on the Sherwood note, IRA's 1986 general ledger shows that the $47,925 lent to Sherwood was repaid in full to IRA on February 19, 1986. The fact that the loan was repaid in full on February 19, 1986, shows that the note was not worthless in 1985. This evidence indicates that the $1,000 sale price was an arbitrary figure determined by Kanter that had no relationship to the fair market value of the note in 1985 and

that the sale to Kanter was not entered into for profit by IRA, but was an attempt to establish a 1985 loss for tax purposes.

Given the fact that IRA and Holding Co. were owned by trusts for the benefit of Kanter's family, that Kanter controlled the management of IRA and Holding Co., that he largely determined the sale prices, that the values placed on the notes by Kanter were contradicted by other evidence, that the sale prices were nominal compared to the face amount of the notes, and that the admitted purpose of the sales was to establish losses for tax purposes, we conclude that the "sales" (if they took place) lacked economic substance and, therefore, did not constitute identifiable events for purposes of loss recognition.

As confirmed by Kanter's testimony, the "sales" were merely attempts by IRA to claim deductions for alleged worthlessness or alleged partial worthlessness of debts without meeting the requirements of section 166.  If the Court were to recognize such practices as bona fide sales for purposes of loss recognition, section 166 would be substantially undermined.  The scheme employed, as a purported sale, does not establish the amount, if any, of loss incurred; consequently, the losses purportedly realized are not recognized.

In addition, we hold that IRA failed to establish that the notes receivable were not sold to related parties within the meaning of section 267.

With respect to the losses claimed on the sales of IRA's notes receivable from Tanglewood, LBG, and Sherwood, IRA's adjusting journal entries and Kanter's testimony indicate that these notes receivable were sold by IRA to Kanter. IRA failed to establish that Kanter did not indirectly own more than 50 percent of IRA, and, therefore, the claimed losses are not allowable. See sec. 267(a) and (b)(2). In fact, the evidence indicates that Kanter did indirectly own more than 50 percent of IRA within the meaning of section 267(b)(2). During 1985, the sole shareholder of IRA was BRT, and the beneficiaries of BRT were members of Kanter's family within the meaning of section 267(b)(1) and (c)(4). Stock owned by BRT is considered as being owned proportionately by its beneficiaries, members of Kanter's family. See sec. 267(c)(1). Stock owned directly or indirectly by members of Kanter's family is considered owned by him. See sec. 267(c)(2). Since the beneficiaries of BRT are considered to own the stock of IRA, the beneficiaries of BRT are members of Kanter's family, and Kanter is considered as owning the stock owned by members of his family for purposes of section 267(b)(2), Kanter owned more than 50 percent of IRA. Therefore, IRA's claimed losses on its sales of the Tanglewood, LBG, and Sherwood notes receivable to Kanter are not allowable. See Pomeranz v. Commissioner, T.C. Memo. 1980-36 (disallowing a loss on a sale of stock by the taxpayer to a corporation owned by a family trust

for the benefit of members of the taxpayer's family on the ground the taxpayer was deemed to own the shares held by the beneficiaries of the trust under section 267).

With respect to the loss claimed on the sale of IRA's note receivable from Funding Systems, IRA's adjusting journal entries and Kanter's testimony indicate that this note receivable was sold by IRA to Holding Co. IRA failed to establish that IRA and Holding Co. were not members of the same controlled group within the meaning of section 267(b)(3), and, therefore, the claimed loss is not allowable. See sec. 267(a) and (b)(3). In fact, the evidence shows that IRA and Holding Co. were members of the same controlled group within the meaning of section 267(b)(3).

As previously stated, IRA was owned by BRT, the beneficiaries of which were members of Kanter's family. The corporate minutes of Holding Co. show that the shareholders of Holding Co. were Kanter, BRT, and various other trusts. Kanter was at times president of Holding Co. Holding Co. was a client of Principal Services.

Kanter directed moneys and other personal service income (such as trustee fees earned by him as trustee of the Hi-Chicago Trust) to Holding Co. The facts show that, like IRA, Holding Co. was owned by members of Kanter's family and that, under the rules of attribution set forth in section 1563(d) and (e), the same five or fewer persons owned 50 percent or more of IRA and Holding

Co.   Therefore, IRA and Holding Co. were members of a brother-sister controlled group under section 1563(a)(2), which is incorporated by reference in section 267(b)(3) and (f).

Finally, IRA failed to establish that any of the alleged debts became wholly worthless in 1985, and, consequently, it is not entitled to bad debt deductions.

Pursuant to section 166(a)(1), a deduction is allowed for any debt which becomes worthless within the taxable year.  When satisfied that a business debt is recoverable only in part, the Commissioner may allow such debt, as a deduction, in an amount not in excess of the part charged off within the taxable year. See sec. 166(a)(2).  As shown above, the notes were not wholly worthless because some of the notes were later paid in full and partial payments were made on others.  Sec. 1.166-3(a)(2)(i), Income Tax Regs., provides generally that if the District Director is satisfied that a debt is partially worthless, the amount which has become worthless will be allowed as a deduction under sec. 166(a)(2), "but only to the extent charged off during the taxable year."  No portion of the notes owing to IRA was charged off during the taxable year on its books and records. The deduction for partial worthlessness is at the discretion of the Commissioner and should not be interfered with by the Courts unless the Commissioner was plainly arbitrary and unreasonable. See Strahan v. Commissioner, 42 F.2d 729, 731 (6th Cir. 1930).

IRA failed to establish that the Commissioner's failure to allow deductions for the partial worthlessness of the debts described was arbitrary or unreasonable.  Accordingly, we hold that IRA is not entitled to any bad debt deduction on the notes receivable discussed.

Issue 26.  Whether IRA Is Entitled to Claimed Bad Debt Deductions for 1987

FINDINGS OF FACT

On its Federal income tax return for 1987, IRA claimed bad debt deductions based on the worthlessness of the following notes receivable:

| Debtor | Deduction |
| --- | --- |
| Claude Ballard | $84,889 |
| Robert Lisle | 12,185 |
| H. Abernathy | 28,939 |
| Forest Activities | 6,000 |
| Total | 132,013 |

In the notice of deficiency, respondent disallowed IRA's claimed bad debt deductions on the ground that it was not established that any bad debts existed in fact and in law or, if existing, were not adequately substantiated as to amount.

The transactions with Ballard and Lisle that gave rise to the notes in question that were reflected on the books and records of IRA were not loans but were amounts earned by Ballard and Lisle for their respective roles in the Prudential income scheme.

IRA's writeoff of these notes receivable from Ballard and Lisle was based on the contention that Ballard and Lisle did not acknowledge that any debt existed.

During 1987 Ballard and Lisle had the resources to pay in full the subject notes held by IRA.

IRA failed to establish that the notes of Ballard and Lisle were in fact debts of Ballard and Lisle. If, however, the notes represented indebtedness, IRA failed to establish that the notes of Ballard and Lisle, in the amounts of $84,889 and $12,185, respectively, became worthless in 1987.

H. Abernathy (Abernathy) was a preferred shareholder of IFI. During 1974 and 1975, IFI lent Abernathy amounts totaling $105,000. The loans were evidenced by three demand notes, signed by Abernathy, that recited an interest rate of 10 percent. In 1977, the loans were partially repaid by crediting Abernathy's preferred stock dividends from IFI against the balance of the loans. As of December 1987, IFI's books reflected a balance due on the loans of $67,098.04. In December 1987, IFI transferred this loan to IRA as part of its consideration for the cancellation of IFI's debt to IRA. IRA reduced the basis of this loan to $28,862.29 and wrote off that amount as a bad debt.

IRA failed to establish that the note receivable from Abernathy had any value prior to 1987 and failed to establish that the note became worthless during 1987.

Forest Activities, Ltd. (Forest), was a limited partnership, previously known as Sherwood Associates. Alpha Financial Corp. (AFC) was the sole general partner of Forest. Gallenberger was the secretary of AFC. The record does not show what consideration or transaction gave rise to the indebtedness owing by Forest to IRA.

Forest owned rental property. According to the 1988 partnership return of Forest, its rental property was sold in a foreclosure on March 31, 1988. According to the January 1, 1988, balance sheet on Forest's 1988 return, Forest had assets with a book value of $2,652,193 including $76,106 cash and liabilities of $4,211,337 on that date.

After the foreclosure, as of December 31, 1988, Forest owned cash of $17,121 and had no liabilities. In 1989, Forest earned $20,055 income and, as of December 31, 1989, had cash of $37,176 and no liabilities. No evidence was presented as to the financial worth of AFC, the general partner.

IRA failed to establish that the note receivable from Forest in the amount of $6,000 existed in fact and failed to establish that the note receivable became worthless during 1987.

OPINION

Section 166(a) allows a deduction for any debt that becomes wholly worthless within the taxable year.

To be entitled to a bad debt deduction under section 166, the taxpayer, among other things, must establish that a genuine debt in fact existed, and that the debt became worthless within that taxable year.  See Andrew v. Commissioner, 54 T.C. 239, 245 (1970); sec. 1.166-1(c), Income Tax Regs.

In deciding whether a debt has become worthless, we consider whether a creditor in the exercise of sound business judgment would conclude that the debt is uncollectible.  See Andrew v. Commissioner, supra at 248.  Thus, whether a debt has become worthless in a particular year is a question of fact.  However, the resolution of such issue is based on objective factors and not merely on the taxpayer's subjective judgment as to worthlessness.  See generally sec. 1.166-2(a), Income Tax Regs.

IRA again argues that certain statements made by respondent's counsel at trial were "concessions", and that the only issue to be decided was whether the debts were worthless in 1987 when they were written off.  Respondent, on the other hand, contends that IRA failed to establish that (1) Ballard's and Lisle's debts became worthless during 1987; (2) the Abernathy debt (a) had any value prior to 1987, and (b) became worthless during 1987; and (3) the Forest limited partnership debt (a) existed in fact, and (b) became worthless during 1987.

We agree with respondent.  First, we reject IRA's concession argument.  It has no merit.

Second, we hold that IRA is not entitled to bad debt deductions for the $84,889 and $12,185 writeoffs of the Ballard and Lisle notes. Between 1982 and 1987, IRA or IFI paid Ballard and Lisle $196,648 and $28,284, respectively, and reflected the payments as notes receivables in those amounts from Ballard and Lisle. IRA did not pay the funds to Ballard and Lisle as loans, but rather as part of the moneys earned by Ballard and Lisle for their role in the Prudential income scheme. In addition, the record contains no notes or other written documentation of an acknowledgment by Ballard or Lisle of purported debts to IRA and IFI. There is no evidence that IRA charged any interest to Ballard or Lisle, collected any interest from them, or demanded any collateral with respect to the purported loans. Both Ballard and Lisle disputed that their alleged debts to IRA existed. In 1987, when IRA wrote off the purported notes, neither Ballard nor Lisle reported the discharge of this indebtedness as income on their respective 1987 income tax return or subsequent returns. Therefore, IRA failed to establish that any valid debt from Ballard or Lisle existed that could be written off in 1987. But even if valid debts existed, the evidence shows that both Ballard and Lisle had sufficient resources in 1987 to pay in full to IRA the alleged notes receivable. Consequently, IRA failed to establish that the alleged notes receivable became worthless in 1987.

IRA also failed to show that the $28,939 note receivable from Abernathy became worthless in 1987. Similarly, with respect to the Forest limited partnership note, IRA did not establish that (1) a bona fide debt, in fact, existed, and (2) that the debt became worthless in 1987.

Issue 27. Whether IRA Is Entitled to Claimed Ordinary Losses on Sales of Notes Receivable for 1987

FINDINGS OF FACT

On its Federal income tax return for 1987, IRA claimed total ordinary losses of $1,176,670 on purported sales to MAF, Inc. (MAF), of business notes receivable from the following entities:

| Note Receivable Maker | Claimed Loss |
|---|---|
| HELO | $485,824 |
| Safari | 42,494 |
| CMB Cinema Trust | 30,512 |
| CMB Cinema Trust II | 7,209 |
| RWL Cinema Trust | 9,290 |
| RWL Cinema Trust II | 29,294 |
| HGA Cinema Trust | 57,725 |
| Elk Investment | 33,000 |
| Inter-Alia Investment | 53,968 |
| Steve and Karen Hargen | 3,452 |
| HELO | 78,034 |
| Cedilla Invest. | 345,868 |
| Total | 1,176,670 |

In the notice of deficiency, respondent disallowed the above losses on the grounds that IRA did not establish its basis in the assets sold or disposed of, it did not demonstrate that the transactions had any substance, and the sales were to a related

party and were subject to section 267, which disallows losses between related parties.

Pursuant to Kanter's instructions, in late December 1987, IRA purportedly sold the notes receivable to MAF for $1 each in an attempt to establish worthlessness for the sole purpose of claiming a loss for Federal income tax purposes. The notes receivable had been recorded on the books and records of IRA but were not evidenced by any written notes and were not secured by any collateral.

During 1987, Morrison was the president of MAF, which was located in Florida. Morrison had known Kanter since the early 1960's. He and Kanter were friends and had mutual clients. Morrison became president of MAF at the request of, and as a favor to, Freeman. Morrison received no compensation for his services as president of MAF. His secretary, Sue Hutton, was secretary of MAF.

During 1987, MAF purportedly purchased the notes receivable from IRA for $1 each as an accommodation to Kanter. The collectibility of the notes did not matter to MAF or Morrison. At the time MAF purportedly purchased the notes from IRA, MAF knew nothing about the financial condition of the alleged makers of the notes.

MAF held some small investments. It ceased doing business in the late 1980's. The last transaction engaged in by MAF was

its purported purchase of the notes from IRA.  MAF never held director or shareholder meetings.

During the years 1979 through 1989, Cedilla Invest. was a subsidiary of IRA.  Cedilla Invest. had total assets of $10,008,632, $526,374, $526,374, and $575,896 on December 31, 1986, December 31, 1987, December 31, 1988, and December 31, 1989, respectively.  Cedilla Invest. earned total income in the amounts of $443,762, $52,656, and $11,702 for 1987, 1988, and 1989, respectively.

During 1983 and 1984, HELO was a subsidiary of Holding Co.

The proceeds of the "loans" to the Safari trust, CMB Cinema Trust, CMB Cinema II Trust, RWL Trust, RWL Trust II, Elk Investment, and Inter Alia Investment were used to invest in unsuccessful film projects.

Ballard reported $41,697, $41,697, and $80 of income from the CMB Cinema Trust II on his 1987, 1988, and 1989 returns, respectively.  Lisle reported $30 and $41,577 of income from the RWL Cinema Trust II on his 1987 and 1988 returns.  Ballard and Lisle were, respectively, grantors of these trusts.  See sec. 671.

With respect to the purported sales of notes receivable to MAF in 1987, IRA failed to establish that it had any basis in the notes.

With respect to the purported sales of notes receivable to MAF in 1987, IRA failed to establish that the sales of the notes were in substance bona fide sales that gave rise to bona fide losses.

IRA failed to establish that any of these notes became wholly or partially worthless in 1987.

## OPINION

IRA again makes the same arguments that were made with respect to Issue 21; namely, that (1) certain statements by respondent's counsel at trial are "concessions"; (2) IRA substantiated its basis and is entitled to the ordinary losses claimed; and (3) alternatively, if the Court holds either that (a) the transactions were not bona fide transactions for tax purposes, or (b) no loss is allowable under section 267 because the sales were to a related party, IRA is still entitled to deductions for partial worthlessness under section 166(a)(2). Respondent, on the other hand, contends that IRA failed to meet its burden of proof on this issue.

We agree with respondent for several reasons. The facts pertaining to the sales of these notes parallel the facts considered in Issue 21, wherein Kanter individually sold notes,

bonds, and other security interests to MAF for nominal consideration.[62]

On December 17, 1987, IRA acquired notes receivable totaling $1,120,889 from IFI in cancellation of IFI's $507,648 note due to IRA. This transfer included the notes receivable listed above except those due from HELO and Cedilla Invest. in the amounts of $485,824 and $345,868, respectively. (This is the same transaction in which IRA acquired the Ballard, Lisle, and Abernathy notes previously discussed.) While the principal amounts of the notes acquired from IFI were greater than the amounts set forth above, through an adjusting journal entry IRA reduced the basis of these notes. On December 30, 1987, IRA sold the notes for $1 each to MAF in an attempt to establish worthlessness. Kanter testified that IRA knew that the notes were worthless at the time IRA acquired the notes from IFI. The transaction was entered into by IRA and IFI as a means to shift

---

[62] Kanter assisted the CMB and RWL Trusts in obtaining these loans from IRA and IFI to permit the trusts to invest in various movie partnerships. The loans to the trusts essentially amounted to nonrecourse loans to Ballard and Lisle, as Ballard and Lisle had no legal obligation to repay the loans. However, because the trusts were grantor trusts, Ballard and Lisle claimed the tax benefits from the trusts' movie partnership investments on their respective individual income tax returns. During the year at issue, Cedilla Invest. was a subsidiary of IRA and is the same entity that was involved in the equipment leasing transactions considered in Issue 22. During 1983 and 1984, HELO was a subsidiary of Holding Co. Elk Investment and Inter Alia Investment had likewise borrowed funds to invest in unsuccessful movie partnerships.

artificially losses from IFI to IRA by mere bookkeeping entries. As further discussed below, if the notes were worthless at the time they were acquired by IRA, IRA could not have suffered a loss by selling the notes because it did not part with anything of value.

The CMB Cinema Trust and CMB Cinema Trust II were trusts for the benefit of Ballard's family and the RWL Cinema Trust and RWL Cinema Trust II were trusts for the benefit of Lisle's family. IRA and/or IFI did not pay or transfer moneys to the CMB Cinema Trust, CMB Cinema Trust II, RWL Cinema Trust and RWL Cinema Trust II as loans but rather as part of the moneys earned by Ballard and Lisle for their roles in the Prudential income scheme and, therefore, the funds were not intended to be repaid. The alleged notes receivable or debts did not in fact exist, and IRA did not establish its basis in the alleged notes receivable.

With respect to the claimed losses on the sales of the other alleged notes receivable, IRA presented no evidence that IRA, as opposed to Administration Co., paid or advanced moneys as loans to the alleged debtors. IRA presented no evidence as to why the funds were advanced to the alleged debtors. Except for a notation as to the interest rate for some of the alleged loans listed in its Loans Receivable ledger, IRA presented no evidence regarding the terms of the alleged loans such as the due dates or interest rates. IRA presented no evidence that the loans were

secured by any collateral, nor was there any evidence of payments on the loans. Although these loans were listed on IRA's books and records as "Notes Receivable" or "N/R", no notes or any other written acknowledgment of the alleged loans was introduced into evidence. With the exception of Kanter, in his capacity as trustee of the HGA Cinema Trust, none of the alleged debtors testified as to the existence of any debt. In our view, IRA's lack of notes or other written acknowledgment of the existence of these debts, lack of any collateral, and lack of repayments indicate that, like the payments to the Ballard and Lisle family trusts, IRA never intended that the alleged debtors would be required to repay these funds. Consequently, the alleged loans did not exist. In sum, we conclude that IRA failed to establish that the claimed notes receivable represented valid debts stemming from debtor-creditor relationships and, therefore, failed to show that it had any basis from which any loss could be determined on their purported sales.

Economically, the sales of the notes receivable of $1,760,682 for $12 make no sense. If the notes were not worthless, IRA would not have sold them for $12. If the notes were worthless, an unrelated third party would not have had any interest in purchasing them for $12.

Kanter testified that he and Freeman agreed that the notes receivable in question were worthless. Kanter explained that the

purpose of the "sales" to MAF was to establish "worthlessness". Kanter's testimony was corroborated by Morrison, who stated that MAF bought the notes from IRA as an "accommodation" to Kanter. Morrison further testified that, at the time MAF "purchased" the notes, Morrison did not know the financial condition of the alleged makers of the notes and that it did not matter to him whether or not the notes were collectible. Like the previously discussed 1985 "sales" of notes receivable by IRA to Kanter and Holding Co., the testimony of Kanter and Morrison, and the lack of economic substance to the "sales" show that the sole purpose of the "sales" was to establish a basis for IRA to claim losses for Federal income tax purposes.

Although IRA did not deduct the alleged notes receivable as bad debts, Kanter testified that he believed that the notes were worthless. However, IRA did not establish that any of the claimed notes became worthless in 1987, and, therefore, IRA is not entitled to a bad debt deduction for 1987 for such notes.

With respect to the notes acquired from IFI, in order to prove entitlement to a bad debt deduction in the amounts claimed, IRA must show that the notes had their face values at the time acquired by IRA on December 22, 1987, and that an event occurred to cause them to become worthless by December 31, 1987. See Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). IRA failed to do so.

With respect to the HELO notes, Kanter testified that "It was an entity that had ceased doing business sometime earlier. I don't know exactly when. It had no assets." This statement that HELO had no assets lacks foundation in his personal knowledge of the financial condition of HELO, and we disregard it. In any event, even if Kanter's testimony is to be believed, his testimony does not establish the year that the alleged HELO debts actually became worthless.

With respect to the Safari, Elk Investment, and Inter Alia notes, Kanter's statements that these entities had no assets also lack in foundation in his knowledge of the financial condition of these entities and, therefore, are disregarded. In any event, even if Kanter's testimony is to be believed, his testimony does not establish the year that these alleged debts actually became worthless.

With respect to the CMB Cinema Trust, CMB Trust II, RWL Cinema Trust, and RWL Cinema Trust II "notes", these "loans" were fictitious and used as a means to transfer funds to Ballard and Lisle. Therefore, IRA is not entitled to a loss on the sale of these "notes."

With respect to the alleged note receivable from Steve and Karen Hargen, Kanter testified that because neither he nor anyone he knew could locate Steve Hargen, "it was considered worthless". No other evidence was presented of any efforts to locate the

Hargens or to collect on the note, nor was any persuasive evidence presented to show that this note became worthless in 1987.

With respect to the note receivable from Cedilla Invest., Kanter testified that "It had no assets, as best I recall, that could be assessed effectively to recoup this note".  This statement is not sufficient evidence to establish that the alleged note became worthless in 1987.  It lacks any foundation in Kanter's personal knowledge of Cedilla Invest.'s assets.  In addition, the balance sheets of Cedilla Invest. included in IRA's 1986 to 1989 tax returns show that Cedilla Invest. had total assets of $10,008,632, $526,374, $526,374, and $575,896 at December 31, 1986, 1987, 1988, and 1989, respectively.  IRA presented no evidence that the fair market value of these assets was less than the liabilities of Cedilla Invest.  IRA's returns also show that Cedilla Invest. earned total income in the amounts of $443,762, $52,656, and $11,702 for 1987, 1988, and 1989, respectively.  These returns indicate that Cedilla Invest. had assets with which to pay the alleged note receivable, that Cedilla Invest. continued to be a going concern after 1987, and, therefore, that the Cedilla Invest. note had current liquidating value or potential value.

In summary, we hold that IRA is not entitled to bad debt deductions for partial worthlessness of the notes receivable in 1987.

Issue 28.  Whether IRA Is Entitled to Certain Capital Losses for 1987

FINDINGS OF FACT

On its Federal income tax return for 1987, IRA reported capital losses as follows:

| Description | Date Acquired | Date Sold | Gross Sale Price | Basis | Loss |
|---|---|---|---|---|---|
| Int'l Films (IFI) | 8/2/76 | 1987 | -- | $65,000 | ($65,000) |
| Brickell Biscayne | 1983 | 12/22/87 | $1,000 | 176,073 | (175,073) |
| Sandberg Village | 1979 | 12/22/87 | 1,000 | 492,691 | (491,691) |
| 1984 Devel. Ltd. | 1982 | 12/22/87 | 1,000 | 23,862 | (22,862) |
| Total | | | 3,000 | 757,626 | (754,626) |

In the notice of deficiency, respondent disallowed the claimed capital losses on the grounds that IRA did not establish its basis in the assets sold or disposed of, IRA did not demonstrate that the transactions had any substance, and the sales were to a related party and were subject to section 267, which disallows losses between related parties.

IRA's records reflect that it sold its 1,500 shares of IFI stock to Gallenberger for $1 on September 28, 1988.  An entry recording the September 1988 sale to Gallenberger was made on IRA's 1988 ledger.  Subsequently, adjusting journal entries were made to IRA's books and records to reverse the 1988 entry as a sale of the stock and to reflect on IRA's books a writeoff of the

stock as a worthless security in 1987. IRA failed to establish that its stock in IFI became worthless in 1987.

Pursuant to Kanter's instructions, in late December 1987, IRA purportedly sold the Brickell Biscayne, Sandberg Village, and 1984 Development, Ltd., partnership interests to MAF for $1,000 each solely in an attempt to establish worthlessness for the purpose of claiming a loss for Federal income tax purposes.

MAF purchased these partnership interests from IRA as an accommodation to Kanter.

At the time of IRA's sale of its interests in Brickell Biscayne and Sandberg Village to MAF, Brickell Biscayne and Sandberg Village were not dissolved and were still engaged in their operations.

With respect to these purported sales of partnership interests, IRA failed to establish that it had any basis in the partnerships. It also failed to establish that the sales of these interests were in substance bona fide sales.

IRA failed to establish that its partnership interests in Brickell Biscayne, Sandberg Village, and 1984 Development Ltd. became worthless in 1987.

### OPINION

Pursuant to section 165(g), an exception is created to the general requirement of realization through sale or exchange for losses on certain securities. If a security which is a capital

asset becomes worthless during the taxable year, the resulting loss is treated as a loss from the sale or exchange of the capital asset on the last day of that year even though a sale or exchange has not actually taken place. Under section 165(g)(2), the term "security" is defined as:

>     (A) a share of stock in a corporation;
>
>     (B) a right to subscribe for, or to receive, a share of stock in a corporation; or
>
>     (C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form.

To be entitled to a deduction under section 165(g), the taxpayer has the burden of showing that (1) the stock had a basis; (2) the stock was not worthless prior to the year in which worthlessness is claimed; and (3) the stock became worthless in the year claimed.

Contrary to IRA's assertion, the record does not establish that the IFI shares became wholly worthless during 1987. IRA's 1988 ledger shows that the IFI shares were sold by it to Gallenberger for $1 in 1988. Although Gallenberger, in her testimony, could not recall details about this purchase, she did acknowledge purchasing the shares for $1 from IRA on September 28, 1988. IRA offered no explanation for the apparent inconsistency in first recording on its books a sale of the stock during 1988 and then later reversing such entry on its records

and instead claiming that the stock became wholly worthless in the preceding year, 1987. Moreover, no evidence was presented to establish IRA's basis in the IFI stock. Consequently, we conclude that IRA failed to meet its burden of establishing entitlement to a worthless security deduction under section 165(g) on the IFI stock. Thus, we sustain respondent's determination that no capital loss is allowable to IRA for 1987 with respect to the IFI stock.

With respect to the claimed capital losses on the sale of the three partnership interests to MAF, the Court again rejects IRA's "concession" argument that certain statements of respondent's counsel constituted an abandonment or waiver of the grounds in the notice of deficiency for disallowance of these losses. We also conclude that IRA failed to establish the amounts claimed as bases and that the purported sales to MAF of the partnership interests were bona fide transactions. Therefore, we sustain respondent's determination.

Issue 29. Whether IRA Is Entitled To Deduct as Business Expenses Amounts Paid to J.D. Weaver in 1979, 1981, and 1982

OPINION

In the notice of deficiency issued to IRA for 1983 respondent disallowed "commission expenses" in the amount of $108,753. The claimed expenses are for payments made by IRA's subsidiary KWJ Corporation to J.D. Weaver. Although respondent acknowledges that the 1983 adjustment was erroneously conceded,

respondent on brief stands by the concession for that year.
However, respondent filed Amendments to Answers in IRA's cases
for 1979, 1981 and 1982. In such Amendments to the Answers,
respondent claimed that the "commission expenses" paid to J.D.
Weaver in 1979, 1981, and 1982 in the amounts of $51,643,
$38,601, and $74,015, respectively, should be disallowed.

Contrary to IRA's contention, respondent's concession for
1983 does not mean a concession by respondent that the payments
to Weaver by IRA's subsidiary KWJ were "commissions" for work or
services Weaver performed for either IRA or KWJ in 1979, 1981 and
1982. It is clear that in the Hyatt transactions, Weaver
influenced Lisle in connection with the awarding of the
Embarcadero management contract to Hyatt. For his influence,
A.N. Pritzker gave Weaver a 10-percent interest in the profits
that Hyatt earned on the hotel. These payments were made by
Hyatt to KWJ. After Hyatt went private, Weaver sold his stock in
KWJ Corporation to IRA. In the sale, Weaver retained the right
to receive 30 percent of the commissions thereafter paid by
Hyatt. As these commissions were later paid by Hyatt to KWJ, the
30-percent portion was remitted to Weaver by IRA pursuant to the
sales agreement. These amounts were claimed as business expense
deductions on the consolidated income tax returns of IRA (which
included KWJ's operations) for the years in question. The Court
is satisfied from the record that after the sale of the KWJ stock

to IRA, Weaver did not perform any services for IRA or KWJ and the payment of the 30-percent amounts to Weaver did not constitute compensation for services rendered. The amounts thus paid are not deductible by KWJ and/or IRA. The full amounts paid by Hyatt to KWJ constitute gross income to IRA. However, the Court is satisfied that the 30-percent payments by IRA to Weaver represented part of the purchase price by IRA for the KWJ stock and, to that extent, the payments to Weaver would add to and increase IRA's basis in the stock of KWJ Corporation. Therefore, respondent is sustained on this issue.

Issue 30. Whether the Assessment and Collection of the Deficiency and Additions to Tax as to IRA for 1980 Are Barred by the Statute of Limitations

FINDINGS OF FACT

IRA's 1980 Federal income tax return was due to be filed on March 15, 1981. Pursuant to two requests for extensions of time for filing, which were granted, the due date for IRA's 1980 return was extended to September 15, 1981. However, IRA did not file its return on or before the extended date. IRA filed its 1980 return by mail in an envelope bearing a U.S. Postal Service postmark of November 20, 1981, properly addressed to the Internal Revenue Service. The letter was sent by ordinary mail and was neither certified nor registered. The return was received by the IRS Kansas City Service Center and was date stamped November 24, 1981. There is an additional date stamp on the return indicating

a filing date of November 21, 1981. The differing dates are not material for purposes of this issue.

On November 20, 1984, IRA and respondent executed a written agreement on Form 872-A, Special Consent to Extend the Time to Assess Tax, to extend the period of limitations on respondent's assessment and collection of IRA's income taxes for 1980. This Form 872-A has generally been referred to as an "open-ended" consent because it extends the period of limitations indefinitely until either the taxpayer or the IRS issues to the other a Form 872-T to effect a termination of the extension. If the taxpayer issues the Form 872-T, the extension continues for a period of 90 days, within which the IRS must issue a notice of deficiency to the taxpayer. Neither IRA nor the IRS issued a Form 872-T. On June 2, 1992, respondent issued the notice of deficiency to IRA for its 1980 tax year.

In its petition, IRA affirmatively alleged that the period of limitations barred respondent's assessment and collection of a deficiency and additions to tax against it for 1980.

In the answer, respondent affirmatively alleged that the applicable period of limitations on assessment and collection against IRA for 1980 had not expired at the time the notice of deficiency was issued because respondent and IRA had executed a written agreement extending the period of limitations indefinitely until the onset of one of the conditions stated

above, and that, because neither party had terminated the consent, the notice of deficiency was timely issued.

OPINION

Section 6501(a) generally requires that a deficiency in income tax be assessed within 3 years after a return is filed. However, under section 6501(c)(4), the parties may extend by agreement the 3-year period of limitations for assessment, "Where, before the expiration of the time prescribed * * * for the assessment * * * both the Secretary and the taxpayer have consented in writing to its assessment after such time".

IRA contends that the period of limitations under section 6501 expired prior to the time the notice of deficiency for 1980 was issued. It maintains that the period of limitations had expired on November 20, 1984, that the Form 872-A extending the period of limitations was executed after the period of limitations had run, and, therefore, the Form 872-A was of no effect. Respondent contends otherwise.

We agree with respondent. The question is whether, under section 6501(c)(4), the parties extended the agreement "before the time prescribed (for assessment)" had expired.

The tax return for 1980, which was due on September 15, 1981, was mailed by ordinary mail, bearing a U.S. Postal Service postmark of November 20, 1981. The return was received by the IRS on either November 21 or November 24, 1981. The IRS Form

872-A, to extend the period of limitations, is dated November 20, 1984.

Where a return is mailed and bears a U.S. Postal Service postmark on or before the due date but is received by the IRS after the due date, the return is timely filed. See sec. 7502(a); Miller v. United States, 784 F.2d 728, 730 (6th Cir. 1986). However, if the return is mailed after the due date, the return is considered filed on the date the return is actually received by the IRS. See Radding v. Commissioner, T.C. Memo. 1988-250. IRA's return was not mailed before the due date of the return. It was mailed more than 1 month late. The return was received on either November 21 or November 24, 1981. Therefore, the return is deemed to have been filed on November 21 or November 24, 1981. The Form 872-A was signed by the parties on November 20, 1984. Therefore, "before the expiration of the time prescribed * * * for the assessment", the parties agreed to an extension of the period of limitations. Thus the notice of deficiency was timely issued.

Accordingly, we hold that the statute of limitations does not bar the assessment and collection of the deficiency in income tax and additions to tax due from IRA for 1980.

Issue 31. Whether IRA Is Liable for the Fraud Addition to Tax for 1987

OPINION

In an amended answer, respondent alleged that IRA was liable for the addition to tax for fraud under section 6653(b) for 1987, based on improper deductions claimed by IRA for certain bad debts and capital losses. Although the Court has sustained respondent's disallowance of these claimed deductions and losses, it has done so, in some instances, because of IRA's failure to establish that (1) the purported sales of many of the assets were bona fide transactions, and (2) the purported buyer was not a related party under section 267. Nevertheless, insofar as IRA's liability for an addition to tax under section 6653(b) for 1987 is concerned, respondent bears the burden of proving, by clear and convincing evidence, that some part of the underpayment for that year resulting from these disallowed deductions and losses was due to fraud. See sec. 7454(a); Rule 142(b).

Although IRA addressed this issue in its briefs, respondent failed to do so. We therefore conclude that respondent abandoned the fraud issue as to IRA for 1987. Accordingly, we hold that IRA is not liable for the addition to tax for fraud under section 6653(b) for that year.

Issue 32.  Whether Assessment and Collection of Federal Income Taxes of Kanter, Ballard, and Lisle Are Barred by the Statute of Limitations for Some Years

OPINION

Petitioners contend that the assessment of tax for the Ballards' 1978, 1979, 1981, 1982, and 1984 years, the Lisles' 1984 year, and the Kanters' 1983 year is barred by the statute of limitations under section 6501(a).

Section 6501(c)(1) provides that the tax may be assessed "at any time" in the case of a false or fraudulent return with the intent to evade tax.  The definition of fraud for purposes of additions to tax under section 6653(b) also applies for purposes of determining the application of section 6501(c)(1).  See Schaffer v. Commissioner, 779 F.2d 849, 857 (2d Cir. 1985), affg. Mandina v. Commissioner, T.C. Memo. 1982-34; Ruidoso Racing Association v. Commissioner, 476 F.2d 502, 505 (10th Cir. 1973), affg. T.C. Memo. 1971-194; Tomlinson v. Lefkowitz, 334 F.2d 262 (5th Cir. 1964); Estate of Temple v. Commissioner, 67 T.C. 143, 159-160 (1976); McGee v. Commissioner, 61 T.C. 249, 252, 261 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

Having found and held that part of the underpayment of tax was due to fraud with intent to evade tax (1) as to Kanter for the years 1978 through 1984 and 1986 through 1989, (2) as to Ballard for 1978 through 1982, 1984, and 1987 through 1989, and (3) as to Lisle for 1984 and 1987 through 1989, it follows that

the assessment and collection of their Federal income taxes for such years are not barred by the statute of limitations. See sec. 6501(c)(2).

Issue 33.  The Liabilities of Kanter, Ballard, and Lisle for Additions to Tax for Negligence

OPINION

The Court has held that Kanter is liable for fraud additions to tax for the years 1978 through 1984 and for the years 1986 through 1989.  The Court has also held that Ballard is liable for the fraud addition to tax for the years 1975 through 1982, for the year 1984, and for the years 1987 through 1989.  The Court has further held that Lisle is liable for the fraud addition to tax for the year 1984 and the years 1987 through 1989.

In the notices of deficiency and/or in amended pleadings, respondent also determined and/or asserted the additions to tax for negligence or intentional disregard of rules or regulations against Kanter under section 6653(a) with respect to activities other than the Prudential activities as to which the Court has concluded that the fraud addition to tax is applicable.[63]

Respondent agrees on brief that for years prior to 1986, if the addition to tax for fraud is applicable, the amount of the fraud addition to tax is calculated on the entire underpayment of tax, including underpayments relating to nonfraudulent

---

[63]   See supra note 3 outlining the various versions of section 6653(a) in effect during the years at issue.

activities, and the addition to tax for negligence or intentional disregard of rules or regulations does not apply to underpayments attributable to nonfraudulent activities.  Therefore, respondent agrees that for all tax years prior to 1986, even though the negligence addition to tax was determined or asserted with respect to nonfraudulent activities, the negligence addition to tax is not applicable if fraud is held applicable for the years prior to 1986.  For tax years after 1985, the addition to tax for fraud applies only to the underpayment in tax attributable to fraud; therefore, a taxpayer may be held liable for the negligence addition to tax on underpayments attributable to nonfraudulent activities.  Thus, with respect to Kanter, the Court holds that the negligence addition to tax is not applicable to Kanter's 1978 through 1984 tax years since the Court has held that Kanter is liable for fraud for those years.  The Court, therefore, considers the negligence addition to tax relating to nonfraudulent activities for Kanter's 1986 through 1989 tax years.  With respect to Ballard and Lisle, the parties agree that the additions to tax asserted against them related only to the Prudential issue.  Since the Court has held that Ballard and Lisle are subject to the fraud addition to tax with respect to the Prudential activity, there are no additions to tax for negligence as to Ballard and Lisle which are to be considered by the Court.

Generally, if any part of a taxpayer's underpayment of income tax for a taxable year is attributable to negligence or intentional disregard of rules or regulations, section 6653(a) imposes an addition to tax equal to 5 percent of the underpayment. For returns the due date for which (determined without regard to extensions) is after December 31, 1986, section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the statutory interest with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations. See Tax Reform Act of 1986, Pub. L. 99-514, sec. 1503(a), 100 Stat. 2742. This addition to tax, equal to 50 percent of the statutory interest, was repealed by sec. 1015(b)(2)(a) of the Technical and Miscellaneous Reverse Act of 1988, Pub. L. 100-647, 102 Stat. 3569, effective for returns the due date for which (determined without regard to extensions) is after December 31, 1988.

Negligence is the failure to exercise due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. See Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 937 (1985).

Kanter contends that no additions to tax under section 6653(a) should be imposed against him because he acted reasonably. Alternatively, he argues that, to the extent he

"inadvertently" failed to address some adjustments, this omission on his part was caused by respondent's representing "at the conclusion of the trial that all issues upon which petitioners bore the burden of proof had been addressed by petitioners (subject to certain specifically identified exceptions)."

Respondent, on the other hand, contends that Kanter is liable for additions to tax under section 6653(a) because he, a knowledgeable tax attorney, was negligent, and he failed to meet his burden of proving that he acted reasonably or exercised due care.

We agree with respondent.  We first reject Kanter's contention that he should somehow be "excused" from liability for additions to tax under section 6653(a) with respect to those adjustments he may have "inadvertently" failed to address because of respondent's alleged statement near conclusion of the trial that Kanter had "addressed all issues" upon which he had the burden of proof.  As previously discussed, we conclude that such statement was not a waiver or concession by respondent of those issues raised in the notices of deficiency.  Furthermore, the Court does not believe that Kanter was misled because the Court twice advised his counsel that he was responsible for seeing that Kanter had fully addressed all issues upon which Kanter bore the burden of proof.

Our findings and conclusions with respect to the following issues clearly show that portions of Kanter's underpayments of income taxes were attributable to negligence or intentional disregard of rules or regulations to the extent the 1986 through 1989 tax years are involved: (1) Commitment fees received by Century Industries (Issue 2); (2) income of the Bea Ritch Trusts (Issue 4); (3) interest deduction for 1986 (Issue 17); and (4) capital gains and losses (Issue 21). Also, Kanter conceded some adjustments but failed to address the additions to tax for negligence with respect thereto. Unlike the underpayments attributable to fraud with respect to the "Prudential Issues" or "The Five", only the negligence additions to tax apply to these issues. See sec. 6653(a)(2); sec. 6653(b)(2).

Issue 34. Whether the Kanters Are Liable for the Section 6659 Addition to Tax for 1981

OPINION

This issue relates to the Kanters' liability for the addition to tax under section 6659 for substantial valuation overstatement with respect to a $4,283 loss claimed from GLS Associates on their 1981 income tax return. We sustained respondent's disallowance of this loss (Issue 13). On their 1981 return, the Kanters also claimed an investment interest expense deduction relating to GLS Associates in the amount of $45,095, which respondent disallowed in the notice of deficiency. In a Stipulation of Settled Issues dated April 12, 1990, the Kanters

conceded the $45,095 investment interest expense adjustment but did not concede the additions to tax attributable thereto. Respondent determined that the amount of the addition to tax under section 6659 was 30 percent of the underpayment attributable to these adjustments.

Section 6659 provides for an addition to tax for underpayments attributable to valuation overstatements. A valuation overstatement exists if, among other conditions, the adjusted basis of property claimed on the return equals or exceeds 150 percent of the correct amount of the basis. As to the year at issue, for valuation overstatements of 150 percent or more but not more than 200 percent, the addition to tax is 10 percent of the underpayment attributable to the valuation overstatement; for valuation overstatements of more than 200 percent but less than 250 percent, the addition is 20 percent of the underpayment attributable to the valuation overstatement; and for valuation overstatements of 250 percent or more, the addition is 30 percent of the underpayment attributable to the valuation overstatement. No addition is imposed under section 6659 unless the underpayment in tax attributable to the valuation overstatement is at least $1,000.

The Kanters contend that they should not be held liable for the addition to tax under section 6659, citing Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo.

1988-408. On brief, they maintain that "neither party introduced any evidence" with respect to the GLS Associates' adjustment.

Respondent, on the other hand, contends that the Kanters failed to establish that they are not liable for the addition to tax under section 6659 with respect to the GLS Associates' valuation overstatement.

The Kanters presented no evidence on this issue. They have not shown that the underpayment was attributable to anything other than a valuation overstatement.[64] Consequently, we sustain

---

[64] Sec. 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements. See McCrary v. Commissioner, 92 T.C. 827 (1989); Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements. See Krause v. Commissioner, 99 T.C. 132, 178 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). However, when valuation is an integral factor in disallowing deductions and credits, sec. 6659 is applicable. See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995). In Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1998-416; Todd v. Commissioner, supra; and McCrary v. Commissioner, supra, it was found that a valuation overstatement did not contribute to an underpayment of taxes. In Todd and Gainer, the underpayments were due exclusively to the fact that the property in each case had not been placed in service. In McCrary, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a lease. As this Court indicated in Becker v. Commissioner, T.C. Memo. 1996-538, Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, which petitioners herein cite, may be interpreted to represent merely an application of Todd.

(continued...)

respondent's determination and hold that the Kanters are liable
for the addition to tax under section 6659 equal to 30 percent of
the underpayment attributable to the GLS Associates adjustment.

Issue 35.  Whether Kanter Is Liable for Section 6661 Additions to
Tax for 1982 Through 1984, and 1986 Through 1988

OPINION

Section 6661(a) provides that, if there is a substantial
understatement of income tax for any year, there will be added to
the tax an amount equal to 25 percent of the amount of any
underpayment attributable to such understatement.  See Pallottini
v. Commissioner, 90 T.C. 498 (1988).  For purposes of this
section, a substantial understatement exists if the amount of the
understatement for the taxable year exceeds the greater of 10
percent of the tax required to be shown on the return or $5,000.
See sec. 6661(b)(1).

The term "understatement" means the excess of the tax
required to be shown on the return over the amount of tax imposed
which is shown on the return.  Sec. 6661(b)(2)(A).  The amount of
the understatement is reduced by that portion of the

_____

(...continued)
However, as the Court further noted in Becker, to the extent that
the Court of Appeals for the Fifth Circuit's reversal in Heasley
may be read as based on a concept that, where an underpayment
derives from a lack of economic substance, the underpayment
cannot be attributable to an overvaluation, this Court, the Court
of Appeals for the Second Circuit, and other Courts of Appeals
have disagreed with the Fifth Circuit.  See Gilman v.
Commissioner, supra.

understatement which is attributable to the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment or the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached thereto. See sec. 6661(b)(2)(B). With respect to tax shelters, the understatement is reduced only if the taxpayer establishes that he reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. See sec. 6661(b)(2)(C)(i). The term "tax shelter" includes a partnership or any other plan or arrangement if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. Sec. 6661(b)(2)(C)(ii).

In notices of deficiency for 1982 through 1984 and 1986 through 1988, respondent determined that the Kanters' entire underpayment for each year was a substantial understatement within the meaning of section 6661. Respondent's determination is presumed correct. Kanter had the burden of proving that respondent's determination was erroneous. He failed to do so.

In amendments to answers for 1982 through 1984 and 1986 through 1988, respondent asserted the section 6661 addition to tax with respect to any underpayments of tax arising from unreported income not included in the notices of deficiency. Respondent had the burden of proof to the extent that the section

6661 addition to tax had been asserted by amended pleadings. See
Rule 142(a).

As his Federal income tax returns show, Kanter did not
adequately disclose the relevant facts concerning the tax
treatment of the various items at issue in these cases. There is
and was no substantial authority for his tax treatment of such
issues. He had no reason to believe that his treatment of tax
shelter items was more likely than not the correct treatment. In
this regard, the assignment of income adjustments (Prudential,
Century Industries, Hi-Chicago Trust, CMS Investors), Bea Ritch
Trusts adjustments, Cashmere adjustments, Schedule E computer
leasing adjustments, and the adjustments disallowing losses on
sales of notes receivable and stock to Windy City and MAF for
nominal consideration are items attributable to tax shelters
because they involve entities and arrangements the principal
purpose of which was avoidance or evasion of Federal income tax.
See United States v. Dahlstrom, 713 F.2d 1423 (9th Cir. 1983).
The evidence affirmatively shows that Kanter did not have
substantial authority for failing to report the assigned income
at issue or substantial authority for his tax treatment of other
items at issue. Therefore, except as otherwise provided in
stipulations of settled or conceded issues, we sustain
respondent's determination that the entire underpayment of income
tax for each of the years 1982 through 1984 and 1986 through 1988

constituted a substantial understatement of tax for which there was no substantial authority or adequate disclosure within the meaning of section 6661. The amounts of the additions to tax under section 6661 can be determined in Rule 155 computations.

Issue 36. Whether Kanter Is Liable for Section 6621(c) Increased Interest for 1978, 1979, 1980 Through 1984, and 1986, and 1987, and 1988

OPINION

For the year at issue, section 6621(c), increased the interest rate due on a deficiency to 120 percent of the statutory rate (established under section 6601) on any underpayment of tax that exceeds $1,000 attributable to "tax motivated transactions", as defined in section 6621(c)(3). A tax-motivated transaction includes, but is not limited to, a valuation overstatement (150 percent or more) under section 6659(c), any loss disallowed under section 465(a), any credit disallowed under section 46(c)(8), any sham transaction, and/or any fraudulent transaction. See sec. 6621(c)(3). Under section 6621(c)(3), tax-motivated transactions also include transactions entered into without the requisite profit motive and which lack economic substance. See Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865

(6th Cir. 1989). Under section 6621(c)(3), tax-motivated transactions also include losses disallowed by reason of invalid debt. See HGA Cinema Trust v. Commissioner, T.C. Memo. 1989-370.

In notices of deficiency for 1981, 1983, 1984, 1986, and 1987, respondent determined that the Kanters' entire underpayment was a substantial underpayment attributable to tax-motivated transactions within the meaning of section 6621(c). Respondent's determination is presumed correct, and Kanter had the burden of proving that the determinations were erroneous.

In the answer to docket No. 1350-87 involving 1982, respondent affirmatively alleged that the entire underpayment was a substantial underpayment attributable to tax-motivated transactions under section 6621(c). In amendments to answers for 1978 through 1984, and 1986 and 1988, respondent affirmatively alleged that the increased underpayments resulting from Kanter's failure to report "kickback" income were attributable to tax-motivated transactions within the meaning of section 6621(c). To the extent that the applicability of the increased interest rate of section 6621(c) has been raised by answer or amendments to answers, respondent bears the burden of proof. See Rule 142(a).

This Court has held that an underpayment attributable to the taxpayer's failure to report income that was assigned to a fraudulent or sham trust is an underpayment attributable to tax-motivated transactions. See Kerr v. Commissioner, T.C. Memo.

1987-470.  Respondent contends that IRA and its subsidiaries, Holding Co. and its subsidiaries, Century Industries, Oyster Bay Associates, the Delta Partnership, the Alpha Partnership, CMS Investors and the Bea Ritch Trusts were fraudulent or sham entities within the meaning of section 6621(c)(3).  Therefore, respondent argues that any underpayments arising from Kanter's failure to report his income that he assigned to these entities or that was otherwise reportable as his income even though reported as income by these entities are attributable to tax-motivated transactions within the meaning of section 6621(c).  More specifically, respondent argues that underpayments relating to Kanter's failure to report kickback income as set forth in the notices of deficiency and amended answers, consulting income assigned to Century Industries, "bonus payment" income assigned to Holding Co. through Delta, Alpha, and CMS Investors, income earned as trustee of Hi-Chicago Trust and assigned to Holding Co., income assigned to and/or otherwise reported by the Bea Ritch Trusts, and commission income from Equitable Leasing assigned to IRA are underpayments attributable to tax-motivated transactions within the meaning of section 6621(c)(3).  We agree with respondent.

With respect to 1980, as previously indicated with respect to negligence, Kanter conceded the investment interest expense deduction of $26,647 from SLG Partners through K & D Associates

and introduced no evidence regarding his liability for additions to tax or the increased interest rate of section 6621(c).  The Court has determined that the SLG transaction was a tax-motivated transaction under section 6621(c).  See HGA Cinema Trust v. Commissioner, supra.  Therefore, any underpayment resulting from this adjustment or from any credits claimed from the SLG transaction for the 1980 year is attributable to tax-motivated transactions within the meaning of section 6621(c).

With respect to 1983 and 1986, Kanter introduced no evidence that respondent erred in determining that the underpayments resulting from the Schedule E computer adjustment of $83,333 for 1983 and Schedule E interest expense adjustment of $50,380 for 1986 were attributable to tax-motivated transactions.  Therefore, any underpayments resulting from these adjustments are attributable to tax-motivated transactions within the meaning of section 6621(c).

The capital gains and losses adjustment of $569,555 for 1983 relates to the sham transaction involving Cashmere.  In the Cashmere transaction, Kanter's liability for the increased interest rate is established essentially by the sham nature of the scheme wherein his primary objective was to sell his real estate partnership interests and receive cash therefor while, at the same time, escaping the recognition of gains associated with the negative capital accounts inherent in such interests.

With respect to the 1987 capital gains and losses adjustment of $3,097,750, included therein is the disallowance of losses claimed on the sale of notes receivable, stock, and partnership interests to Windy City and MAF for nominal consideration. Kanter admitted that the purpose of these sales was to establish losses for tax purposes. As discussed in the disallowance of these losses, the claimed losses were based on sham transactions wholly lacking in economic substance. Consequently, any underpayments resulting from these adjustments are attributable to tax-motivated transactions within the meaning of section 6621(c).

Issue 37.  Whether IRA Is Liable for the Section 6651(a)(1) Addition to Tax for 1980

OPINION

In the notice of deficiency, respondent determined that IRA was liable for an addition to tax under section 6651(a)(1) equal to 15 percent of the deficiency for filing a delinquent return for 1980.

Section 6651(a)(1) provides that if there is a failure to file a return on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there will be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is not for more than 1 month, with an additional 5

percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.

IRA failed to file timely its Federal income tax return for 1980. Although the due date for IRA's filing of its 1980 return had been extended to September 15, 1981, the return was not received by the Internal Revenue Service until on or about November 21, 1981. See Issue 30. IRA has not shown that such failure to file timely the return was due to reasonable cause and was not due to willful neglect. Therefore, we hold that IRA is liable for the section 6651(a)(1) addition to tax equal to 15 percent of the deficiency for 1980.

Issue 38. Whether IRA Is Liable for the Section 6653(a) Additions to Tax for 1980, and 1982 Through 1988

OPINION

In the notices of deficiency to IRA for 1980 and 1982 through 1988, respondent determined that all of the underpayments for each year were attributable to negligence or intentional disregard of rules or regulations under section 6653(a).

IRA contends that it is not liable for the section 6653(a) addition to tax because it reasonably relied upon the advice of tax professionals, including Kanter and the certified public accountants who maintained its books and prepared its tax returns.

Respondent, on the other hand, contends that IRA failed to establish that it is not liable for the section 6653(a) addition to tax.

We conclude that IRA is liable for the addition to tax under section 6653(a) for 1980, 1982, 1983, 1984, 1985, 1986, 1987, and 1988, with respect to its underpayments from the equipment leasing transactions adjustments (Issue 22). As previously noted, Mallin, a tax attorney and an individual with considerable experience in the leasing field, brokered the transactions and recommended them to IRA and Kanter. Kanter further testified that, in having IRA invest in these transactions, he relied upon Mallin. However, it is important to note that Mallin was not acting as an outside, disinterested, and independent adviser to IRA, because he was paid a commission by the leasing company based on IRA's cash investment in each transaction. Indeed, during the course of Mallin's testimony, he acknowledged that he was acting as a broker, not as a tax attorney, in brokering these and other leasing transactions. Moreover, the Court did not accept Mallin's conclusory claims regarding the transactions' profit potential and economic substance. Also, no offering memorandum or prospectus was prepared and furnished to IRA with respect to the subject transactions. IRA failed to establish that a reasonable inquiry was made into the merits of the deductions and credits prior to its investment in these

transactions. It was not shown that any of IRA's other advisers had knowledge or had been apprised of all the relevant facts. See Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Zmuda v. Commissioner, 731 F.2d 1417 (9th Cir. 1984). Although reasonable reliance on the advice of professionals may be a defense to negligence, IRA did not show that the reliance in the instant cases was reasonable. See Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Consequently, we sustain respondent's determinations that IRA is liable for the addition to tax for negligence or intentional disregard of rules or regulations under section 6653(a) for 1980, 1983, 1984, 1985, and 1986 on the underpayments from the equipment leasing transaction adjustments. These section 6653(a) additions include (1) an addition to tax under section 6653(a) for 1980, (2) an addition to tax under section 6653(a)(1) and (2) for 1983, 1984, and 1985, and (3) an addition to tax under section 6653(a)(1)(A) and (B) for 1986.

We also conclude that IRA failed to establish that it acted reasonably and in good faith in claiming the disallowed 1985 capital losses (Issue 25) from its purported sales of various assets to Kanter and Holding Co. As discussed previously, IRA failed to show that section 267 was inapplicable or that the sales were bona fide. Consequently, we sustain respondent's

determination that IRA is liable for the addition to tax under section 6653(a)(1)(A) and (B) for 1985 on the underpayment from the disallowed capital losses.

We also conclude that IRA failed to establish that it was not negligent in claiming (1) the disallowed 1987 bad debt deductions (Issue 26), (2) the disallowed 1987 ordinary losses (Issue 27), and (3) the disallowed 1987 capital losses (Issue 28). IRA claimed the bad debt deductions with respect to the promissory notes of Ballard and Lisle. There was no showing that these debts were worthless. Moreover, IRA later pursued collection efforts upon these notes, with the result that it obtained payment from Ballard upon his notes and received Lisle's renewed promise to pay his notes. Also, as to IRA's claimed losses, IRA failed to show a reasonable basis for treating as bona fide its purported sales of various assets to MAF. Consequently, we sustain respondent's determination that IRA is liable for the addition to tax under section 6653(a)(1)(A) and (B) for 1987 on the underpayments from the disallowed losses and bad debt deductions.

Lastly, we conclude that IRA failed to establish that it was not negligent in claiming the disallowed 1988 $1,073,835 Decision Holdings Form 4797 loss (Issue 23). IRA failed to show that it was reasonable to claim that the TG limited partnership had a basis of $1,091,641 in the assets that it transferred to Decision

Holdings in a purported section 351 transaction. Consequently, we sustain respondent's determination that IRA is liable for the addition to tax under section 6653(a)(1)(A) and (B) for 1988 on the underpayment from the disallowed Form 4797 loss.

Issue 39.  Whether IRA Is Liable for the Section 6659(a) Additions to Tax for 1982 and 1983

OPINION

Consistent with the previous discussion with respect to Issues 22 and 23, a portion of each of the underpayments in income tax for 1982 and 1983 is attributable to gross overstatements by IRA as to the valuation of computer equipment and the attempt to structure a transaction under section 351 to realize a loss.  In both instances, the transactions were factual and legal shams, lacked economic substance, and lacked a profit motive as well as a business purpose.  See Rose v. Commissioner, supra.  In the section 351 situation, the transactions, under section 357(b) and (c) had no bona fide business purpose, were purposely intended to avoid Federal income tax, and the liabilities to which the properties were subject exceeded the adjusted bases of the properties.  IRA presented no meaningful evidence relating to the valuation of the computer equipment nor evidence relating to the inapplicability of section 357(b) and (c) in the section 351 transaction.

In our view, the underpayments of taxes shown on IRA's income tax returns for the years in question are attributable to

the prohibited conduct; i.e. the deliberate overvaluations.  In
each of the transactions the indebtedness incurred by IRA/Cedilla
for purchase of the equipment greatly exceeded the amounts paid
by prior owners of the equipment, and no evidence was presented
to establish the reason for such increases in cost.  IRA's
overvaluations with respect to the computer equipment are
inseparable from the transactions' lack of economic substance and
profit motive and their sham character.  The same rationale
applies to the section 351 transaction.  Accordingly, we sustain
respondent's determination that a portion of the underpayment for
each of the years 1982 and 1983 is attributable to a valuation
overstatement involving the equipment leasing transactions.

Issue 40.  Whether IRA Is Liable for the Section 6661 Additions
to Tax for 1983 Through 1988

OPINION

This issue relates to the addition to tax under section 6661
for IRA's understatements of tax attributable to a number of
adjustments that we have sustained for 1983 through 1988.

In the notices of deficiency issued to IRA for 1983 through
1988, respondent determined that the entire deficiency for each
year was a substantial understatement of tax for which IRA was
liable for the addition to tax under section 6661(a).

IRA contends that it is not liable for the section 6661(a)
addition to tax because there was substantial authority for the
positions it took with respect to the disallowed items.

Respondent, to the contrary, contends that IRA failed to meet its burden of establishing that it was not liable for the section 6661(a) additions.

We agree with respondent. IRA failed to establish that substantial authority existed supporting its position on the disallowed equipment leasing transaction items. (Issue 22). In sustaining respondent's disallowance of the credits and deductions claimed by IRA, we note that IRA failed to offer probative evidence (1) that the equipment leasing transactions had economic substance, and (2) that the long-term notes issued were valid recourse indebtedness. Among other things, we did not accept Mallin's conclusory opinions concerning the transactions' profit potential and the reasonably expected residual value of the equipment. Examinations into the economic substance of leasing transactions are inherently factual, and, in conducting the economic substance inquiry, significant objective factors include the reasonableness of the income projections and residual value projections. See Levy v. Commissioner, 91 T.C. 838, 856 (1988). Thus, IRA's reliance on other equipment leasing cases in which taxpayers prevailed is inapposite. An authority is of little relevance if it is distinguishable on its facts from the facts of the case at issue. See sec. 1.6661-3(b), Income Tax Regs.

In addition, IRA did not show that (1) the disallowed leasing transaction items were not tax shelter items, and (2) it reasonably believed, at the time its returns were filed, that its treatment of the items was more likely than not the proper treatment. See sec. 1.6661-2(d), Income Tax Regs. Therefore, we sustain respondent's determinations that IRA is liable for additions to tax under section 6661 for 1983 through 1988 on the understatements of tax attributable to the leasing transaction items.

Similarly, we conclude that IRA failed to establish that it had substantial authority for its treatment of the disallowed 1985 capital losses (Issue 25). In sustaining respondent's disallowance of the losses, we found that IRA made no showing that section 267 was inapplicable or that the losses were bona fide. Consequently, we sustain respondent's determination that IRA is liable for an addition to tax under section 6661(a) for 1985 on the understatement attributable to the capital loss items.

The Court concludes that IRA failed to establish that it had substantial authority for its treatment of (1) the disallowed bad debt deductions (Issue 26), (2) the disallowed ordinary losses (Issue 27), and (3) the disallowed capital losses (Issue 28). As previously discussed, IRA failed to show that the debts, in fact, became worthless during 1987. With respect to the 1987 ordinary

and capital loss items, IRA failed to make any showing that (1) the purported sales were bona fide transactions, and/or (2) that section 267 was inapplicable. Moreover, with respect to the purported sales of certain assets made to MAF, IRA also failed to show that (1) the loss items were not tax shelter items, and (2) it reasonably believed that its treatment of the items was more likely than not the proper treatment. Consequently, we sustain respondent's determination that IRA is liable for an addition to tax under section 6661(a) for 1987 on the understatement from the disallowed bad debt deduction, ordinary losses, and capital losses items.

Finally, we conclude that IRA failed to establish that it had substantial authority for its treatment of the disallowed 1988 Decision Holdings Form 4797 loss (Issue 23). IRA did not show that the TG limited partnership had an adjusted basis of $1,091,641 in the assets it transferred to Decision Holdings. Moreover, IRA did not show that (1) this loss item was not a tax shelter item, and (2) it reasonably believed its treatment of the item was more likely than not the proper treatment. Therefore, we sustain respondent's determination that IRA is liable for an addition to tax under section 6661(a) for 1988 on the understatement attributable to the disallowed Form 4797 loss item.

Issue 41.  Whether IRA Is Liable for the Section 6662(a) Accuracy-Related Penalty for 1989

OPINION

In the notice of deficiency for 1989, respondent determined that IRA was liable for an accuracy-related penalty of $175,780 due to negligence or disregard of rules or regulations and a substantial understatement of tax.  IRA had the burden of proving that the imposition of the accuracy-related penalty was erroneous.  It failed to do so.  Therefore, we sustain respondent's determination.

Conclusion

To reflect our disposition of the issues in controversy and those settled or conceded by the parties,

Decisions in all dockets will be entered under Rule 155.